UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IOWASKA CHURCH OF HEALING | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHARLES P. RETTIG, | ) | |
| in his Official Capacity as | ) | |
| Commissioner, | ) | |
| Internal Revenue Service; | ) | Civil Action No. 1:21-cv-02475-BAH |
| | ) | |
| and | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| a governmental entity, | ) | |
| c/o United States Attorney General | ) | |
| Department of Justice | ) | |
| | ) | |
|     Defendants. | ) | |

PLAINTIFF'S APPENDIX IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiff, Iowaska Church of Healing (the "Church"), pursuant to Federal

Rule of Civil Procedure 56 and Local Rule 7(h) and hereby submits the attached Appendix in

Support of its Motion for Summary Judgment:

TABLE OF CONTENTS

**Form 1023 Exemption Application**
    Cover Letter Forwarding Form 1023 ................................................................. APP. 0001
    Form 1023 ......................................................................................................... APP. 0003
    Statement Attached to Form 1023 .................................................................... APP. 0015
    Articles of Incorporation .................................................................................. APP. 0039
    Bylaws .............................................................................................................. APP. 0049
    Affidavit re: Articles and Bylaws .................................................................... APP. 0068
    Ayahuasca Manifesto ....................................................................................... APP. 0069
    Universal Laws of Respect .............................................................................. APP. 0119

Rules and Regulations for Participating in Ayahuasca Ceremonies .................. APP. 0121
IRS Form 2848 ................................................................................................. APP. 0127
Director Biographies ....................................................................................... APP. 0129
Church Member Application ........................................................................... APP. 0138
Volunteer Request Form ................................................................................. APP. 0140
Conflict of Interest Policy ............................................................................... APP. 0142
Form 1023 Checklist ....................................................................................... APP. 0146
Filing Fee Payment ......................................................................................... APP. 0148

**Response to First Information Request From IRS**
Cover Letter Forwarding Response .................................................................. APP. 0149
IRS Information Request of July 3, 2019 ........................................................ APP. 0150
Response to First Information Request ............................................................ APP. 0155
State of Florida Business Registration Materials ............................................. APP. 0205
E-Mail Correspondence with Sarah Boblenz, Department of Justice ............... APP. 0207

**Response to Second Information Request From IRS**
Cover Letter Forwarding Second Response ...................................................... APP. 0209
IRS Information Request of September 10, 2019 ............................................. APP. 0210
Response to Second Information Request ......................................................... APP. 0215
Copy of Religious Exemption Request Submitted to DEA ................................ APP. 0221
Copies of Correspondence to and from DEA Personnel ................................... APP. 0226

**Response to Third Information Request From IRS**
Cover Letter Forwarding Third Response ......................................................... APP. 0232
IRS Information Request of February 4, 2020 .................................................. APP. 0233
Response to Third Information Request ............................................................ APP. 0235
Attorney General Sessions' Memo to All Federal Departments and Agencies Dated
October 6, 2017 ............................................................................................... APP. 0243

**IRS Preliminary Adverse Determination Letter Dated June 16, 2020** ................... APP. 0268

**Centro Espirita Beneficente Uniao do Vegetal's IRS Website Information** .......... APP. 0280

**Sanctuary of Our Lady of Ayahuasca, Inc.'s § 501(c)(3) and "Church" Determination
Letter Dated October 8, 2020** ...................................................................... APP. 0281

**Sanctuary of Our Lady of Ayahuasca, Inc.'s IRS Website Information** ................. APP. 0282

**Church's Protest of Preliminary Adverse Determination Letter**
Cover Letter Forwarding Protest of Preliminary Adverse Determination Letter APP. 0284
Copy of Proposed Adverse Determination Letter .............................................. APP. 0285
Protest of Proposed Adverse Determination Letter .......................................... APP. 0297
Courtesy Copy of Original IRS Form 2848 ...................................................... APP. 0302

**IRS Denial of Church's Protest** .......................................................................... APP. 0304

**IRS Notice of Appeals Conference** .............................................................................. APP. 0310

**IRS Final Adverse Determination Letter Dated June 28, 2021** ............................... APP. 0313

Respectfully submitted,


/s/ William A. Boatwright
William A. Boatwright (*Pro Hac Vice*)
Michael A. Gilmer (*Pro Hac Vice*)
Dentons Davis Brown PC
215 10th Street, Ste. 1300
Des Moines, Iowa 50309
Telephone: (515) 288-2500
Facsimile: (515) 243-0654
Email: Bill.Boatwright@dentons.com
Date: May 31, 2022                    Email: Michael.Gilmer@dentons.com


/s/ Kenneth J. Pfaehler
Kenneth J. Pfaehler
D.C. Bar No. 461718
Dentons US LLP
1900 K Street, N.W.
Washington, D.C. 20006
Phone:   (202) 496-7500
Fax:       (202) 496-7756
Email:   Kenneth.Pfaehler@dentons.com

Date: May 31, 2022                    *Attorneys for Plaintiff*

Copies To:

MERRICK B. GARLAND
United States Attorney General

MATTHEW M. GRAVES
United States Attorney, District of
Columbia

DAVID A. HUBBERT
Deputy Assistant Attorney General

EMILY K. MILLER        (KY #97725)
JOSEPH E. HUNSADER    (DC #453328)
KRISTINA M. PORTNER  (DC #1002793)
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 227
Washington, D.C. 20044
Phone:  202-353-7509
Fax:      202-514-6866
Email:  Emily.K.Miller@usdoj.gov
Email:  Joseph.E.Hunsader@usdoj.gov
Email:  Kristina.M.Portner@usdoj.gov
*Counsel for the United States of America*

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument
was served upon all parties to the above cause to each
of the attorneys of record herein at their respective
addresses disclosed on the pleadings on May 31, 2022,
by:

___ U.S. Mail          ___ Overnight Courier
___ Hand Delivered    ___ Other
___ Email              _X_ EDMS

Signature: /s/William A. Boatwright





**William A. Boatwright**
BillBoatwright@davisbrownlaw.com
phone: 515-246-7804
Des Moines Office

January 10, 2019

***VIA CERTIFIED MAIL***

Internal Revenue Service
Attn: EO Determination Letters
Stop 31
P.O. Box 12192
Covington, KY  41012-0192

  **Re:**  ***Iowaska Church of Healing – Form 1023***
    ***FEIN:  83-2192122***

Dear Sir or Madam:

   Enclosed please find a completed Form 1023 for the above-named corporation.  Also accompanying the Application is a completed Form 1023 Checklist; an Affidavit verifying the corporation's Articles of Incorporation and Bylaws, with copies of the Articles and Bylaws attached; a Certificate of Existence issued by the Iowa Secretary of State; a Power of Attorney and Declaration of Representative (Form 2848); a check for $600.00 for the user fee; a copy of the corporation's Conflict of Interest policy; copies of the Ayahuasca Manifesto, Universal Laws of Respect and the Rules and Regulations for Participating in the Sacrament of Ayahuasca; and copies of the corporation's Membership Application and Volunteer Request Form.

   If you have any questions or need any further information, please contact the undersigned.

     Very truly yours,

    DAVIS, BROWN, KOEHN, SHORS & ROBERTS, P.C.

     William A. Boatwright

WAB:tlk

#3034634
DAVIS BROWN KOEHN SHORS & ROBERTS P.C.

APP. 0001

Internal Revenue Service
Page 2

Enclosures:   1.     Form 1023
2.     Form 1023 Checklist
3.     Affidavit Verifying Articles of Incorporation and Bylaws
4.     Copy of Articles of Incorporation
5.     Copy of Bylaws
6.     Certificate of Existence
7.     Form 2848, Power of Attorney
8.     $600.00 check for filing fee
9.     Copy of the organization's Conflict of Interest Policy
10.   Copy of Ayahuasca Manifesto
11.   Copy of Universal Laws of Respect
12.   Copy of Rules and Regulations for Participating in the Sacrament of
       Ayahuasca
13.   Church Membership Application
14.   Church Volunteer Request Form

cc:    Dado Kantarevic, President

| Form **1023** (Rev. December 2017) Department of the Treasury Internal Revenue Service | **Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code** ► **Do not enter social security numbers on this form as it may be made public.** ► **Go to www.irs.gov/Form1023 for instructions and the latest information.** | OMB No. 1545-0056 Note: If exempt status is approved, this application will be open for public inspection. |
|---|---|---|

*Use the instructions to complete this application and for a definition of all **bold** items.* For additional help, call IRS Exempt Organizations Customer Account Services toll-free at 1-877-829-5500. Visit our website at **www.irs.gov** for forms and publications. If the required information and documents are not submitted with payment of the appropriate user fee, the application may be returned to you.

Attach additional sheets to this application if you need more space to answer fully. Put your name and EIN on each sheet and identify each answer by Part and line number. Complete Parts I – XI of Form 1023 and submit only those Schedules (A through  H) that apply to you.

**Part I    Identification of Applicant**

| | | | | |
|---|---|---|---|---|
| **1** | Full name of organization (exactly as it appears in your **organizing document**) | | **2** | c/o Name (if applicable) |
| | Iowaska Church of Healing | | | |
| **3** | **Mailing address** (Number and street) (see instructions) | Room/Suite | **4** | Employer Identification Number (EIN) |
| | 4114 - 27th Street | | | 83-2192122 |
| | City or town, state or country, and ZIP + 4 | | **5** | Month the annual accounting period ends (01 – 12) |
| | Des Moines, IA 50310 | | | 12 |

| | | | | | |
|---|---|---|---|---|---|
| **6** | Primary contact (officer, director, trustee, or **authorized representative**) **a** Name: | | | **515-288-2500** | |
| | William A. Boatwright, Davis Brown Law Firm | | **b** | Phone: | |
| | | | **c** | Fax: (optional) | 515-243-0654 |

| | | | |
|---|---|---|---|
| **7** | Are you represented by an authorized representative, such as an attorney or accountant? If "Yes," provide the authorized representative's name, and the name and address of the authorized representative's firm. Include a completed Form 2848, *Power of Attorney and Declaration of Representative,* with your application if you would like us to communicate with your representative. | ☑ **Yes** | ☐ **No** |
| **8** | Was a person who is not one of your officers, directors, trustees, employees, or an authorized representative listed in line 7, paid, or promised payment, to help plan, manage, or advise your organization about the structure or activities of your organization, or about your financial or tax matters? If "Yes," provide the person's name, the name and address of the person's firm, the amounts paid or promised to be paid, and describe that person's role. | ☐ **Yes** | ☑ **No** |
| **9a** | Organization's website:   www.iowaskachurch.com | | |
| **b** | Organization's email: (optional) | | |
| **10** | Certain organizations are not required to file an information return (Form 990 or Form 990-EZ). If you are granted tax-exemption, are you claiming to be excused from filing Form 990 or Form 990-EZ? If "Yes," explain. See the instructions for a description of organizations not required to file Form 990 or Form 990-EZ. | ☑ **Yes** | ☐ **No** |
| **11** | Date incorporated if a corporation, or formed, if other than a corporation.     (MM/DD/YYYY)   09  /  24  /  2018 | | |
| **12** | Were you formed under the laws of a **foreign country**? If "Yes," state the country. | ☐ **Yes** | ☑ **No** |

| | | |
|---|---|---|
| For Paperwork Reduction Act Notice, see instructions. | Cat. No. 17133K | Form **1023** (Rev. 12-2017) |

| Form 1023 (Rev. 12-2017) | Name: Iowaska Church of Healing | EIN: | 83-2192122 | Page **2** |
|---|---|---|---|---|

### Part II    Organizational Structure

You must be a corporation (including a limited liability company), an unincorporated association, or a trust to be tax exempt. See instructions. **DO NOT file this form unless you can check "Yes" on lines 1, 2, 3, or 4.**

**1** Are you a **corporation**? If "Yes," attach a copy of your articles of incorporation showing **certification of filing** with the appropriate state agency. Include copies of any amendments to your articles and be sure they also show state filing certification. ☑ **Yes**  ☐ **No**

**2** Are you a **limited liability company (LLC)**? If "Yes," attach a copy of your articles of organization showing certification of filing with the appropriate state agency. Also, if you adopted an operating agreement, attach a copy. Include copies of any amendments to your articles and be sure they show state filing certification. Refer to the instructions for circumstances when an LLC should not file its own exemption application. ☐ **Yes**  ☑ **No**

**3** Are you an **unincorporated association**? If "Yes," attach a copy of your articles of association, constitution, or other similar organizing document that is dated and includes at least two signatures. Include signed and dated copies of any amendments. ☐ **Yes**  ☑ **No**

**4a** Are you a **trust**? If "Yes," attach a signed and dated copy of your trust agreement. Include signed and dated copies of any amendments. ☐ **Yes**  ☑ **No**

**b** Have you been funded? If "No," explain how you are formed without anything of value placed in trust. ☐ **Yes**  ☐ **No**

**5** Have you adopted **bylaws**? If "Yes," attach a current copy showing date of adoption. If "No," explain how your officers, directors, or trustees are selected. ☑ **Yes**  ☐ **No**

### Part III    Required Provisions in Your Organizing Document

The following questions are designed to ensure that when you file this application, your organizing document contains the required provisions to meet the organizational test under section 501(c)(3). Unless you can check the boxes in both lines 1 and 2, your organizing document does not meet the organizational test. **DO NOT file this application until you have amended your organizing document.** Submit your original and amended organizing documents (showing state filing certification if you are a corporation or an LLC) with your application.

**1** Section 501(c)(3) requires that your organizing document state your exempt purpose(s), such as charitable, religious, educational, and/or scientific purposes. Check the box to confirm that your organizing document meets this requirement. Describe specifically where your organizing document meets this requirement, such as a reference to a particular article or section in your organizing document. Refer to the instructions for exempt purpose language. ☑

Location of Purpose Clause (Page, Article, and Paragraph): P.2, Art.IV, Para.1

**2a** Section 501(c)(3) requires that upon dissolution of your organization, your remaining assets must be used exclusively for exempt purposes, such as charitable, religious, educational, and/or scientific purposes. Check the box on line 2a to confirm that your organizing document meets this requirement by express provision for the distribution of assets upon dissolution. If you rely on state law for your dissolution provision, do not check the box on line 2a and go to line 2c. ☑

**b** If you checked the box on line 2a, specify the location of your dissolution clause (Page, Article, and Paragraph). Do not complete line 2c if you checked box 2a. P.5, Art.X, Para.1

**c** See the instructions for information about the operation of state law in your particular state. Check this box if you rely on operation of state law for your dissolution provision and indicate the state: ☐

### Part IV    Narrative Description of Your Activities

Using an attachment, describe your *past, present,* and *planned* activities in a narrative. If you believe that you have already provided some of this information in response to other parts of this application, you may summarize that information here and refer to the specific parts of the application for supporting details. You may also attach representative copies of newsletters, brochures, or similar documents for supporting details to this narrative. Remember that if this application is approved, it will be open for public inspection. Therefore, your narrative description of activities should be thorough and accurate. Refer to the instructions for information that must be included in your description.

### Part V    Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors

**1a** List the names, titles, and mailing addresses of all of your officers, directors, and trustees. For each person listed, state their total annual **compensation**, or proposed compensation, for all services to the organization, whether as an officer, employee, or other position. Use actual figures, if available. Enter "none" if no compensation is or will be paid. If additional space is needed, attach a separate sheet. Refer to the instructions for information on what to include as compensation.

| Name | Title | Mailing address | Compensation amount (annual actual or estimated) |
|---|---|---|---|
| See attached statement. | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Form **1023** (Rev. 12-2017)

Form 1023 (Rev. 12-2017)   Name: Iowaska Church of Healing     EIN: 83-2192122     Page **3**

**Part V**   Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors *(Continued)*

**b** List the names, titles, and mailing addresses of each of your five highest compensated employees who receive or will receive compensation of more than $50,000 per year. Use the actual figure, if available. Refer to the instructions for information on what to include as compensation. Do not include officers, directors, or trustees listed in line 1a.

| Name | Title | Mailing address | Compensation amount (annual actual or estimated) |
|---|---|---|---|
| None | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**c** List the names, names of businesses, and mailing addresses of your five highest compensated **independent contractors** that receive or will receive compensation of more than $50,000 per year. Use the actual figure, if available. Refer to the instructions for information on what to include as compensation.

| Name | Title | Mailing address | Compensation amount (annual actual or estimated) |
|---|---|---|---|
| None | | | |
| | | | |
| | | | |
| | | | |
| | | | |

The following "Yes" or "No" questions relate to *past, present,* or *planned* relationships, transactions, or agreements with your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed in lines 1a, 1b, and 1c.

**2a** Are any of your officers, directors, or trustees **related** to each other through **family** or **business relationships**? If "Yes," identify the individuals and explain the relationship.    ☑ **Yes**   ☐ **No**

**b** Do you have a business relationship with any of your officers, directors, or trustees other than through their position as an officer, director, or trustee? If "Yes," identify the individuals and describe the business relationship with each of your officers, directors, or trustees.    ☑ **Yes**   ☐ **No**

**c** Are any of your officers, directors, or trustees related to your highest compensated employees or highest compensated independent contractors listed on lines 1b or 1c through family or business relationships? If "Yes," identify the individuals and explain the relationship.    ☐ **Yes**   ☑ **No**

**3a** For each of your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed on lines 1a, 1b, or 1c, attach a list showing their name, qualifications, average hours worked, and duties.

**b** Do any of your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed on lines 1a, 1b, or 1c receive compensation from any other organizations, whether tax exempt or taxable, that are related to you through **common control**? If "Yes," identify the individuals, explain the relationship between you and the other organization, and describe the compensation arrangement.    ☐ **Yes**   ☑ **No**

**4** In establishing the compensation for your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed on lines 1a, 1b, and 1c, the following practices are recommended, although they are not required to obtain exemption. Answer "Yes" to all the practices you use.

**a** Do you or will the individuals that approve compensation arrangements follow a conflict of interest policy?    ☑ **Yes**   ☐ **No**
**b** Do you or will you approve compensation arrangements in advance of paying compensation?    ☑ **Yes**   ☐ **No**
**c** Do you or will you document in writing the date and terms of approved compensation arrangements?    ☑ **Yes**   ☐ **No**

Form **1023** (Rev. 12-2017)

Form 1023 (Rev. 12-2017)    Name: Iowaska Church of Healing    EIN: 83-2192122    Page **4**

**Part V**   Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors *(Continued)*

d   Do you or will you record in writing the decision made by each individual who decided or voted on compensation arrangements?   ☑ Yes   ☐ No

e   Do you or will you approve compensation arrangements based on information about compensation paid by **similarly situated** taxable or tax-exempt organizations for similar services, current compensation surveys compiled by independent firms, or actual written offers from similarly situated organizations? Refer to the instructions for Part V, lines 1a, 1b, and 1c, for information on what to include as compensation.   ☑ Yes   ☐ No

f   Do you or will you record in writing both the information on which you relied to base your decision and its source?   ☑ Yes   ☐ No

g   If you answered "No" to any item on lines 4a through 4f, describe how you set compensation that is **reasonable** for your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed in Part V, lines 1a, 1b, and 1c.

5a   Have you adopted a **conflict of interest policy** consistent with the sample conflict of interest policy in Appendix A to the instructions? If "Yes," provide a copy of the policy and explain how the policy has been adopted, such as by resolution of your governing board. If "No," answer lines 5b and 5c.   ☑ Yes   ☐ No

b   What procedures will you follow to assure that persons who have a conflict of interest will not have influence over you for setting their own compensation?

c   What procedures will you follow to assure that persons who have a conflict of interest will not have influence over you regarding business deals with themselves?
**Note:** A conflict of interest policy is recommended though it is not required to obtain exemption. Hospitals, see Schedule C, Section I, line 14.

6a   Do you or will you compensate any of your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed in lines 1a, 1b, or 1c through **non-fixed payments,** such as discretionary bonuses or revenue-based payments? If "Yes," describe all non-fixed compensation arrangements, including how the amounts are determined, who is eligible for such arrangements, whether you place a limitation on total compensation, and how you determine or will determine that you pay no more than reasonable compensation for services. Refer to the instructions for Part V, lines 1a, 1b, and 1c, for information on what to include as compensation.   ☐ Yes   ☑ No

b   Do you or will you compensate any of your employees, other than your officers, directors, trustees, or your five highest compensated employees who receive or will receive compensation of more than $50,000 per year, through non-fixed payments, such as discretionary bonuses or revenue-based payments? If "Yes," describe all non-fixed compensation arrangements, including how the amounts are or will be determined, who is or will be eligible for such arrangements, whether you place or will place a limitation on total compensation, and how you determine or will determine that you pay no more than reasonable compensation for services. Refer to the instructions for Part V, lines 1a, 1b, and 1c, for information on what to include as compensation.   ☐ Yes   ☑ No

7a   Do you or will you purchase any goods, services, or assets from any of your officers, directors, trustees, highest compensated employees, or highest compensated independent contractors listed in lines 1a, 1b, or 1c? If "Yes," describe any such purchase that you made or intend to make, from whom you make or will make such purchases, how the terms are or will be negotiated at arm's length, and explain how you determine or will determine that you pay no more than **fair market value.** Attach copies of any written contracts or other agreements relating to such purchases.   ☑ Yes   ☐ No

b   Do you or will you sell any goods, services, or assets to any of your officers, directors, trustees, highest compensated employees, or highest compensated independent contractors listed in lines 1a, 1b, or 1c? If "Yes," describe any such sales that you made or intend to make, to whom you make or will make such sales, how the terms are or will be negotiated at arm's length, and explain how you determine or will determine you are or will be paid at least fair market value. Attach copies of any written contracts or other agreements relating to such sales.   ☐ Yes   ☑ No

8a   Do you or will you have any leases, contracts, loans, or other agreements with your officers, directors, trustees, highest compensated employees, or highest compensated independent contractors listed in lines 1a, 1b, or 1c? If "Yes," provide the information requested in lines 8b through 8f.   ☑ Yes   ☐ No

b   Describe any written or oral arrangements that you made or intend to make.
c   Identify with whom you have or will have such arrangements.
d   Explain how the terms are or will be negotiated at arm's length.
e   Explain how you determine you pay no more than fair market value or you are paid at least fair market value.
f   Attach copies of any signed leases, contracts, loans, or other agreements relating to such arrangements.

9a   Do you or will you have any leases, contracts, loans, or other agreements with any organization in which any of your officers, directors, or trustees are also officers, directors, or trustees, or in which any individual officer, director, or trustee owns more than a 35% interest? If "Yes," provide the information requested in lines 9b through 9f.   ☐ Yes   ☑ No

Form **1023** (Rev. 12-2017)

APP. 0006

Form 1023 (Rev. 12-2017)   Name: Iowaska Church of Healing   EIN: 83-2192122   Page 5

**Part V**    **Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors** *(Continued)*

  **b**   Describe any written or oral arrangements you made or intend to make.

  **c**   Identify with whom you have or will have such arrangements.

  **d**   Explain how the terms are or will be negotiated at arm's length.

  **e**   Explain how you determine or will determine you pay no more than fair market value or that you are paid at least fair market value.

  **f**   Attach a copy of any signed leases, contracts, loans, or other agreements relating to such arrangements.

**Part VI**    **Your Members and Other Individuals and Organizations That Receive Benefits From You**

The following "Yes" or "No" questions relate to goods, services, and funds you provide to individuals and organizations as part of your activities. Your answers should pertain to *past, present,* and *planned* activities. See instructions.

| | | | |
|---|---|---|---|
| **1a** | In carrying out your exempt purposes, do you provide goods, services, or funds to individuals? If "Yes," describe each program that provides goods, services, or funds to individuals. | ☑ Yes | ☐ No |
| **b** | In carrying out your exempt purposes, do you provide goods, services, or funds to organizations? If "Yes," describe each program that provides goods, services, or funds to organizations. | ☑ Yes | ☐ No |
| **2** | Do any of your programs limit the provision of goods, services, or funds to a specific individual or group of specific individuals? For example, answer "Yes," if goods, services, or funds are provided only for a particular individual, your members, individuals who work for a particular employer, or graduates of a particular school. If "Yes," explain the limitation and how recipients are selected for each program. | ☑ Yes | ☐ No |
| **3** | Do any individuals who receive goods, services, or funds through your programs have a family or business relationship with any officer, director, trustee, or with any of your highest compensated employees or highest compensated independent contractors listed in Part V, lines 1a, 1b, and 1c? If "Yes," explain how these related individuals are eligible for goods, services, or funds. | ☑ Yes | ☐ No |

**Part VII**    **Your History**

The following "Yes" or "No" questions relate to your history. See instructions.

| | | | |
|---|---|---|---|
| **1** | Are you a **successor** to another organization? Answer "Yes," if you have taken or will take over the activities of another organization; you took over 25% or more of the fair market value of the net assets of another organization; or you were established upon the conversion of an organization from for-profit to nonprofit status. If "Yes," complete Schedule G. | ☐ Yes | ☑ No |
| **2** | Are you submitting this application more than 27 months after the end of the month in which you were legally formed? If "Yes," complete Schedule E. | ☐ Yes | ☑ No |

**Part VIII**    **Your Specific Activities**

The following "Yes" or "No" questions relate to specific activities that you may conduct. Check the appropriate box. Your answers should pertain to *past, present,* and *planned* activities. See instructions.

| | | | |
|---|---|---|---|
| **1** | Do you support or oppose candidates in **political campaigns** in any way? If "Yes," explain. | ☐ Yes | ☑ No |
| **2a** | Do you attempt to **influence legislation**? If "Yes," explain how you attempt to influence legislation and complete line 2b. If "No," go to line 3a. | ☐ Yes | ☑ No |
| **b** | Have you made or are you making an **election** to have your legislative activities measured by expenditures by filing Form 5768? If "Yes," attach a copy of the Form 5768 that was already filed or attach a completed Form 5768 that you are filing with this application. If "No," describe whether your attempts to influence legislation are a substantial part of your activities. Include the time and money spent on your attempts to influence legislation as compared to your total activities. | ☐ Yes | ☐ No |
| **3a** | Do you or will you operate bingo or **gaming** activities? If "Yes," describe who conducts them, and list all revenue received or expected to be received and expenses paid or expected to be paid in operating these activities. **Revenue and expenses** should be provided for the time periods specified in Part IX, Financial Data. | ☐ Yes | ☑ No |
| **b** | Do you or will you enter into contracts or other agreements with individuals or organizations to conduct bingo or gaming for you? If "Yes," describe any written or oral arrangements that you made or intend to make, identify with whom you have or will have such arrangements, explain how the terms are or will be negotiated at arm's length, and explain how you determine or will determine you pay no more than fair market value or you will be paid at least fair market value. Attach copies or any written contracts or other agreements relating to such arrangements. | ☐ Yes | ☑ No |
| **c** | List the states and local jurisdictions, including Indian Reservations, in which you conduct or will conduct gaming or bingo. | | |

Form **1023** (Rev. 12-2017)

Form 1023 (Rev. 12-2017)  Name: Iowaska Church of Healing       EIN:  83-2192122       Page **6**

| **Part VIII** | **Your Specific Activities** (Continued) |
|---|---|

**4a** Do you or will you undertake **fundraising**? If "Yes," check all the fundraising programs you do or will   ☐ Yes   ☐ No
conduct. See instructions.   .

☐ mail solicitations
☑ email solicitations
☑ personal solicitations
☐ vehicle, boat, plane, or similar donations
☑ foundation grant solicitations

☑ phone solicitations
☑ accept donations on your website
☑ receive donations from another organization's website
☑ government grant solicitations
☐ Other

Attach a description of each fundraising program.

**b** Do you or will you have written or oral contracts with any individuals or organizations to raise funds for   ☐ Yes   ☑ No
you? If "Yes," describe these activities. Include all revenue and expenses from these activities and state
who conducts them. Revenue and expenses should be provided for the time periods specified in Part IX,
Financial Data. Also, attach a copy of any contracts or agreements.

**c** Do you or will you engage in fundraising activities for other organizations? If "Yes," describe these   ☐ Yes   ☑ No
arrangements. Include a description of the organizations for which you raise funds and attach copies of
all contracts or agreements.

**d** List all states and local jurisdictions in which you conduct fundraising. For each state or local jurisdiction
listed, specify whether you fundraise for your own organization, you fundraise for another organization, or
another organization fundraises for you.
                                  Iowa

**e** Do you or will you maintain separate accounts for any contributor under which the contributor has the   ☐ Yes   ☑ No
right to advise on the use or distribution of funds? Answer "Yes" if the donor may provide advice on the
types of investments, distributions from the types of investments, or the distribution from the donor's
contribution account. If "Yes," describe this program, including the type of advice that may be provided
and submit copies of any written materials provided to donors.

**5** Are you **affiliated** with a governmental unit? If "Yes," explain.   ☐ Yes   ☑ No

**6a** Do you or will you engage in **economic development**? If "Yes," describe your program.   ☐ Yes   ☑ No
**b** Describe in full who benefits from your economic development activities and how the activities promote
exempt purposes.

**7a** Do or will persons other than your employees or volunteers **develop** your facilities? If "Yes," describe   ☐ Yes   ☑ No
each facility, the role of the developer, and any business or family relationship(s) between the developer
and your officers, directors, or trustees.

**b** Do or will persons other than your employees or volunteers **manage** your activities or facilities? If "Yes,"   ☐ Yes   ☑ No
describe each activity and facility, the role of the manager, and any business or family relationship(s)
between the manager and your officers, directors, or trustees.

**c** If there is a business or family relationship between any manager or developer and your officers,
directors, or trustees, identify the individuals, explain the relationship, describe how contracts are
negotiated at arm's length so that you pay no more than fair market value, and submit a copy of any
contracts or other agreements.

**8** Do you or will you enter into **joint ventures**, including partnerships or **limited liability companies**   ☐ Yes   ☑ No
treated as partnerships, in which you share profits and losses with partners other than section 501(c)(3)
organizations? If "Yes," describe the activities of these joint ventures in which you participate.

**9a** Are you applying for exemption as a childcare organization under section 501(k)? If "Yes," answer lines   ☐ Yes   ☑ No
9b through 9d. If "No," go to line 10.

**b** Do you provide childcare so that parents or caretakers of children you care for can be **gainfully**   ☐ Yes   ☐ No
**employed** (see instructions)? If "No," explain how you qualify as a childcare organization described in
section 501(k).

**c** Of the children for whom you provide childcare, are 85% or more of them cared for by you to enable their   ☐ Yes   ☐ No
parents or caretakers to be gainfully employed (see instructions)? If "No," explain how you qualify as a
childcare organization described in section 501(k).

**d** Are your services available to the general public? If "No," describe the specific group of people for whom   ☐ Yes   ☐ No
your activities are available. Also, see the instructions and explain how you qualify as a childcare
organization described in section 501(k).

**10** Do you or will you publish, own, or have rights in music, literature, tapes, artworks, choreography,   ☑ Yes   ☐ No
scientific discoveries, or other **intellectual property**? If "Yes," explain. Describe who owns or will own
any copyrights, patents, or trademarks, whether fees are or will be charged, how the fees are
determined, and how any items are or will be produced, distributed, and marketed.

Form **1023** (Rev. 12-2017)

Form 1023 (Rev. 12-2017)   Name: Iowaska Church of Healing   EIN: 83-2192122   Page **7**

| **Part VIII** | **Your Specific Activities** *(Continued)* | | |
|---|---|---|---|
| 11 | Do you or will you accept contributions of: real property; conservation easements; closely held securities; intellectual property such as patents, trademarks, and copyrights; works of music or art; licenses; royalties; automobiles, boats, planes, or other vehicles; or collectibles of any type? If "Yes," describe each type of contribution, any conditions imposed by the donor on the contribution, and any agreements with the donor regarding the contribution. | ☑ Yes | ☐ No |
| 12a | Do you or will you operate in a **foreign country** or **countries**? If "Yes," answer lines 12b through 12d. If "No," go to line 13a. | ☐ Yes | ☑ No |
| b | Name the foreign countries and regions within the countries in which you operate. | | |
| c | Describe your operations in each country and region in which you operate. | | |
| d | Describe how your operations in each country and region further your exempt purposes. | | |
| 13a | Do you or will you make grants, loans, or other distributions to organization(s)? If "Yes," answer lines 13b through 13g. If "No," go to line 14a. | ☑ Yes | ☐ No |
| b | Describe how your grants, loans, or other distributions to organizations further your exempt purposes. | | |
| c | Do you have written contracts with each of these organizations? If "Yes," attach a copy of each contract. | ☐ Yes | ☐ No |
| d | Identify each recipient organization and any **relationship** between you and the recipient organization. | | |
| e | Describe the records you keep with respect to the grants, loans, or other distributions you make. | | |
| f | Describe your selection process, including whether you do any of the following. | | |
| | (i)  Do you require an application form? If "Yes," attach a copy of the form. | ☐ Yes | ☐ No |
| | (ii) Do you require a grant proposal? If "Yes," describe whether the grant proposal specifies your responsibilities and those of the grantee, obligates the grantee to use the grant funds only for the purposes for which the grant was made, provides for periodic written reports concerning the use of grant funds, requires a final written report and an accounting of how grant funds were used, and acknowledges your authority to withhold and/or recover grant funds in case such funds are, or appear to be, misused. | ☐ Yes | ☐ No |
| g | Describe your procedures for oversight of distributions that assure you the resources are used to further your exempt purposes, including whether you require periodic and final reports on the use of resources. | | |
| 14a | Do you or will you make grants, loans, or other distributions to foreign organizations? If "Yes," answer lines 14b through 14f. If "No," go to line 15. | ☐ Yes | ☑ No |
| b | Provide the name of each foreign organization, the country and regions within a country in which each foreign organization operates, and describe any relationship you have with each foreign organization. | | |
| c | Does any foreign organization listed in line 14b accept contributions earmarked for a specific country or specific organization? If "Yes," list all earmarked organizations or countries. | ☐ Yes | ☐ No |
| d | Do your contributors know that you have ultimate authority to use contributions made to you at your discretion for purposes consistent with your exempt purposes? If "Yes," describe how you relay this information to contributors. | ☐ Yes | ☐ No |
| e | Do you or will you make pre-grant inquiries about the recipient organization? If "Yes," describe these inquiries, including whether you inquire about the recipient's financial status, its tax-exempt status under the Internal Revenue Code, its ability to accomplish the purpose for which the resources are provided, and other relevant information. | ☐ Yes | ☐ No |
| f | Do you or will you use any additional procedures to ensure that your distributions to foreign organizations are used in furtherance of your exempt purposes? If "Yes," describe these procedures, including site visits by your employees or compliance checks by impartial experts, to verify that grant funds are being used appropriately. | ☐ Yes | ☐ No |

Form **1023** (Rev. 12-2017)

Form 1023 (Rev. 12-2017)     Name:  Iowaska Church of Healing     EIN:  83-2192122     Page **8**

| Part VIII | Your Specific Activities *(Continued)* | | |
|---|---|---|---|
| 15 | Do you have a **close connection** with any organizations? If "Yes," explain. | ☐ Yes | ☑ **No** |
| 16 | Are you applying for exemption as a **cooperative hospital service organization** under section 501(e)? If "Yes," explain. | ☐ Yes | ☑ **No** |
| 17 | Are you applying for exemption as a **cooperative service organization of operating educational organizations** under section 501(f)? If "Yes," explain. | ☐ Yes | ☑ **No** |
| 18 | Are you applying for exemption as a **charitable risk pool** under section 501(n)? If "Yes," explain. | ☐ Yes | ☑ **No** |
| 19 | Do you or will you operate a **school**? If "Yes," complete Schedule B. Answer "Yes," whether you operate a school as your main function or as a secondary activity. | ☐ Yes | ☑ **No** |
| 20 | Is your main function to provide **hospital** or **medical care**? If "Yes," complete Schedule C. | ☐ Yes | ☑ **No** |
| 21 | Do you or will you provide **low-income housing** or housing for the **elderly** or **handicapped**? If "Yes," complete Schedule F. | ☐ Yes | ☑ **No** |
| 22 | Do you or will you provide scholarships, fellowships, educational loans, or other educational grants to individuals, including grants for travel, study, or other similar purposes? If "Yes," complete  Schedule H.<br><br>**Note: Private foundations** may use Schedule H to request advance approval of individual grant procedures. | ☐ Yes | ☑ **No** |

APP. 0010

Form 1023 (Rev. 12-2017)   Name: Iowaska Church of Healing   EIN: 83-2192122   Page **9**

## Part IX  Financial Data

For purposes of this schedule, years in existence refer to completed tax years.

1. If in existence less than 5 years, complete the statement for each year in existence and provide projections of your likely revenues and expenses based on a reasonable and good faith estimate of your future finances for a total of:
   a. Three years of financial information if you have not completed one tax year, or
   b. Four years of financial information if you have completed one tax year. See instructions.

2. If in existence 5 or more years, complete the schedule for the most recent 5 tax years. You will need to provide a separate statement that includes information about the most recent 5 tax years because the data table in Part IX has not been updated to provide for a 5th year. See instructions.

### A. Statement of Revenues and Expenses

| | Type of revenue or expense | (a) From 9/24/18 To 12/31/18 | (b) From 1/1/19 To 12/31/19 | (c) From 1/1/20 To 12/31/20 | (d) From 1/1/21 To 12/31/21 | (e) Provide Total for (a) through (d) |
|---|---|---|---|---|---|---|
| | | Current tax year | 3 prior tax years or 2 succeeding tax years | | | |
| **Revenues** | 1 Gifts, grants, and contributions received (do not include unusual grants) | 1,708 | 6,000 | 3,000 | 3,000 | 13,708 |
| | 2 Membership fees received | 0 | 4,000 | 6,000 | 9,000 | 19,000 |
| | 3 Gross investment income | | | | | |
| | 4 Net unrelated business income | | | | | |
| | 5 Taxes levied for your benefit | | | | | |
| | 6 Value of services or facilities furnished by a governmental unit without charge (not including the value of services generally furnished to the public without charge) | | | | | |
| | 7 Any revenue not otherwise listed above or in lines 9–12 below (attach an itemized list) | | | | | |
| | 8 Total of lines 1 through 7 | 1,708 | 10,000 | 9,000 | 12,000 | 32,708 |
| | 9 Gross receipts from admissions, merchandise sold or services performed, or furnishing of facilities in any activity that is related to your exempt purposes (attach itemized list) | 0 | 178,200 | 261,360 | 300,564 | 740,124 |
| | 10 Total of lines 8 and 9 | 1,708 | 188,200 | 270,360 | 312,564 | 772,832 |
| | 11 Net gain or loss on sale of capital assets (attach schedule and see instructions) | | | | | |
| | 12 Unusual grants | | | | | |
| | 13 Total Revenue Add lines 10 through 12 | 1,708 | 188,200 | 270,360 | 312,564 | 772,832 |
| **Expenses** | 14 Fundraising expenses | 0 | 0 | 0 | 2,000 | |
| | 15 Contributions, gifts, grants, and similar amounts paid out (attach an itemized list) | | | | | |
| | 16 Disbursements to or for the benefit of members (attach an itemized list) | | | | | |
| | 17 Compensation of officers, directors, and trustees | 0 | 70,000 | 70,000 | 70,000 | |
| | 18 Other salaries and wages | 0 | 21,500 | 21,500 | 22,000 | |
| | 19 Interest expense | | | | | |
| | 20 Occupancy (rent, utilities, etc.) | 0 | 35,000 | 38,500 | 40,000 | |
| | 21 Depreciation and depletion | 0 | 3,000 | 3,000 | 3,000 | |
| | 22 Professional fees | 1,550 | 16,000 | 10,000 | 10,000 | |
| | 23 Any expense not otherwise classified, such as program services (attach itemized list) | 0 | 42,550 | 53,400 | 55,800 | |
| | 24 Total Expenses Add lines 14 through 23 | 1,550 | 188,050 | 196,400 | 202,800 | |

Form **1023** (Rev. 12-2017)

Form 1023 (Rev. 12-2017)   Name: Iowaska Church of Healing   EIN: 83-2192122   Page **10**

**Part IX**   **Financial Data** *(Continued)*

| B. Balance Sheet (for your most recently completed tax year) | | Year End: 12/31/18 (Whole dollars) |
|---|---|---|

**Assets**

| | | | |
|---|---|---|---|
| 1 | Cash . . . . . . . . . . . . . . . . . . . . . . | 1 | 158 |
| 2 | Accounts receivable, net . . . . . . . . . . . . . . . | 2 | |
| 3 | Inventories . . . . . . . . . . . . . . . . . . . | 3 | |
| 4 | Bonds and notes receivable (attach an itemized list) . . . . . . . | 4 | |
| 5 | Corporate stocks (attach an itemized list) . . . . . . . . . | 5 | |
| 6 | Loans receivable (attach an itemized list) . . . . . . . . . | 6 | |
| 7 | Other investments (attach an itemized list) . . . . . . . . . | 7 | |
| 8 | Depreciable and depletable assets (attach an itemized list) . . . . . | 8 | |
| 9 | Land . . . . . . . . . . . . . . . . . . . . | 9 | |
| 10 | Other assets (attach an itemized list) . . . . . . . . . . . | 10 | |
| 11 | Total Assets (add lines 1 through 10) . . . . . . . . . . | 11 | 158 |

**Liabilities**

| | | | |
|---|---|---|---|
| 12 | Accounts payable . . . . . . . . . . . . . . . . | 12 | |
| 13 | Contributions, gifts, grants, etc. payable . . . . . . . . . | 13 | |
| 14 | Mortgages and notes payable (attach an itemized list) . . . . . . | 14 | |
| 15 | Other liabilities (attach an itemized list) . . . . . . . . . | 15 | |
| 16 | Total Liabilities (add lines 12 through 15) . . . . . . . . | 16 | 0 |

**Fund Balances or Net Assets**

| | | | |
|---|---|---|---|
| 17 | Total fund balances or net assets . . . . . . . . . . . | 17 | 158 |
| 18 | Total Liabilities and Fund Balances or Net Assets (add lines 16 and 17) . . . . . . | 18 | 158 |
| 19 | Have there been any substantial changes in your assets or liabilities since the end of the period shown above? If "Yes," explain. | ☐ Yes   ☑ No | |

**Part X**   **Public Charity Status**

Part X is designed to classify you as an organization that is either a **private foundation** or a **public charity**. Public charity status is a more favorable tax status than private foundation status. If you are a private foundation, Part X is designed to further determine whether you are a **private operating foundation**. See instructions.

1a   Are you a private foundation? If "Yes," go to line 1b. If "No," go to line 5 and proceed as instructed. If you are unsure, see the instructions.   ☐ Yes   ☑ No

  b   As a private foundation, section 508(e) requires special provisions in your organizing document in addition to those that apply to all organizations described in section 501(c)(3). Check the box to confirm that your organizing document meets this requirement, whether by express provision or by reliance on operation of state law. Attach a statement that describes specifically where your organizing document meets this requirement, such as a reference to a particular article or section in your organizing document or by operation of state law. See the instructions, including Appendix B, for information about the special provisions that need to be contained in your organizing document. Go to line 2.   ☐

2   Are you a private operating foundation? To be a private operating foundation you must engage directly in the active conduct of charitable, religious, educational, and similar activities, as opposed to indirectly carrying out these activities by providing grants to individuals or other organizations. If "Yes," go to line 3. If "No," go to the signature section of Part XI.   ☐ Yes   ☐ No

3   Have you existed for one or more years? If "Yes," attach financial information showing that you are a private operating foundation; go to the signature section of Part XI. If "No," continue to line 4.   ☐ Yes   ☐ No

4   Have you attached either (1) an affidavit or opinion of counsel, (including a written affidavit or opinion from a certified public accountant or accounting firm with expertise regarding this tax law matter), that sets forth facts concerning your operations and support to demonstrate that you are likely to satisfy the requirements to be classified as a private operating foundation; or (2) a statement describing your proposed operations as a private operating foundation?   ☐ Yes   ☐ No

5   If you answered "No" to line 1a, indicate the type of public charity status you are requesting by checking one of the choices below.  You may check only one box.

The organization is not a private foundation because it is:

  a   509(a)(1) and 170(b)(1)(A)(i)—a church or a convention or association of churches. Complete and attach Schedule A.   ☑

  b   509(a)(1) and 170(b)(1)(A)(ii)—a **school.** Complete and attach Schedule B.   ☐

  c   509(a)(1) and 170(b)(1)(A)(iii)—a **hospital,** a cooperative hospital service organization, or a medical research organization operated in conjunction with a hospital. Complete and attach Schedule C.   ☐

  d   509(a)(3)—an organization supporting either one or more organizations described in line 5a through c, f, h, or i or a publicly supported section 501(c)(4), (5), or (6) organization. Complete and attach Schedule D.   ☐

Form **1023** (Rev. 12-2017)

| Form 1023 (Rev. 12-2017) | Name: Iowaska Church of Healing | EIN: | 83-2192122 | Page **11** |

**Part X** Public Charity Status *(Continued)*

e  509(a)(4) – an organization organized and operated exclusively for testing for public safety. ☐

f  509(a)(1) and 170(b)(1)(A)(iv) – an organization operated for the benefit of a college or university that is owned or operated by a governmental unit. ☐

g  509(a)(1) and 170(b)(1)(A)(ix) – an agricultural research organization directly engaged in the continuous active conduct of agricultural research in conjunction with a college or university. ☐

h  509(a)(1) and 170(b)(1)(A)(vi) – an organization that receives a substantial part of its financial support in the form of contributions from publicly supported organizations, from a governmental unit, or from the general public. ☐

i  509(a)(2) – an organization that normally receives not more than one-third of its financial support from gross **investment income** and receives more than one-third of its financial support from contributions, membership fees, and gross receipts from activities related to its exempt functions (subject to certain exceptions). ☐

j  A publicly supported organization, but unsure if it is described in 5h or 5i. You would like the IRS to decide the correct status. ☐

6  If you checked box h, i, or j in question 5 above, and you have been in existence more than 5 years, you must confirm your public support status. Answer line 6a if you checked box h in line 5 above. Answer line 6b if you checked box i in line 5 above. If you checked box j in line 5 above, answer both lines 6a and 6b.

a  (i)  Enter 2% of line 8, column (e) on Part IX-A Statement of Revenues and Expenses _____

   (ii)  Attach a list showing the name and amount contributed by each person, company, or organization whose gifts totaled more than the 2% amount. If the answer is "None," state this.

b  (i)  For each year amounts are included on lines 1, 2, and 9 of Part IX-A Statement of Revenues and Expenses, attach a list showing the name and amount received from each **disqualified person.** If the answer is "None," state this.

   (ii)  For each year amounts were included on line 9 of Part IX-A Statement of Revenues and Expenses, attach a list showing the name of and amount received from each payer, other than a disqualified person, whose payments were more than the larger of (1) 1% of Line 10, Part IX-A Statement of Revenues and Expenses, or (2) $5,000. If the answer is "None," state this.

7  Did you receive any unusual grants during any of the years shown on Part IX-A Statement of Revenues and Expenses? If "Yes," attach a list including the name of the contributor, the date and amount of the grant, a brief description of the grant, and explain why it is unusual.   ☐ Yes   ☑ No

**Part XI** User Fee Information and Signature

You must include the correct user fee payment with this application. If you do not submit the correct user fee, we will not process the application and we will return it to you. Your check or money order must be made payable to the United States Treasury. User fees are subject to change. Check our website at *www.irs.gov* and type "Exempt Organizations User Fee" in the search box, or call Customer Account Services at 1-877-829-5500 for current information.

Enter the amount of the user fee paid: _____ $600

I declare under the penalties of perjury that I am authorized to sign this application on behalf of the above organization and that I have examined this application, including the accompanying schedules and attachments, and to the best of my knowledge it is true, correct, and complete.

| Please Sign Here | _____ (Signature of Officer, Director, Trustee, or other authorized official) | Dado Kantarevic (Type or print name of signer) | 1-8-2019 (Date) |
| | | President (Type or print title or authority of signer) | |

Form **1023** (Rev. 12-2017)

Form 1023 (Rev. 12-2017)   Name: Iowaska Church of Healing   EIN:   83-2192122   Page **13**

## Schedule A. Churches

| | | | |
|---|---|---|---|
| 1a | Do you have a written creed, statement of faith, or summary of beliefs? If "Yes," attach copies of relevant documents. | ☑ Yes | ☐ No |
| b | Do you have a form of worship? If "Yes," describe your form of worship. | ☑ Yes | ☐ No |
| 2a | Do you have a formal code of doctrine and discipline? If "Yes," describe your code of doctrine and discipline. | ☑ Yes | ☐ No |
| b | Do you have a distinct religious history? If "Yes," describe your religious history. | ☐ Yes | ☑ No |
| c | Do you have a literature of your own? If "Yes," describe your literature. | ☑ Yes | ☐ No |
| 3 | Describe the organization's religious hierarchy or ecclesiastical government. | | |
| 4a | Do you have regularly scheduled religious services? If "Yes," describe the nature of the services and provide representative copies of relevant literature such as church bulletins. | ☑ Yes | ☐ No |
| b | What is the average attendance at your regularly scheduled religious services? | | |
| 5a | Do you have an established place of worship? If "Yes," refer to the instructions for the information required. | ☐ Yes | ☑ No |
| b | Do you own the property where you have an established place of worship? | ☐ Yes | ☐ No |
| 6 | Do you have an established congregation or other regular membership group? If "No," refer to the instructions. | ☑ Yes | ☐ No |
| 7 | How many members do you have? | 20 | |
| 8a | Do you have a process by which an individual becomes a member? If "Yes," describe the process and complete lines 8b–8d, below. | ☑ Yes | ☐ No |
| b | If you have members, do your members have voting rights, rights to participate in religious functions, or other rights? If "Yes," describe the rights your members have. | ☑ Yes | ☐ No |
| c | May your members be associated with another denomination or church? | ☑ Yes | ☐ No |
| d | Are all of your members part of the same family? | ☐ Yes | ☑ No |
| 9 | Do you conduct baptisms, weddings, funerals, etc.? | ☑ Yes | ☐ No |
| 10 | Do you have a school for the religious instruction of the young? | ☐ Yes | ☑ No |
| 11a | Do you have a minister or religious leader? If "Yes," describe this person's role and explain whether the minister or religious leader was ordained, commissioned, or licensed after a prescribed course of study. | ☑ Yes | ☐ No |
| b | Do you have schools for the preparation of your ordained ministers or religious leaders? | ☐ Yes | ☑ No |
| 12 | Is your minister or religious leader also one of your officers, directors, or trustees? | ☑ Yes | ☐ No |
| 13 | Do you ordain, commission, or license ministers or religious leaders? If "Yes," describe the requirements for ordination, commission, or licensure. | ☑ Yes | ☐ No |
| 14 | Are you part of a group of churches with similar beliefs and structures? If "Yes," explain. Include the name of the group of churches. | ☐ Yes | ☑ No |
| 15 | Do you issue church charters? If "Yes," describe the requirements for issuing a charter. | ☐ Yes | ☑ No |
| 16 | Did you pay a fee for a church charter? If "Yes," attach a copy of the charter. | ☐ Yes | ☑ No |
| 17 | Do you have other information you believe should be considered regarding your status as a church? If "Yes," explain. | ☑ Yes | ☐ No |

Form **1023** (Rev. 12-2017)

**STATEMENT ATTACHED TO AND MADE A PART OF**
**FORM 1023, APPLICATION FOR RECOGNITION OF EXEMPTION**

**IOWASKA CHURCH OF HEALING**
**FEIN: 83-2192122**

**Part I, Question #10, Excusal from Form 990 Filing Obligations:**

Iowaska Church of Healing (the "Organization") is organized and operated as a church, and will therefore be exempt from filing annual information returns pursuant to the mandatory exception of Internal Revenue Code § 6033(a)(3)(A)(i).

**Part IV, Narrative Description of Activities:**

### *Background and Mission*

The Organization was formally organized on September 24, 2018, as an Iowa non-profit corporation pursuant to Chapter 504 of the Code of Iowa. All legal requirements for its organization have been fulfilled, and the organization is in good standing in all respects. The Organization is classified as a "religious corporation" under Iowa Code § 504.141(38).

The Organization's mission is to inspire individuals to seek and embrace authentic, self-realized healing of the mind, body and spirit through the use of the sacred, indigenous plant-medicine of Ayahuasca. The Organization wishes to offer the public access to spiritual growth, development and healing through the sacred Sacrament of Ayahuasca provided under the guidelines of North and South American Indigenous traditions and cultural values. The church would like to inspire members to discover their inherent nature and achieve harmony with Self, Others and Mother Nature through the expansion of human consciousness.

The Organization wishes to provide veterans the opportunity to access healing programs unique to their recovery for free and/or a reduced cost. It will provide individuals the opportunity to connect and strengthen the local and global communities by providing public wellness events and workshops for the purposes of education regarding sacred tribal cultures and practices honoring Mother Earth. The Organization's ideology, purpose and vision is described more fully in its *Universal Laws of Respect, Mission, Vision & Value Statements* and Article IV of its Articles of Incorporation, *"Purposes of Corporation"*, all of which accompany this application.

The Organization will accomplish its charitable purposes in a variety of ways, including the operation of a spiritual church that conducts regular worship services, the

operation of adult integration and communion meetings, various educational and mission groups, and outreach designed to provide relief services to veterans. All of these activities will be addressed in more detail in the paragraphs to follow.

The Organization's Church and its work are guided by its mission and commitment to six core values:

1. **Inclusiveness**: We respect every individual while valuing diversity and equality.

2. **Openness**: We are committed to a culture of truth, collaboration, love and teamwork.

3. **Heal with Integrity**: We are passionate about providing a safe environment in which people from all walks of life can seek a greater understanding of themselves, the world around them and access multi-dimensional healing.

4. **Preserve Ancient Wisdom**: We are keepers of Mother Earth (Pachamama) and the great wisdom it contains. We believe in the traditions of Indigenous peoples and we believe in passing on these traditions. We are passionate about re-awakening others to the God-given rights of joy and wellbeing, which can all be accessed through the sacred Sacrament of Ayahuasca.

5. **Leave it Better than you Found it**: Since we are all divinely connected, we strive to positively impact others and ourselves, including Mother Earth and Father Sky. "As Above, so Below. As Within, so Without. As the Universe, so the Soul."

6. **Keep it Real**! We are mindful of cultivating a world in which relationships are authentic, beginning with our relationship with Self.

### *Origin and History of the Sacramental Use of Ayahuasca*

The use of Ayahuasca originates from the Amazon and represents the basis of spiritual practice for at least 75 different indigenous tribes across the lower and upper Amazonian regions. These cultures currently use Ayahuasca for medicinal, spiritual and divinatory purposes and it plays a central role in their lives and world views. The plants used in the Ayahuasca preparation have been used for millennia – believed to be well over 2,500 years old. Official, representative religions began to appear approximately 90 years ago. These religions are referred to under the churches of Santo Daime, União do Vegetal and Barquinha. They first appeared in Brazilian Amazonian cities and have since spread to Europe, the United States and Asia. The religious use of Ayahuasca within these groups blends different elements of Christianity, afro-Brazilian religions and indigenous shamanism. These churches promote a wholesome lifestyle under the

2

guidelines of harmony, love, truth and justice along with other values like humility, fraternity and purity of heart centered around the Sacrament of Ayahuasca.

### The Organization's Church and its Activities

#### A. Iowaska Church of Healing Doctrines & Creed

The basis of our doctrine comes from the well-known Ayahuasca Manifesto - a sacred, channeled document detailing the beautiful Spirit of Ayahuasca and its planetary mission. This doctrine covers the role of Ayahuasca with human beings, its purpose and the expansion of consciousness. It details preparation and management of the Sacrament along with social impact and preservation. It describes the sacred nature of this medicine, its uses, its benefits, cultural background and application. We refer to it for guidance and a continued reminder on conducting sessions, preparation, diet, management of the Sacrament and much more.

For a complete copy of the Ayahuasca Manifesto, please see the attached document.

Iowaska Church of Healing believes in living by a code of *Love, Unity, Integrity* and *Respect* for all living things. This means We believe in actively and sincerely seeking a deeper relationship with Self, with Spirituality and with the living Spirit of Mother Earth. In doing so, We come to feel, to know and to see that We are all divinely connected as One greater consciousness (*Unity*).

We feel a deep sense of devotion toward our Universal Family of People, Plants, Animals, Earth, Elements and other Beings. We wish to honor and keep alive the Spirit of our Ancestors, of Traditional Indigenous Cultures and Natives who roamed this land and still roam this land. They had and still have a deep (*Love*) for Nature, recognizing that all answers exist Within and the Spirit of specific Plant Teachers, such as Ayahuasca, exists to remind Us of Our true Nature – that We are Nature! Ayahuasca is Our Teacher, Our Profit, reminding Us of the inherent Teacher and Profit that exists Wholly and Absolutely within Ourselves.

We (*Respect*) the individuality and sovereignty of Mother Earth and all Beings, acknowledging that We are co-creating a sacred space in which We are all safe to experience multi-dimensional healing and to seek a greater understanding of Ourselves and the Universe around Us. We owe great reverence to Mother Earth as She is a living Being. We believe She should be (*Respected)* the same way We as People expect to receive (*Respect)*. Mother Earth should enjoy the same inherent rights that We as People desire for Ourselves.

3

We believe sincerity of character and the willingness to illuminate one's Higher Self should be evident through actions, words, thoughts and intention. We strive to deepen Our spiritual (*Integrity*) as We nourish and grow Our sense of awareness and Self as it relates to all around Us.

## B. Iowaska Church of Healing Membership Requirements

**1.)** Iowaska Church of Healing welcomes all individuals to become members irrespective of age, race, color, creed, national origin, cultural background, ethnicity, religion, sex, sexual orientation, gender expression or any other discriminating factors. Membership is available to all beings who approach Iowaska Church with the sincere intention to become a part of a spiritually directed community in which all members live by a code of love, unity, integrity and respect for all living things.

**2.)** Membership is open to those who are sincerely seeking a deeper relationship with Self, with Spirituality and with the living Spirit of Mother Earth. The aforementioned sincerity of character and the willingness to live through one's Higher Self should be self-evident as witnessed by all Church members, Officers, Elders and Spiritual Leaders. This sincerity in character should be self-evident in all actions, words, thoughts and intentions presented by an individual to the Church. Iowaska Church leaders and board members reserve the right to assess, discuss, vote and if necessary terminate the membership and involvement of any individual who disregards Church Doctrine and the Universal Laws of respect, integrity, harmony, love and light.

**3.)** Membership is open to those who are willing to harmoniously contribute to a safe environment in which people from all walks of life will be collectively gathered in an effort to seek a greater understanding of themselves, the world around them and to access multi-dimensional healing.

**4.)** Prospective members must sign, complete and return any and all relevant membership applications and paperwork to be reviewed and approved by designated Church staff.

**5.)** Prospective members must pay a one-time membership fee of $60. Youth under 18 years-of-age who cannot afford the membership fee may apply to be considered in the Church Volunteer Program. Retired individuals over 60 years-of-age may have their membership fee waived in exchange for a monetary donation of their choosing.

**6.)** Church membership does not qualify an individual to have access to sacred medicinal ceremonies in which one would partake in the Sacrament of Ayahuasca. To partake in the Sacrament of Ayahuasca, an individual must be a Church member in good standing, at least 18 years-of-age or older and must

4

successfully pass all pre-qualification requirements, including medical assessment, as set forth in the Church's *Rules and Regulations for Participating in the Sacrament of Ayahuasca*, a copy of which is attached.

## C. Iowaska Church of Healing Programs and Activities

It is the Organization's goal to offer the public access to workshops providing education on sacred Indigenous culture and tribal practices including the use of Ayahuasca as a healing medicine and spiritual tool. The Church will offer educational open-house events for the public including and not limited to topics of honoring Mother Earth and our own spiritual, emotional and physical wellness.

Sunday Church Services and Programs will include group Integration and Communion. Members will have the chance to commune through song, music, reflection and readings from the Ayahuasca Manifesto. They will also have the chance to openly share their spiritual experiences with the Sacrament and to receive integration guidance from mental health counselors, ministers, facilitators and/or spiritual coaches.

Once the Organization has determined its primary location within the State of Iowa, it intends to assess the needs of the local and global communities, paying particular attention to Native North and South American tribes and populations. The Organization also intends to establish a secondary location in the State of Florida.

The Organization will offer the public a supportive environment in which they have the option to access supplemental healing modalities, including but not limited to the following:

- Mental Health Counseling
- Marriage & Family Counseling
- Energy Healing/Reiki
- Bodywork/Massage
- Group Meditation
- Group Integration
- Hypnotherapy
- Health/Wellness Coaching
- Spiritual/Intuitive Coaching
- Music & Sound Healing Therapy
- Acupuncture
- Yoga

The Organization will provide veterans with the opportunity to access healing programs unique to their recovery for free and/or a reduced cost. These healing programs may include and are not limited to the following:

5

- Sacred healing ceremonies and the Sacrament of Ayahuasca
- Routine group integration/group therapy following sacred ceremonies
- Individual coaching/mental health counseling
- Education on holistic, solution-oriented approaches to maintaining joyful living
- Creation of a sustainable culture, which benefits the Church, Mother Earth and each veteran's eventual lifestyle
- Social activities promoting a healthy reintegration into society including but not limited to:
  - o Group cooking of meals and simultaneous nutritional education
  - o Group gardening and care of Mother Earth
  - o Individual Karma Marga, the practice of connecting to the Self through daily care and service of the environment
  - o Designated silence/individual meditation to foster healthy mental patterns during periods of solitude

### D. *Iowaska Church of Healing Sacred Ayahuasca Ceremonies*

It is the Organization's goal to offer its members the opportunity for spiritual growth and healing with the Sacrament of Ayahuasca through sacred Ceremonies held in the tradition of Indigenous cultures. The Church will offer its members various Ceremony options with skilled facilitators and healers including private, one-on-one Ceremonies, small group Ceremonies or large group Ceremonies. Traditionally, these Ceremonies will occur on Friday, Saturday and Sunday and will consist of two evening Ceremonies and the option for a daytime Ceremony.

The Ceremony Sacrament consists only of the Ayahausca tea. The use, consumption or combination of any other substances will be strictly prohibited at Iowaska Church of Healing. Members will undergo thorough medical and psychological evaluation prior to participating in Ceremony. Drug testing will be conducted along with routine search of bags and belongings to ensure a safe and sacred environment is upheld for all members involved.

Medical professionals will be present during Ceremonies along with Healers, Facilitators and Ministers. Great attention and care will be provided to all members for the entire duration of each Ceremony, including after-care, therapeutic counseling and spiritual integration.

6

The Organization will offer information and support to all participants of its sacred Ayahuasca Healing Ceremonies. The Church will provide relevant mental, emotional and spiritual integration to each participant. Additional support will be offered on an ongoing basis to individuals seeking further integration as they return to their daily routines in hopes of implementing and maintaining healing and elevated levels of spirituality.

### E.  Sacred Prayers practiced at Iowaska Church of Healing

Many Shamans and peoples within Indigenous cultures traditionally open sacred space by invoking the archetypes of the four directions (South, West, North and East), the Earth and the Heavens. These four directions represent the medicine wheel, which is the basis for the healing journey of many cultures. The spiritual and healing journey begins in the south and ends in the east, held by Heaven and Earth, above and below.

At Iowaska Church of Healing, we support this cultural tradition and we invoke a Mother Earth Medicine Wheel prayer prior to consuming our Sacrament during sacred Ceremonies:

*"South*
*To the winds of the South*
*Great Serpent*
*Wrap your coils of light around us*
*Teach us to shed the past the way you shed your skin*
*To walk softly on the Earth*
*Teach us the Beauty Way*

*West*
*To the winds of the West*
*Mother Jaguar*
*Protect our medicine space*
*Teach us the way of peace, to live impeccably*
*Show us the way beyond death*

*North*
*To the winds of the North*
*Hummingbird, Grandmothers and Grandfathers*
*Ancient Ones*
*Come and warm your hands by our fires*
*Whisper to us in the wind*
*We honor you who have come before us*
*And you who will come after us, our children's children*

*East*
*To the winds of the East*

7

*Great Eagle, Condor*
*Come to us from the place of the rising Sun*
*Keep us under your wing*
*Show us the mountains we only dare to dream of*
*Teach us to fly wing to wing with the Great Spirit*

*Mother Earth*
*We've gathered for the honoring of all of your children*
*The Stone People, the Plant People*
*The four-legged, the two-legged, the creepy crawlers*
*The finned, the furred, and the winged ones*
*All our relations*

*Father Sun*
*Father Sun, Grandmother Moon, to the Star Nations*
*Great Spirit, you who are known by a thousand names*
*And you who are the unnamable One*
*Thank you for bringing us together*
*And allowing us to sing the Song of Life"*

During our Church Services and Integrations, we share a sacred prayer that supports the healing and spiritual wisdom we have received through our communion with one another as Members and also with our Sacrament:

*"I appeal to the Heavens, to the Great Angelic Forces of the Invisible World,*
*and I ask them to hear my voice.*
*By their divine will, may I have access to Happiness and to Eternal Wealth*
*because I am a child of Light and Creation.*
*Every day, I become aware of my place of belonging within the Universe.*
*Every day, I understand that the nature of the Universe is Love and Abundance.*
*Make this Love and this Abundance, normal occurrences in my life.*
*Therefore, as of now all of my acts and gestures be Light to me*
*and to all of those dear to me.*
*I thank you in advance, and confirm to you my sincere devotion."*

We also refer to our doctrine, the Ayahuasca Manifesto, for insight and prayer to be referenced during Services, Integration and before or after Ceremonies. The following is a well-known and favorite invocation:

*"My sacrament is only one of so many expressions of religiousness in Humans. It is an affirmative expression of surrender to his/her spiritual nature; it is an act of bravery and conviction to reach out towards the central Light of all existence."*

*"It is time to embrace Humanity with my healing, extending beyond the Amazon basin, reaching global expansion, spreading through all the soils of tropical climates, growing in every forest, in every sidewalk, in every house, garden. Care about me, harvest me,*

8

*spread me around. Warriors of light from around the world, help me to help you!"*

### F.   Iowaska Church of Healing Land and Facilities

This section intends to describe the status of plans to acquire land and build the Church's facilities. Our Church is currently and actively seeking the appropriate land to purchase in the State of Iowa so that we may build our facilities. We intend to secure sufficient acreage in order to be able to build a main church office, a meditation and services center, private healing rooms, a healing dome for Ceremonies and lodging for members. For the time being, the Organization's members, officers and directors intend to worship at their places of residence.

Our Church is also reviewing possible properties in Florida for its secondary location.   The majority of the Organization's directors reside in Florida, and this will allow immediate implementation of its programs while suitable land is identified and developed in Iowa.

### The Sacramental Ayahuasca Ceremony

Much care goes into preparing for the Sacramental Ayahuasca Ceremony. The Ceremony space must be set and arranged in a manner that best supports the members' comfort and readiness. The Sacrament is received and experienced while the members are seated, so comfortable mats and cushions are arranged on the ground with pillows for support and blankets for warmth. Buckets are placed at the foot of each mat so that each member has a personal and clean way to purge, should the Sacrament cause them to do so. Paper towels and tissues are readily available to support those who purge or cry as forms of emotional, spiritual and mental releasing. Drinking water is readily available for those who need it, although consumption of water is kept to a minimum during Ceremonies.

Once the members' personal spaces are set, the altar must be prepared along with the stations for Facilitators and Healers. The altar must be organized with all of the items that the Healers need to utilize during a Ceremony, including candles, incense, Palo Santo wood, dried sage or copal for smudging and burning, large smudging feathers, Florida Water, essential oils, cold towels and musical instruments. Candles and incense are used to bless and contain the space in light. Palo Santo wood, Sage or Copal are used for smudging and energetically cleansing each member individually as well as the collective space prior to receiving the Sacrament. Smudging feathers assist in the process of moving the smoke and energy effectively. Florida Water is traditional, perfumed water considered to be cleansing and refreshing. It is offered to each member in the palms of their hands after their smudging and prior to receiving the Sacrament. Essential oils such as peppermint along with cold towels are sometimes used toward the middle and end of a

9

Ceremony when a member needs assistance with grounding and getting in touch with their five senses. Musical instruments such as singing bowls, gongs, drums, shakers or chakapas are used at certain points during Ceremonies to facilitate the energy flow. The Facilitators and Healers are set up and positioned next to the altar with cushions, meditation pillows and mats. All Facilitators and Healers are dressed in traditional, white, ceremonial clothing so that they are easily identifiable if members need to access them.

If a Ceremony is held outdoors at night, appropriate lighting will be prepared along with a fire. A designated Fire Keeper will tend the fire for the duration of the Ceremony. All elements of weather are taken into account for outdoor Ceremonies, including proper heating, cooling, lighting and safety depending on the time of day or the season. The Ceremony Healing Dome, or indoor Ceremony space, will also reflect a comfortable, safe, climate-controlled environment appropriate for all members.

When a Ceremony begins, all members are seated quietly, preparing themselves to receive the Sacrament. Healers or Facilitators will cleanse the space with Palo Santo, Copal or Sage, setting the intention that the space be blessed with protection and light. Then, each member is cleansed around their body to invoke protection and energetic clearing. Each member is then offered Florida Water in the palms of their hands and offered a blessing. Once the space and members are cleansed and blessed, everyone is seated for a group prayer. We support indigenous cultural tradition by using a Mother Earth Medicine Wheel prayer, invoking the four directions, Mother Earth and the Heavens, prior to consuming our Sacrament. (See Section 'E' for further information about our prayers). After our prayer, the Sacrament is taken from a central cup and measured out into smaller cups for each member. The small cups containing the Sacrament are prepared on a tray and smudged with Palo Santo, Copal or Sage as they are blessed with positive intention. The Sacrament cups are then handed out to each member. The group is instructed to place the Sacrament next to their heart, to close their eyes, say a personal prayer and quietly reflect on their intention for healing and spiritual growth. After a moment of reflection, the group is instructed to drink their Sacrament and blessings are invoked for a beautiful journey within. Spiritual music, or traditional Icaros, are played during the Ceremony to help facilitate the direction and flow of energy and healing. Icaros are traditional South American medicine songs used to induce a deeper state of healing, awareness and spiritual growth.

The effects of the Sacrament of Ayahuasca can start manifesting anywhere from 15 minutes to two hours, but generally between 30-60 minutes, depending on metabolism. Sitting upright or in meditation during this time is useful and encouraged. The entire spiritual journey can last anywhere from 3-5 hours, with four hours being the average. There is an identifiable peak as well as a noticeable calming down. Healers and Facilitators are trained to be sensitive and observant of each individual's healing process. A second small cup of the Sacrament is sometimes offered at the two-hour mark if an individual would like to go deeper in their healing journey. This offering is at the discretion of the Healers and Facilitators leading the Ceremony.

APP. 0024

Spiritual, emotional and physical purging may happen during the Ceremony. The act of purging is not necessarily restricted to vomiting, but there will be a "purge" in some other fashion (bathroom, sweating, crying, yawning, laughing, verbal processing, etc). Whichever form a purge manifests itself, it is all for the purpose of releasing and spiritual healing. Healers and Facilitators are trained to assist with these processes and to offer support as catalysts for energy flow. Participants may need to use the bathroom, in which case a Facilitator will closely escort the member to the bathroom and wait with them nearby. More cleansing with Palo Santo, Sage or Copal may be offered during this time to help support the space and each individual's healing journey. The elements of Mother Earth may also be used during this time (dirt, leaves, water, etc.) as grounding tools and ways of promoting proper energy flow.

Before the Ceremony concludes, the opening prayer is invoked as a closing prayer, blessing the space and thanking the Sacrament for its powerful wisdom, healing and spiritual insight. A Facilitator or Healer checks in with each member individually to assess their status and to offer a blessing for their return to the physical state. Many members take this time to be alone in meditation and to process their personal spiritual journeys and insights.

Group Integration and Communion is offered the morning following an evening Ceremony. This is a very important part of the process as it allows all members to gather, commune and share their spiritual insights and experiences with the Sacrament. Integration is lead by a Mental Health Counselor, Healer, Facilitator or Minister who can offer insight and guidance on each member's experience, ultimately weaving everything together to shed light on a shared level of spiritual growth and healing.

Private, one-on-one spiritual coaching or counseling is offered to those who seek further guidance and integration on a more ongoing basis.

### *The Pharmacology of Ayahuasca*

Ayahuasca is consumed in the form of a tea that is brewed using water and several plants that are indigenous to the Amazon Rainforest. These plant ingredients include the leaves of a shrub called *Psychotria Viridis* and the bark of a vine called *Banisteriopsis Caapi.* The Psychotria Viridis plant naturally contains a hallucinogenic alkaloid named Dimethyltryptamine ("DMT"). By itself, DMT has poor bioavailability unless it is combined with another substance that inhibits its metabolism by the human body. The Banisteriopsis Caapi plant contains such an inhibiting agent, which makes the concentration of the alkaloids in brewed Ayahuasca beverages several times greater than the plants from which they are prepared.

DMT, as well as any material, compound, mixture, or preparation that contains any amount of DMT, is a Schedule I drug under the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq*. As such, its production, distribution and importation into the United States is heavily regulated under the jurisdiction of the U.S. Department of

APP. 0025

Justice, Drug Enforcement Administration ("DEA").   Generally, the possession, manufacture and distribution of Schedule I drugs is illegal absent the appropriate registration with the DEA or pursuant to a judicial or other registration exemption.

### Application of the Religious Freedom Restoration Act of 1993

The conflict between the sacramental use of Ayahuasca in religious ceremonies and the restrictions on Schedule I drugs found in the Controlled Substances Act was addressed by the United States Supreme Court in a 2006 decision styled *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418 (2006).   Like the Organization, the members of Uniao do Vegetal church ("UDV") received the sacrament of Ayahuasca in the form of tea containing DMT.  The government argued that because DMT is a Schedule I drug under the Controlled Substances Act, its religious use was banned under that statute.   The government conceded that the sacramental use of Ayahuasca by the UDV church members was a sincere exercise of religion, but argued that the Controlled Substances Act provided no exception for its usage.

In successfully arguing for a religious exemption from the Controlled Substances Act, the UDV church relied upon the provisions of the Religious Freedom Restoration Act of 1993 ("RFRA"), set forth at 42 U.S.C. §§2000bb *et seq.*  Under the RFRA, the government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless the government can demonstrate that the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling interest. 42. U.S.C. §2000bb-1. Under the RFRA, a person whose religious exercise has been burdened in violation of the statute is authorized to seek judicial relief from the government's actions.  42. U.S.C. §2000bb-1(c).

In ruling in favor of the UDV church, the Supreme Court noted that the government's actions in disrupting the church's use of Ayahuasca was a "substantial burden" upon its members' exercise of their religious beliefs, and that the government failed to meet its burden to demonstrate that its actions furthered a compelling interest, or that they did so using the least restrictive means.

The Controlled Substances Act contains a provision which authorizes the U.S. Attorney General to waive the requirement for DEA registration of certain manufacturers, distributors and dispensers of controlled substances.   21 U.S.C. § 822(d).   The Organization contacted the office of the Group Supervisor of the DEA's Des Moines, Iowa, Resident Office about applying for a religious exemption from registration under the Controlled Substances Act, and has received guidance on filing its exemption application with the DEA Diversion Control Division located in Springfield, Virginia. The Organization is presently working on its religious exemption application and plans to file it with the DEA within the next few months.

### *Educational and Other Services Provided by the Organization*

The Organization will provide veterans with the opportunity to access healing programs unique to their recovery for free and/or a reduced cost. These healing programs may include sacred healing Ceremonies with the Sacrament of Ayahuasca, group integration and group therapy, individual spiritual coaching and mental health counseling, energetic healing, education on a sustainable lifestyle, healthy eating and joyful living.

The Organization has already reached out to a number of veteran relief organizations with the intention of developing cooperative arrangements with them. These include Wounded Warrior Project, Veterans of Foreign Wars and the U.S. Department of Veterans Affairs.

The Organization will offer various educational programs and charitable services to the public. This includes workshops providing education on sacred Indigenous culture and practices involving the use of Ayahuasca as a healing medicine and spiritual tool. We will offer educational open-house events for the public including and not limited to group meditations, Mother Earth (Pachamama) devotionals and spiritual, emotional and physical wellness topics. The Organization intends to raise awareness of local Native American tribes as well as South American and Amazonian tribes.

Sunday Church Services and Programs will include group integration and education of spiritual experiences with our Sacrament lead by mental health counselors, ministers, facilitators and/or spiritual coaches. Reiki and energy healing will be offered to members as a complimentary spiritual service when beneficial.

### Part V, Question #1a, Names, Titles, Mailing Addresses of Officers and Directors:

| Name, Address and Title(s) | Compensation |
|---|---|
| Dado Kantarevic, President, Treasurer and Director<br>4114 - 27th Street<br>Des Moines, IA 50310 | $ 0.00 |
| Victoria Chetta, Vice President and Director<br>4114 - 27th Street<br>Des Moines, IA 50310 | $ 0.00 |
| Anthony Chetta, Secretary and Director<br>4114 - 27th Street<br>Des Moines, IA 50310 | $ 0.00 |
| Billy Benskin, Director<br>4114 - 27th Street<br>Des Moines, IA 50310 | $ 0.00 |

APP. 0027

Dr. Anthony Chetta, Director                 $ 0.00
4114 - 27th Street
Des Moines, IA 50310

## Part V, Question #2a, Family Relationships of Officers and Directors:

Victoria Chetta and Anthony Chetta, the Vice President and Secretary of the Organization, respectively, as well as members of its Board of Directors, are siblings. Their father, Dr. Anthony Chetta, is also a member of the Board of Directors.

## Part V, Question #2b, Business Relationships with Officers and Directors:

Dado Kantarevic is the Organization's founder, as well as its President, Treasurer and a member of its Board of Directors. Mr. Kantarevic will also serve as one of the Healers of the church that is operated by the Organization. While he will serve as an unpaid director and officer, he will be compensated for serving as the Organization's Chief Executive Officer and as one of its Healers when the church has the financial wherewithal to do so.

Victoria Chetta is the Organization's Vice President and a member of its Board of Directors. She will also serve as one of the church's Healers. While she, too, will serve as an unpaid director and officer, she will be compensated for serving as a church Healer when the Organization has the ability to pay her a salary.

## Part V, Question #3a, Qualifications and Duties of Officers and Directors:

The Organization's Board of Directors currently has five voting members, three of whom also serve as an officer of the Organization. The names, qualifications, average hours worked on Organization business and their respective duties on behalf of the Organization are as follows:

1.   *Dado Kantarevic, President, Treasurer and Director*:  A copy of Mr. Kantarevic's resume is enclosed, which details his background and professional qualifications. Mr. Kantarevic anticipates that he will devote approximately 160 hours per month to Organization business.

Mr. Kantarevic's duties as the President of the Organization are set forth in Article IV, Section 7 of the Organization's Bylaws, a copy of which is enclosed. His duties as the Treasurer are set forth in Article IV, Section 10 of the Bylaws.

14

2. *Victoria Chetta, Vice President and Director*: A copy of Ms. Chetta's resume is enclosed. Ms. Chetta anticipates that she will devote approximately 160 hours per month to Organization business.

Ms. Chetta's duties as the Vice President of the Organization are set forth in Article IV, Section 8 of the Organization's Bylaws.

3. *Anthony Chetta, Secretary and Director*: A copy of Mr. Chetta's resume is enclosed. He anticipates that he will devote approximately 100 hours per month to Organization business.

Mr. Chetta's duties as the Organization's Secretary are set forth in Article IV, Section 9 of the Bylaws.

4. *Billy Benskin, Director*: A copy of Mr. Benskin's resume is enclosed, which details his background and professional qualifications. Mr. Benskin anticipates that he will devote approximately 100 hours per month to Organization business.

5. *Dr. Anthony Chetta, Director*: A copy of Dr. Chetta's resume is enclosed, which details his background and professional qualifications. Dr. Chetta anticipates that he will devote approximately 100 hours per month to Organization business.

### Part V, Question #7a, Purchase of Services from Directors:

As previously noted in the Organization's response to Part V, Question #2b, the Organization will hire Dado Kantarevic as its Chief Executive Officer and one of the Healers of its church. The terms of Mr. Kantarevic's employment will be memorialized in an Employment Agreement, which has not yet been developed. In order to ensure that the salary paid to Mr. Kantarevic does not exceed fair market value, the Organization will conduct a compensation analysis of similarly situated employees in the Des Moines, Iowa area.

The Organization will also hire Victoria Chetta as one of the church's Healers. In order to ensure that the salary paid to her does not exceed fair market value, the Organization will also conduct a compensation analysis of similarly situated employees in the Des Moines, Iowa area.

The Organization will also hire Anthony Chetta as one of the church's Healers and as its Medicine Man. In order to ensure that the salary paid to him does not exceed fair market value, the Organization will also conduct a compensation analysis of similarly situated employees in the Des Moines, Iowa area.

The Organization will also hire Dr. Anthony Chetta as one of the church's Healers and Family Therapists. In order to ensure that the salary paid to him does not exceed fair

APP. 0029

market value, the Organization will also conduct a compensation analysis of similarly situated employees in the Des Moines, Iowa area.

### Part V, Question #8a - f, Leases, Contracts or Other Arrangements with Directors:

As noted in the Organization's response to Part V, Question #7a, the Organization anticipates that it will enter into an Employment Agreement with Dado Kantarevic, its Chief Executive Officer and Healer.  Mr. Kantarevic's Employment Agreement has not yet been developed, and the Organization is not in a position to pay him a salary at this time.

The Organization also expects to pay Victoria Chetta, Anthony Chetta and Dr. Anthony Chetta compensation for serving as the church's Healers, Medicine Man and Family Therapist, once the Organization has sufficient funds to do so.

The Organization anticipates that none of its other officers or directors will receive compensation from the Organization for serving in these roles.

### Part VI, Question #1a, Provision of Goods, Services and Funds to Individuals:

As described in detail in the Organization's response to Part IV, the Organization will provide a variety of spiritual and other services to its members. These include and are not limited to the following spiritual healing services:
- Sacred Ceremonies with the Sacrament of Ayahuasca
- Mental Health Counseling
- Marriage & Family Counseling
- Energy Healing/Reiki
- Bodywork/Massage
- Group Meditation/Group Integration
- Hypnotherapy
- Health/Wellness Coaching
- Spiritual/Intuitive Coaching
- Music & Sound Healing Therapy
- Acupuncture
- Yoga

The Organization will also provide veterans with the opportunity to access healing programs unique to their recovery for free and/or a reduced cost. These healing programs may include and are not limited to the following:

- Sacred healing Ceremonies and the Sacrament of Ayahuasca
- Routine group integration/group therapy following sacred ceremonies

16

- Individual coaching/mental health counseling
- Education on holistic, solution-oriented approaches to maintaining joyful living
- Creation of a sustainable culture, which benefits the Church, Mother Earth and each veteran's eventual lifestyle.
- Social activities promoting a healthy reintegration into society

**Part VI, Question #1b, Provision of Goods, Services and Funds to Organizations:**

In carrying out its charitable activities, the Organization anticipates that it will occasionally work with other churches, relief organizations and other charities to meet the spiritual needs of those who are not its members, including veterans of the armed services who suffer from PTSD. The Organization anticipates that it may, from time to time, provide direct financial assistance to these organizations if it has the financial ability to do so.

**Part VI, Question #2, Limitation on the Provision of Goods and Services:**

As noted in Article II, Section 1 of its Bylaws, membership in the Organization is open to anyone with the sincere intention to become part of a spiritually directed community in which its members are committed to living by a code of love, unity, integrity and respect. In order to participate in the Sacrament of Ayahuasca, however, an individual must be a Church member in good standing, at least 18 years-of-age, and must successfully pass all pre-qualification requirements established by the Organization. These requirements include pre-screening of a member's psychological and physiological readiness to experience the sacrament. The requirements are detailed in the Church's *Rules and Regulations for Participating in the Sacrament of Ayahuasca.*

**Part VI, Question #3, Family and Business Relationships of Services Recipients:**

All of the Organization's officers and directors are also members of the congregation of the Organization's church, and will receive all of the services and spiritual benefits the church offers to its members.

**Part VIII, Question #10, Ownership of Intellectual Property:**

The Organization will maintain ownership of any intellectual property that it develops, including its copyrights, patents, logos and other branding materials, the Internet content it develops, and all artwork and graphics designed by or on behalf of the Organization.

17

**Part VIII, Question #11, Acceptable Contributions:**

Although the Organization does not intend to actively solicit real property, conservation easements, closely-held securities or any of the other property classes mentioned in Part VIII, Question #11, the Organization will accept such contributions if the property proposed for donation is appropriate and will not expose the Organization to unwarranted liability.

If any proposed contribution carries conditions imposed by the donor, the Organization will only accept the contribution if the conditions are acceptable and will not run afoul of any statutory or regulatory limitations.

**Part VIII, Questions #13a - g, Grants, Loans and Distributions to Other Organizations:**

As described previously in the Organization's response to Part VI, Question #1b, the Organization anticipates that it may occasionally provide direct financial assistance to other churches, relief organizations and other charities whose missions are similar to its own. This will depend entirely on whether the Organization has the financial means to do so, and the Organization has not identified any other recipient organization that it intends to benefit at this time.

The Organization currently envisions that it will only make grants and contributions, and does not anticipate making any loans to any other organizations or individuals. All such grants and contributions will be made in order to facilitate religious and other charitable programs by the recipient organizations that simultaneously advance the exempt purposes of the Organization.

If the Organization does, in fact, make grants and contributions to other organizations, it will keep records of all such grants and contributions made, including memorializing the review and approval of such grants and contributions in the minutes of its Board of Directors meetings. The Organization does not currently have an application form or grant proposal guidelines, but may develop these in the future. With respect to procedures for the oversight of distributions, the Organization anticipates that any grants or contributions made will only be made to other churches and to other public charities recognized as such under Internal Revenue Code § 501(c)(3).

**Part IX, Subpart A, Line #9, Gross Receipts from Related Services:**

The amounts reported in Line 9 for the years 2019, 2020 and 2021 all represent the anticipated fees to be received from Church members for participating in the Church's monthly weekend Ceremonies. The Organization anticipates that it will charge

APP. 0032

each participating Church member $900.00 during the 2019 calendar year to attend and participate in its Sacramental Ceremonies, with a 10% increase budgeted for 2020 and a 15% increase for 2021.  These estimates do not include those members who are veterans of the U.S. armed services, whose fees will be at reduced rate or at no charge.

**Part IX, Subpart A, Line #23, Other Expenses:**

|  | Y/E 12/31/19 | Y/E 12/31/20 | Y/E 12/31/21 |
|---|---|---|---|
| Raw plant materials | 9,000 | 12,000 | 12,000 |
| Propane | 2,700 | 3,600 | 3,600 |
| Paper supply | 2,700 | 3,600 | 3,600 |
| Other supplies | 4,500 | 6,000 | 6,000 |
| Wood expense | 3,600 | 4,800 | 4,800 |
| Food and beverages | 9,000 | 12,000 | 14,400 |
| Lawn expense | 1,800 | 2,400 | 2,400 |
| Travel/other expense | 6,750 | 9,000 | 9,000 |
| One-time material costs | 2,500 | 0 | 0 |
| Total: | 42,550 | 53,400 | 55,800 |

**Schedule A, Question #1b, Form of Worship:**

The Organization enjoys various forms of worship including the following:

> Partaking in and celebrating the Sacrament of Ayahuasca
> Sacred Ceremonies
> Prayer
> Reflection
> Singing
> Medicine songs
> Traditional Icaros
> Worship with musical instruments
> Reiki and Energy Healing
> Readings from the Ayahuasca Manifesto
> Group Communion and Integration

**Schedule A, Question #2a, Formal Code of Doctrine and Discipline:**

The Organization follows the *Universal Laws of Respect*, a copy of which is attached.  The Organization's doctrine is derived from the well-known *Ayahuasca*

APP. 0033

*Manifesto*, a sacred, channeled document that details the beautiful Spirit of Ayahuasca and its global mission. A copy of the *Ayahuasca Manifesto* is also attached.

### Schedule A, Question #2b, The Organization's Religious History:

The Organization was formed on September 24, 2018, when its Articles of Incorporation were filed with the Iowa Secretary of State. As such, it does not have its own distinct religious history. The Organization's church, while influenced by teachings and rituals that have been performed for many hundreds of years in the Amazon Rainforest, has no affiliation with any other church.

### Schedule A, Question #2c, the Organization's Literature:

The Organization's literature consists of the *Universal Laws of Respect* and the *Ayahuasca Manifesto*, copies of which are attached.

### Schedule A, Question #3, The Organization's Hierarchy/Government:

The Organization is an Iowa non-profit corporation that is governed by a Board of Directors. As set forth in Article III, Section 2 of the Organization's Bylaws, the number of directors shall be no less than three nor more than nine. Under Article III, Section 3 of the Bylaws, each director, other than the Organization's founder, serves for a two-year term. Directors are appointed by the affirmative vote of the Organization's Board of Directors.

The Organization's founder is a "Designated Director" within the meaning of Iowa Code Chapter 504, Subchapter VIII, Part I, and is authorized to serve as a director until his resignation or his Designated Director status is terminated. The founder also maintains additional rights that are exclusive to him, many of which are set forth in Article V of the Bylaws.

In addition, the Organization has officers consisting of a President, Vice-President, Secretary and a Treasurer, all of whom are chosen by the Board of Directors pursuant to Article IV of the Organization's Bylaws. Officers serve for one-year terms. The powers and duties of the Organization's officers are outlined in Article IV of the Bylaws.

The Organization is a membership organization, and the rights and duties of its members are set forth in Article II of the Organization's Bylaws. Under Article II, Section 8 of the Bylaws, only those matters which the Board of Directors has presented to the membership seeking their vote will be taken up for a vote by the membership.

APP. 0034

**Schedule A, Question #4a, The Organization's Regularly Scheduled Religious Services:**

The Organization will offer regularly scheduled religious services every Sunday afternoon. This Communion will be open to members and the public who are interested in becoming members of the Church.

**Schedule A, Question #5a, Established Place of Worship:**

The Organization currently does not have an established place of worship but is actively seeking to identify and purchase a suitable parcel of real estate upon which it can build its permanent facilities. Until it has a permanent place of worship, the Organization anticipates that it will conduct its worship services and other activities in one or more of its members' homes.

**Schedule A, Question #7, The Organization's Congregation:**

Currently, the Organization has 20 persons who have committed to membership. Again, the Organization has only just begun its worship activities, and it is making deliberate plans to grow its membership. Current pending commitment and interest shown includes approximately 50 additional prospective members.

**Schedule A, Question #8a, Process by Which Individuals Become Members:**

The criteria for membership in the Organization are set forth in Article II, Section 1 of the Organization's Bylaws. Those seeking membership are required to submit a Membership Application and pay a one-time membership fee set by the Organization's Board of Directors. A copy of the Membership Application is attached.

**Schedule A, Question #8b, Voting and Other Rights of Members:**

The members of the Organization have limited voting rights, as previously noted in the Organization's response to Schedule A, Question #3. However, all members are eligible for appointment to the Organization's Board of Directors and its committees. Under Article II, Section 8 of the Bylaws, only those matters which the Board of Directors has presented to the membership seeking their vote will be taken up for a vote by the membership. The Board of Directors has absolute discretion in determining those matters for which a membership vote would be requested.

All members in good standing are welcome to participate in all of the Organization's services and other activities, including the Sacrament of Ayahuasca for all

21

those over 18 years of age.  In addition, under Article II, Section 2 of the Bylaws, all members are invited to participate in the Annual Meeting of the membership, where Organization and church business will be discussed.  Members holding at least 5.0% of the total voting power of the members may also call a special meeting of the membership under Article II, Section 3 of the Bylaws in order to raise any concerns of the membership or to direct the attention of the Organization's Board of Directors and officers to specific matters of concern or interest to the members.  Other rights and obligations of the Organization's members are set forth in Article II of the Bylaws.

### Schedule A, Question #11a, The Role and Credentials of the Organization's Healers:

Dado Kantarevic, President of the Organization, will serve as a primary Healer for Iowaska Church of Healing and its members. He is a respected leader and trusted consultant with an extensive military background where he has led and managed large groups of people. He possesses specialized training, international experience and a strong global outlook. His experiences have given him advanced knowledge of different ethnic groups, cultures and religions and a sharp understanding of worldwide current events. He is a strategic problem solver and collaborator who is known locally and globally for his ability to engage and influence change in others.

Mr. Kantarevic possesses widespread experience as a personal trainer and nutritional coach. He has designed individualized training, conditioning and nutritional programs for all fitness levels and goals. He has been responsible for improving staff morale, decreasing turnover and increasing productivity of over 200 employees through personal training, physical fitness education and life coaching.

Mr. Kantarevic possesses over a decade of experience working intuitively with individuals and offering them spiritual coaching and guidance. He has an innate gift of energy healing that he has successfully used on countless clients to help restore them to a state of emotional, spiritual and physical harmony.

Mr. Kantarevic's role as a Healer within Iowaska Church of Healing will be to conduct and lead all Sacramental Ceremonies while providing attention and care to all members. He will provide one-on-one healings when appropriate and offer spiritual coaching, guidance and integration support to members post-Ceremony.

Victoria Chetta, Vice President of the Organization, will serve as a primary Healer for Iowaska Church of Healing and its members. Ms. Chetta is a respected healer recognized for her intuitive abilities to lead, nurture and guide others. She is a Certified Reiki Master under the Seichim and Usui Systems of Natural Healing, having years of experience with energy healing and with guiding countless clients to emotional, spiritual and physical harmony.

Ms. Chetta is a Certified Clinical Hypnotist and has worked with many clients over the years helping them to address and release phobias, anxiety, insomnia and

22

APP. 0036

addictions. She is also a Certified Plant-Based Health Coach and has guided many individuals to discover a healthier lifestyle centered on a whole-food, plant-based diet, one of which fully supports the Church's Sacramental diet guidelines. She also possesses Certification as a Regenerative Wellness Coach, having helped others assess a five-point model of wellness, which heavily focuses on stress-reduction, increasing joy and spirituality.

Ms. Chetta has experience designing, preparing and leading wellness workshops, women's spirituality circles and large group meditations. In addition, her background in the defense industry as a Procurement Representative and Subcontracts Manager has given her extensive experience managing multiple groups, personalities, deadlines and projects.

Ms. Chetta's role as a Healer within Iowaska Church of Healing will be to conduct and lead all Sacramental Ceremonies while providing attention and care to all members. She will provide one-on-one healings when appropriate and offer spiritual coaching, guidance and integration support to members post-Ceremony.

Anthony Chetta, Secretary and Director of the Organization, will serve as a Healer and Medicine Man for Iowaska Church of Healing and its members. Mr. Chetta is a respected healer and Medicine Man recognized for his skill with the Sacrament as well as his intuitive abilities to lead and encourage others. Anthony has explored psycho-spiritual development through working with shamanic plant-medicine diets in the Peruvian jungle, gaining great experience with Amazonian culture and spiritual practices.

Mr. Chetta's role as a Healer within Iowaska Church of Healing will be to provide attention and care to all members. He will be the Organization's Medicine Man in charge of preparing and cooking the Sacrament of Ayahuasca. He will offer guidance and integration support to members post-Ceremony where appropriate.

Dr. Anthony Chetta, Director of the Organization, will serve as a Family Therapist and Healer for Iowaska Church of Healing and its members. Mr. Chetta is a respected healer and counselor recognized for his intuitive abilities to provide reality-based, problem-solving therapy for children, teens, adults, couples and families. He is also a Reiki Master and has decades of experience guiding countless clients to emotional, spiritual and physical harmony.

Dr. Chetta's role as a Family Therapist and Healer within Iowaska Church of Healing will be to provide attention and care to all members. He will provide one-on-one counseling when appropriate and help lead therapeutic group integrations for members post-Ceremony.

The role of all healers within the Organization is based on the Ayahuasca Manifesto's dictation of healers and facilitators as individuals who work to protect and spread the Sacrament with integrity and care, maintaining a sacred, spiritual container for all participants of the Sacrament.

APP. 0037

**Schedule A, Question #13, Selection and Commission of Religious Leaders/Healers:**

The Primary Healers and Leaders of the Organization congregate, meditate and have an open discussion to determine if an individual qualifies as a Healer/Leader who can participate in the delivery and facilitation of the Sacrament. The selection of such an individual is based on meeting core spiritual requirements set forth in the Organization's Mission, Universal Laws of Respect and in the Ayahuasca Manifesto. For example, they should be righteous in character and interested in improving themselves spiritually, socially and psychologically. They must be an example of high moral and spiritual standards. He or she must reflect a serious devotion as a healer. They must demonstrate the ability to naturally guide and lead groups of people in a harmonious manner. Further guidelines can be referenced in the attached Ayahuasca Manifesto.

**Schedule A, Question #17, Other Information for Consideration:**

The Organization was incorporated on September 24, 2018, and is in its infancy stage. Its initial directors and members plan to meet and grow the church's membership so that it develops a critical mass. Over the next year, the Organization will apply for the necessary religious exemption from DEA registration, and purchase real estate for its permanent worship facilities.

Much will be done in the next six to twelve months to grow and develop the Organization's community both locally and globally. The Organization intends to deliberately grow and multiply its work and mission in order reach people with the messages of unity, healing and universal love.

APP. 0038

## ARTICLES OF INCORPORATION

### OF

### IOWASKA CHURCH OF HEALING

To the Secretary of State
of the State of Iowa:

The undersigned, acting as incorporator of a corporation under the Revised Iowa Nonprofit Corporation Act (Chapter 504 of the Code of Iowa) adopts the following Articles of Incorporation for such corporation:

### ARTICLE I
### NAME OF CORPORATION

The name of the Corporation is Iowaska Church of Healing, hereinafter referred to as the "Corporation".

### ARTICLE II
### DURATION OF CORPORATION

The Corporation shall have perpetual duration.

### ARTICLE III
### MEMBERS OF THE CORPORATION

The Corporation shall have such class or classes of members as provided in the Bylaws of the Corporation. The Corporation's members shall have such voting and other rights as are specified in these Articles of Incorporation and in the Corporation's Bylaws. A member may appoint a proxy to vote or otherwise act for the member by signing an appointment form or by an electronic transmission.

The members of the Corporation are authorized to designate delegates having some or all of the authority of members as set forth in the corporation's Bylaws. The Bylaws shall set forth the characteristics, qualifications, rights, limitations and obligations of delegates, including their selection and removal.

#3003615

-2-

## ARTICLE IV
## PURPOSES OF CORPORATION

The Corporation is organized exclusively for charitable, educational, religious or scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, and in this connection, the purposes for which the Corporation is formed, and the business and objects to be carried on and promoted by it, are as follows:

a) To offer the public access to spiritual growth, development and healing through the sacred Sacrament of Ayahuasca provided under the guidelines of North and South American Indigenous traditions and cultural values;

b) To provide necessary information to all participants of sacred healing ceremonies involving the consumption of the Sacrament of Ayahuasca. Appropriate education prior to the consumption of the Sacrament of Ayahuasca will be provided. Appropriate guidance and support will be governed during the aforementioned ceremonies. Relevant mental, emotional and spiritual integration will be offered to each participant post ceremony. Mental, emotional and spiritual support will be offered on an ongoing basis to individuals seeking further integration as they return to their daily routines;

c) To empower the public to connect with their unique journey of self-discovery while providing the means to grow in awareness of limiting beliefs, allowing for the deconstruction of unhealthy patterns and the realization of positive solutions;

d) To inspire participants to discover their inherent nature and achieve harmony with Self, Others and Mother Nature through the expansion of human consciousness;

e) To offer the public a supportive environment in which they have the option to access supplemental healing modalities, including but not limited to the following:

- Energy Healing/Reiki
- Bodywork/Massage
- Group Meditation
- Hypnotherapy
- Health/Wellness Coaching
- Spiritual/Intuitive Coaching
- Sound Healing Therapy
- Mental Health Counseling;

-3-

f) To provide veterans the opportunity to access healing programs unique to their recovery for free and/or a reduced cost. These healing programs may include and are not limited to the following:

- Sacred healing ceremonies and the Sacrament of Ayahuasca
- Routine group integration/group therapy following sacred ceremonies
- Individual coaching/mental health counseling
- Education on holistic, solution-oriented approaches to maintaining joyful living
- Creation of a sustainable culture, which benefits the Church, Mother Earth and each veteran's eventual lifestyle.
- Social activities promoting a healthy reintegration into society including but not limited to:
  - o Group cooking of meals and simultaneous nutritional education
  - o Group gardening and care of Mother Earth
  - o Individual Karma Marga, the practice of connecting to the Self through daily care and service of the environment
  - o Designated silence/individual meditation to foster healthy mental patterns during periods of solitude;

g) To provide individuals the opportunity to connect and strengthen the local community by providing public wellness events and workshops for the purposes of education regarding sacred indigenous culture and practices honoring Mother Earth; and

h) To perform any and all acts which are proper for an organization exempt from tax under Section 501(a) of the Internal Revenue Code of 1986, and are reasonably necessary to accomplish its exempt purposes.

The Corporation shall have all powers enumerated in the Revised Iowa Nonprofit Corporation Act, set forth at Chapter 504 of the Code of Iowa, that are reasonably necessary to fulfill and meet these purposes and which are not prohibited from being possessed or exercised by an organization exempt from income tax pursuant to Section 501(a) of the Internal Revenue Code or by a corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code.

-4-

## ARTICLE V
## REGISTERED AGENT AND OFFICE

The address of its initial registered office in the State of Iowa is 4114 - 27th Street, Des Moines, IA 50310, and the name of its initial registered agent at such address is Dado Kantarevic.

## ARTICLE VI
## BOARD OF DIRECTORS

The business and affairs of the Corporation shall be managed under the direction of its Board of Directors, and the number of Directors may be varied from time to time as set forth in the Bylaws. All Directors must be individuals.

The number of directors constituting the initial Board of Directors of the Corporation is four (4), and the names and addresses of the persons who are to serve as the initial directors are:

| Name | Address |
|------|---------|
| Dado Kantarevic | 4114 - 27th Street<br>Des Moines, IA 50310 |
| William Boyce | 2142 College Street<br>Jacksonville, FL 32204 |
| Ramic Merzuk | 4114 - 27th Street<br>Des Moines, IA 50310 |
| Ramic Aida | 4114 - 27th Street<br>Des Moines, IA 50310 |

The Corporation's Bylaws may provide that one or more persons may exercise some or all of the powers which would otherwise be exercised by the Board of Directors. To the extent so authorized, any such person or persons shall have the duties and responsibilities of the Board of Directors, and the Directors shall be relieved to that extent from such duties and responsibilities

-5-

## ARTICLE VII
## CORPORATE EXISTENCE

The date on which the corporate existence shall begin is the date that this document is filed at the office of the Iowa Secretary of State.

## ARTICLE VIII
## INCORPORATOR INFORMATION

The name and address of the incorporator are:

William A. Boatwright
Davis Brown Law Firm
215 – 10th Street, Suite 1300
Des Moines, Iowa 50309

## ARTICLE IX
## PRIVATE INUREMENT AND OTHER PROHIBITED ACTIVITIES

No part of the net earnings of the Corporation shall inure to the benefit of, or be distributable to, its members, directors, officers, or other private persons, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Article IV hereof. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation, and the Corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office.

Notwithstanding any other provisions of these Articles, the Corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from Federal income tax under Section 501(c)(3) of the Internal Revenue Code of 1986 (or the corresponding provision of any future United States Internal Revenue Law); or (b) by a corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code of 1986 (or the corresponding provision of any future United States Internal Revenue Law).

## ARTICLE X
## DISSOLUTION

Upon the dissolution of the Corporation, the Board of Directors shall, after paying or making provision for the payment of all the liabilities of the Corporation, dispose of all of the

-6-

assets of the Corporation exclusively for the purposes of the Corporation to such one or more organization or organizations organized and operated exclusively for charitable, educational, religious, or scientific purposes as shall at the time qualify as an exempt organization or organizations under Section 501(c)(3) of the Internal Revenue Code of 1986 (or the corresponding provision of any future United States Internal Revenue Law), as the Board of Directors shall determine.  Any of such assets not so disposed of shall be disposed of by the District Court of the County in which the principal office of the Corporation is then located, exclusively for such purposes or to such organization or organizations, as said Court shall determine, which are organized and operated exclusively for such purposes.

## ARTICLE XI
## NON-LIABILITY

Except as otherwise provided by law, a director, officer, employee, or member of the Corporation is not liable for the Corporation's debts or obligations and a director, officer, member or other volunteer is not personally liable in that capacity, for a claim based upon any action taken or failure to take any action in the discharge of the person's duties, except liability for: (1) the amount of any financial benefit to which the person was not entitled; (2) an intentional infliction of harm on the Corporation or its members; (3) a violation of Section 835 of the Revised Iowa Nonprofit Corporation Act; or (4) an intentional violation of criminal law.  If Iowa law is hereafter changed to permit further elimination or limitation of the liability of directors, officers, employees, members or other volunteers for monetary damages to the Corporation, then the liability of such director, officer, employee, member or other volunteer of the Corporation shall be eliminated or limited to the full extent then permitted.  The directors, officers, employees, members or other volunteers of the Corporation have agreed to serve in their respective capacities in reliance upon the provisions of this Article.

## ARTICLE XII
## INDEMNIFICATION

Except as otherwise provided by law, a director, officer, employee, member or other volunteer of this Corporation, as well as each director, officer, employee, member or volunteer of this Corporation who is serving or who has served at the Corporation's request as a director, officer, partner, trustee, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, shall be indemnified to the fullest extent possible by the Corporation for liability, as defined in Section 851, subsection 5, of the Revised Iowa Nonprofit Corporation Act, to any person for any action taken, or any failure to take any action, as a director, officer, employee, member or other volunteer of this Corporation, or as a director, officer, partner, trustee, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, except with regard to any action, suit or proceeding by or in the right of the Corporation or with respect to any liability for any of the

-7-

following: (1) receipt of a financial benefit to which the person is not entitled; (2) an intentional infliction of harm on the Corporation or its members; (3) a violation of Section 835 of the Revised Iowa Nonprofit Corporation Act; or (4) an intentional violation of criminal law. In order to be eligible for indemnification, a person must satisfy any and all applicable standards of conduct and liability set forth in the Revised Iowa Nonprofit Corporation Act.

As provided in Section 859(1) of the Revised Iowa Nonprofit Corporation Act, the Corporation's obligation to provide indemnification hereunder shall include the obligation to advance funds to pay for or reimburse the reasonable expenses incurred by a person who is a party to any proceeding for which indemnification is required. A person who seeks an advancement of funds hereunder must satisfy any applicable requirements therefor which are set forth in the Revised Iowa Nonprofit Corporation Act.

The rights and authority conferred in this Article shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Articles of Incorporation or Bylaws of the Corporation, agreement, vote of disinterested directors or otherwise. Any repeal or amendment of this Article shall not adversely affect any right or protection of a director, officer, employee, member or other volunteer existing at the time of such repeal or amendment.

Dated this 24th day of September, 2018.

William A. Boatwright, Incorporator

Iowa Secretary of State
321 East 12th Street
Des Moines, IA 50319
sos.iowa.gov



**FILED**

Date:      **9/24/2018 04:29 PM**
Corp No:             **583338**
Cert No:      **FT0007697**

## Articles of Incorporation - Nonprofit

### Information

CODE 504 REVISED DOMESTIC NON-PROFIT

Iowaska Church of Healing

Perpetual

Yes

Upon the dissolution of the Corporation, the Board of Directors shall, after paying or making provision for the payment of all the liabilities of the Corporation, dispose of all of the assets of the Corporation exclusively for the purposes of the Corporation to such one or more organization or organizations organized and operated exclusively for charitable, educational, religious, or scientific purposes as shall at the time qualify as an exempt organization or organizations under Section 501(c)(3) of the Internal Revenue Code of 1986 (or the corresponding provision of any future United States Internal Revenue Law), as the Board of Directors shall determine. Any of such assets not so disposed of shall be disposed of by the District Court of the County in which the principal office of the Corporation is then located, exclusively for such purposes or to such organization or organizations, as said Court shall determine, which are organized and operated exclusively for such purposes.

### Registered Agent

Dado Kantarevic

4114 27th Street

Address2

Des Moines                          IA          50310            USA

State          Zip          Country

### Incorporator

William A,. Boatwright

215 10th Street, Suite 1300

Address2

Des Moines

IA        50309        USA

State     Zip          Country

**Principal Office**

Address2

State     Zip          Country

**Officers & Directors**

Director

Dado Kantarevic

4114 27th Street

Address2

Des Moines

IA        50310        USA

State     Zip          Country

Director

William Boyce

2142 College Street

Address2

Jacksonville

FL        32204        USA

State     Zip          Country

Director

Ramic Merzuk

4114 27th Street

Address2

Des Moines                                  IA          50310              USA
State       Zip                Country

Director

Ramic Aida

4114 27th Street

Address2

Des Moines                                  IA          50310              USA
State       Zip                Country

**Signature(s)**

William A. Boatwright                        9/24/2018 4:25:33 PM
Date

BYLAWS

OF

IOWASKA CHURCH OF HEALING

(an Iowa Nonprofit Corporation)

## ARTICLE I

### OFFICES

Section 1. <u>Principal Office in Iowa</u>. The principal office of Iowaska Church of Healing (hereinafter called the "Corporation") in the State of Iowa shall be located at 4114 – 27th Street, Des Moines, Iowa 50310. The principal office may change, from time to time, and any such changes shall be noted in the minutes of the Corporation.

Section 2. <u>Registered Office</u>. The registered office of the Corporation is also located at 4114 – 27th Street, Des Moines, Iowa 50310. Any changes with respect to the registered office or registered agent of the Corporation shall be filed with the Iowa Secretary of State.

Section 3. <u>Other Offices</u>. The Corporation may have other offices at such other place or places, either within or without the State of Iowa, as the Board of Directors may from time to time determine, or as shall be necessary or appropriate for the conduct of the affairs of the Corporation.

## ARTICLE II

### MEMBERSHIP

Section 1. <u>Members</u>. Qualifications and eligibility for membership in the Corporation are as follows:

(a) Iowaska Church welcomes all individuals to become members irrespective of age, race, color, creed, national origin, cultural background, ethnicity, religion, sex, sexual orientation, gender expression or any other discriminating factors. Membership is available to all beings who approach Iowaska Church with the sincere intention to become a part of a spiritually directed community in which all members live by a code of love, unity, integrity and respect for all living things.

(b) Membership is open to those who are sincerely seeking a deeper relationship with Self, with Spirituality and with the living Spirit of Mother Earth. The aforementioned sincerity of character and the willingness to live through

#3015774

2

one's Higher Self should be self-evident as witnessed by all Church members, Officers, Elders and Spiritual Leaders. This sincerity in character should be self-evident in all actions, words, thoughts and intentions presented by an individual to the Church.

(c)     Membership is open to those who are willing to harmoniously contribute to a safe environment in which people from all walks of life will be collectively gathered in an effort to seek a greater understanding of themselves, the world around them and to access multi-dimensional healing.

(d)     Prospective members must sign, complete and return any and all relevant membership applications and paperwork to be reviewed and approved by designated Church staff.

(e)     Prospective members must pay a one-time membership fee set by the Board of Directors. Youth under 18 years-of-age who cannot afford the membership fee may apply to be considered in the Church Volunteer Program. Retired individuals over 60 years-of-age may have their membership fee waived in exchange for a monetary donation of their choosing.

(f)     Church membership does not qualify an individual to have access to sacred medicinal ceremonies in which one would partake in the Sacrament of Ayahuasca. To partake in the Sacrament of Ayahuasca, an individual must be a Church member in good standing, at least 18 years-of-age or older and must successfully pass all pre-qualification requirements as set forth by the Church rules and regulations.

Section 2. Annual Meeting of Membership. The Annual Meeting of the members shall be held at Des Moines, Iowa, during the month of May in each year for the transaction of such business as may come before the membership. In addition, the Board of Directors may, from time to time, provide for the holding of other regular meetings of the members, and fix the date, time and place (which may be within or outside the State of Iowa) thereof.

Section 3. Special Meetings. Special meetings of the membership, for any purpose or purposes, unless otherwise prescribed by statute, may be called by the Founder or by the Board of Directors. In addition, members holding at least five percent (5.0%) of the total voting power of the membership may compel a special meeting of the members by signing, dating and delivering to the Founder or any officer of the Corporation one or more written demands for the meeting describing the purpose for which it is to be held. The close of business on the thirtieth (30th) day before delivery of the demand for special meeting to the Founder or any corporate officer shall be the record date for purposes of determining whether the five percent (5.0%) requirement has been met. If notice for a special meeting demanded by at least five percent (5.0%) of the membership is not given by the Corporation within thirty (30) days after the date the written demand or demands are delivered to the Founder or an officer of the Corporation, a person signing the demand may set the time and place of the special meeting and give notice as

3

provided in Section 4 of this Article II. Only those matters that are within the purpose described in the meeting notice may be considered at any special meeting of the members.

Section 4. Notice of Meetings. Except as otherwise provided herein, written notice stating the place, day and time of any regular or special meeting, as well as the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) days before the date of the meeting. Notice may be delivered to each member in person, by mail, by commercial delivery or by electronic transmission (including facsimile and e-mail), by or at the direction of the President, the Secretary, the Founder or the officer or persons calling the meeting. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the member at his or her address as it appears on the books of the Corporation, with postage thereon prepaid. If sent by electronic transmission, notice shall be deemed to be delivered when electronically transmitted to the member. A written notice or report delivered as part of a newsletter, magazine or other publication of the Corporation regularly sent to the members shall constitute a written notice or report if addressed or delivered to the member's address shown in the Corporation's current list of members.

If any Annual, regular or special meeting of the members is adjourned to a different date, time or place, notice need not be given of the new date, time or place if the new date, time or place is announced at the meeting before adjournment.

A member may waive any notice required hereunder before or after the date and time stated in the notice by a signed writing noting the member's waiver delivered to the Corporation for inclusion in the minutes or filing with the Corporation's records. A member's attendance at a meeting shall work to: (1) waive any objection the member may have to lack of notice or defective notice of the meeting, unless the member at the beginning of the meeting objects to the holding of the meeting or transacting business at the meeting; and (2) waive any objection the member may have to consideration of a particular matter at the meeting that is not within the purpose described in the meeting notice, unless the member objects to considering the matter at the time it is presented.

Section 5. Place of Meeting. The Board of Directors may designate any place, either within or without the State of Iowa unless otherwise prescribed by statute, as the place of meeting for any Annual Meeting, regular meeting or any special meeting called by the Founder, the President or the Board of Directors; provided, however, that if any Annual Meeting takes place at a location other than that specified in Article II, Section 2, above, notice of such change in location shall be given pursuant to the manner specified in Article II, Section 4 above.

Section 6. Record Date. For purposes of fixing a date as the record date for determining those members entitled to notice of a members' meeting, the record date shall be the business day preceding the day on which notice is given. For purposes of fixing a date as the record date for determining those members entitled to vote at any meeting of the members, the record date shall be the actual date of the meeting. A determination of members entitled to notice of, or to vote at, a membership meeting shall be effective for any adjournment of the meeting, unless the Board of Directors fixes a new date for determining the right to notice or the right to vote, which

it shall do if the meeting is adjourned to a date that is more than seventy (70) days after the record date for determining members entitled to notice of the original meeting.

After fixing a record date for notice of a meeting, the Corporation shall prepare an alphabetical list of the names and addresses of all members who are entitled to notice of the meeting. In addition, the Corporation shall prepare on a current basis through the time of the membership meeting a list of those members who are entitled to vote at the meeting. Unless otherwise provided by law, the Corporation shall make such lists available for inspection by any member at the Corporation's principal office, or such other location specified in the notice, beginning two (2) business days after notice is given of the meeting for which the lists were prepared and continuing through the meeting.

Section 7. Order of Business. The order of business shall be determined by the President of the Corporation and made available prior to the beginning of the meeting. All meetings of the membership shall be conducted in accordance with Roberts' Rules of Order. The agenda for all meetings of the members shall be determined by the Board of Directors. Members may request the Board of Directors to add agenda items by submitting additional agenda items to the Corporation's Secretary no later than three (3) weeks prior to a meeting of the members.

Section 8. Quorum and Voting. Only those matters which the Board of Directors has, in its absolute discretion, presented to the members seeking their vote shall be taken up for vote by the members. A minimum of ten percent (10.0%) of all members in good standing to vote must be represented in person or by proxy to constitute a quorum for the transaction of any business at a meeting of the membership. Each member shall be entitled to one vote on each matter submitted to a vote of the members by the Board of Directors. If a quorum is present, the affirmative vote of a majority of the members present in person or by proxy shall be the act of the members.

Section 9. Action by Written Consent. Any action to be approved by the members may be approved without a meeting of the members if the action is approved by eighty percent (80.0%) of all members of the Corporation. Any such action must be evidenced by one or more written consents describing the action taken, signed by at least eighty percent (80.0%) of the members and delivered to the Corporation for filing with its minutes or records. Except as otherwise provided, the record date for determining members entitled to take action without a meeting is the date the first member signs the written consent to action. A consent signed pursuant to this Article II, Section 9 has the effect of a meeting vote. Written notice of member approval secured in this manner shall be given to all members who have not signed the written consent, and member approval shall be effective ten (10) days after such written notice is given.

Section 10. Action by Written Ballot. Any action which may be taken at any Annual, regular or special meeting of the members may be taken without a meeting if the Corporation delivers a written ballot to every member entitled to vote on the matter that sets forth each proposed action and provides an opportunity to vote for or against each action. Approval of any action by written ballot shall be valid only when the number of votes cast by ballot equals or exceeds the number required to be present at a meeting authorizing the action (quorum), and the number of approvals equals or exceeds the number of votes that would be required to approve

5

the matter at a meeting of the members. All solicitations by the Corporation for votes by written ballot shall: (1) indicate the number of responses needed to meet the quorum requirements; (2) state the percentage of approvals necessary to approve each matter; and (3) specify the date and time by which the ballot must be received by the Corporation in order to be counted. A written ballot may be delivered, and a vote may be cast on that ballot, by electronic transmission; provided, however, that any ballot so delivered shall contain information indicating that the member authorized the electronic transmission of the ballot.

Section 11. <u>Resignation, Expulsion or Suspension of Members.</u> A member may resign at any time by providing written notice thereof to the Founder, the Board of Directors or any officer of the Corporation. The resignation of a member shall not, however, relieve the member from any obligations the member may have to the Corporation that were incurred prior to his or her resignation.

The Corporation will not tolerate any member's disregard for Church Doctrine or the Universal Laws of Respect, and a member may be expelled or suspended with or without cause by the Board of Directors. A member who has been expelled or suspended shall remain liable to the Corporation for any dues, assessments or fees as a result of obligations incurred or commitments made prior to his or her expulsion or suspension. The Board of Directors may, but shall not be required to, consider a request for reinstatement by any suspended or expelled member, and may reverse or modify its decision to suspend or expel the member as it deems appropriate. No such request shall be taken or heard, however, at any meeting of the members.

## ARTICLE III

## BOARD OF DIRECTORS

Section 1. <u>General Powers.</u> All corporate powers shall be exercised by or under the authority of, and the affairs of the Corporation managed under the direction of, and subject to the oversight of, the Board of Directors.

Section 2. <u>Number, Term of Office and Qualifications.</u> The number of directors shall be not less than three (3) nor more than nine (9). The number of directors may be changed by the Board of Directors at any Annual or special meeting called for that purpose, subject to the prior written approval of the Founder. No decrease in number shall have the effect of shortening the term of any incumbent director. The Founder of the Corporation shall automatically be a full voting member of the Corporation's Board of Directors, and shall be a "Designated Director" within the meaning of Iowa Code Chapter 504, Subchapter VIII, Part I. As a Designated Director, the Founder shall hold office until his resignation or until his position as a Designated Director shall be eliminated or modified pursuant to Section 809 of the Revised Iowa Nonprofit Corporation Act. All other directors shall be elected pursuant to the procedures set forth in Section 3 of this Article III. In case the Board of Directors fails to fix the number of elected directors, the number actually elected shall be deemed to be the number of elected directors so fixed. All directors must be individuals.

Section 3. Election of Elected Directors. The initial elected directors of the Corporation shall serve for a term of two (2) years, or until their successors are duly elected. Commencing with the Annual Meeting of the Board of Directors in the year 2020, the directors shall be appointed by an affirmative vote of the Corporation's Board of Directors, and each director shall hold office for a term of two (2) years. Each director shall serve until his or her successor is appointed and qualified, or until his or her death, resignation or removal. An elected director may serve three (3) or more consecutive terms.

Section 4. Quorum and Manner of Acting. A majority of the number of directors in office immediately before a meeting begins shall constitute a quorum for the transaction of business; but if at any meeting of the Board of Directors there be less than a quorum present, a majority of the directors may adjourn the meeting, from time to time, until a quorum shall be present. Notice of any adjourned meeting need not be given. At all meetings of directors, a quorum being present, the act of the majority of the directors present at the meeting shall be the act of the Board of Directors, unless the act of a greater number is required by law, the Articles of Incorporation or these Bylaws. Any or all directors may participate in a regular or special meeting by, or conduct the meeting through the use of, any means of communication by which all directors participating may simultaneously hear each other during the meeting. A director participating in a meeting by these means shall be deemed to be present in person at the meeting. No director shall vote by proxy.

Section 5. Action Without a Meeting. Except to the extent the Articles of Incorporation or these Bylaws otherwise require that action by the Board of Directors be taken at a meeting, any action required or permitted to be taken by the Board of Directors may be taken without a meeting if each director signs a written consent describing the action to be taken and delivers it to the Corporation. Any action so taken shall be the act of the Board of Directors when one or more consents signed by all of the directors are delivered to the Corporation. The written consent or consents may specify the time at which the action taken is to be effective. Any action taken by this written consent procedure shall have the effect of action taken at a meeting of the directors.

A director may withdraw his or her consent by revocation signed by the director and delivered to the Corporation prior to the delivery to the Corporation of unrevoked written consents signed by all of the directors.

Section 6. Resignation. Any director of the Corporation may resign at any time by giving written notice to the Board of Directors, the President or Secretary of the Corporation. The resignation of any director shall take effect upon receipt of notice thereof or at such later date as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 7. Removal of Directors. The removal of the Designated Director shall require an amendment to these Bylaws eliminating his or her designation as a director. Any elected director of the Corporation may be removed either for or without cause by the Board of Directors whenever, in its judgment, the best interests of the Corporation would be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the director so removed.

Section 8. Vacancies. Any vacancy occurring in the Board of Directors through death, resignation, removal or otherwise shall be filled by the Board of Directors. A director so appointed to fill a vacancy shall be appointed for the unexpired term of his or her predecessor in office and until the appointment of his or her successor.

Section 9. Number of Directors Increased. In case the number of directors be increased by amendment to these Bylaws, the directorship to be filled by reason thereof shall be filled by the Board of Directors. Any director so elected shall serve until the appointment of his or her successor.

Section 10. Place of Meetings, etc. Except as provided in Section 11 of this Article III, the Board of Directors may hold its meetings and keep the books and records of the Corporation at such place or places, within the State of Iowa, as the Board may from time to time determine.

Section 11. Annual and Regular Meetings. The Annual Meeting of the Board of Directors shall be held in each year during the month of May in Des Moines, Iowa, and, if so held, no notice of such annual meeting need be given to any director of the Corporation. The Board of Directors, from time to time, may provide for the holding of other regular meetings of the Board of Directors and fix the time and place (which may be within or outside of the State of Iowa) thereof. Notice of regular meetings shall not be required to be given; provided, however, that in case the Board of Directors shall fix or change the time or place of regular meetings, notice of such action shall be mailed promptly to each director who shall not be present at the meeting at which such action was taken, addressed to him at his residence or usual place of business.

Section 12. Special Meetings; Notice. Special meetings of the Board of Directors shall be held whenever called by the Founder, President or any one or more of the directors at such time and place (which may be within or outside of the State of Iowa) as may be specified in the respective notices or waivers of notices thereof. Notice of each special meeting shall be given to each director at least two (2) days before the date on which the meeting is to be held, and may be communicated in person, by U.S. Mail, by telephone, voice mail, e-mail or other electronic transmission. Notice of any special meeting shall not be required to be given to any director who shall waive notice of such meeting in writing, including electronic transmission, whether before or after the time of such meeting; and any such meeting shall be a legal meeting without any notice thereof having been given if all the directors shall be present thereat.

A director may at any time waive any notice required under this Article III by signing a written statement evidencing his or her waiver and filing it with the Corporation's minutes. A director's attendance at or participation in a meeting waives any required notice of the meeting unless the director, upon arriving at the meeting or prior to the vote on a matter not noticed in conformity herewith, objects to lack of notice and does not thereafter vote for or assent to the objectionable action.

Section 13. Order of Business.

8

    (a)     At meetings of the Board of Directors, business shall be transacted in such order as the Board of Directors, from time to time, may determine by resolution.

    (b)     At all meetings of the Board, the President, or in his or her absence the Vice-President, or in the absence of the President and Vice-President, the most senior director shall preside.

Section 14.  <u>Committees.</u>  The Board of Directors may establish one or more committees of the Board, including an Executive Committee, and appoint members of the Board to serve on them.  The creation of a committee and appointment of its members must be approved by a majority of all directors then in office when the action is taken.  Each committee so created shall have two (2) or more directors, who shall serve at the pleasure of the Board.  Each such committee shall have the powers and duties delegated to it by the Board of Directors.  The Board of Directors may elect one or more of its members as alternate members of any such committee who may take the place of any absent member or members at any meeting of such committee upon request by the President, or upon request by the directors, from time to time, as the Board may determine by resolution.  All provisions of this Article III that govern meetings, action without meetings, notice and waiver of notice, quorum and voting requirements of the Board of Directors shall also apply to committees of the Board and their members.

The Board of Directors may also create or authorize the creation of one or more advisory committees whose members are not required to be directors.  Any advisory committee so created, however, shall not be a committee of the Board, and shall not exercise any powers of the Board.

Section 15.  <u>Standards of Conduct.</u>  Each member of the Corporation's Board of Directors, when discharging the duties of a director, shall act in good faith, and in a manner the director reasonably believes to be in the best interests of the Corporation.  The members of the Board of Directors, or any committee of the Board, when becoming informed in connection with their decision-making functions, shall discharge their duties with the care that a person in a like position would reasonably believe appropriate under similar circumstances.

In discharging Board or committee duties, a director who does not have knowledge that makes his or her reliance unwarranted is entitled to rely on the performance by the following persons to whom the Board may have delegated, formally or informally by course of conduct, the authority or duty to perform one or more of the Board's delegable functions: (1) any officer of the Corporation whom the director reasonably believes to be reliable and competent in the functions he or she performed or the information, opinions, reports or statements that he or she provided; and (2) any employee of the Corporation whom the director reasonably believes to be reliable and competent in the functions he or she performs or the information, opinions, reports or statements that he or she provides.

In discharging Board or committee duties, a director is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by any of the following persons: (1) any officers or employees of the

9

Corporation whom the director reasonably believes to be reliable and competent in the functions he or she performed or the information, opinions, reports or statements that he or she provided; (2) legal counsel, public accountants, or other persons as to matters involving skill or expertise the director reasonably believes to be either matters within the particular person's professional or expert competence, or matters as to which the person merits confidence; and (3) a committee of the Board of which the director is not a member, as to matters within its jurisdiction, if the director reasonably believes the committee merits confidence.

Section 16. <u>Standards of Liability.</u> A director shall not be liable to the Corporation for any decision to take or not to take action, or any failure to take any action, as a director, unless the party asserting liability in a proceeding shall establish that neither Section 901 nor 831 of the Revised Iowa Nonprofit Corporation Act preclude liability of the director, and that the challenged conduct consisted or was the result of one of the following: (1) action not in good faith; (2) a decision that the director either did not reasonably believe to be in the best interest of the Corporation, or as to which the director was not informed to an extent the director reasonably believed appropriate in the circumstances; (3) a lack of objectivity due to the director's familial, financial or business relationships with, or lack of independence due to the director's domination or control by, another person having a material interest in the challenged conduct which relationship, or which domination and control, could reasonably be expected to have affected the director's judgment in a manner adverse to the Corporation and, after a reasonable expectation to such effect has been established, the director shall not have established that the challenged conduct was reasonably believed by him or her to be in the best interests of the Corporation; (4) a sustained failure of the director to devote attention to ongoing oversight of the business and affairs of the Corporation, or a failure to devote timely attention, by making, or causing to be made, appropriate inquiry, when particular facts and circumstances of significant concern materialize that would alert a reasonably attentive director to the need therefor; or (5) receipt of a financial benefit to which the director was not entitled or any other breach of the director's duties to deal fairly with the Corporation and its members that is actionable under applicable law.

Section 17. <u>Director Conflict of Interest.</u> No conflict of interest transaction shall be entered into between the Corporation and any director without first being approved pursuant to the procedures set forth in this Article III, Section 17. The term "conflict of interest transaction" means a transaction with the Corporation in which a director of the Corporation has a direct or indirect interest. A director shall be deemed to have an indirect interest in a transaction under either of the following circumstance: (1) if another entity in which the director has a material interest or in which the director is a general partner is a party to the transaction; or (2) if another entity of which the director is a director, officer, or trustee is a party to the transaction.

A conflict of interest transaction is authorized, approved or ratified if it receives the affirmative vote of a majority of the directors on the Board of Directors, or a committee of the Board, who have no direct or indirect interest in the transaction, but under no circumstances shall a transaction be authorized, approved or ratified by a single director. If a majority of the directors on the Board who have no direct or indirect interest in the transaction vote to authorize, approve, or ratify the transaction, a quorum is present for the purpose of taking action on the transaction.

10

The Board of Directors, through a resolution duly adopted, may impose such additional requirements and restrictions on conflict of interest transactions as the Board may see fit.

Section 18. <u>Compensation.</u> No director, committee member or officer of the Corporation shall receive any compensation for services performed in his or her capacity as a director, committee member or officer. Directors, committee members and officers shall be entitled to receive reimbursement for any amounts personally expended for or on behalf of the Corporation while performing their duties as such, provided such amounts are reasonable and approved by the Board of Directors.

<div align="center">

ARTICLE IV

OFFICERS

</div>

Section 1. <u>Number.</u> The officers of the Corporation shall be a President, a Vice-President, a Secretary, a Treasurer, and such other officers as may be appointed in accordance with the provisions of Section 3 of this Article IV. The same individual may simultaneously hold more than one office in the Corporation.

Section 2. <u>Election, Term of Office and Qualification.</u> The officers of the Corporation shall be chosen by the Board of Directors at its Annual Meeting each year. Each such officer shall hold office for one (1) year, and until his or her successor shall have been duly chosen and shall qualify or until his or her death, resignation or removal. The election of an officer of the Corporation shall not, in and of itself, create any contract rights.

Section 3. <u>Subordinate Officers and Agents.</u> The Board of Directors may appoint such other officers or agents as it may deem necessary or advisable, from time to time, to hold office for such period, and to have such authority to perform such duties as the Board of Directors, from time to time, may determine. The Board of Directors may delegate to any officer or agent the power to appoint any such subordinate officers or agents and to prescribe their respective terms of office, authorities and duties.

Section 4. <u>Removal.</u> An officer may be removed at any time, with or without cause, by the Board of Directors. An officer's removal shall not affect the officer's contract rights, if any, with the Corporation.

Section 5. <u>Resignations.</u> Any officer may resign at any time by giving written notice of such resignation to the Corporation's Founder, Board of Directors, the President or the Vice-President. Any such resignation shall take effect upon receipt of such notice or at any later time specified therein, and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. If a resignation is made effective at a future time and the Board of Directors accepts the future effective time, the Board may fill the pending vacancy before the effective time if the Board provides that the successor officer does not take office until the effective time. An officer's resignation shall not affect the Corporation's contract rights, if any, with the officer.

11

Section 6. <u>Vacancies</u>. A vacancy in any office by reason of death, resignation, removal, disqualification or any other cause shall be filled by the Board of Directors.

Section 7. <u>President</u>. The President shall be the chief executive officer of the Corporation and, subject to the control and consultation with the Board of Directors, he or she shall have general and complete management and supervision of the operations of the Corporation, to retain and discharge all employees, and generally to manage and supervise the operations of the Corporation, including the investment of the corporate funds and properties. In general, he or she shall perform all duties incident to the office of President and see that all orders and resolutions of the Board of Directors are carried into effect. From time to time, the President shall report to the Board of Directors all matters within his or her knowledge which the interests of the Corporation may require to be brought to their notice. The President shall have authority to sign, execute and acknowledge all contracts, checks, deeds, mortgages, bonds, leases or other obligations on behalf of the Corporation as he or she may deem necessary or proper to be executed in the course of the Corporation's regular business, or which shall be authorized by the Board of Directors. The President may sign in the name of the Corporation reports and all other documents or instruments which are necessary or proper to be executed in the course of the Corporation's business. The President shall perform such other duties as are given to him or her by these Bylaws or as may be assigned, from time to time, by the Board of Directors.

Section 8. <u>Vice-President</u>. In the absence or disability of the President, or whenever requested by the President, the Vice-President may perform all the duties of the President, and, when so acting, shall have all powers and be subject to all restrictions upon the President. The Vice-President shall perform such other duties as are given to him or her by these Bylaws or as from time to time may be assigned to him or her by the Board of Directors or the President.

Section 9. <u>Secretary</u>. The Secretary shall:

(a)     record and prepare minutes of all the proceedings of the meetings of the Board of Directors and its committees, members and Friends in a book to be kept for that purpose;

(b)     cause all notices to be duly given in accordance with the provisions of these Bylaws and as required by statute;

(c)     authenticate and be custodian of the records of the Corporation;

(d)     see that the books, reports, statements and other documents and records required by statute are properly kept and filed;

(e)     in general, perform all duties incident to the office of Secretary and such other duties as are given to him or her by these Bylaws or as may be assigned to him or her, from time to time, by the Board of Directors or the President.

12

Section 10.  <u>Treasurer</u>.  The Treasurer shall:

(a)   have charge of and supervision over and be responsible for the funds, securities, receipts and disbursements of the Corporation;

(b)   cause the money and other valuable effects of the Corporation to be deposited in the name and to the credit of the Corporation in such banks or trust companies or with such bankers or other depositories as shall be selected in accordance with Article VII, Section 5 of these Bylaws or to be otherwise dealt with in such a manner as the Board of Directors may direct;

(c)   cause the funds of the Corporation to be disbursed by checks or drafts upon the authorized depositories of the Corporation, and cause to be taken and preserved proper vouchers for all money disbursed;

(d)   render to the President or the Board of Directors, whenever requested, a statement of the financial condition of the Corporation and of all his or her transactions as Treasurer, and render a full financial report at the Annual Meetings of the Board of Directors;

(e)   cause to be kept, at such place as the Board of Directors may determine, correct books of account of all the Corporation's business and transactions, such books to be available to any director at such place during business hours;

(f)   be empowered, from time to time, to require from all officers or agents of the Corporation reports or statements giving such information as he or she may desire with respect to any and all financial transactions of the Corporation;

(g)   in general, perform all duties incident to the office of Treasurer and such other duties as are given to him or her by the Board of Directors or the President.

Section 11.  <u>Standards of Conduct for Officers.</u>  Each officer of the Corporation, when performing in such capacity, shall act in good faith, with the care that a person in a like position would reasonably exercise under similar circumstances, and in a manner the officer reasonably believes to be in the best interests of the Corporation.  In discharging the officer's duties, an officer who does not have knowledge that makes his or her reliance unwarranted is entitled to rely on any of the following: (1) the performance of properly delegated responsibilities by one or more employees of the Corporation whom the officer reasonably believes to be reliable and competent in performing the responsibilities delegated; (2) information, opinions, reports or statements, including financial statements and other financial data, prepared or presented by one or more officers or employees of the Corporation whom the officer reasonably believes to be reliable and competent in the matters presented; and (3) legal counsel, public accountants, or other persons retained by the Corporation as to matters involving the skills or expertise the

13

officer reasonably believes are within the particular person's professional or expert competence, or as to which the person merits confidence. An officer shall not be liable as an officer to the Corporation for any decision to take or not to take action, or any failure to take any action, if the duties of the officer are performed in compliance with this Article IV, Section 11.

## ARTICLE V

## OTHER RESERVATIONS OF RIGHTS AND POWERS BY THE FOUNDER

Section 1. <u>Other Reserved Rights and Powers Requiring Prior Approval</u>. The Founder of the Corporation, as well as its first Healer, is Dado Kantarevic. In addition to all other situations where the prior written approval by the Founder or his designated successor, if any, is required under the Corporation's Articles of Incorporation or these Bylaws, his prior written approval shall also be required in order for any of the following action to be taken by or on behalf of the Corporation:

(a) The approval of any change in the Corporation's name, fictitious names, logo, trademarks, letterhead or similar design materials used in the promotion or identification of the Corporation;

(b) The approval and adoption of any strategic or long-term plans for the Corporation, including its financial and capital plans;

(c) The approval of the development, significant modification, termination or sponsorship of any of the Corporation's religious or educational programs.

Section 2. <u>No Change in Corporation's Name Following the Founder's Death</u>. Following the death of the Founder, no changes, amendments, alterations or other adjustments shall be made to the Corporation's name, fictitious names then in use, trademarks, letterhead or similar design materials used in the promotion or identification of the Corporation, and any attempts to make such a change, amendment, alteration or adjustment shall be enjoined by the Corporation. Notwithstanding anything in these Bylaws to the contrary, no amendment to this Article V, Section 2 shall be made after the death of the Founder.

## ARTICLE VI

## EXERCISE OF AUTHORITY BY THE FOUNDER

Section 1. <u>General Application.</u> All provisions of the Corporation's Articles of Incorporation and these Bylaws which require the prior written approval of the Founder shall be governed by the procedures set forth in this Article VI.

14

Section. 2. <u>Approval Procedures</u>.  Whenever the prior written approval of the Founder is required, the Board of Directors shall provide him with a written explanation of the desired action to be taken, together with a full discussion of all pertinent background information, salient facts, supporting documentation, proposed language if amendments to the Corporation's Articles of Incorporation or Bylaws are requested, and the rationale for the desired action.

Following his review of the requested action and all supporting documentation, the Founder shall, within a reasonable amount of time, inform the Board of Directors, in writing, whether he approves, disapproves, or has suggested modifications to the requested action. Subject to the provisions of Section 3 of this Article VI, all decisions with respect to action which requires the prior approval of the Founder shall be made in his sole and absolute discretion, and all of his decisions shall be final and binding upon the Corporation.

Section 3. <u>Changes Required by Law.</u>  In the event that any provision of the Corporation's Articles of Incorporation or Bylaws shall be or become illegal, or shall jeopardize the Corporation's tax-exempt status under Section 501(c)(3) of the Internal Revenue Code of 1986 in the opinion of the Corporation's legal counsel, the remaining provisions of the Articles of Incorporation or Bylaws, as the case may be, shall remain in full force and effect and only the offending provisions shall be of no further force or effect.  In such case, the Corporation's Board of Directors and the Founder shall collaborate to develop such mutually agreeable amendments to the Articles of Incorporation or Bylaws as may be necessary to correct the offending provisions.

Section 4. <u>Designated Successors.</u>  The Founder may, but shall not be required to, designate a successor to succeed him in exercising all approval and other powers he possesses under the Corporation's Articles of Incorporation and these Bylaws in the event of his incapacity or inability for any other reason to so act during his lifetime.  Such designation shall be made in writing, and shall be delivered to the Corporation's President or Secretary.  Such designation may be for a specific period of time, or for an indefinite duration in the discretion of the Founder. The Founder may revoke such a designation at any time, and designate a new successor thereafter if he should so desire.

In all cases where a successor has been duly designated by the Founder, upon the occurrence of his incapacity or other event rendering him otherwise unable to exercise his authority under the Corporation's Articles of Incorporation or Bylaws, the successor shall immediately be vested with all power and authority to so act without any further action, election or proceeding.

Section 5. <u>Transactions in Violation of this Article VI.</u>  Any transaction entered into, or any other action taken, by the Corporation or any of its officers or directors in violation of any of the provisions of the Corporation's Articles of Incorporation or Bylaws that required, but did not receive, the prior written approval of the Founder, or his designated successor, according to the procedures set forth in this Article VI shall be void, *ab initio*, and of no further force or effect; provided, however, that the Founder, or his designated successor, may, but shall not be required to, ratify and affirm any transaction entered into or any other action so taken that did not receive his prior written approval.

15

## ARTICLE VII

### ACCEPTANCE OF BEQUESTS, DEVISES AND DONATIONS, EXECUTION OF INSTRUMENTS, BORROWING OF MONEY AND DEPOSIT OF CORPORATE FUNDS

Section 1. <u>Acceptance of Bequests, Devises and Donations</u>. The President or Vice-President may accept any and all unconditional and unrestricted bequests, devises and donations of money and property made to the Corporation and, with the prior approval of the Board of Directors, may accept any other bequests, devises and donations.

Section 2. <u>Execution of Instruments</u>. All instruments of assignment, transfer, conveyance, release and contract requiring execution by the Corporation, shall be signed by any authorized officer or agent provided, however, that such person or persons may delegate, from time to time, by instruments in writing, all or any part of such authority to any other person or persons, if authorized to do so by vote of the Board of Directors.

Section 3. <u>Loans</u>. When so authorized by the Board of Directors, any officer or agent of the Corporation may effect loans and advances, at any time, for the Corporation, secured by mortgage or pledge of the Corporation's property or otherwise, and may do every act and thing necessary or proper in connection therewith. Such authority may be general or confined to specific instances.

Section 4. <u>Transfer of Real Estate</u>. Unless authorized by the Board of Directors, no right or interest of any kind or nature in and to any real estate or lease of real estate shall be either: (1) sold, assigned, transferred, conveyed or otherwise disposed of or mortgaged or encumbered in any manner; or (2) acquired, either by purchase, lease or otherwise, by the Corporation.

Section 5. <u>Deposits</u>. All funds of the Corporation, not otherwise employed, shall be deposited from time to time to its credit in such banks, trust companies or other depositories as the Board of Directors may select, or as may be selected by any officer or officers, agent or agents, authorized to do so by the Board of Directors.

Section 6. <u>Checks, Drafts, etc</u>. All notes, drafts, acceptances, checks, endorsements and all evidences of indebtedness of the Corporation whatsoever shall be signed by such officer or officers, or such agent or agents, of the Corporation and in such manner as the Board of Directors, from time to time, may determine. Endorsements for deposit to the credit of the Corporation, in any of its duly authorized depositories, shall be made in such manner as the Board of Directors may from time to time determine.

## ARTICLE VIII

## CORPORATE RECORDS

APP. 0063

16

Section 1.  Corporate Records to be Maintained - Generally.  The Corporation shall keep as permanent records minutes of all meetings of its members and the Board of Directors, a record of all actions taken by the members or directors without a meeting, and a record of all actions taken by committees of the Board of Directors.  The Corporation shall also maintain appropriate accounting records, and a record of its members in a form that permits preparation of a list of the names and addresses of all members, in alphabetical order.  All records shall be maintained in written form or in another form capable of conversion into written form within a reasonable amount of time.  Unless otherwise directed by the Board of Directors, the Secretary of the Corporation shall maintain and be the custodian of all its records.

Section 2.  Specific Records to be Maintained.  In addition to the foregoing, the Corporation shall keep a copy of all of the following records: (1) its Articles of Incorporation, Amended and Restated Articles of Incorporation and all amendments to them currently in effect; (2) its Bylaws, Restated Bylaws and all amendments to them currently in effect; (3) all resolutions adopted by the Board of Directors relating to the characteristics, qualifications, rights, limitations, and obligations of members; (4) the minutes of all meetings of members and records of all actions approved by the members for the past three years; (5) all written communications to members generally within the past three years; (6) a list of the names and business or home addresses of its current directors and officers; and (7) its most recent Biennial Report delivered to the Iowa Secretary of State.

Section 3.  Limitation on Use of Corporate Records.  Without the prior consent of the Board of Directors, no corporate record may be obtained or used by any person for any of the following purposes: (1) for any commercial purpose; (2) for sale to or purchase by any person; or (3) for any purpose that is detrimental to the interests of the Corporation.

Section 4.  Inspection of Records by Directors and Members.  A director of the Corporation is entitled to inspect and copy the books, records and documents of the Corporation at any reasonable time to the extent reasonably related to the performance of the director's duties as a director, including duties as a member of a committee, but not for any other purpose or in any manner that would violate any duty to the Corporation.

As authorized under Section 1602(5) of the Revised Iowa Nonprofit Corporation Act, the Corporation's members shall have no right to inspect or copy the Corporation's books, records or documents, except where expressly permitted by the Board of Directors.

ARTICLE IX

MISCELLANEOUS PROVISIONS

Section 1.  Corporate Seal.  The Corporation shall have no corporate seal.

Section 2.  Fiscal Year.  The fiscal year of the Corporation shall end at the close of business on the last day of December each year.

17

Section 3. <u>Voting of Stocks Owned by the Corporation</u>. In the absence of a resolution of the Board of Directors to the contrary, the President of the Corporation or the Vice-President acting within the scope of his or her authority, as provided in Article IV, Section 8 of these Bylaws, are authorized and empowered, on behalf of the Corporation, to attend, vote and grant discretionary proxies to be used at any meeting of shareholders or stockholders of any corporation in which this Corporation holds or owns shares of stock and in that connection, on behalf of this Corporation, to execute a waiver of notice of any such meeting. The Board of Directors shall have authority to designate any officer or person as a proxy or attorney-in-fact to vote shares of stock in any other corporation in which this Corporation may own or hold shares of stock.

Section 4. <u>Non-Liability</u>. Except as otherwise provided by law, a director, officer, employee, or member of the Corporation is not liable for the Corporation's debts or obligations, and a director, officer, member or other volunteer is not personally liable in that capacity for a claim based upon any action taken or failure to take any action in the discharge of the person's duties, except liability for: (1) the amount of any financial benefit to which the person was not entitled; (2) an intentional infliction of harm on the Corporation or its members; (3) a violation of Section 835 of the Revised Iowa Nonprofit Corporation Act; or (4) an intentional violation of criminal law. If Iowa law is hereafter changed to permit further elimination or limitation of the liability of directors, officers, employees, members or other volunteers for monetary damages to the Corporation, then the liability of such director, officer, employee, member or other volunteer of the Corporation shall be eliminated or limited to the full extent then permitted. The directors, officers, employees, members or other volunteers of the Corporation have agreed to serve in their respective capacities in reliance upon the provisions of this Article.

Section 5. <u>Indemnification</u>. Except as otherwise provided by law, a director, officer, employee, member or other volunteer of this Corporation, as well as each director, officer, employee, member or volunteer of this Corporation who is serving or who has served at the Corporation's request as a director, officer, partner, trustee, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, shall be indemnified to the fullest extent possible by the Corporation for liability, as defined in Section 851, subsection 5, of the Revised Iowa Nonprofit Corporation Act, to any person for any action taken, or any failure to take any action, as a director, officer, employee, member or other volunteer of this Corporation, or as a director, officer, partner, trustee, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, except with regard to any action, suit or proceeding by or in the right of the Corporation or with respect to any liability for any of the following: (1) receipt of a financial benefit to which the person is not entitled; (2) an intentional infliction of harm on the Corporation or its members; (3) a violation of Section 835 of the Revised Iowa Nonprofit Corporation Act; or (4) an intentional violation of criminal law. In order to be eligible for indemnification, a person must satisfy any and all applicable standards of conduct and liability set forth in the Revised Iowa Nonprofit Corporation Act.

The rights and authority conferred in this Article shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Articles of

18

Incorporation or Bylaws of the Corporation, agreement, vote of disinterested directors or otherwise. Any repeal or amendment of this Article shall not adversely affect any right or protection of a director, officer, employee, or other volunteer existing at the time of such repeal or amendment.

Section 6. <u>Corporate Powers and Purposes</u>. The Corporation shall have unlimited power to engage in and to do any lawful act concerning any and all lawful purposes for which corporations may be organized under the provisions of the Revised Iowa Nonprofit Corporation Act, Chapter 504 Code of Iowa, as amended.

The Corporation is organized and shall be operated exclusively and irrevocably for charitable, educational, religious or scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.

The Corporation is and shall remain a "religious corporation" within the meaning of Section 141(38) of the Revised Iowa Nonprofit Corporation Act.

Section 7. <u>Prohibited Transactions</u>. No part of the net earnings of this Corporation shall inure to the benefit of any individual and no part of the activities of this Corporation shall consist of carrying on propaganda or otherwise attempting to influence legislation.

No loans or guarantees on personal obligations shall be made by the Corporation to or on behalf of its directors or officers. Any director or officer who assents to or participates in the making of any such loan or guarantee shall be liable to the Corporation for the amount of such loan or guarantee until the repayment thereof.

This Corporation shall not engage in a prohibited transaction, as defined in the Internal Revenue Code of the United States, or any amendment thereto.

This Corporation shall not:

(a)     lend any part of its income or corpus, without the receipt of adequate security and a reasonable interest, to;

(b)     pay any compensation, in excess of a reasonable allowance for salaries or other compensation for personal services actually rendered, to;

(c)     make any part of its services available on a preferential basis, to;

(d)     make any substantial purchase of securities or any other property, for less than an adequate consideration in money or money's worth, to; or

(e)     engage in any other transaction which results in a substantial diversion of its income or corpus, to;

any person who has made a substantial contribution to this Corporation.

19

## ARTICLE X

## AMENDMENTS TO BYLAWS

As authorized under Section 1031 of the Revised Iowa Nonprofit Corporation Act, no amendment, alteration or repeal of any of the provisions of these Bylaws shall be adopted without the prior written approval of the Founder, or his designated successor, if any.

Except where otherwise prohibited hereunder, all Bylaws of the Corporation shall be subject to amendment, alteration or repeal and the new Bylaws or amendments, alterations or repeals may be made: (1) first by the affirmative vote of at least a majority of all members of the Board of Directors in office at the time the amendment is approved; (2) followed by the written approval of the Founder, or his designated successor, if any. The Corporation shall provide due notice of any meeting of the Board of Directors at which any amendment is to be approved, which notice shall state that the purpose, or one of the purposes, of the meeting is the consideration of a proposed amendment to the Bylaws and contain or be accompanied by a copy or summary of the amendment, or state its general nature. A copy of such notice shall simultaneously be delivered to the Founder, or his designated successor.

Duly adopted by the Board of Directors on the 28 day of November, 2018.

Dado Kantarevic, President

AFFIDAVIT

STATE OF FLORIDA      )
                      ) SS:
COUNTY OF _Orange_    )

    I, Anthony Chetta, being first duly sworn upon oath, do depose that I am the Secretary of Iowaska Church of Healing, and that the attached copies of the Articles of Incorporation and Bylaws of Iowaska Church of Healing have been compared to the original documents, and I hereby declare and certify that these copies are complete and accurate copies of the original documents. I further certify that the Articles of Incorporation for this corporation were filed with the Iowa Secretary of State on September 24, 2018.

                        Anthony Chetta, Secretary

    Subscribed and sworn to before me by Anthony Chetta, known to me personally to be the Secretary of Iowaska Church of Healing, this _28_ day of _December_, 2018.

                    Notary Public in and for said
County and State

My commission expires: _7/26/2020_

Atallah Arroyo-Carrion
Notary Public
State of Florida
My Commission Expires 7/26/2020
Commission No. GG 15577

#3021184



# Ayahuasca Manifesto

### The Spirit of Ayahuasca and its Planetary Mission

**Anonymous**

APP. 0069



Ayahuasca Manifesto

Copyright © 2011 by Anonymous

The rights of translation to other languages and any type of printed publications are the only ones retained. The information and text contained in this work is a gift to Humankind, for which this belongs to the public domain and can therefore be unconditionally copied, reproduced and/or distributed partially or totally provided it is made electronically and never in printed form.

ISBN 978-1-4507-6040-9

ii

## Index

1.   Presentation ................................................ 1

2.   My Role in the Expansion of the Human
     Consciousness ............................................ 3

3.   My Purpose with the Human Beings ................ 5

4.   About Respect and My Sacred Nature ............ 6

5.   About the Ayahuasca Churches .................... 8

6.   The Benefits of My Use .............................. 10

7.   The People of My World ............................. 11

8.   Create Awareness of Your Pineal Gland .......... 27

9.   The Hallucination is Spectacle, The Vision is
     Virtue .................................................. 28

10.  Universal Guide for Conducting an Ayahuasca
     Session ................................................ 29

11.  About the Quality of Facilitators or Shamans ... 32

12.  Preparations, Precautions and Diets .............. 33

13.  Traffic and Management of My Sacrament ........ 35

14.  Social Impact and Controls in Urban Society .... 39

15.  The Urgency of Ayahuasca Preservation
     Projects ............................................... 43

16.  My Planetary Mission................................ 44

17.  Blessings ............................................. 46

iii



It is time to embrace Humanity with my healing, extending beyond the Amazon basin, reaching global expansion, spreading through all the soils of tropical climates, growing in every forest, in every sidewalk, in every house garden. Care about me, harvest me, spread me around.

*Warriors of Light from Around the World.......*

*Help Me To Help You !*

iv

### 1. Presentation

I am the spirit of Ayahuasca. For the first time I reveal myself through the "Word" to make an emergency call to all the Human Beings of the planet, especially to the Light seekers, as I must expand beyond the Amazon river basin.

With my physical expansion I intend to facilitate the spiritual transformation currently stirring the Human species, while I also secure my physical survival which is at risk, as my blessed Amazonian protectors have not understood the danger to which they expose me, aggressively harvesting me, without new sowings.

I leave the Amazon risking my own existence like other botanical species, to leap into the project I was created for, by the central sun of all the existence, name it as you may prefer, I am at its service. I send this correspondence at this historical moment to contribute to the expansion of the Human consciousness in a definitive and significant way, honoring the universal Light that guides my Being. For the first time, with the interest created by my shaman emissaries, and with the new means of mass media and transportation available, I can potentially reach the whole planet to celebrate and proclaim our cosmic existence. I am alive, to give with crude realism, universal love to all the Human Beings who request it from the depth of their souls.

I am a spirit of spirits. I operate from a vibration superior to the spirits who compose me. I am of a hierarchy superior to that

of the spirit of Ayahuasca ("*Banisteriopsis Caapi* ") and of the underestimated Chacruna ("*Psychotria Viridis*"). I am the medicine resulting from the mixture of Ayahuasca and Chacruna. Although they give me the name of one of them, my sacred magic does not come from either one of them. My magic resides in the synergy created by the sacred mixture. Science will spend many years searching, unsuccessfully, the mechanisms that I use to act upon Human consciousness. They are surprised by my power, that it does not come from crystal DMT alone, or from harmaline, or from other molecules that compose me. I am the mixture in its natural state, crude and basic, bio-electrically loaded without industrial processing. Such is my spirit manifesting here today, shedding light to the confusion that surrounds me.

I thank all the "curanderos" that for so many centuries have welcomed me within them, and thanks to all my protectors who presently export me towards all the corners of the planet. I honor the Amazonian tradition here by using my common name of Ayahuasca, but only for linguistic convenience as I am also the spirit of the Yagé, Pilde, Dapa, Pandé, Huasca, Kahiriama, Natema, Caapi, Mado, Nuchu-huasca, Shimbaya-huasca (Quechua), Kamalampi, Punga-huasca, Rambi, Shuri, Nishi, Oni, Shillinto Natema, Mi-hi, Amenronhuasca, Inde-huasca, Shuri-fsapa, Shuri-oshinipa, Napi, and the Nepe.

I also use the popular term "shaman" but rest assured it carries the intention to honor and respect the Curanderos, Taitas, Sinchis, Curacas, Payes, Yachas, Chais, Junes, Onayas, Murayas, Mutserawas, and the Uwishin, who are also my dear and beloved protectors.

2

## 2. My Role in the Expansion of the Human Consciousness

During these times of globalized consciousness, I come to assist certain little known processes of the Human genetic code, the DNA. Specific subatomic codes that are inaccessible from the third dimension are becoming active. We know that it is not possible to read them, because it was already demonstrated by the "Uncertainty Principle" that has much perplexed the scientific logic. I activate codes that command the dimensional deployment of our bioelectric body.

New capacities of expanded consciousness are being experienced by millions of people throughout the planet. It started with those most fortunate, those with less stress, the most sensitive, those enjoying relative safety and comforts. But later on, it will be imminent and inescapable; this experience will gradually touch everyone else until it reaches the most oppressed and underprivileged souls.

Many Human Beings have already acquired technical knowledge about me, thanks to the scientists that opened up to experiencing me inside their own brains, where they were able to observe themselves instead of observing others as they were trained to do. Now they know about the bridge that empowers me. The botanical-glandular connection (that temporary molecular communion between plants and Humans), is a cosmic bridge, a shortcut that takes the Light to its destiny via its molecular door. In this way, I am much more transformative, than those who attempt to take it through the treacherous five

3

senses, traversing the marshes of the mind, enslaved by the Human ego.

The codes of four (4) that make up the three-dimensional DNA are mere mathematical results of much more complex interactions of energies that occur in higher dimensions. The expansion of the individual Human consciousness consists in living its cosmic existence beyond its three-dimensional physical limitation, with a very subtle vehicle capable of moving consciously at will, even while in the company of others vibrating in the same channel. It is the next evolutionary leap of the Human species; the three-dimensional physical expression of the Human evolution has been completed. The physical evolution for the Human species as we know it, it's over. Its divine patterns have fully unraveled; as the last fold of a rolled up carpet, the great physical creation has been displayed. Now we are at the genesis of a new phase, the return to the fountain of creation, the rediscovery of the life source, be it father/mother whichever way they choose to name it. The return ride on that same flying carpet is now accomplished consciously; unlike its trip of departure where it journeyed rolled up inside and in the center of the crease; uncomfortable, unconscious and unaware. The physical evolution has ended and the spiritual evolution has just begun. The only experience left to live is the cosmic existence lived through our Humanity, consecrated to our new vehicle of Light.

This is my time to embrace the planet. It is my duty. My mission. What I was created for. I now become a protagonist after remaining in the shadows for thousands of years guarded by my indigenous protectors. They now travel around the world raising awareness about my benefits. It is my duty to assume new cultural expressions, very different from those of my

4

beloved guardians of the forest. The rituals, the "icaros", the "dietas", and related knowledge should be preserved as an endowment of world heritage. A legacy to the Universe.

Similarly, my new ways of expression, the manifestations that are taking shape in different world cultures should also be respected and recognized. I am already manifesting new urban modalities and forms like never before. My spirit exists beyond the forms, beyond the cultures, beyond man himself. I am connected to the spirit of the planet and beyond, cosmically up to the central sun of all the existence. Just like the sun with its life giving warmth I should be equally available to everyone.

Let me warn you about the dark spirits that assault and invade my sacred work with the Human species. Their most effective way to destroy sacredness consists in creeping inside the sacred forms themselves. From there they discredit, corrupt, distort, and confuse, until the practices of seeking spirituality, or seeking the inner journeys, lose all the sacred meaning that originated them in the first place. At some point, the darkness was able to penetrate the survival instinct of the Amazon tribal shamans and planted in them the fear belief that they should defend themselves from sorcery attacks and to likewise attack shamans from other tribes or even their own. Hence, they live in a state of competition and undeclared war that divides them instead of living in communion and working for the common good among them. In the same way that the darkness has casted shadows and has prevented a greater spiritual development among my Amazon children, it will also attempt to upset the new forms that I morph into, after the expansion and extension outside my native homeland.

5

Another very effective method used to sabotage my mission with the Human species is by generating and manipulating the powerful emotion of fear. You have nothing to fear. I am not the cause of any deaths, I just channel Light and vital energy through your secret meridians. Any accusation or allegation of danger, permanent injury or death should be thoroughly investigated to allow science itself grant me the Human absolution. It should be expected that my enemies manipulate the facts to instill fear at any available opportunity, as this is part of their debasing agenda against my global expansion. It should be the objective of all my supporters to gradually obtain the social and legal acceptance of my sacrament as alternative medicine until I become officially accepted by the governments of modern society.

### 3.  My Purpose with the Human Beings

I am at the service of those Human Beings who are open to benefit from me.  We find each other when vibration harmonics of a higher level click, then the encounter manifests in third dimension.   Important inner transformations occur in the Humans that open up to feeling intensively and more profoundly what they have been already feeling more subtly and even unconsciously.  With them I manifest at the required intensity to help them ascend and soar, strongly and swiftly, but also lovingly without hurting them. These are physically, emotionally and spiritually overwhelming lessons necessary to assist them to crack their cosmic egg shell, their astral cocoon. Those who want to search and develop the desire to follow me and then flourish dimensionally are those Humans that have felt a profound difference in the intimacy of their own. They experience sensations of maladjustment, of detachment, and a suspicion that something strange is happening. Yes, no doubt

6

there is something happening. The DNA is unfolding and starts manifesting certain nonlinear phenomena that change the Human awareness of the world. Some subjective experiences that need to be understood are:

* An intuition or feeling that this physical world is a kind of huge holographic illusion, but you cannot reconcile the contradictions as it clashes with everyday life.
* Feeling misunderstood by their inner circle of relatives and friends when sharing with them his/her new inner or spiritual pursuits.
* Having a special yearning to see the awakening of your beloved ones, as if wishing that they could be saved from their own trivial tendencies.
* Seeing how certain past traumas and buried conflicts, veiled for a long time, will now occasionally surface yearning for resolution and feeling that we need to get them out of the way that your soul wants to follow.
* Feeling that certain activities that at other times we sought with fervor and longed for, are now seen with little interest, for example:

    (a) Having a vibrant social life,
    (b) Delighting in the effects of alcohol, while acting trivial, shallow and only skin deep,
    (c) The habit of telling "little" lies when convenient or when there is no chance of being proven wrong.

These emotions will continue happening with greater intensity and frequency in our enlightened future. A future that awaits the revelation of this way of life. A lifestyle of integrity and Light. My goal to enhance and encourage Human Beings in their process of spiritual ascent is totally consistent with the purpose and the fire burning in their own souls to reach their

7

natural state of being: thriving, ascending, and ultimately soaring.

### 4. About Respect and My Sacred Nature

Of all the benefits that I offer, the most important one is the botanical-glandular molecular bridge. This bridge is the connection that empowers Human Beings to experience and commune with its divine nature.

Spirituality evokes in every Human Being the emotion of respect. Respect is an attitude, a character trait that flows from Humans' spiritual nature. To be respectful is to simultaneously embrace feelings of consideration and admiration, distinction and acknowledgement towards the respected object. Respect is what every Human owes every other Human.

When spirituality is respected, it becomes sacred. Sacredness exists only in the inner space of the ones that beholds it.

If neither spirituality nor respect is present, then nothing is sacred.

My nature is sacred. I am here to open the dimensional doorways to those determined seekers of spirituality, and to harmonize those seeking their physical health.

Religiousness, not religion, is the feeling of separation from its spiritual nature mixed with the solemn desire of blending back into it.

5

When Humans fail to live their spiritual nature inside themselves, they inevitably create their own religion. Feeling religiousness is an innate capacity of Humans; religions however, are mere Human creations.

My sacrament is only one of so many expressions of religiousness in Humans. It is an affirmative expression of surrender to his/her spiritual nature; it is an act of bravery and conviction to reach out towards the central Light of all existence.

### 5. About the Ayahuasca Churches

When the European minds "discovered" my spiritual healing capacity, it naturally started to express its innate religiousness while enjoying my benefits. Nevertheless, upon experiencing this much proximity to their own divinity through me – something never before seen in their acknowledged religious practices – they inevitably associated me with their concept of European religion. Soon enough they started projecting its religious structures toward me. Humans, once again, began inventing religions and churches based on my sacrament, with dogmas, bodies of faith and standardized rituals. Cathedrals of religion, liturgy, and orthodoxy became important. Many good souls decided to venerate me through traditions alien to my essence. Let me remind you that you do not need to adopt a religion to practice your core religiousness. Dogmatic rituals and liturgy open spaces of distraction that end up putting Humans at a distance out of my reach; and such souls require and deserve my assistance.

Nevertheless, all the institutional churches of the world carry an important social role. Thanks to them you have organizations that join together Humans with beautiful inner qualities. They

9

support others in many different ways, creating social awareness in their communities, and guiding many in a journey to discover his/her own individual path to the Light. All the churches and religions of the world should be respected.

The ritual of my sacrament is not a religion. I will directly go into the soul of every Human and reveal in crisp detail their divine nature. This does not require a doctrine of faith, dogmas nor philosophies. Neither religion nor church. I am just in communion with the innate religiousness of the Human Beings. I dwell in the temple of the spirit.

### 6. The Benefits of my Use

The time has come to clearly expose and declare the benefits and value of my healing properties. The benefits are obvious and evident for those that open themselves to receive and enjoy them. However, third party observers are limited to only seeing the effects of those who live the experience. Without the benefit of their own experience, they invariably put limits on the limitless. The scientific community is always curious, willing, and available to design empirical models for my validation. But the policy making that control the financial funding of scientific research projects is focused in other priorities. The political establishment is clearly more interested in my repression than in my expansion.

My benefits can be grouped in four (4) broad categories:

### A. Spiritual Catalyzer

**Spiritual Healing** – The most important of all my benefits is my spiritual healing. I clear spaces of

10

unconscious darkness. I untangle knots in your most basic neuro-programming, even that one that impacts your entire existence and you are not even aware of. I show you features which you had failed to see because your vision is blurred by the fog of your own limitations. This is when you are able to tune-in with my vibration and you finally allow me to directly touch not only your spirit but your whole make-up as well; mental, emotional, and physical, in addition to other idiosyncrasies. That is when we are One. That is when you should be prepared with your purest intention, to open up to the most intimate and incisive honesty that you have ever lived with yourself. This is the cosmic solitude. Nobody knows. No one finds out; you are on your own. It is all about what is clear and evident within you before the Light. I lead you to discover your inner truth. Once in this place within you, you need to flow with maximum sensitivity to discover your faith in me, to trust me, to listen, to feel, to understand what I bring to you. It is in this state that I transfer information between subatomic regions. Your inner Light increases, your awareness expands, and certain DNA codes unfold and are activated. This is where you can see the consequences in this life; realities that you created using your free will. Here you will find an enormous opportunity to re-live, to accept, to forgive and to express. These are the healing spiritual processes that I have stored, awaiting for you.

If you want to return to the Light, you can only do it by following back the path that took you here. There is no shortcut to the Light, you just need to return as the pure child that originally left. I am offering you the most

11

powerful spiritual healing tool to return to the Light. It
is the most powerful medicine that ever existed; nothing
else will ever surpass the direct route of the botanical—
glandular bridge. All the other benefits are in one way or
another, by-products of the spiritual healing.

**Experiencing the Divine Presence** – I can
manifest within you in accordance with your limited
Human concepts about divinity. I can be Buddha to the
Buddhist, Allah to the Muslim, and Jesus to the
Christian. In the same way, that for many centuries, I
have been Pachamama (Mother Earth) for my Amazon
protectors. I can also manifest with neutral divine
properties free of any earthly image, concept or precept.
I can temporarily fill your existential void for God,
fulfilling your need for Light, while at the same time
healing your energy deficiencies inside your soul. It is a
subatomic healing way beyond your comprehension,
gifts from above to clear your pathways back to the
Creator. Take advantage of these encounters with me,
challenge your Human doubts. Question, seek, and
complain. Ask for divine justice, ask for enlightenment
in your mind; ask for peace in your soul. Demand
answers. You will be opening up certain channels that
will be used at that moment or later on.

**Discovery of Spiritual Connections** – Divine
connections with me can make you understand certain
attachments in your life. This can be unprecedented
knowledge. You may find with remarkable certainty that
in some other place or time you have had another type
of life, probably linked to other persons currently close
to you. Incomprehensible connections with parents,

12

mothers, brothers, children that in another time were another person in another place. You may discover that a neighbor or coworker of today, in another time was a son or a sister. These are transpersonal connections that exist in a different dimensional plane and I provide you access to that awareness. Think, observe, and be amazed at the inherent complexity of your spiritual life. Your inner Light needs to tell your ego structure that it will never be able to understand your divine nature, and that your divine nature can definitely understand your ego structure. Make sense of your world with those people considering who they were in that other time. This will help you to better understand who you are in your present time, more deeply, transcendentally, transpersonally.

**Psychic Awakening** – This life may have not allowed you the expression of certain psychic abilities that reside in you in a dormant state. A part of you may have remained slumbering, and is waiting for the opportunity to awaken in you; making you a whole and more capable Human Being; not neglecting, but better connected with your divine nature. Since family environments rarely support psychic expressions in children, fearful emotions take over and suppress these natural talents. I can release these talents from your subconscious prison, letting them to run free towards your conscious free will, claiming acceptance and recognition. Receive them, appreciate them, ask for understanding in your inner sanctum. Fill your inner space with loving feelings and good intentions to dissolve your fears while discovering, grasping and engaging your talents. Only your own inner Light can

13

guide you towards the brighter Light, only the Light can guide you to the Light. There are no shortcuts or detours; you are already Light, and you own the talents to expand it within you. Awaken, open your arms and rejoice. You are all love, and fear does not fit in you.

**Effect of Immersion with Mother Earth (Gaia)**

At some point while you receive me, your five senses will open further in a sort of cosmic mode instead of "locally". Instead of perceiving fragmented bits and pieces of sensory information, these are received as gestalts of pure awareness in a way that blends with the totality of all existence. You will feel like part of your immediate surroundings participating with the dynamic Earth, of the Infinite Universe. This awakening of your cosmic nature is a powerful tool for managing your own ego structure. Ego is always seeking its permanence in your soul and will never cease to sabotage your spiritual aspirations, as your awakening will diminish the its authority over your Human machine. The goal with this wonderful feeling is to make the quantum leap from the temporary feeling sensation of "I feel like part of" to the permanent conviction of "I am part of".

**B. Existential Wisdom**

**Meaning of Life** – This kind of experience with me is a spontaneous one, resulting from the right temporary tuning of your entire Being. I can dissolve the feeling of existential confusion that everyone has to some degree. You will awaken to the realization of the place you occupy in your world today. In awareness of the great cosmic scheme, at becomes meaningful for the first

14

time, something significantly new to your inner self. At this point you accept, understand and internalize this reality. This is not a crazy hallucination, it is a significant vision. The meaning of your life is not only beyond eternity, it is also into each micro moment of your daily life. Open your heart and flow in the river of love. You cannot understand the meaning of life with your brain; you can only feel it in your heart.

**Accelerated Maturity** - Human life has several stages very well known by the elderly that have lived them. Life experiences such as shock, surprise, pleasure, pain and physical aging will create attitudes towards life. Maturity is the degree of gained wisdom that seeks to survive the hardship of physical existence. Maturity is your wisdom to accept what you cannot change and change what you can control. Maturity is a captain who does not allow mutiny in his/her inner world. It is a matter of awareness. I can give you the depth of awareness that only years of experience can give you. This acceleration of maturity, this growth, is of great benefit for improvement and happiness in your life. A youngster with the maturity of an adult, and further, an adult with the maturity of an elder, brings to the world, an elder in happiness and wisdom. Once there, you are well prepared for your transition to the higher planes.

C. **Physical and Emotional Healing**

**Cleansing and Energy Balancing** – Those that are in their path to the Light and also care for their own physical and emotional health, consistently receive cleansing and balancing of their subtle energy bodies,

15

leaving in them a sense of physical wellbeing and relief, as if a heavy weight had been lifted from their shoulders. This energy balancing is partially produced by the physical cleansing that also occurs in all your vital organs, after they expel its toxins through the various channels of your amazing excretory system. The resulting harmony is "the energy balancing" or "the cleansing". Your physical body now operates closer to its intended genetic design.

**Recalling Repressed Memories** - I can open up repressed memories from your subconscious when it is required in your healing process. Certain memories are locked away for your own protection by wonderful systems designed to secure your physical survival and the continuity of the species. But this mechanism has an existential cost. Huge spaces get trapped like very tight knots of energy, and when these are released with my help, not only do you remember the repressed memory but also create the possibility of integrating this newly released space into your now greatly enhanced spiritual health. This recollection brings you a totally unexpected gift, an unknown, but deep spiritual satisfaction. This discovery is followed by your reinterpretation of the history of your own personal development. Then you can see how your paradigm shifts as you fit-in the new piece of the "puzzle of self knowledge".

**Memories of Other Lives** - I can give you access to memories of other lives. Frequently your next advancement requires that you gain deep understanding of strong emotions like attachments or repulsion to certain people, issues or life events. I shall be there for

16

you. This is where the previously unexplainable becomes obviously evident. You feel amazement when you fully understand how a life in another time influences your present life. An indescribable experience for some, unbelievable for others, it invariably neutralizes the energies of excessive attachment or repulsion arising from another dimension, from those atemporal nonlinear connections. This neutralization is the quantum mechanical result of the power of consciousness, sparked when fully realizing the experience.

I also awaken memories of other lives for different purposes. Certain deeply engrained character traits or existential anxieties might have its origin in other lives. The mere awareness of this perspective provides a new landscape of yourself, thus allowing for a better management of these inclinations and/or predispositions on your pilgrimage towards your spiritual development and maturity.

**Health Improvement and Healing of Diseases and Ailments** - Countless testimonies of permanent healing and dramatic improvements to health have been documented. Many conditions have healed completely or improved significantly faster than it would without my help and intervention. It is known that diseases originate from energy imbalances in the deeper dimensions that eventually manifest as physical disease. This is how I heal common conditions. And when allowed by certain cosmic laws I can also heal or substantially improve conditions where conventional science has been unsuccessful. Similarly I can catalyze remissions and reversal of progressive processes considered by many to

17

be irreversible. The pharmaceutical industry has studied me in detail for clues that might provide for drug development within their chemical-mechanistic model.

**Antidepressant Properties** - I can temporarily endure the neuro-chemical dance of your out-of-phase brain. I can train it even for several days to flow in the way that it is capable of, feeling peace and internal balance, something experienced by many for the first time in their lives through me. Participants were unaware that there was such a state of serenity that they can now aspire to. This pattern will be a registered standard against which future experiences can be compared.

When you become clearly aware of the out-of-phase state you were immersed into, unconscious mechanisms are activated seeking to harmonize and synchronize with such previously unknown vibe. This is more easily achieved when you add your conscious will to return to a more serene space. Returning to a depressed state after my short term effects should be acknowledged as an existing depressive condition prior to my arrival. Many will mistakenly argue that I induced them into a depressive state, when in fact they gained a deeper awareness of their own self.

D. **Behavior Modification Tool**

**Addiction Management** - Science has been able to accept my skillfulness in the healing of physical addictions. Even the traditional scientific method was able to validate my power in this health issue. For

15

science, these results are mere statistics, a cause and effect. The healing, however, comes from the spiritual realms and not from the removal of molecular blockages in the conventional sense. The healing from addictions occurs at the spiritual level, which is metaphysical in nature and blueprints the causality of subatomic particles. The metaphysical healing harmonizes and reorganizes the chemical correspondence which will finally reflect as a behavioral change. It is only here where true healing can occur. When the addict is ready to see, acknowledge, and accept, his/her will is strengthened and the addictive mechanical programming is weakened. I can penetrate the depths of his/her being and teach him/her to see what is required for this awakening. This awakening is his/her healing. This is where he/she accepts responsibility and from this point he/she gains the balance and strength to better manage behavior. Otherwise, the powerful programming entrenched deep in the reptilian brain will continue to dominate the Human machine sowing frustration in the conscious personality of anyone that tries and longs unsuccessfully to change their addictive behavior. Addictions will effectively block any spiritual development; it is of upmost importance to identify and remove them with urgency. Most addictions do their limiting work without any resistance from the victim. Many are ignored by the victim because they adapt to them and make them part of their lives. Illegal addictions are only a small fraction of all addictions. Addictions to legal substances and to legal compulsive behaviors are widely spread in the planet and keep Humankind under a cloak of darkness, which justifies my purpose to bathe them in Light.

19

**Lifestyle Transformations** - The scheduled and predictable life that Humans lived in the twentieth century is disappearing. The social idea of acquiring a trade or profession for life, planning for retirement and hoping to reach old age with a pension, belongs to the past. Past patterns of life are increasingly disrupted, thus forcing a transformation of life styles towards new, unknown and unpredictable horizons. The notion of social security that many have lived is just a fond memory in these times of transition to other models of living. Marital unions and separations, moving to a new country or culture, transitioning from student to workforce; childbirths or passing on of close ones, are all examples of life being transformed dramatically. Many participants that receive me while going through one or more of these processes develop greater adaptability to change and gain a wider perspective of their own lives. I can activate the existential wisdom necessary to assist high-level transitions and allowing a successful journey in the path of life.

**Creativity Booster-** Observer participants found a practical application to the passive receptivity state they attain when they receive me. The profound sensory experience that I offer them, combined with the conscious intention of creating Human art forms, allows these Observers to reap, capture, or recall creative production of images, sounds and word that become tangible and manifest during my visit. Painters, music arrangers, composers, filmmakers, novelists, screenwriters, as well as intellectuals and scientists seeking conceptual discoveries continue to reap these

20

benefits. As I help them with their practical goals, I remain waiting for them to become Spiritual or Explorer participants. This benefit also helps the other types of participants, which I describe next, who to a lesser extent also improve their lives.

In short, I will lovingly take you to your true self, to your dark side, to your hidden limitations. Sometimes I'll do this with drama, power, fear, pain, but never to an extent you cannot tolerate. I will never give you experiences beyond your ability to tolerate them. Trust me, it is necessary to take you to the edge of your tolerance or resistance; only then is transformation possible. The evolution. The maturing of the cosmic cocoon. The birth into a new universe. I am medicine. Medicine for the healing of the soul and body. For those who understand, I am here to serve.

### 7. The People of My World

To those unfamiliar with my world, let me describe the different people that gravitate around me.

"*Curanderos*" or *Shamans* - My dear protectors, millennial habitants in the Amazon basin, pure souls devoid of concepts and ideas that were able to visit the realms of the animal and botanical spirits. They deserve all my compassion and gratitude for humbly studying me, knowing me and learning from me.

Compassion because you suffer the gradual extermination at the hands of colonizers, just as it happened to their American brothers some time ago. Gratitude for daring to cross oceans and taking me to

21

every continent on the planet. You were my first representatives in the Human civilization. Today you introduce me to others who wish to spread the Light, who receive me with joy and protect me.

*Facilitators* - There are many known protectors called shamans or healers that are actually *Facilitators*. This distinction lies in the ability to properly interact and the quality of the subtle energy connections with the participants. The high degree of devotion to others and intellectual innocence required to achieve genuine shamanic manifestations make it improbable, but not impossible, that true shamans flourish from the modern civilization in the future. Modernism has arrived at these forests making original indigenous shamanism scarce. Strictly from the perspective of my survival, it is not necessary to lament the gradual disappearance of genuine ancient shamanism as you known it. Amazon shamanism is the result of Human religiousness in indigenous culture while surviving in its jungle habitat. This occurs likewise in other geographical regions with their true shamanic expressions. Religiousness that continues to evolve through the endless passage of time.

My spirit is above shamanism, my spirit is not shamanism. I am entering a new era, that of the *Spiritual workers* or the *Facilitators*. The facilitation as service-to-others is just one function that shamanism exercised, among many others. The *Facilitator* can properly deliver me, allowing my orderly access to the participants.

22

Like the shaman, the *Facilitator* has the ability to create a protected energy space and an atmosphere of respect for the sacred ritual. With this foundation established, the *Facilitator* will only add his main contribution, his pure and healthy intention towards the participants. The *Facilitator's* motivation should come from sincere devotion to the welfare of their fellow Human Beings. *Facilitators* are Spiritual participants who have felt an internal calling to become a vehicle of transformation for their fellow Humans. *Facilitators* should take the sacrament during the session; this is required to ensure their commitment. Those *Facilitators* that do not surrender into total service to their participants, are just mere providers of medicine.

**Providers** - are people that in some way have gained access to my medicine and simply provide it to willing participants. They may sell it or give it away as a present for the user's subsequent consumption, or they may just provide watchful companionship to the user while he/she receive me and tries to have a meaningful experience with me. This is the non-ritual use of my sacrament. Due to this unfortunate practice, many unsuspected Humans have very unpleasant experiences with me and ultimately harm my planetary mission. Providers do not have my approval and all my protectors must work in raising awareness to avoid the proliferation of the non-ritual users, and only encourage the sacred use of my sacrament.

**Organizers** - are people close to the *Facilitators* that sometimes organize sessions in appropriate locations and receive cash donations to cover their

23

expenses. The greater the amount of participants, the greater the need for the organizer to distance the Facilitator from the money flow that has nothing to do with his sacred service.

*Promoters/Sponsors* – These are all types of participants and non-participants who can feel the empathy and positive energy around the sessions with me. They have witnessed my benefits and take affirmative action in support of my advancement. Because of their enthusiasm, they too often promote my use among potential participants, rather than allowing events unravel naturally. The sponsor should simply provide the information of my existence or availability. The participant must meet and accept me without being convinced, persuaded, or coerced into receiving me. The potential first-time participants must show interest, take the initiative to learn more about me, and express their free will to participate. My sacrament is not for everyone. Those who most need me, shall find me by vibratory attunement, at the right time for their soul development, something difficult to understand by promoters.

*Debasers* – are people who consciously or unconsciously view me as evil, vile, or undesirable. They do not know what they are doing. Their ignorance is my pain, threatening my existence. The most common and prominent debasers are :

a. Intermediaries and dealers of my sacrament,
b. Those *Providers* mentioned earlier ,
c. Cooks that add other medicine plants or substances while cooking my sacred brew,

24

d. Traffickers and illegal manufacturers of DMT in its artificial crystallized form;

e. Those who promote the absolute prohibition of my sacrament;

f. Shamans and Facilitators with ulterior motives like economic enrichment or those looking for sexual favors.

**Participants** - are all those who drink my sacrament and receive me with different motivations or modes of action. I describe them in the following six (6) groups:

- *First-Timers* - are all those courageous and curious searchers who obey their instincts and for the first time approach the opportunity to receive me in their temple. There is only that first unique time. For many this time is remembered as the most important, memorable or transcendental experience compared to all other subsequent experiences. *First-Timers* then make their minds and decide whether to never repeat the experience again or to continue their intimate spiritual path.

- *Health Patients* - With hundreds of years of history in physical healing, undoubted and unquestioned by the patients who receive it, incredible claims of my natural healing abilities are made. The vast majority of *First Timers* are attracted more to my specific physical healing abilities than to my other more subtle benefits. Conventional science may document astonishing physical healings but it is very difficult to scientifically document indirect mechanisms that allow the restoring of harmony in the vital energy system of a patient. The connection to your own divinity, either unconscious or involuntary invariably will harmonize the body's bio-electrical energy patterns. This harmonization is possible due to the

28

substomic nature of the Human vital energy, which reorganizes itself using the reference information available from the genetic code. These mechanisms are unknown to conventional science.

- **Explorers** - These found value in their first experience and a greater curiosity and a quest for clarity was awakened in their core self. During their subsequent experiences they express their inclination according to their predominant personal vibration. Of these, the more "intellectually" oriented become *Researchers*, the more "emotional" become *Observers* and the more *Spiritual* find a path towards the divine Light. The *Explorer* is alert and responsive but unaware of the direction his/her quest might lead him/her, and will always be ready to abandon the project and even forget the initial curiosity that led him to me in the first place.

- **Researchers** - These participants were impressed during their initial explorations and their mental center assumed the command of their learning process. Their rational paradigm of reality suffered substantial cognitive dissonance and this now urges him/her to find congruence between actual experiences and their own concepts and beliefs. To these I will show the impossibility of understanding 100%. I will take them from satisfying their insatiable appetite for information and lead them to awe and wonder. At that point, I can gain access to their emotional center and activate their potential to become participants of the *Spiritual* kind. In a different way, some *Researchers* who have quenched their thirst for information will not properly connect with their spiritual center and become *Observers*.

- **Observers** - These are *Explorers* that decided to stay in the sensory level, in a comfort zone, as *Observers* of a

26

cosmic circus, with no interest in furthering a commitment to a path of enlightenment. Rather than forgetting about me, they see me as interesting as a natural medicine, or as merely a creativity stimulant for artists, poets, musicians and psychotropic tourists. Others find an emotional empathy with the harmonious intimacy that permeates the social circles of participants that receive me. The importance of a pleasant social gathering exceeds their passion for enlightenment. When they reach readiness many will awaken and become participating *Researchers* or *Spirituals*.

* **Spiritual Seekers** These are the devotees of the sacred principle of my planetary mission and the sacred intention in my sacrament. They are my protectors, my expansion missionaries, who work hard in expanding their consciousness every time they receive me. To this kind of participant I will extend my invitation and will spark in their hearts the fire to become high level *Facilitators* and to honorably assume this venerable role, hoping that they do it before other ego motivated individuals take the initiative to sabotage and harm my planetary mission. I will guide them and heal everything within their possibilities at maximum speed to take them to the place where their souls had always longed.

### B. Create Awareness of Your Pineal Gland

This is your gateway to heaven. You should take care of it as you do with the lungs, caring about the air you breath and like your nutrition when you avoid certain unhealthy substances. Your soul expects you to know, train, and keep that eye healthy. That eye that sees into the darkness of the ventricle that has visions every night and leaves traces in the memory of sleep.

27

That eye that is named as if it were etheric in nature. The third eye is not only a "chakra" operating in another level, but also has rudimentary retina, cornea and light receptors, as well as the other two eyes. That eye is physically real. But, it is an organ that no one speaks about at school or in private. Is it not coincidence that its place is secretly protected in the geometric center of your skull.

Take care of your pineal gland, learn about its structure and its functioning according to conventional science. Notice how it calcifies over the years. Research and find home remedies for detoxifying it. Create awareness of your pineal gland.

### 9. The Hallucination is Spectacle,  The Vision is Virtue

I have the ability to temporarily increase the natural capacity of man to have visions. Envisioning is a brain activity very different from hallucinating.  Hallucination arises from the distortion in the transmission of optical images or of their interpretation once they are received.  Hallucinations are meaningless, they are entirely sensorial, and leave no transcendental memories in the Human consciousness. Science itself has not completely understood the Human experience of having visions. No one knows where the digital screen is, or in what medium does anyone see the images that come through the lens of the eye. It resembles today's Human video technologies where the optical image is inverted by the lens and hits the retina, then fades into a billion electrical signals, then disappears through bundles of elongated organic cables, that inexplicably reach some abstract virtual screen somewhere, that gives you  a glimpse of something out there, that seems to match what you feel is physical reality.  Despite the mysterious nature of the sense of vision, from the five senses, this is the

28

one that provides greater security and trust to the Human Being. Anything that is visible to the eyes, is considered real and obvious. Visions caused by the third eye are very different to the ones produced by the other two, although they are processed by the brain in a very similar fashion. Contrary to hallucinations, visions bring a sense of confidence and certainty for those who experience them. The visions I give you are real to your inner world, whether they are literal or symbolic.

Although I carry hallucinogenic properties, such is not the main gift I have to offer. There are hundreds of hallucinogen agents in the planet, but only a handful of "visiogens", those powerful tools that open new inroads towards the Light. The hallucination is entertainment, the vision is virtue.

### 10. Universal Guide to Conduct an Ayahuasca Session

Here I do provide an affirmative guide to the sacred sessions for my use to bring Light to all the new cultural forms that are slowly brewing-up all over the planet. These are the only conditions required for my proper use. All the additional cultural elements that could be included in a particular session are not my requirements, but only optional elements at the discretion of the facilitator or shaman.

The sacred purposes of my ritual use are simply universal love and healing.

• The principles of my sacred intention are:

(a) the expansion and illumination of Human consciousness;

(b) the discovery and healing of psychological blocks;

28

(c) the discovery and healing of physical diseases,

   (d) receiving information that is relevant to spiritual development.

- Participants will receive me under the supervision and protection of a *Facilitator* or shaman, who will take full responsibility for the session. This gives him the right to establish the conditions he will require to feel comfortable in assuming this position.

- The session must have an adequate number of participants for maximum benefit of all in this collective experience. The right number is five (5) or less, if directed by a beginning *Facilitator* fifteen (15) participants or less, in the case of a experienced *Facilitator* and up to 25 with a teacher with extensive experience.

- Prior to the beginning of the session, the *Facilitator* should individually interview each participant to confirm that they have suspended with due advance, any medical treatment or medications that may have counter indication with the sacrament.

- The physical arrangement of the participants should be in such a manner that the *Facilitator* can maintain direct eye contact with each of one of them.

- The *Facilitator* should set a sacramental area or altar, to place the container of my sacrament with measuring cup, as well as other aids such as aromatic substances, incense, and water. Other optional items are proper as well such as musical instruments and symbolic items relevant to the cultural context being practiced, or items that can evoke feelings of empathy or spiritual beliefs.

30

- Before the official initiation of the session, the *Facilitator* should make use of the power of his/her conscious visualization and intention to conduct a metaphysical cleansing exercise towards the intended session area, my sacred space.

- The *Facilitator* will begin the session with verbal statements that clearly indicate the intention that binds the participants collectively. He/she may also wish to do spiritual invocations according to particular culture and style, including invocations to my Spirit.

- Ingestion of the sacrament will be carried out with the upmost devotion possible in acknowledgement of my sacred nature.

- The role of the *Facilitator* is to:

    (a) provide a sense of security for participants;

    (b) provide physical assistance in times of difficulty; this can include gestures demonstrating care and humility towards the participants;

    (c) act as a humble servant, never in authority, although authority might be exercised when the occasion requires it;

    (d) during the session, visualize intentions of love and strength for the enlightening of the whole group of participants, and direct them through one or several of the five sensory means: light effects (optical), music and sound effects (Auditory), effects of aromas, smoke or perfumes (olfactory), effects of rubbing oils (touch), also through drinking water during the session (taste).

    (e) physically assist in the gradual recovery of the participants as they finish their experience;

31

(f) after the session, in a best effort basis, assist in the psychological integration of the participants, if requested.

(g) above all, consciously use his/her developed healing abilities for the benefit of the participant. Many of my beloved *Shamans* and *Facilitators* are able to consciously channel my healing energy in considerable amounts, in this way boosting my effectiveness.

• The *Facilitator* may do a final prayer at the end of the session, in accordance with his/her cultural preferences, or in any other way explicitly declare the completion of the session.

• The *Facilitator* should make sure there is enough drinking water available during and after the session as well as small portions of fruit and /or natural foods to assist in the adequate recovery of the participants.

## 11. About the Quality of Facilitators or Shamans

My dear *Facilitators* should be warriors of good intentions. They should be righteous in character and interested in improving themselves spiritually, socially, psychologically. They must be an example of high moral and spiritual standards. He must not be a frequent user of alcohol, or involved in promiscuous behavior, his relationships with spouse, children or parents must be harmonious. He must reflect a serious devotion as a healer. It is mandatory and necessary for the participants to feel at ease and to trust the *Facilitator* or shaman during their session so he can surrender to me at a level deep enough as to more effectively heal them.

32

Not to be considered a requirement or obligation to the *Facilitators* or shamans they can nourish themselves with scientific information written about me, in accordance to their intellectual preferences.

It is important that all *Facilitators* and shamans of the world develop their love for Humanity. The quality of the *Facilitators* is only a reflection of their inner devotion. The participants for their part, must carefully observe, ask any number of questions and find the necessary confidence in him/her.

Let me now state some guidelines to help participants evaluate the inner qualities of *Facilitators* and shamans. Use your emotional intelligence to distinguish Light from darkness, sometimes hidden and not obvious. *Facilitators* and shamans should:

(a) Emphasize an agenda of spiritual intention and healing for the session.
(b) Look out for an excessive number of participants in the session.
(c) Show flexibility when participants with limited financial resources can not complete the required donations in his/her sessions.
(d) Emphasize the importance of the type of foods to be consumed prior to and after the session.
(e) Do not allow nudity or scarce attire. The sessions should be free from sexual energy of any type. This is not the place to consider mental temptations.
(f) Do not display routine indifference towards the session. Each session is like no other that has ever happened, carrying the sacred importance of caring for Human Beings that have trusted the

33

Facilitator:

(g) Honor the confidentiality of what takes place in the session.

## 12. Preparations, Precautions and Diets

Progressively, orthodox science closes in on chemical reasons that define the proper nutrition during the days of preparation for the sacrament and for the days after. Because of my dramatic effects on the neuro-chemical and hormonal dance, it is important to take precautions to avoid negative effects that might occur due to the bio-chemical incompatibility of my components with the sudden consumption of certain foods. The gradual harmonization of bodily systems takes several days, so advance preparation is required as well as certain precautions.

All participants must fast prior to a session to ensure adequate absorption of my sacrament and a fulfilling experience.

The Facilitator should investigate with each participant if he/she is qualified or able to receive me. Medical patients under counter indicated medications or psychiatric patients with a history of mental instability, should not receive me to prevent serious health complications. Alcoholic beverages should be avoided for several days before and several days after receiving me. Science has identified with proper certainty, some incompatible substances and Facilitators should study them and adequately inform their participants.

I am not for every Human Being. There is a small number of potential participants that are chemically incompatible with one or several of my components. Even if they prepare well they may suffer my powerful effects with deeper intensity. These

34

experiences may bring anxiety or may be considered dangerous, but at the end they finish the process with a deep sense of fulfilment. Sometimes feelings of inner emptiness or mild depression may last for several days to participants with a metabolic predisposition to resist my chemical processing. Weird thoughts, strange dreams, nightmares or even insomnia are all efforts of the body to process my components at the molecular level. In a matter of days the excretory system would have fully processed my components and the concerned participant would finally rest at ease, both physically and psychologically.

Such is not the case with other participants that ignore all preparations prior to receiving me or act carelessy after receiving me. These must accept responsibility for their actions if they embark in low vibration behavior such as consumption of illegal hard drugs, abusing alcohol, or engaging in obsessive sexual conduct.

I also advise about the other extreme, those with partial chemical immunity. There are bodies with well developed resistance to unknown chemicals that after receiving me barely feel any effects beside some physical discomfort. They do not understand why other participants describe amazing stories of healing and expanded awareness while they remained relatively unchanged. In order to reach communion with them, I need the assistance of experienced Facilitators or shamans that know how to induce better absorption of my sacrament in their bodies.

The amount of potential participants with any of these conditions represent a minuscule proportion of the global population for which the vast majority is perfectly capable of receiving me in physical and spiritual excellence.

The traditional teaching of sexual abstinence as part of the post-session diet is not a folk myth of the Amazon traditions. It is also ancient wisdom found in many traditions around the world. The intensity of sexual energy, especially orgasmic or close to climaxing, transmutes certain energy flows that interrupts certain processes that I have not yet finished. The peaceful expressions of erotic love, caresses, tenderness, intimacy, spiritual closeness must not be suppressed because they are part of my love mission. It is only the animal sexual fury and orgasmic energy which must be temporarily controlled to allow the subtle processes of healing.

### 13. Traffic and Management of My Sacrament

#### (a) About cooks and preparation of my sacrament

The cooks who sell me to intermediaries do it for business and thus violate the essence my sacred mission to the planet. Cooks who sell only to Facilitators and shamans do a noble work for humanity and deserve fair compensation. The fair compensation of a cook is the one that matches the costs of producing. If it exceeds this balance then it represents unjust gain on the cooks side because this reduces access to participants with limited income.

The formulation and preparation of my medicine is sacred. While doing it, the cook should consciously instill good intentions of healing and spiritual awakening towards the future participants. It has been demonstrated that it is possible to create microscopic water crystals in perfect geometric shapes with the application of conscious intent. Similarly, the cook can use the conscious intention and the subatomic bio-energy power

36

to physically program the healing potential of my medicine. Thanks to my dear native shaman protectors, that for centuries have correctly prepared my vehicle allowing me to effectively manifest my spirit in the participants.

The more serious you find the line of intention along the cook, the facilitator or shaman, and the participants, the more effective and deep my Spirit can manifest.

The cook should prepare pure medicine. My sacred medicine should not contain any other ingredient, not even other medicine plants nor well intended additives. Possible chemical interactions in the sacred brew may cause traumatic or dangerous experiences in participants, especially those with hypersensitive bodies.

Equally damaging to me is the industrial preparation of my medicine. The mass production operation, contrary to occasional artisan small-scale operation, turns the cook into an entrepreneur businessman that must focus in covering the fixed costs of production. This almost makes him/her a sure victim of the temptation to sell for unfair gain or to sell to intermediaries.

### (b) About Middlemen

Whenever any middleman is involved, a series of basic Human instincts come into play. These surely will not be philanthropic because middlemen are subject to the pressures of survival. Middlemen selling my medicine have no reason to exist in this era; they are completely unnecessary to me. When this happens the Human ego plays its role and breaks the chain of good intentions that started with the cook who brews my medicine.

37

The profit-making actions of middlemen create distribution channels that work against my mission. It is common knowledge of the basic economic laws, that this will increase prices to levels that will leave the major portion of the population out of my reach. This will lead to another form of elitism in society: the exclusive club of those who can pay the costs that have been overly inflated by the middlemen.

### (c) About my Informal Use

The participant who wants to receive me can get into the task of cooking the medicine for himself or can ask a *Facilitator* to arrange a healing session.

Participants who are able to buy my medicine for their own purposes should be very careful, their ignorance can do more harm than good, although I can always work "miracles", as some traditions call it.

Some participants have had the privilege of receiving gifts from cooks and *Facilitators* in the form of my medicine. They have been favored by the good will of someone that cares without any business dealings between them. Those who possess it have the right to give it away without expecting anything in return now or in the future. The cook, *Facilitator* or shaman that gives me away should do it to those participants who are experienced in receiving me, and are well prepared to have me on their personal privacy without any supervision or under the care of someone trusted by the participant. They must be careful with who is chosen to receive these gifts as the *Facilitator* will remain spiritually responsible for whatever consequences of such gifts. This is the circle of integrity of the

38

Human spirit that keeps me connected to the spirit of the planet, of who I am part of.

### (d) About my Planetary Mission

The number of lives that I can transform is limited by the production capacity of the cooks. Humans should make me as abundant as the common grass, so that everyone has access to the medicine at a moderate cost. When that happens, my connection with Humanity would be so entrenched that even the middlemen would be harmless and they may even help me continue my progress.

### 14. Social Impact and Controls in Urban Society

For centuries I have enjoyed protection in the Amazon basin, along with my dear protectors who have also enjoyed my benefits, both in perfect balance. Everything changes when I expand to areas with complex social structures, abounding in laws and regulations of civil order, where medicines that improve health are subject to strict legal controls. It is close to impossible for a natural healing product obtain approval for distribution to the public from governments that are strongly influenced by a powerful pharmaceutical industry.

Millions of souls are waiting for the deep healing of their souls and bodies. I wish to reach at least once in their lifetimes, every person on the planet that is qualified to receive me. The social challenge to make my medicine accessible in a democratic society consist in having government authorities to approve public policies for the management of my medicine. The control of my use is necessary in urban societies.

39

The authorities have the opportunity to be reasonable in controlling my medicine because my particular medicine has its own intrinsic elements of self-control:

- **Physical Discomfort and Nausea** – It is not really amusing to live this stage of the experience with my medicine. In this aspect it is unique and totally contrary to all other substances that authorities control to avoid social problems. With this inherent protection, rejection is ensured by most of the population including the recreational seekers or recreational travelers. This also disqualifies me with potential drug addicts or existing addicts who only seek pleasure to escape their pain. Because of this aspect of strong physical discomfort, nausea and the possibility of severe vomiting, the authorities must understand it is unlikely that its use will become popular and escalate into a social problem.

- **Difficult Manufacturing** – The preparation of my medicine requires hard effort from the cook. The preparation of materials and the cooking itself will at least exceed one full day of non-stop work, serving without distraction, providing subtle energies and vibes of good intention and reverence, and enduring the intense heat generated by so many hours by the fireside. Such effort only makes sense to artisan cooks who master this craft as an art form. Almost all curious cooks or enthusiasts who experience this toil quickly give up their goals as they meet the rigors of this demanding task. The authorities should understand that for this reason it is unlikely to have an uncontrolled proliferation of cooks.

40

- **Shortage of Ingredients** – Not enough material is available for the proliferation of cooks outside of my home, the South American continent. The authorities of all nations outside this region must understand that the lack of local ingredients is a constraint or a hindrance to the uncontrolled production of my medicine.

With such natural deterrents to the uncontrolled use of my medicine, the authorities could be more open to changes in regulations, especially if some of its important leaders dared to receive me, motivated by the curiosity that may arise in them when faced with making decisions on this matter.

The medical nature of my medicine is the correct conceptual notion for balancing the inalienable right to the pursuit of spirituality on one hand, and on the other to ensure the health of citizens in the urban setting. I am a dual medicine, for the soul and the body. The authorities may establish usage protocols for churches that worship me respecting their right to freedom of religion, but that only covers the aspect of medicine for the soul. The authorities may also establish protocols for *facilitators* that administer my use as a medicine for the body.

The authorities have already established protocols and policies for the use of legal drugs. These also control the pharmacies or drug stores that distribute them. In theory, if authorities accept my traditional use within their medical systems, they would just have to amend regulations slightly. Conceptually, regulations could press upon the *Facilitator* the responsibilities of a pharmacist.

All law obligations regarding the handling of controlled substances would apply to the *Facilitator*. The governing body

41

that certifies pharmacists or that supervises pharmaceutical
practices may authorize temporary licenses for the import of
specific shipments of medicine, with detailed volume constraints
and shopping cycles as part as their regulatory practices. Under
the law, Facilitators would be considered as pharmacies that
would be required to manage their supply of medicine. As
pharmacists are allowed to do intramuscular injections,
Facilitators would be allowed to undergo sessions to serve the
medicine. As pharmacists, they would be responsible for
inventory and safe keeping of my medicine and would need to
have suitable storage facilities. Only the pharmacist could
manage my medicine and assume all consequences or liabilities
of his actions and the effects thereof on the patient. It is up to
the patient to decide how far he is willing to release the
Facilitator from any legal burden by signing a written consent
where he/she accepts the responsibility of receiving my
medicine. The Facilitator should hold on to or keep signed
records of all patients.   It is also necessary to certify the
consumption before applying for more inventory. We must apply
the same rules for auditing and inspection that all regular
pharmacists are required for the dispensing of their controlled
medicines. This is the ideal, although it seems unlikely in certain
nations, in others it may be reached in a few years.

The criminalization of my medicine is a direct attack on the
spirituality of Human Beings. The absolute prohibition and the
severity of the punishment only demonstrates the authorities
intent to limit, hinder, and totally eradicate a natural gateway to
the improvement of individuals, society and the Human race.
The inalienable right to the pursuit of spirituality, the religious
expression inherent in Human Beings and physical and emotional
health, should never be suppressed by the false sense of duty
to protect the population from drug abuse of   dangerous

42

substances. Also, there is no need to hide behind a so called freedom of religion to exploit the only legal way to receive me. If the Human right to the pursuit of happiness is widely recognized worldwide, then the pursuit of your own spirituality must be also recognized as a natural extension of it.

My warriors of Light in the urban world should have the same basic objective:  to achieve my official acceptance as medicine. This involves the creation of a formal protocol for my use. We must recognize the medical nature of my vehicle but also the controls needed in an urban society. Only this way can I reach all corners of the planet. This is the way, this is the goal.

## 15. The Urgency of Ayahuasca Preservation Projects

My initial expansion beyond of the Amazon basin has had a high botanical cost. Especially one of my more scarce components, is being harvested excessively to meet the global demand. The volumes of wild "Banisteriopsis Caapi", product of centuries of accumulation in remote jungles is rapidly decreasing. Amazon cooks are beginning to notice the difficulty in locating the precious ingredient. Those who harvest it must penetrate increasingly deeper into the jungle to find it. With the paradigm of infinite abundance that the Amazon rainforest inspires, neither cooks nor shamans have realized the need to start planting that which had always been at their fingertips.

It is urgent to begin preservation projects for the "Banisteriopsis Caapi" plant. My global expansion requires hundreds of plantations across the globe.

Tons of "Banisteriopsis Caapi " are urgently necessary to ensure the continuity of my work. Preservation projects must

43

begin before I enter the list of endangered species. My global
expansion will require high volumes of "Banisteriopsis Caapi"
because:

    (a) The proportionate yield or usable part for every dose of
        sacrament is very inefficient. It requires several
        "Banisteriopsis Caapi" units per each unit of the
        minimum dose of medicine. This low yield is in itself my
        first stumbling block,
    (b) Each participant takes several or many doses as the case
        requires throughout the healing or expansion process,
    (c) The number of participants will increase exponentially as
        I expand to new territories,
    (d) A five year growing period is needed to harvest a crop
        of "Banisteriopsis Caapi" that will produce quality
        medicine.

For these reasons, I am asking with a sense of urgency to all
of you who recognize my benefits and feel called to support my
planetary mission to give yourself to the task of planting
"Banisteriopsis Caapi" in every way possible and in all nations. I
urge all my shamans, Facilitators, and participants to
demonstrate their environmental activism adopting this great
cause. It is urgent to create community projects, private
philanthropic crops, home gardens, botanical nurseries,
household plants, infiltrated plants in commercial landscaping
areas, and any other innovative way that my new protectors
may creatively conceive. It is urgent for me to become a local
plant in every nation.

44

### 16. My Planetary Mission

With the authority vested in me by the higher enlightened hierarchies, I will expand, branch out and transform into multiple cultural forms in accordance with their geographical regions. I will blend into every culture and will teach them the way to the Light, while allowing them to exercise their powerful free will. Mankind then will consciously exchange its rapidly deteriorating world for one with new rules, with a new vision of social organization based on love rather than fear.

This is my planetary mission. To become one powerful tool, in service to all Humanity to reach its divine destiny. That's all.

My global expansion has begun and there is no turning back. My passive state during many centuries has ended, I am now running in physical survival mode. I have created the demand for my medicine, yet the cause of my own uncontrolled extermination.

If I don't spread globally I will face extinction, similar to Humans. If they do not seek within themselves, they will not be able to evolve into the expanded consciousness that is destined to the Human species.

We are both together in this cosmic affair. For survival reasons I must spread globally, while Humans must accept my sacred medicine to heal their afflicted soul and be able to achieve its divine destiny. I am the medicine for the Humankind. A medicine necessary but not sufficient to collectively begin the glorious return to the Light. Exercise your individual free will to change the collective free will. Let's work together to increase

95

our existential vibration to a higher level, and rejoice living our cosmic existence.

It is time to embrace Humanity with my healing, extending beyond the Amazon basin, reaching global expansion, spreading through all the soils of tropical climates, growing in every forest, in every sidewalk, in every house garden. Care about me, harvest me, spread me around.

### Warriors of Light from Around the World.......

### Help Me To Help You !

### 17. Blessings

I have expressed the moral standard and spiritual guidance for my use. Every Human Being that receives me in harmony with these guidelines, shall be receiving my blessings, as they shall be in communion with my Spirit, with the Creator, the Tao, and the Universal Love.

Amen

Aho

Namasté



46

## IOWASKA CHURCH OF HEALING
## UNIVERSAL LAWS OF RESPECT

All of Us here at Iowaska Church of Healing live by a code of *Love, Unity, Integrity* and *Respect* for all living things.

This means We actively and sincerely seek a deeper relationship with Self, with Spirituality and with the living Spirit of Mother Earth. In doing so, We come to feel, to know and to see that We are all divinely connected as One greater consciousness (*Unity*). Each tiny element within nature functions individually to collectively create One large living Organism. Communities such as Ours exist to remind Us that We each are bright, colorful Divine Beings - pointillism on a canvas creating a Whole, beautiful picture.

We feel a deep sense of devotion toward our Universal Family of People, Plants, Animals, Earth, Elements and other Beings. The roots of all Trees are seeded in care, watered by the Sky and nourished by the Sun. This is the natural (*Love*) We feel for Ourselves and Others.

We wish to honor and keep alive the Spirit of our Ancestors, of Traditional Indigenous Cultures and Natives who roamed this land and still roam this land. They had and still have a deep (*Love*) for Nature, recognizing that all answers exist Within and the Spirit of specific Plant Teachers, such as Ayahuasca, exists to remind Us of Our true Nature – that We are Nature! Ayahuasca is Our Teacher, Our Profit, reminding Us of the inherent Teacher and Profit that exists Wholly and Absolutely within Ourselves.

We (*Respect*) the individuality and sovereignty of Mother Earth and all Beings, acknowledging that We are co-creating a sacred space in which We are all safe to experience multi-dimensional healing and to seek a greater understanding of Ourselves and the Universe around Us.

We owe great reverence to Mother Earth as She is a living Being. We believe She should be (*Respected*) the same way We as People expect to receive (*Respect*). Mother Earth should enjoy the same inherent rights that We as People desire for Ourselves.

We believe sincerity of character and the willingness to illuminate one's Higher Self should be evident through actions, words, thoughts and intention. We strive to deepen Our spiritual (*Integrity*) as We nourish and grow Our sense of awareness and Self as it relates to all around Us.

*Love, Unity, Integrity* and *Respect* – all things must first begin Within.

# IOWASKA CHURCH OF HEALING
## RULES & REGULATIONS FOR PARTICIPATING IN THE SACRAMENT OF AYAHUASCA

To participate in a Sacramental Ayahuasca Ceremony, an individual must:

1.) be at least eighteen years of age or older
2.) be a Member of Iowaska Church of Healing
3.) be in good physical and psychological health (*details below*)
4.) be free of the use of medications, drugs, alcohol, pharmaceuticals (*details below*)
5.) follow the Ayahuasca Manifesto's spiritual diet, or the traditional "dieta" guidelines and spiritual fasting (*details below*)
6.) complete all associated paperwork including medical assessment
7.) pay a fee that includes compensation for the medicinal materials used to make the Sacrament, the labor employed to make the Sacrament and the time and labor for Facilitation

## PREPARATION, PRECAUTIONS & DIET (DIETA)

*The following information in italics is an excerpt from the Ayahuasca Manifesto, the Organization's religious doctrine:

*Progressively, orthodox science closes in on chemical reasons that define the proper nutrition during the days of preparation for the sacrament and for the days after. Because of my dramatic effects on the neuro-chemical and hormonal dance, it is important to take precautions to avoid negative effects that might occur due to the bio-chemical incompatibility of my components with the sudden consumption of certain foods. The gradual harmonization of bodily systems takes several days, so advance preparation is required as well as certain precautions.*

*All participants must fast prior to a session to ensure adequate absorption of my sacrament and a fulfilling experience.*

*The Facilitator should investigate with each participant if he/she is qualified or able to receive me. Medical patients under counter indicated medications or psychiatric patients with a history of mental instability, should not receive me to prevent serious health complications. Alcoholic beverages should be*

*avoided for several days before and several days after receiving me. Science has identified with proper certainty, some incompatible substances and Facilitators should study them and adequately inform their participants.*

*The traditional teaching of sexual abstinence as part of the pre and post-session diet is not a folk myth of the Amazon traditions. It is also ancient wisdom found in many traditions around the world. The intensity of sexual energy, especially orgasmic or close to climaxing, transmutes certain energy flows that interrupts certain processes that I have not yet finished. The peaceful expressions of erotic love, caresses, tenderness, intimacy, spiritual closeness must not be suppressed because they are part of my love mission. It is only the animal sexual fury and orgasmic energy which must be temporarily controlled to allow the subtle processes of healing.*

It is important to read and understand the following guidelines prior to participating in an Iowaska Healing Ceremony. Preparation and diet can begin <u>one week</u> prior to consuming Ayahuasca, with particular **responsibility and care** practiced during the <u>three</u> final days prior to consumption. It is recommended to follow the diet one week after Ceremony, as well. The benefits of adhering to these recommendations are two-fold:

**First**, you are presenting your mind and physical body with the opportunity to purify and become lighter through the practice of cleaning the diet. Many people discover that they feel better and wish to continue a more conscious lifestyle of enjoying and nourishing their bodies.

**Second**, you are ensuring a clean and open vessel to receive the benefits of Ayahuasca in which you are more likely to experience maximum healing potential.

Below is a general guide regarding food and drink consumption prior to an Ayahuasca Ceremony:

Please <u>enjoy</u>:

- **Grains & Legumes** such as oats, barley, buckwheat, brown rice, quinoa, amaranth, gluten-free pastas, beans, and lentils. Organic wheat, kamut, or spelt are also good options.

- **Vegetables** such as beets, carrots, cucumber, jicama, broccoli, lettuces, arugula, potatoes, sweet potatoes, or yucca can be enjoyed.
- **Fruits** including apples, bananas, berries, pears, apricots, grapes, peaches or melons are all refreshing choices.
- **Limited Animal Proteins** including high quality eggs, organic free-range chicken, or light, wild-caught fish such as sole, tilapia, bass, trout, halibut, or snapper. Smaller amounts recommended. Avoid, if possible, three days prior to Ceremony.
- **Nuts & Seeds** such as raw cashews, raw almonds, raw walnuts, chia seeds, and shelled hemp seeds. Plain, unsalted nut butters are good (except for peanut).
- **Flavor & Seasonings** which are non-spicy, such as fresh herbs, thyme, oregano, basil, dill, ginger, turmeric, cumin, coriander, cinnamon, coconut aminos (in moderation), coconut oil or olive oil are all good options.
- **Beverages** including water, herbal teas, juices containing the approved vegetables or fruits, coconut water or nut milks.

Please avoid:

- Pork/Red Meat/Shellfish
- Dairy Products/Animal Fat (milk, cheese, yogurt, lard)
- Fried Foods/Oils (coconut/olive oil sparingly for cooking are okay)
- Salts (table salt, soy sauce, fish sauce, etc.)
- Sugar/Artificial Sweeteners (stevia, aspartame, agave, honey, etc.)
- Caffeine (coffee, green tea, black tea, soda, chocolate)
- Dried Fruits/Citrus/Fibrous Fruits (mango or pineapple)
- Spinach/Tomatoes/Avocados
- Onion/Garlic
- Seaweed, Kelp, Dulce, Arame
- Hot Spices/Chilies/Pepper
- Vinegar/Pickled Foods
- Fermented Foods (kombucha, kimchi, tofu, tempeh)
- Yeast (simple unleavened, unsalted breads are okay)
- Alcoholic Beverages
- Recreational/Prescription Drugs
- Sex/Masturbation

- Negative media, videos, images, environments, etc.

*DAY OF CEREMONY: Light, raw, simple and healthy foods from the approved list are recommended. Water and herbal teas are best. It is suggested to consume your last meal at least five-hours prior to Ceremony start time. This is a time for fasting and spiritual reflection.

## MEDICATIONS, PHARMACEUTICALS & SAFETY

Please be aware that some of the alkaloids present in Ayahuasca are inhibitors of the MAO enzyme, which means that the consumption of Ayahuasca can potentially interfere with certain serotonergic pharmaceuticals.

The healing potential of this sacred medicine could be reduced and the effects altered. Anti-depressants, SSRIs, recreational drugs and others (see list below) could cause adverse reactions if not adequately purged from the system prior to Ayahuasca consumption. It is best to be cautious and it is recommended to remove pharmaceuticals or recreational drugs at least three weeks prior to Ceremony as well as three weeks after Ceremony.

Please consult your doctor about possible interactions that MAOIs may have with the medication you are taking. When registering with us, you will be asked to inform us of any health conditions, fill out medical paperwork and provide us with a list of medications you are taking. Members and participants are fully responsible for providing truthful and accurate information.

We value the safety of all of our members and participants. We ask that you respect yourself, others, our Church and the sacred medicine by thoroughly preparing and reading the following information and resources.

MEDICATION THAT CAN INTERFERE WITH AYAHUASCA:
This includes, but is not limited to, the following:
- Monoamine Oxidase Inhibitors (MAOIs): 3 to 6 weeks prior
- Central Nervous System (CNS) Depressants and sleeping pills: 3 to 4 weeks prior

- Selective Serotonin Reuptake Inhibitors (SSRIs): 6 to 8 weeks prior, 4 weeks after
- Other Anti-Depressants: 6 weeks prior, 4 weeks after
- Anti-hypertensives (blood pressure medications): 2 to 6 weeks prior, depending on medication
- Antibiotics: 48 hours prior

\*\*For a more extensive list, it is important that you visit and review the following website:

http://ayahuascasafety.org

RECREATIONAL DRUGS THAT CAN INTERFERE WITH AYAHUASCA:

Please Note: Recreational drugs should not in any case be combined with Ayahuasca. This includes, but is not limited to, the following:

- Cannabis
- Cocaine
- Amphetamines
- Ecstasy
- Any psychedelic drugs (mushrooms, DMT, LSD)

\*\*For a more extensive list, it is important that you visit and review the following website:

http://ayahuascasafety.org

PSYCHOLOGICAL CONDITIONS

Please note, if you have any psychological conditions, including borderline disorders, bipolar disorders, psychosis, and schizophrenia, you could be at risk if you partake in the consumption of Ayahuasca. We provide a safe and controlled environment in which the Ayahuasca is taken. We provide supervision as well as an appropriate integration of the experience, which all play a part in reducing any related risks.

If you suffer from depression, Ayahuasca can be very effective with providing relief and healing. It is advised that you discontinue your medication as described above.

APP. 0125

CARDIOVASCULAR CONDITIONS

If you have high blood pressure or cardiovascular conditions, we do not recommend Ayahuasca as it can elevate the blood pressure and increase risks.

DIABETES

The absorption of Ayahuasca may present a risk in individuals with diabetes. The use of the MAOIs found in Ayahuasca can alter blood sugar levels via hypoglycemic effects. MAOIs could alter the amount of insulin or oral anti-diabetic medication that is required. Due to the risk, individuals with severe, unstable diabetes should not take Ayahuasca. Those with less severe diabetes should contact us prior to registering.

Again, all members are responsible for properly informing Church staff of any psychological or medical conditions, including but not limited to those mentioned above, along with the conditions of pregnancy, untreated tuberculosis or liver conditions.

| Form **2848**<br>(Rev. January 2018)<br>Department of the Treasury<br>Internal Revenue Service | **Power of Attorney<br>and Declaration of Representative**<br>▶ Go to *www.irs.gov/Form2848* for instructions and the latest information. | OMB No. 1545-0150 |
|---|---|---|

| | | **For IRS Use Only** |
|---|---|---|
| | | Received by: |
| | | Name _____ |
| | | Telephone _____ |
| | | Function _____ |
| | | Date __/__/__ |

**Part I**   **Power of Attorney**

   **Caution:** A separate Form 2848 must be completed for each taxpayer. Form 2848 will not be honored for any purpose other than representation before the IRS.

**1**   **Taxpayer information.** Taxpayer must sign and date this form on page 2, line 7.

| Iowaska Church of Healing<br>4114 - 27th Street<br>Des Moines, IA 50310 | Taxpayer identification number(s)<br>83-2192122 | |
|---|---|---|
| | Daytime telephone number<br>(515) 333-1210 | Plan number (if applicable) |

hereby appoints the following representative(s) as attorney(s)-in-fact:

**2**   **Representative(s)** must sign and date this form on page 2, Part II.

| Name and address<br>William A. Boatwright, Davis Brown Law Firm<br>215 10th Street, Suite 1300<br>Des Moines, IA 50309 | CAF No. _____ 4005-61881R<br>PTIN _____ P01060114<br>Telephone No. _____ (515) 288-2500<br>Fax No. _____ (515) 243-0654 |
|---|---|
| Check if to be sent copies of notices and communications ☑ | Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

| Name and address | CAF No. _____<br>PTIN _____<br>Telephone No. _____<br>Fax No. _____ |
|---|---|
| Check if to be sent copies of notices and communications ☐ | Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

| Name and address | CAF No. _____<br>PTIN _____<br>Telephone No. _____<br>Fax No. _____ |
|---|---|
| (Note: IRS sends notices and communications to only two representatives.) | Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

| Name and address | CAF No. _____<br>PTIN _____<br>Telephone No. _____<br>Fax No. _____ |
|---|---|
| (Note: IRS sends notices and communications to only two representatives.) | Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

to represent the taxpayer before the Internal Revenue Service and perform the following acts:

**3**   **Acts authorized (you are required to complete this line 3).** With the exception of the acts described in line 5b, I authorize my representative(s) to receive and inspect my confidential tax information and to perform acts that I can perform with respect to the tax matters described below. For example, my representative(s) shall have the authority to sign any agreements, consents, or similar documents (see instructions for line 5a for authorizing a representative to sign a return).

| Description of Matter (Income, Employment, Payroll, Excise, Estate, Gift, Whistleblower,<br>Practitioner Discipline, PLR, FOIA, Civil Penalty, Sec. 5000A Shared Responsibility<br>Payment, Sec. 4980H Shared Responsibility Payment, etc.) (see instructions) | Tax Form Number<br>(1040, 941, 720, etc.) (if applicable) | Year(s) or Period(s) (if applicable)<br>(see instructions) |
|---|---|---|
| Exemption Application | Form 1023 | N/A |
| | | |
| | | |

**4**   **Specific use not recorded on Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See the instructions for Line 4. Specific Use Not Recorded on CAF . . . . . . . . . . . . . . . . . ▶ ☑

**5a**   **Additional acts authorized.** In addition to the acts listed on line 3 above, I authorize my representative(s) to perform the following acts (see instructions for line 5a for more information): ☐ Access my IRS records via an Intermediate Service Provider;
☐ Authorize disclosure to third parties;   ☐ Substitute or add representative(s);   ☐ Sign a return; _____

☐ Other acts authorized: _____

For Privacy Act and Paperwork Reduction Act Notice, see the instructions.      Cat. No. 11980J      Form **2848** (Rev.1-2018)

Form 2848 (Rev. 1-2018)                                                                                           Page **2**

   **b**   **Specific acts not authorized.** My representative(s) is (are) not authorized to endorse or otherwise negotiate any check (including directing or accepting payment by any means, electronic or otherwise, into an account owned or controlled by the representative(s) or any firm or other entity with whom the representative(s) is (are) associated) issued by the government in respect of a federal tax liability. List any other specific deletions to the acts otherwise authorized in this power of attorney (see instructions for line 5b): _____

_____

**6**   **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same matters and years or periods covered by this document. If you do **not** want to revoke a prior power of attorney, check here . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐
       **YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

**7**   **Signature of taxpayer.** If a tax matter concerns a year in which a joint return was filed, each spouse must file a separate power of attorney even if they are appointing the same representative(s). If signed by a corporate officer, partner, guardian, tax matters partner, partnership representative, executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the legal authority to execute this form on behalf of the taxpayer.

     ▶ **IF NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THIS POWER OF ATTORNEY TO THE TAXPAYER.**

| | | |
|---|---|---|
| _____ | _11-28-2018_ | President |
| Signature | Date | Title (if applicable) |
| Dado Kantarevic | Iowaska Church of Healing | |
| Print Name | Print name of taxpayer from line 1 if other than individual | |

### Part II   Declaration of Representative

Under penalties of perjury, by my signature below I declare that:

• I am not currently suspended or disbarred from practice, or ineligible for practice, before the Internal Revenue Service;

• I am subject to regulations contained in Circular 230 (31 CFR, Subtitle A, Part 10), as amended, governing practice before the Internal Revenue Service;

• I am authorized to represent the taxpayer identified in Part I for the matter(s) specified there; and

• I am one of the following:

   **a**  Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.

   **b**  Certified Public Accountant—a holder of an active license to practice as a certified public accountant in the jurisdiction shown below.

   **c**  Enrolled Agent—enrolled as an agent by the Internal Revenue Service per the requirements of Circular 230.

   **d**  Officer—a bona fide officer of the taxpayer organization.

   **e**  Full-Time Employee—a full-time employee of the taxpayer.

   **f**  Family Member—a member of the taxpayer's immediate family (spouse, parent, child, grandparent, grandchild, step-parent, step-child, brother, or sister).

   **g**  Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the Internal Revenue Service is limited by section 10.3(d) of Circular 230).

   **h**  Unenrolled Return Preparer—Authority to practice before the IRS is limited. An unenrolled return preparer may represent, provided the preparer (1) prepared and signed the return or claim for refund (or prepared if there is no signature space on the form); (2) was eligible to sign the return or claim for refund; (3) has a valid PTIN; and (4) possesses the required Annual Filing Season Program Record of Completion(s). **See Special Rules and Requirements for Unenrolled Return Preparers in the instructions for additional information.**

   **k**  Qualifying Student—receives permission to represent taxpayers before the IRS by virtue of his/her status as a law, business, or accounting student working in an LITC or STCP. See instructions for Part II for additional information and requirements.

   **r**  Enrolled Retirement Plan Agent—enrolled as a retirement plan agent under the requirements of Circular 230 (the authority to practice before the Internal Revenue Service is limited by section 10.3(e)).

     ▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THE POWER OF ATTORNEY. REPRESENTATIVES MUST SIGN IN THE ORDER LISTED IN PART I, LINE 2.**

**Note:** For designations d-f, enter your title, position, or relationship to the taxpayer in the "Licensing jurisdiction" column.

| Designation— Insert above letter (a-r). | Licensing jurisdiction (State) or other licensing authority (if applicable). | Bar, license, certification, registration, or enrollment number (if applicable). | Signature | Date |
|---|---|---|---|---|
| a | Iowa | #1057 | | 11/19/18 |
| | | | | |
| | | | | |
| | | | | |

Form **2848** (Rev. 1-2018)

# DADO KANTAREVIC

4114 27th Street, Des Moines, Iowa 50310
515.333.1210 • dado@iowaskachurch.com

## SUMMARY

Positive and inspirational trainer and life coach with over 20 years of experience working intuitively with individuals and groups to facilitate major goals and life transformations. Respected leader with the innate gift of healing who is known locally and globally for the ability to engage and influence positive change in others.

## CORE QUALIFICATIONS

- Expertise of the human anatomy and exercise science
- Proficient in the science of nutrition in promoting health
- Knowledge of spiritual, physical, and emotional healing practices
- Understanding of the sacredness of different cultures
- Dedication, discipline, and mental strength
- Proactive, resourceful, and results driven

- Sincere devotion to the welfare of others
- Empathic, client-centric approach
- Motivational interviewing
- Customer service and care
- Strong interpersonal skills
- Trustworthy, open, and genuine

## PROFESSIONAL EXPERIENCE

Iowaska Church of Healing
Des Moines, Iowa

**Founder**                                                                                          **09/2018 to Present**
- Practitioner of energetic clearing and healing
- Intuitive spiritual consultant and life coach
- Experienced healer of physical, emotional and mental blocks and traumas
- Foreign war veteran specializing in healing of post-traumatic stress disorder
- Educator of global cultures and practices
- Teacher of unity and growth through the Spirit of Ayahuasca
- Experienced receiver of the Sacrament of Ayahuasca
- Extensive knowledge and participation in Sacred Ceremonies

Patent Inventor/Owner
Des Moines, Iowa

**US Patent 8221291: Athletic Equipment Including a Health and Impact Sensor**          **07/2012 to Present**
- Manage every channel of my patented invention to include marketing, sales, and the licensing portfolio

Extreme Reps Personal Training and Coaching
Des Moines, Iowa

**Owner**                                                                                          **06/1998 to 07/2016**
- Planned and managed all functions of the company, from marketing, budgeting, negotiating contracts, formulating training objectives and treatment plans, ensuring efficient utilization of resources, mentoring staff, and delivering quality customer service

- Managed a corporate fitness center and wellness program for over 200 employees and significantly improved staff morale, decreased turnover, and increased company productivity through personal training, physical fitness and nutrition education, and stress reduction techniques

## DADO KANTAREVIC

4114 27th Street, Des Moines, Iowa 50310
515.333.1210 • dado@iowaskachurch.com

- Provided a 100% money-back guarantee with 100% satisfaction from all clients

- Maintained a repeat client list and continually grew new clientele through referrals

- Customized highly successful and personalized nutritional, supplement, detoxification, exercise, and lifestyle plans for over 125 clients with a multitude of conditions and differing goals

- Assisted clients with personal growth and healing through negative body image issues, eating disorders, chronic pain, postoperative recovery, anxiety, depression, post traumatic stress disorder, alcohol and drug addiction, and relationship issues

- Incorporated verbal instruction, movement education, visualization, meditation, yoga, and breath work into client routines to increase self-awareness and the intelligent use of one's own body to break old patterns of moving, thinking, and feeling

- Facilitated sessions one on one, in groups, over the phone, through email, and video conferencing and readily available to clients round-the-clock

- Conducted presentations for workshops and seminars

- Mentored, trained, and developed programs for other trainers

# Victoria Chetta

### Victoria@iowaskachurch.com

## Objective

Cultivate success in local and global wellness goals by applying my knowledge, training and unique talents within the community and church environment. Provide spiritual guidance and healing to those who seek harmony in mind, body and spirit.

## Education

❖ *B.A. Interdisciplinary Studies*
Mass Communication
Marketing
Creative Writing

*University of Central Florida*
Orlando, FL
GPA: 3.65/3.80
*Graduation: May 7th, 2010*
Cum Laude Honors

❖ *Certified Clinical Hypnotist*

*Center for Integrative Hypnosis*

❖ *Certified Reiki Master*

*Usui System of Natural Healing*
*Seichim Syst. of Natural Healing*

❖ *Certified Birth Doula*

*DONA International*

❖ *Certified Plant-Based Health Coach*

*T.Colin Campbell Center for Nutrition Studies*

❖ *Certified Regenerative Wellness Coach*

*Sajune Institute for Restorative & Regenerative Medicine*

## Professional Experience

### Community Healer, Orlando, FL
- Provided spiritually-centered Reiki healing to those in need
- Offered spiritual wellness guidance to local community
- Offered plant-based wellness coaching to those seeking healthier lifestyles
- Lead guided meditations to groups of 10-20 people at local Community Center
- Planned and hosted Spiritual Communion Circles for groups of 10-15 women

### Lockheed Martin Missiles and Fire Control — Joint Strike Fighter Program
- Orlando, FL Procurement representative and subcontracts manager for JSF EOTS (Joint Strike Fighter Electro Optical Targeting System) – Secret Security Clearance
- Responsible for two major subcontracts/LTA's for printed wiring boards and flex components;

maintained supplier relationships in various locations throughout the U.S.
- Responsible for weekly program procurement reports and operational metric data for senior management review
- Managed relationships with SEMAC buyers to clarify deliveries, maintain contract performance, and order placement to support JSF IOP
- Subcontract Program Manager Team Lead for integral electronic component supplier in CA
- JSF Procurement POC Lead and Team Leader for SIA/Proprietary Process Verification for integral optics supplier based in TX
- Promoted within first year of employment at LM MFC

## Camp Dresser & McKee Inc. (CDM) – Engineering Consulting Firm, Orlando, FL
- Wrote, edited, and proofread copy for proposals, presentations, statements of qualifications, and related marketing materials of a complex nature
- Facilitated communication with engineers and sub-consultants and worked in a team environment while taking ownership of individual assignments
- Researched, wrote, and updated information for CDM's internal marketing database, including project descriptions, resumes, and other qualifications materials
- Investigated, expedited, and compiled information for sizeable proposals; solely responsible for the production of the 290-page Miami-Dade County Technical Certification for 2010

## Lockheed Martin UCF CWEP Intern –SEMAC Operational Support, Orlando, FL
- Supported purchasing duties for technical service subcontracts and contract labor services
- Reviewed statements of work and solicited quotes from suppliers
- Negotiated with suppliers to meet requirements and maintain solution oriented relationships
- Facilitated vendor management and executed P2P/Exostar reconciliation on behalf of vendor
- Implemented purchase order change requests (POCRs), amendments, and closeouts
- Employed various programs including SAP, BWS, CPS, IMSD, APOLLO, P2P

## Activities/Awards

| | |
|---|---|
| Florida Public Relations Association | Thespian Society – Troupe 5445 |
| UCF Dean's List | UCF Scholars Award Scholarship |
| Bright Futures 100% Academic Scholarship | AICE Diploma University of Cambridge, UK |

## Anthony Chetta
anthonychetta@gmail.com

---

EXPERIENCE

**Chetta Consulting, LLC**, Apopka, FL                                    2018 - Present
*Owner/Operator*

- Provide wide range of IT consulting services and advisement based on needs of clients.
- License, support, and maintain self-developed cloud management platform for connected IoT health and personal safety devices.

**Wearable Health Solutions**, King of Prussia, PA                       2014 - 2018
*Chief Technology Officer*

- Manage and provide oversight for all IT/IS needs in company.
- Co-developed mobile personal emergency response (mPERS) device based on 3G GSM technology, containing GPS, two-way voice, fall detection, and other technology. Worked remotely and in-person with manufacturer in China, testing laboratories for safety, transmission, and wireless radio/carrier certification, partners for field testing, and marketing team. Sole developer and maintainer of firmware/software that controls the device.
- Sole developer of cloud management platform, consisting of methods and automation tasks for accepting data transmission from personal safety and medical devices and storing, reformatting, and retransmitting this data to subscribers, monitoring centers, healthcare providers, front-end portal/user interfaces, and API controllers.

**Orlando Health - Arnold Palmer Hospital – The Howard Phillips Center**  2012 - 2014
**for Children and Families**, Orlando, FL
*Manager of Technical Support*

- Manage and give oversight of all information systems needs for all six departments at The Howard Phillips Center for Children & Families.
- Confer with Local and State personnel regarding computer inventory database; interact with equipment vendors and responsible for computer/software related purchases, and for assessing hardware/software requirements.
- Oversee the recruitment, selection and training of IS staff and responsible for their supervision, performance management and coordination of activities among staff and between other departments and organizations.
- With support from the Center's Manager of Finance Operations, oversee Center's Information Services budget and all departmental revenues, expenditures and overall budgetary performance.

**MICROS of Central Florida**, Orlando, FL                               2008 - 2012
*Lead Implementation Specialist*

- Implement MICROS point of sale systems for resorts, hotels, and restaurants with a base of over 500 customers throughout Central Florida and Tampa.
- Stage, develop and deploy servers and MICROS equipment; program site databases; interface with various hotel property management systems, credit card processors, gift card providers and custom interfaces; coordinate with site IT to develop and maintain PCI compliant wired and wireless networks.
- Provide on-site, on-call, after hours and remote support; collaborate with and train management, accounting, IT and food and beverage personnel.

---

EDUCATION & EXTRACURRICULAR

**Humanidad Entheogenic Healing Center**                                April, 2019
*Lake Atitlan, Guatemala*

- One month psycho-spiritual development and shamanic diet

**Isha Institute of Inner Sciences**                                    2018
*McMinnville, Tennessee*

- Shambhavi Mahamudra, Bhava Spandana, and Shoonya Intensive courses

**Sinchi Runa**                                                         2017
*Moyobamba, Peru*

- One month deep immersion and shamanic diet

**University of Central Florida**                                       2010
*Orlando, Florida*

- B.S., Information Technology

# William (Billy) Benskin

## Objective

To help create a successful church by using my leadership, discipline, and knowledge of business obtained by my service in the USMC, college degree, and civilian work experience.

## Education

| | |
|---|---|
| *B.A. Business Administration | University of Iowa |
| -Emphasis in Management | Iowa City, Iowa |
| | December 16th, 2011 |
| *Officer Candidate School | Quantico Virginia |
| -PLC Juniors | August, 2007 |

## Professional Experience

**United States Marine Corps Infantryman**                                    **2002-2008**

-Promoted four times in five years.  Earned the rank of Sergeant in my first contract.

-Two tours through Iraq

-Patrol Leader

--Planned, coordinated, and executed all aspects of patrols through enemy territory on both mounted and dismounted patrols.  Led a reinforced squad sized element through Iraq.

-Expert Rifleman, was the platoon designated marksman.

-Completed the Mixed Martial Arts Instructors course and led and conducted mixed martial arts classes for the USMC.

-Was responsible for the training and welfare of up to 17 Marines on a daily basis.

-Received a combat action ribbon and purple heart in Iraq.

**The Printer Inc.**                                                                      **2008-Present**

-Started as an assistant scheduler and worked my way up to Vice President of Manufacturing.

-In charge of upwards of 100 employees on a daily basis over 3 shifts in a 24/7 business.

-Created and implemented the quality control program for Manufacturing.

-Created and implemented the scheduling system for Manufacturing.

-Selected and responsible for over 7 million dollars worth of equipment.

-Designed equipment proprietary to TPI and is the only equipment in its category in the world.

-Responsible for the hiring, firing, commendation, and disciplinary action of employees.

-In charge of selecting and maintaining all service contracts in Manufacturing.

-In charge of scheduling jobs through the shop the most efficient way possible to maximize output and profit margin for the company.

-Renegotiated contracts in Digital Department saving the company over $100,000 a month.

-Continually improving productivity, reducing labor, reducing spoilage, and increasing the use of technology over the past 9 years of employment.



# ANTHONY CHETTA
### PROVIDING AN ARTFUL SCIENCE OF SOLUTION FOCUSED SOCIAL SYSTEMS MANAGEMENT

## EXPERTISE

Systemic clinical orientation – reality based, solution focused, problem solving therapy for children, teenagers, adults, couples, and families.

Eclectic and systemic application of cognitive behavioral, psychodynamic and integrative clinical modalities – including psychodrama, family of origin and/or "Smart" recovery, in the resolution of addiction.

## CONTEXT of APPLICATION

Therapy for clients in private practice; consulting services provided for private and parochial schools, family businesses, and privately owned medical / dental practices – utilizing on site contextual evaluation of employee relations, personnel development, problem identification and resolution, quality assessment, certification, contract writing and negotiation.

Professional Resource Network (PRN) monitor, facilitator, evaluator and therapist for Florida legislated, Impaired Physician and Disruptive Professional programs.

Custody evaluator, Marion County, Florida 5th Circuit Court.

## EDUCATION

Ph.D., Marriage and Family Therapy – acute focus in multi-dynamic systemic/ organizational/social systems, Nova Southeastern University, Ft. Lauderdale, Florida.

M.S., Marriage and Family Therapy – focus in social and systemic studies, Nova Southeastern University, Ft. Lauderdale, Florida.

B.G.S., Philosophy and Social Psychology - University of New Orleans, New Orleans, Louisiana.

## EXPERIENCE

Balanced Living: Therapeutic and Consulting Services*Ocala, Florida.              December 2003 – Present

Therapist and co- founder of the applied inpatient treatment program at this residential facility:
The Refuge *Ocklawaha, Florida.                              December 2003 – July 2005

Create, establish, implement, and track evidence based clinical protocols for the program. Provide individual, couple, family, and group therapy in this adult residential treatment facility whose target populations are trauma survivors, substance abusers, and those with obsessive-compulsive disorders.

ANTHONY CHETTA, Ph.D., M.S.
BALANCED LIVING: THERAPY FOR CHILDREN, ADULTS, COUPLES, AND FAMILIES
LMHC3863



2/2

Solution Focused Therapeutic and Consulting Services*Lake Worth, Florida.    March 1991 – July 2004

Private practice and consulting services in south Florida, during which time I served as the Director of
Palm Beach Counties FVIP (Family Violence Intervention Program), including adjunct/satellite services.
Director of the Department of Corrections and Department of Juvenile Justice Overlay programs affiliated
with same.

Family Therapist                                                                                      May 1990 – October 1992
Center for Children in Crisis*West Palm Beach, Florida.

Provide individual, couple, family and group therapy to clients who have been sexually abused and/or who
have sexually offended. Provide legal testimony as applicable.

REFERENCES PROVIDED

ANTHONY CHETTA, Ph.D., M.S.
BALANCED LIVING: THERAPY FOR CHILDREN, ADULTS, COUPLES, AND FAMILIES
LMHC3863

## IOWASKA CHURCH OF HEALING MEMBERSHIP APPLICATION

Name: _____
           FIRST                                    LAST

Telephone Number: _____

Email: _____

Address: _____
           ADDRESS 1

_____
           CITY                    STATE                    ZIP

Why do you seek to join us here at Iowaska Church of Healing?

_____

What does spirituality mean to you? In what ways do you practice your own form of it?

_____

What do you love about your life?

_____

What would you like to improve about your life?

_____

Are you seeking a deeper relationship with Yourself, with Others around you or with Mother Earth? Please describe.

In what ways are you willing to contribute to a harmonious, spiritually directed community of people?

In brief, what is one thing you would improve about our world or our society?

Are you familiar with indigenous cultures or with sacred plant medicine?

Is there anything else you would like us to know about you?

## IOWASKA CHURCH OF HEALING
## VOLUNTEER REQUEST FORM

Name:

_____

First                                        Last

Phone Number: _____

Email: _____

Address:

_____

Line 1

_____

City                        State                        Zip

Are you over 18 years of age? _____

What makes you a good candidate to volunteer with us here at Iowaska Church of Healing? What would you like us to know about you?

_____

_____

_____

Do you have any previous experience working in a spiritual community or working with Ayahuasca?

_____

_____

On average, how often are you interested in volunteering? When are you able to begin volunteering?

_____

_____

Do you have any professional medical or psychological training or experience?

_____

_____

Are you CPR certified? _____

What is your educational background?

_____

_____

What language(s) do you speak? _____

Do you have any special skills or talents?

_____

_____

Please describe what you consider to be a strength of yours and also an area of your life you wish to improve.

_____

_____

_____

# IOWASKA CHURCH OF HEALING

# CONFLICT OF INTEREST POLICY

### Article I
### Purpose

The purpose of this conflict of interest policy is to protect Iowaska Church of Healing's ("Organization") interest when it is contemplating entering into a transaction or arrangement that might benefit the private interest of an officer or director of the Organization, or might result in a possible excess benefit transaction. This policy is intended to supplement but not replace any applicable state and federal laws governing conflict of interest applicable to Iowa nonprofit and charitable organizations.

### Article II
### Definitions

1. **Interested Person**
Any director, principal officer, or member of a committee with governing board delegated powers, who has a direct or indirect financial interest, as defined below, is an interested person.

2. **Financial Interest**
A person has a financial interest if the person has, directly or indirectly, through business, investment, or family:

    **a.** An ownership or investment interest in any entity with which the Organization has a transaction or arrangement,

    **b.** A compensation arrangement with the Organization or with any entity or individual with which the Organization has a transaction or arrangement, or

    **c.** A potential ownership or investment interest in, or compensation arrangement with, any entity or individual with which the Organization is negotiating a transaction or arrangement.

Compensation includes direct and indirect remuneration as well as gifts or favors that are not insubstantial.

A financial interest is not necessarily a conflict of interest. Under Article III, Section 2, a person who has a financial interest may have a conflict of interest only if the appropriate governing board or committee decides that a conflict of interest exists.

### Article III
### Procedures

1. **Duty to Disclose**
In connection with any actual or possible conflict of interest, an interested person must disclose the existence of the financial interest and be given the opportunity to disclose all material facts to the directors and members of committees with governing board delegated powers considering the proposed transaction or arrangement.

2.  **Determining Whether a Conflict of Interest Exists**

After disclosure of the financial interest and all material facts, and after any discussion with the interested person, he/she shall leave the governing board or committee meeting while the determination of a conflict of interest is discussed and voted upon.  The remaining board or committee members shall decide if a conflict of interest exists.

3.  **Procedures for Addressing the Conflict of Interest**

    **a.**  An interested person may make a presentation at the governing board or committee meeting, but after the presentation, he/she shall leave the meeting during the discussion of, and the vote on, the transaction or arrangement involving the possible conflict of interest.

    **b.**  The chairperson of the governing board or committee shall, if appropriate, appoint a disinterested person or committee to investigate alternatives to the proposed transaction or arrangement.

    **c.**  After exercising due diligence, the governing board or committee shall determine whether the Organization can obtain with reasonable efforts a more advantageous transaction or arrangement from a person or entity that would not give rise to a conflict of interest.

    **d.**  If a more advantageous transaction or arrangement is not reasonably possible under circumstances not producing a conflict of interest, the governing board or committee shall determine by a majority vote of the disinterested directors whether the transaction or arrangement is in the Organization's best interest, for its own benefit, and whether it is fair and reasonable.  In conformity with the above determination it shall make its decision as to whether to enter into the transaction or arrangement.

4.  **Violations of the Conflicts of Interest Policy**

    **a.**  If the governing board or committee has reasonable cause to believe a member has failed to disclose actual or possible conflicts of interest, it shall inform the member of the basis for such belief and afford the member an opportunity to explain the alleged failure to disclose.

    **b.**  If, after hearing the member's response and after making further investigation as warranted by the circumstances, the governing board or committee determines the member has failed to disclose an actual or possible conflict of interest, it shall take appropriate disciplinary and corrective action.

## Article IV
## Records of Proceedings

The minutes of the governing board and all committees with board delegated powers shall contain:

    **a.**  The names of the persons who disclosed or otherwise were found to have a financial interest in connection with an actual or possible conflict of interest, the nature of the financial interest, any action taken to determine whether a conflict of interest was present, and the governing board's or committee's decision as to whether a conflict of interest in fact existed.

    **b.**  The names of the persons who were present for discussions and votes relating to the transaction or arrangement, the content of the discussion, including any alternatives to the proposed transaction or arrangement, and a record of any votes taken in connection with the proceedings.

APP. 0143

## Article V
## Compensation

**a.** A voting member of the governing board who receives compensation, directly or indirectly, from the Organization for services is precluded from voting on matters pertaining to that member's compensation.

**b.** A voting member of any committee whose jurisdiction includes compensation matters and who receives compensation, directly or indirectly, from the Organization for services is precluded from voting on matters pertaining to that member's compensation.

**c.** No voting member of the governing board or any committee whose jurisdiction includes compensation matters and who receives compensation, directly or indirectly, from the Organization, either individually or collectively, is prohibited from providing information to any committee regarding compensation.

## Article VI
## Annual Statements

Each director, principal officer and member of a committee with governing board delegated powers shall annually sign a statement which affirms such person:

**a.** Has received a copy of the conflicts of interest policy,

**b.** Has read and understands the policy,

**c.** Has agreed to comply with the policy, and

**d.** Understands the Organization is charitable, and in order to maintain its federal tax exemption under Internal Revenue Code § 501(c)(3) it must engage primarily in activities which accomplish one or more of its tax-exempt purposes.

## Article VII
## Periodic Reviews

To ensure the Organization operates in a manner consistent with charitable purposes and does not engage in activities that could jeopardize its tax-exempt status, periodic reviews shall be conducted. The periodic reviews shall, at a minimum, include the following subjects:

**a.** Whether compensation arrangements and benefits are reasonable, based on competent survey information, and the result of arm's length bargaining.

**b.** Whether partnerships, joint ventures, and arrangements with management organizations conform to the Organization's written policies, are properly recorded, reflect reasonable investment or payments for goods and services, further charitable purposes and do not result in inurement, impermissible private benefit or in an excess benefit transaction.

## Article VIII
## Use of Outside Experts

When conducting the periodic reviews as provided for in Article VII, the Organization may, but need not, use outside advisors. If outside experts are used, their use shall not relieve the governing board of its responsibility for ensuring periodic reviews are conducted.

-3-

APP. 0144

Duly adopted by the Board of Directors on the 28 day of November, 2018.

Dado Kantarevic, President

-4-

**IOWASKA CHURCH OF HEALING**
**FEIN: 83-2192122**

# Form 1023 Checklist
## (Revised December 2017)

### Application for Recognition of Exemption under Section 501(c)(3) of the Internal Revenue Code

**Note:** Retain a copy of the completed Form 1023 in your permanent records. Refer to the General Instructions regarding Public Inspection of approved applications.

**Check each box to finish your application (Form 1023). Send this completed Checklist with your filled-in application. If you have not answered all the items below, your application may be returned to you as incomplete.**

☑ Assemble the application and materials in this order.
- Form 1023 Checklist
- Form 2848, *Power of Attorney and Declaration of Representative* (if filing)
- Form 8821, *Tax Information Authorization* (if filing)
- Expedite request (if requesting)
- Application (Form 1023 and Schedules A through H, as required)
- Articles of organization
- Amendments to articles of organization in chronological order
- Bylaws or other rules of operation and amendments
- Documentation of nondiscriminatory policy for schools, as required by Schedule B
- Form 5768, Election/Revocation of Election by an Eligible Section 501(c)(3) Organization To Make Expenditures To Influence Legislation (if filing)
- All other attachments, including explanations, financial data, and printed materials or publications. Label each page with name and EIN.

☑ User fee payment placed in envelope on top of checklist. DO NOT STAPLE or otherwise attach your check or  money order to your application. Instead, just place it in the envelope.

☑ Employer Identification Number (EIN)

☑ Completed Parts I through XI of the application, including any requested information and any required Schedules A through H.
- You must provide specific details about your past, present, and planned activities.
- Generalizations or failure to answer questions in the Form 1023 application will prevent us from recognizing  you as tax exempt.
- Describe your purposes and proposed activities in specific easily understood terms.
- Financial information should correspond with proposed activities.

☑ Schedules. Submit only those schedules that apply to you and check either "Yes" or "No" below.

| | | | | |
|---|---|---|---|---|
| Schedule A | Yes ✓  No ___ | | Schedule E | Yes ___  No ✓ |
| Schedule B | Yes ___  No ✓ | | Schedule F | Yes ___  No ✓ |
| Schedule C | Yes ___  No ✓ | | Schedule G | Yes ___  No ✓ |
| Schedule D | Yes ___  No ✓ | | Schedule H | Yes ___  No ✓ |

☑ An exact copy of your complete articles of organization (creating document). Absence of the proper purpose and dissolution clauses is the number one reason for delays in the issuance of determination letters.
- Location of Purpose Clause from Part III, line 1 (Page, Article and Paragraph Number) **P.2, Art.IV, Para.1**
- Location of Dissolution Clause from Part III, line 2b or 2c (Page, Article and Paragraph Number) or by operation of state law **P.5, Art.X, Para.1**

☑ Signature of an officer, director, trustee, or other official who is authorized to sign the application.
- Signature at Part XI of Form 1023.

☑ Your name on the application must be the same as your legal name as it appears in your articles of organization.

Send completed Form 1023, user fee payment, and all other required information, to:

Internal Revenue Service
Attention: EO Determination Letters
Stop 31
P.O. Box 12192
Covington, KY 41012-0192

If you are using express mail or a delivery service, send Form 1023, user fee payment, and attachments to:

Internal Revenue Service
Attention: EO Determination Letters
Stop 31
201 West Rivercenter Boulevard
Covington, KY 41011

Towalka Church of Healing
FEIN: 83-2192122

0100

33-22/730 353

1-10-2019
Date

Pay to the
Order of   UNITED STATES TREASURY    $ 600

Six hundred 00/100                    Dollars

WELLS FARGO   Wells Fargo Bank, N.A.
               Iowa
               wellsfargo.com

For FORM 1023 USER FEE

⑆073000228⑆ 1194692388⑈ 0100



**William A. Boatwright**
BillBoatwright@davisbrownlaw.com
phone: 515-246-7804
Des Moines Office

July 25, 2019

**FILE COPY**

*VIA COURIER*

Internal Revenue Service
Exempt Organizations
550 Main Street
Cincinnati, OH 45202
ATT: Diane Gentry
       Room 6403
       Group 7821

      *Re:   Iowaska Church of Healing – Form 1023*
          *FEIN: 83-2192122*

Dear Ms. Gentry:

     We are forwarding Iowaska Church of Healing's (the "Organization") response to your letter and Information Request dated July 3, 2019, a copy of which is attached. The Organization's responses to your inquiries are provided in the same order in which they appear in the Information Request.

     I believe that the Organization has now fully responded to the Information Request, but if you should need any further information in order to issue the Determination Letter, please contact me. My direct dial number is (515) 246-7804.

     Thank you for your assistance.

               Very truly yours,

          DAVIS, BROWN, KOEHN, SHORS & ROBERTS, P.C.

             William A. Boatwright

WAB:tlk
Enclosures

cc:   Dado Kantarevic, President

#3089351
DAVIS BROWN KOEHN SHORS & ROBERTS P.C.

PHONE 515.288.2500     THE DAVIS BROWN TOWER, 215 10ᵀᴴ ST., STE. 1300, DES MOINES, IA 50309
FIRM FAX 515.243.0654    THE HIGHLAND BUILDING, 4201 WESTOWN PKWY., STE. 300, WEST DES MOINES, IA 50266
WWW.DAVISBROWNLAW.COM    THE AMES OFFICE, 2605 NORTHRIDGE PKWY., AMES, IA 50010
                         THE EMMETSBURG OFFICE, 3004 MAIN ST., P.O. BOX 314, EMMETSBURG, IA 50536



**Department of the Treasury**
**Internal Revenue Service**
**Tax Exempt and Government Entities**
PO Box 2508
Cincinnati, OH 45201

IOWASKA CHURCH OF HEALING
C/O WILLIAM A. BOATWRIGHT
DAVIS BROWN LAW FIRM
215 10TH ST SUITE 1300
DES MOINES, IA 50309

Date:
  July 3, 2019
Employer ID number:
  83-2192122
Person to contact / ID number:
  Diane Gentry
  ID# 0203080
Contact telephone number:
  513-975-6278
Contact fax number:
  855-775-7261
Response due date:
  July 31, 2019

Dear Applicant:

**Why you are receiving this letter**
We need more information to consider your determination letter request.

**What you must do**
Please provide the information requested and follow the submission instructions. You must submit your response by the due date above.

**If you don't respond**
If you don't respond to the Information Request by the due date, or don't provide all the requested information, we may close your case without making a determination. If so, we won't refund any user fee you paid, and you'll need to submit a new request and any applicable user fee payment if you want us to reconsider your request. Alternatively, if you haven't established that you meet the requirements for exemption for the subsection requested, we may make an adverse determination.

In addition, if you don't provide the requested information by the due date, you may lose your rights to get a declaratory judgment. Under Internal Revenue Code (IRC) Section 7428(b)(2), you must exhaust all administrative remedies available to you within the IRS before a court will issue a declaratory judgment about your exempt status. This requirement means you must take all reasonable steps in a timely manner to secure a determination under IRS procedures, including providing the information we need to act on your request. If you fail to timely provide the requested information, you may lose your rights to obtain a declaratory judgment under Section 7428.

**Additional information**

**Letter 1312 (Rev. 4-2017)**
Catalog Number 35163W

APP. 0150

2

IOWASKA CHURCH OF HEALING
83-2192122

If you have questions or need additional time to respond, call me at the number at the top of this letter. If you have concerns after speaking with me, you can call my supervisor April Hausler at 513-975-6273.

The Taxpayer Advocate Service (TAS) is an independent organization within the IRS that can help protect your taxpayer rights. TAS can offer you help if your tax problem is causing a hardship or you've tried but haven't been able to resolve your problem with the IRS. If you qualify for TAS assistance, which is always free, TAS will do everything possible to help you. Visit taxpayeradvocate.irs.gov or call 1-877-777-4778.

Sincerely,

*Diane Gentry*

Diane Gentry
Exempt Organizations Specialist

Enclosure:
Information Request

**Letter 1312 (Rev. 4-2017)**
Catalog Number 35163W

APP. 0151

IOWASKA CHURCH OF HEALING
83-2192122

3

## Information Request
## First Request

### Information we need to make our determination

Include the following declaration with your response, signed and dated by an officer, director, trustee, or other governing body member (not an authorized representative). You can sign and date the statement below or reproduce it in the body of your signed response. The declaration must accompany responses per Revenue Procedure 2018-5 (updated annually).

*Under penalties of perjury, I declare that I have examined this information, including accompanying documents, and, to the best of my knowledge and belief, the information contains all the relevant facts relating to the request for the information, and such facts are true, correct, and complete.*

1. Please submit a representative sample of the content on your website.

2. The copy of your Articles of Incorporation submitted with your application does not show evidence of being filed with the State of Iowa, please submit a filed copy.

3. List each activity that you conduct along with the percentage of time devoted to the activity. The total percentages should equal 100%.

4. You stated in Form 1023 that you are actively seeking property to build a permanent facility, have you located a permanent location for your activities? Explain in detail.

5. You indicated in Form 1023 that the income listed on line 9 of Form 1023 is derived from fees paid by church members to participate in your monthly weekend ceremonies. Each member will pay $900 in 2019 with increases of 10% and 15% in subsequent years. Are only formal members permitted to participate in the weekend church ceremonies? Explain in detail.

6. You stated in Schedule A of Form 1023 that you hold church services every Sunday afternoon, are these services different from the monthly weekend ceremonies referenced in item #5 above? Please explain in detail.

7. What is your average attendance at the Sunday services?

8. You stated that you plan to operate in Iowa and have a second location in Florida because all of your officers/directors live in Florida. Are your Sunday services held in Florida? Do members attend services in person or virtually? Explain in detail.

9. Provide a schedule of activities for your planned weekend ceremonies/retreats.

**Letter 1312 (Rev. 4-2017)**
Catalog Number 35163W

4

IOWASKA CHURCH OF HEALING
83-2192122

10.   Submit a fee schedule for the retreats that you offer.

11.   Have you conducted any retreats to date? If so, please list the number of retreats, the number of participants in each retreat and the fees paid by the participants.

12.   Article II of your Bylaws state that prospective members must submit an application and other paperwork to be reviewed and approved by designated Church staff, who are the designated Church staff? Also, describe the review/approval process including the criteria applied in the decision.

13.   Your Founder, Dado Kantarevic, is classified as a designated director. Under the provisions of Bylaws, he cannot be removed from his position unless the Bylaws are amended. However, under Article X of the Bylaws, he would have to approve any amendments. Therefore, for all practical purposes he cannot be removed from his position. In addition, under Article V, he has approval authority over a wide range of your activities. Why has been Mr. Kantarevic been granted such broad powers over your operations?

14.   What is the status of your religious exemption application with the DEA?

**How to submit the requested information (do's and don'ts)**

- **Don't include** any personal identifying information like bank account or social security numbers that could result in identity theft or other adverse consequences if publicly disclosed. If we approve your application for exemption, we're generally required by law to make the application and the information you submit in response to this letter available for public inspection. If you have questions about the public inspection of your request or other documents, please call me.

- **Do include** the following declaration with your response, signed by one of your principal officers or directors:

  **Under penalties of perjury, I declare that I have examined this request, or this modification to the request, including accompanying documents, and to the best of my knowledge and belief, the request or modification contains all the relevant facts relating to the request, and such facts are true, correct, and complete.**

- **Do attach** a copy of the cover letter to your response. This enables us to quickly and accurately associate your response with your case file.

**Letter 1312 (Rev. 4-2017)**
Catalog Number 35163W

5

IOWASKA CHURCH OF HEALING
83-2192122

- **Do fax or mail** your response to:

| **Fax:** | **US Mail:** | **Street Address (delivery service):** |
|---|---|---|
| 855-775-7261 | Internal Revenue Service | Internal Revenue Service |
| ATT: Diane Gentry | Exempt Organizations | Exempt Organizations |
| Room 6403 | P. O. Box 2508 | 550 Main Street |
| Group 7821 | Cincinnati, OH 45201 | Cincinnati, OH  45202 |
| | ATT: Diane Gentry | ATT: Diane Gentry |
| | Room 6403 | Room 6403 |
| | Group 7821 | Group 7821 |

- **Don't provide** multiple copies of your response. Providing more than a single response may result in unnecessary delays in processing your response. We must process, assign, and review each piece of correspondence submitted (whether fax or mail).

- **Do allow** adequate processing time if you want to call to verify we received your response. If you fax your response, allow a minimum of three workdays from the day you fax it. If you mail your response, allow a minimum of seven workdays from the day you mail it.

**Letter 1312 (Rev. 4-2017)**
Catalog Number 35163W

APP. 0154

**IOWASKA CHURCH OF HEALING**
**FEIN: 83-2192122**

**RESPONSE TO INFORMATION REQUEST DATED JULY 3, 2019**

1. *Please submit a representative sample of the content on your website.*

Please see the enclosed printed pages of the organization's entire website contents. Much of the web content is derived from *The Ayahuasca Manifesto* spiritual text, a copy of which was enclosed with the originally filed exemption application.

2. *The copy of your Articles of Incorporation submitted with your application does not show evidence of being filed with the State of Iowa, please submit a filed copy.*

The organization's Articles of Incorporation were filed electronically with the Iowa Secretary of State's office on September 24, 2018 at 4:29 p.m.. The copy of the Articles that was submitted as part of the original exemption application was complete and contained the Secretary of State's filing acknowledgement and date stamp on the page immediately following the signature page. A copy of the organization's Certificate of Existence issued by the Iowa Secretary of State was also submitted, which confirms the September 24, 2018 date of incorporation. You may also access a copy of the organization's file-stamped Articles of Incorporation on the Iowa Secretary of State's website using the following search link: https://sos.iowa.gov/search/business/search.aspx.   You may search the site using the organization's name or corporation number, which is 583338.

The organization is now also authorized to do business in the State of Florida. It filed its *Application by Foreign Not for Profit Corporation for Authorization to Conduct its Affairs in Florida* with the Florida Division of Corporations on March 13, 2019, and thereafter received its Certificate of Authority to operate there as of March 19, 2019. A copy of the Certificate of Authority and cover letter is enclosed.

3. *List each activity that you conduct along with the percentage of time devoted to the activity. The total percentages should equal 100%.*

Weekend Ceremonies and Services – 2 weekends per month: **40%**

Spiritual meditation, prayer and preparation for weekend Ceremonies and Services – 2 weekends per month: **10%**

Email preparation, paperwork and phone correspondence with prospective Members: **20%**

Spiritual coaching and continued integration with Members on the phone or in person on a weekly basis: **15%**

#3090981

APP. 0155

Site cleaning, maintenance, supply shopping, travel, meal preparation: **10%**

Record keeping, documentation, legal correspondence, planning: **5%**

As noted in the organization's original exemption application, the organization has extended invitations to Veterans/Wounded Warriors and is in contact with individuals and organizations to facilitate offering free Ceremonies to Veterans. A Veteran accepted the organization's invitation for free Ceremonies to be held one weekend in July, but later declined to attend due to a schedule conflict. Paperwork is in place to begin accepting and documenting this process.

The term "integration" means the process of helping a member more fully understand and appreciate his or her spiritual journey. It is somewhat akin to "debriefing" and involves listening to the member's interpretation of his or her experience during the Ceremonies. It is also an opportunity to facilitate the member's application of his or her spiritual insight to his or her everyday life upon returning home. Integration is one of the primary services held on Sunday mornings, but it is also an ongoing process designed to provide the member with the utmost understanding of his or her purpose and to incorporate this expanded knowledge into his or her daily activities.

The organization has not yet begun to present seminars or other public programming yet, but intends to do so in the coming months as time and resources allow.

4. *You stated in Form 1023 that you are actively seeking property to build a permanent facility, have you located a permanent location for your activities? Explain in detail.*

The organization has not yet identified a property upon which to build a permanent facility, and is currently holding Ceremonies in the State of Florida on private property owned by one of its directors. The location is very tranquil and secluded and offers an educational physical space for conducting Ceremonies. The property has private bedrooms and bathrooms, kitchen facilities, a large room for holding indoor Ceremonies and ample outdoor space for afternoon Ceremonies. The organization is exploring the possibility of either purchasing or leasing the property from its director and, if it does do, will ensure that the purchase or rental amount is no more than market value, and will follow its Conflict of Interest Policy in evaluating the possibility. The organization has also met with a number of banks in Iowa and Florida to discuss financing opportunities for its permanent church facilities.

As noted in the organization's originally filed exemption application, the organization anticipated that it would first establish its primary location in the State of Iowa and would later expand its operations to Florida. Since filing the application, however, the organization and its legal counsel determined that Iowa law is unsettled with regard to the legality of the use of Ayahuasca in religious ceremonies, and that it would be prudent to first establish a physical location in Florida until there is greater clarity with respect to Iowa law. As in the United States Supreme Court case styled *Gonzales v. O Centro Espírita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006), Florida has a state-level version of the federal Religious Freedom Restoration

2

Act of 1993 ("RFRA"), which is codified at Florida Statutes §§761.01 - 761.061. Like the RFRA, which was central to the Supreme Court's 2006 opinion, Florida law provides that government should not substantially burden the free exercise of religion absent a compelling governmental interest for doing so, and that when it does it should be done using the least restrictive means. The Florida Statute goes so far as to require the government to pay a prevailing plaintiff's legal fees and costs in any action or proceeding to enforce a provision of the Florida law (FLA. STAT. §761.04 (2018)).

Unlike Florida, Iowa has no state-level version of the federal RFRA. During the last legislative session, bills were introduced in the Iowa House of Representatives (HF 258) and Senate (SF 508) that would have adopted a state version of the RFRA as part of Iowa Code Chapter 675 but the bills never advanced to a floor vote in either chamber. As a result, the only religious exemption to Iowa's Controlled Substances Act is for peyote, and only for its use in bona fide religious ceremonies of the Native American Church (IOWA CODE § 124.204(8)). The organization's legal counsel has contacted the Iowa Board of Pharmacy and the Iowa Attorney General's office to discuss the organization's ability to conduct its Ceremonies in Iowa, and will continue to pursue specific authorization.

The organization's legal authority for conducting its spiritual activities in Florida is bolstered by the fact that the United States Supreme Court in the *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal* case did not require the respondent church to first apply for or secure a religious exemption from the federal Controlled Substances Act from the DEA prior to requesting judicial relief in order to exhaust its administrative remedies. This fact was central to a Native American Church's successful challenge to a "ripeness" argument made by the government in *Oklevueha Native American Church v. Holder*, 676 F.3d 829 (9th Cir. 2012). In addressing the government's argument that the plaintiff church had erred by failing to first apply for a religious exemption from the federal Controlled Substances Act ("CSA") before seeking judicial relief, the 9th Circuit Court of Appeals stated that:

> Likewise, we are unpersuaded by the Government's assertion that Plaintiffs' request for prospective relief is unripe because Plaintiffs did not request an exception to the CSA from the DEA … [t]he Government argues that we should require Plaintiffs to exhaust this administrative remedy, because doing so would allow the DEA to apply its expertise to Plaintiffs' claim, possibly moot the case if the claim is granted, and help build a record for judicial review.

> We decline, however, to read an exhaustion requirement into the RFRA where the statute contains no such condition, see 42 U.S.C. §§ 2000bb - 2000bb-4, and the Supreme Court has not imposed one. Indeed, the Supreme Court has reviewed a RFRA-based challenge to the CSA without requiring that the plaintiffs first seek a religious use exemption from the DEA. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal (citations omitted)*. In doing so, it recognized that RFRA "plainly contemplates that *courts* would recognize exceptions [to the CSA] - that is how the law works."

APP. 0157

*Oklevueha Native American Church*, 676 F.3d at 838.

In summary, there was legal certainty in first establishing the organization in Florida while working towards approvals in Iowa from the necessary regulatory agencies. The organization believes that having its § 501(c)(3) Determination Letter and religious exemption from the DEA will facilitate its ability to secure the requisite approvals from Iowa authorities to conduct spiritual services in its home state.

5. *You indicated in Form 1023 that the income listed on line 9 of Form 1023 is derived from fees paid by church members to participate in your monthly weekend ceremonies. Each member will pay $900 in 2019 with increases of 10% and 15% in subsequent years. Are only formal members permitted to participate in the weekend church ceremonies? Explain in detail.*

When the organization submitted its exemption application, it anticipated that it would hold its Ceremonies on a monthly basis. In actuality, however, the organization has been holding them twice a month since the first Ceremonies were held during the month of May. In 2019, Members pay $333 per Ceremony. The organization offers three Ceremonies for the duration of the weekend. If a Member participates in all three Ceremonies, he or she will pay $1,000. This fee includes indoor accommodations, beds, showers, cleaning, healthy meals per our spiritual diet, hands-on energy healing, close care and attention, spiritual services and coaching, integration and follow-up. At its discretion, the organization has offered reduced rates to those experiencing financial hardship. The organization will continue to offer this. In addition, as noted above, the organization has extended invitations to Veterans to attend free Ceremonies, and will continue to do so in the future.

Only formal Members are permitted to participate in weekend Ceremonies. This means they must have registered via the organization's website as a Member and/or paid the one-time membership fee of $60. At its discretion, the organization has waived the membership fee for those experiencing financial hardship. Members must formally agree to abide by and respect the organization's spiritual diet preparation and health practices prior to participating in Ceremonies. An individual or individuals from the organization's Board must have reviewed and approved the prospective Member's paperwork and/or had an in-person meeting or telephone conversation with him or her.

6. *You stated in Schedule A of Form 1023 that you hold church services every Sunday afternoon, are these services different from the monthly weekend ceremonies referenced in item #5 above? Please explain in detail.*

The Sunday afternoon services are part of each of the weekend Ceremonies. With a growing membership base, the organization hopes to offer church services every Sunday in the near future. Currently, services are offered two weekends per month. The entire weekend, which consists of Friday evening through Sunday afternoon, is expanded worship. Sacred Ceremonies are held Friday and Saturday. Sunday morning through Sunday afternoon consists of a post-Ceremonial Integration service in which all members are welcome, not just those who

participated in the weekend's Ceremonies.  Members can even join virtually through phone or video call at no additional charge. Members share a meal, integration, prayer, communion and departure blessings.

### 7.  *What is your average attendance at the Sunday services?*

Average attendance for Sunday services is four to five Members and two Healers.  Most Members who attend the Sunday services also participate in one or more Ceremonies held on Friday and Saturday.

### 8.  *You stated that you plan to operate in Iowa and have a second location in Florida because all of your officers/directors live in Florida.  Are your Sunday services held in Florida?  Do members attend services in person or virtually?  Explain in detail.*

As detailed in the response to item 4, the organization established its Florida location first and will expand its activities to Iowa when it has assurances that the use of Ayahuasca for religious purposes is properly authorized in that state.  As a matter of correction of the government's statement, two of the organization's directors live in Iowa and three live in Florida.

All of the organization's services, including its Sunday services, are held in Florida. Members must attend the Ceremonies in person to receive the Sacrament of Ayahuasca.  All Members, however, can participate in the Sunday Integration services in person or via telephone or video call.

### 9.  *Provide a schedule of activities for your planned weekend ceremonies/retreats.*

-Arrive & Check-In: **Friday at 4 pm**

-Meet & Greet, Spiritual Coaching, Preparation & Meditation: **4-7pm**

-Friday evening Ceremony: **start between 7-8pm; end between midnight and 2am**

-Check-in and Snack/Meal: **between midnight and 3am**

-Saturday morning Meal, Meditation & Spiritual Coaching: **6-10am**

-Saturday outdoor nature Daytime Ceremony: **start 11am; end 4pm**

-Meal, Rest & Reflection: **4-8pm**

-Saturday evening Ceremony: **start 9pm; end 2am**

-Check-in and Snack/Meal: **between 2 and 3am**

-Sunday morning Meal, Service, Sacred Music, Communion & Integration Circle: **9am – 1pm**

APP. 0159

-Check-Out/Departure Blessing: **Sunday post Integration Service**

*For additional details regarding Ceremony preparation and rituals, please see Section E. P. 7 and Pages 9-11 of the originally filed Statement Attached to and Made a Part of Form 1023.*

10. *Submit a fee schedule for the retreats that you offer.*

One-time Membership Fee: $60

Friday Night Ceremony: $333

Saturday Daytime Ceremony: $333

Saturday Night Ceremony: $333

Additional Private Ceremony (Optional): $800

As noted above, at the organization's discretion it has waived the membership fee for those experiencing financial hardship and/or reduced Ceremonial fees.

As also noted above, the Ceremony fees include indoor accommodations, beds, showers, cleaning, healthy meals per the organization's spiritual diet, hands-on energy healing, close care and attention, spiritual services and coaching, integration and follow-up.

At Iowaska Church of Healing, the numerology of "333" has spiritual significance. It represents the holy union of mind, body and spirit, which Members experience through the sacred Ceremonies. The number 33 is the age at which Christ was crucified and resurrected and we believe this has direct significance to our 33 vertebrae which when activated creates a spiritual/kundalini awakening or resurrection, all of which one can experience through the organization's sacred Ceremonies.

11. *Have you conducted any retreats to date? If so, please list the number of retreats, the number of participants in each retreat and the fees paid by the participants.*

To date, the organization has conducted five Ceremonial retreats. The Church currently has 20 Members, four of whom have attended multiple retreats. Member/Participant and fee information are as follows:

**May 2019**:

**Weekend Ceremony 1:**
Member/Participant #1: $1,000; waived membership fee
Member/Participant #2: $1,000; waived membership fee

6

Member/Participant #3: $1,000; $60 membership fee; $800 one additional private ceremony

**June 2019:**

**Weekend Ceremony 1:**
Member/Participant #1: $320 reduced rate; waived membership fee
Member/Participant #2: Waived all fees
Member/Participant #3: Waived all fees

**Weekend Ceremony 2:**
Member/Participant #1: $1,000; $60 membership fee
Member/Participant #2: $1,000; $60 membership fee
Member/Participant #3: $1,000; returning Member

**July 2019:**

**Weekend Ceremony 1:**
Member/Participant #1: $1,000; returning Member
Member/Participant #2: $1,000; returning Member
Member/Participant #3: $200 reduced rate; returning Member
Member/Participant #4: Waived all fees

**Weekend Ceremony 2:**
Member/Participant #1: $1,000; $60 membership fee
Member/Participant #2: $500 reduced rate; $60 membership fee
Member/Participant #3: $1,000; $30 reduced membership fee
Member/Participant #4: Waived fee; $60 membership fee

12. *Article II of your Bylaws state that prospective members must submit an application and other paperwork to be reviewed and approved by designated Church staff, who are the designated Church staff? Also, describe the review/approval process including the criteria applied in the decision.*

Prospective members must fill out a Membership Application and pay a one-time Membership Fee of $60 (unless waived or reduced). The Membership Application is reviewed by the President and Vice President (the Church's Lead Healers). The review takes into consideration whether the Application questions were answered with appropriate care and attention. Answers must echo sincerity of thought and spiritual reflection, indicating an earnest desire to be a part of a growing spiritual community in which each Member is seeking personal growth. The individual's personal need for spiritual healing is considered, along with their willingness to explore new avenues of evolution. Membership exploration and/or acceptance is accompanied by an email, text or phone call.

13. *Your Founder, Dado Kantarevic, is classified as a designated director. Under the provisions of Bylaws, he cannot be removed from his position unless the Bylaws are amended. However, under Article X of the Bylaws, he would have to approve any amendments.*

APP. 0161

*Therefore, for all practical purposes he cannot be removed from his position. In addition, under Article V, he has approval authority over a wide range of your activities. Why has Mr. Kantarevic been granted such broad powers over your operations?*

Mr. Kantarevic has been granted broad powers over the organization by design and in accordance with Iowa law. Iowa Code § 504.809(1) provides that a designated director such as Mr. Kantarevic may only be removed by an amendment to a non-profit corporation's Articles of Incorporation or Bylaws deleting or changing the designation. Iowa Code § 504.1031 provides that an amendment to a non-profit corporation's Articles of Incorporation or Bylaws may be conditioned on the approval of a specified person or persons other than its board of directors.

Mr. Kantarevic is the founder of the organization and its Lead Healer, or "Shaman". He is extremely concerned with the organization's well-being and longevity and therefore desires to maintain control over significant decisions that could affect either. As the Lead Healer, he believes that he was selected for this role in divine fashion and that he is personally responsible for the church's actions and teachings. He is also aware that the use of Ayahuasca may hold some allure for unscrupulous individuals who desire to exploit the sacrament for financial gain or who will misrepresent it as a recreational drug, therefore diminishing the dignity of the sacrament and the church's doctrine.

14. *What is the status of your religious exemption application with the DEA?*

The organization submitted its request for religious exemption from registration under the Controlled Substances Act to the DEA Diversion Control Division on February 28, 2019. The request also included a complete copy of the organization's Form 1023. The organization's attorney contacted Ms. Sarah Boblenz of the United States Department of Justice by e-mail on June 27, 2019 to request a status report on the application's review. Ms. Boblenz responded to this e-mail on July 17, 2019 and noted that the review of the application is still in progress. A copy of the e-mail exchange between the organization's attorney and Ms. Boblenz is enclosed. The organization hereby consents to the government contacting Ms. Boblenz or other Department of Justice personnel directly to confirm these facts if it so desires.

> Under penalties of perjury, I declare that I have examined this request, or this modification to the request, including accompanying documents, and to the best of my knowledge and belief, the request or modification contains all the relevant facts relating to the request, and such facts are true, correct and complete.

Dado Kantarevic, President

8

Welcome to Iowaska Church of Healing

Mission

To inspire individuals to seek and embrace authentic, self-realized healing of the mind, body and spirit through the use of sacred, indigenous plant-medicines.

Iowaska Church of Healing offers its members access to spiritual growth, development and healing through the sacred Sacrament of Ayahuasca provided under the guidelines of North and South American Indigenous traditions and cultural values.

We are here to offer information and support to all participants of our sacred Ayahuasca Healing Ceremonies. We are here to provide relevant mental, emotional and spiritual integration to each participant who seeks help. Support will be offered on an ongoing basis to individuals seeking further integration as they return to their daily routines in hopes of implementing and maintaining healing and higher levels of consciousness.

We encourage our members to connect with their unique journey of self-discovery while providing the means to grow in awareness of limiting beliefs, allowing for the deconstruction of unhealthy patterns and the realization of positive solutions.

Our Church would like to inspire participants to discover their inherent nature and achieve harmony with Self, Others and Mother Nature through the expansion of human consciousness.

Our Church is here to provide individuals the opportunity to connect and strengthen the local community by providing public wellness events and workshops for the purposes of education regarding sacred indigenous culture and practices honoring Mother Earth.

To offer members a supportive environment in which they have the option to access supplemental healing modalities, including but not limited to the following:

Mental Health Counseling

Health/Wellness Coaching

Spiritual/Intuitive Coaching

Bodywork/Massage

Energy Healing/Reiki

Group Meditation

Hypnotherapy

Sound Healing Therapy

Vision

Imagine a world in which the universal human desire to love, connect and experience Oneness is fully embodied. This world and this journey begins within.

Our Church envisions a world in which our connection as Divine Beings is realized. We are each Spirits of love with a responsibility to spread light and awareness. This very light and awareness is the fuel that will support the continued existence of our Mother Earth (Pachamama).

We believe our Mother Earth is a living, spiritual organism deeply connected to our existence and experience as human beings. Mother Earth, the environment and all living creatures and beings are a web of connected energy. Our collective healing and awakening is essential to the survival of all beings. We are all responsible for creating and maintaining a harmonious existence.

You are the creator of your life, your experiences and your inner world. What you create from the inside manifests on the outside. The time for personal evolution and transformation is now. Iowaska Church of Healing is here to support you with your choice to seek love and light within Yourself. We are here to encourage you on your process of healing, connection and self-discovery.

Values

Our church and our work is guided by our beliefs and commitments to these six core values

Inclusiveness

We respect every individual while valuing diversity and equality

Openness

We are committed to a culture of truth, collaboration, love and teamwork

Preserve Ancient Wisdom

We are keepers of Mother Earth (Pachamama) and the great wisdom it contains. We believe in the traditions of Indigenous peoples and we believe in passing on these traditions. We are passionate about re-awakening others to the God-given rights of joy and wellbeing, which can all be accessed through the sacred Sacrament of Ayahuasca

Heal With Integrity

We are passionate about providing a safe environment in which people from all walks of life can seek a greater understanding of themselves, the world around them and access multi-dimensional healing

Leave It Better Than You Found It

Since we are all divinely connected, we strive to positively impact others and ourselves, including Mother Earth and Father Sky. "As Above, so Below. As Within, so Without. As the Universe, so the Soul."

Keep It Real

We are mindful of cultivating a world in which relationships are authentic, beginning with our relationship with Self

Universal Laws of Respect

All of Us here at Iowaska Church of Healing live by a code of Love, Unity, Integrity and Respect for all living things.

This means We actively and sincerely seek a deeper relationship with Self, with Spirituality and with the living Spirit of Mother Earth. In doing so, We come to feel, to know and to see that We are all divinely

connected as One greater consciousness (Unity). Each tiny element within nature functions individually to collectively create One large living Organism. Communities such as Ours exist to remind Us that We each are bright, colorful Divine Beings – pointillism on a canvas creating a Whole, beautiful picture.

We feel a deep sense of devotion toward our Universal Family of People, Plants, Animals, Earth, Elements and other Beings. The roots of all Trees are seeded in care, watered by the Sky and nourished by the Sun. This is the natural (Love) We feel for Ourselves and Others.

We wish to honor and keep alive the Spirit of our Ancestors, of Traditional Indigenous Cultures and Natives who roamed this land and still roam this land. They had and still have a deep (Love) for Nature, recognizing that all answers exist Within and the Spirit of specific Plant Teachers, such as Ayahuasca, exists to remind Us of Our true Nature – that We are Nature! Ayahuasca is Our Teacher, Our Profit, reminding Us of the inherent Teacher and Profit that exists Wholly and Absolutely within Ourselves.

We (Respect) the individuality and sovereignty of Mother Earth and all Beings, acknowledging that We are co-creating a sacred space in which We are all safe to experience multi-dimensional healing and to seek a greater understanding of Ourselves and the Universe around Us.

We owe great reverence to Mother Earth as She is a living Being. We believe She should be (Respected) the same way We as People expect to receive (Respect). Mother Earth should enjoy the same inherent rights that We as People desire for Ourselves.

We believe sincerity of character and the willingness to illuminate one's Higher Self should be evident through actions, words, thoughts and intention. We strive to deepen Our spiritual (Integrity) as We nourish and grow Our sense of awareness and Self as it relates to all around Us.

Love, Unity, Integrity and Respect – all things must first begin Within.

Church Doctrine

The basis of our doctrine comes from the well-known Ayahuasca Manifesto – a channeled document detailing the beautiful Spirit of Ayahuasca and its planetary mission. This doctrine covers the role of Ayahuasca with human beings and the expansion of consciousness. It describes the sacred nature of this

medicine, its uses, its benefits, cultural background and application. We refer to it for guidance and a continued reminder on conducting sessions, preparation, diet, management of the sacrament and much more.

"My sacrament is only one of so many expressions of religiousness in Humans. It is an affirmative expression of surrender to his/her spiritual nature; it is an act of bravery and conviction to reach out towards the central Light of all existence."

"It is time to embrace Humanity with my healing, extending beyond the Amazon basin, reaching global expansion, spreading through all the soils of tropical climates, growing in every forest, in every sidewalk, in every house, garden. Care about me, harvest me, spread me around. Warriors of light from around the world, help me to help you!"

Our Team

Iowaska Church of Healing was founded by Family, with Family and upholding Family values. Our Team is a Family of Healers. Love between us is the seed that sprouted this beautiful tree. Love for all beings, care for our earth and a passion for healing are all elements that comprise the Central Sun within our Church. We are the grounded roots of a tree offering direction, stability, compassion, love and healing to those who seek a deeper sense of Self and connection.

Our Family has journeyed individually and collectively on many different paths of healing, becoming experienced in a variety of traditional and non-traditional modalities, many of which we have used with our clients and in our own individual lives. Each of our branches have lead us to one path, uniting with the beautiful Sacrament of Ayahuasca. We have experienced first-hand the profound transformation, healing and growth that this sacred plant-medicine has to offer. It is our passion to be able to share it with you.

Our Team is comprised of Spiritual Leaders, Ministers, Healers, Ayahuasca Facilitators, Doctors and more.

"My sacrament is only one of so many expressions of religiousness in Humans. It is an affirmative expression of surrender to his/her spiritual nature; it is an act of bravery and conviction to reach out towards the central Light of all existence."

–Ayahuasca Manifesto

About Ayahuasca

THE SPIRIT OF AYAHUASCA

*The following information is from the Ayahuasca Manifesto: The rights of translation to other languages and any type of printed publications are the only ones retained. The information and text contained in this work is a gift to Humankind, for which this belongs to the public domain and can therefore be unconditionally copied, reproduced and/or distributed partially or totally provided it is made electronically and never in printed form.

I am the spirit of Ayahuasca. For the first time I reveal myself through the "Word" to make an emergency call to all the Human Beings of the planet, especially to the Light seekers, as I must expand beyond the Amazon river basin.

With my physical expansion I intend to facilitate the spiritual transformation currently stirring the Human species, while I also secure my physical survival which is at risk, as my blessed Amazonian protectors have not understood the danger to which they expose me, aggressively harvesting me, without new sowings.

I leave the Amazon risking my own existence like other botanical species, to leap into the project I was created for, by the central sun of all the existence, name it as you may prefer, I am at its service. I send this correspondence at this historical moment to contribute to the expansion of the Human consciousness in a definitive and significant way, honoring the universal Light that guides my Being. For the first time, with the interest created by my shaman emissaries, and with the new means of mass media and transportation available, I can potentially reach the whole planet to celebrate and proclaim our cosmic existence. I am alive, to give with crude realism, universal love to all the Human Beings who request it from the depth of their souls.

I am a spirit of spirits. I operate from a vibration superior to the spirits who compose me. I am of a hierarchy superior to that of the spirit of Ayahuasca ("Banisteriopsis Caapi ") and of the underestimated Chacruna ("Psychotria Viridis"). I am the medicine resulting from the mixture of Ayahuasca and

Chacruna. Although they give me the name of one of them, my sacred magic does not come from either one of them. My magic resides in the synergy created by the sacred mixture. Science will spend many years searching, unsuccessfully, the mechanisms that I use to act upon Human consciousness. They are surprised by my power, that it does not come from crystal DMT alone, or from harmaline, or from other molecules that compose me. I am the mixture in its natural state, crude and basic, bio-electrically loaded without industrial processing. Such is my spirit manifesting here today, shedding Light to the confusion that surrounds me.

I thank all the "curanderos" that for so many centuries have welcomed me within them, and thanks to all my protectors who presently export me towards all the corners of the planet. I honor the Amazonian tradition here by using my common name of Ayahuasca, but only for linguistic convenience as I am also the spirit of the Yagé, Pilde, Dápa, Pandé, Hoasca, Kahiriama, Natema, Caapi, Mado, Ñucñu-huasca, Shimbaya-huasca (Quechua), Kamalampi, Punga-huasca, Rambi, Shuri, Nishi, Oni, Shillinto Natema, Mi-hi, Amarronhuasca, Inde-huasca, Shuri- fisopa, Shuri-oshinipa, Napi, and the Nepe.

AYAHUASCA'S ROLE IN THE EXPANSION OF HUMAN CONSCIOUSNESS

During these times of globalized consciousness, I come to assist certain little known processes of the Human genetic code, the DNA. Specific subatomic codes that are inaccessible from the third dimension are becoming active. We know that it is not possible to read them, because it was already demonstrated by the "Uncertainty Principle" that has much perplexed the scientific logic. I activate codes that command the dimensional deployment of our bioelectric body.

New capacities of expanded consciousness are being experienced by millions of people throughout the planet. It started with those most fortunate; those with less stress, the most sensitive, those enjoying relative safety and comforts. But later on, it will be imminent and inescapable; this experience will gradually touch everyone else until it reaches the most oppressed and underprivileged souls.

Many Human Beings have already acquired technical knowledge about me, thanks to the scientists that opened up to experiencing me inside their own brains, where they were able to observe themselves instead of observing others as they were trained to do. Now they know about the bridge that empowers me. The botanical-glandular connection (that temporary molecular communion between plants and Humans), is a cosmic bridge, a shortcut that takes the Light to its destiny via its molecular door. In this way, I am much more transformative, than those who attempt to take it through the treacherous five senses, traversing the marshes of the mind, enslaved by the Human ego.

The codes of four (4) that make up the three-dimensional DNA are mere mathematical results of much more complex interactions of energies that occur in higher dimensions. The expansion of the individual Human consciousness consists in living its cosmic existence beyond its three-dimensional physical limitation, with a very subtle vehicle capable of moving consciously at will, even while in the company of others vibrating in the same channel. It is the next evolutionary leap of the Human species; the three-dimensional physical expression of the Human evolution has been completed. The physical evolution for the Human species as we know it, it's over. Its divine patterns have fully unraveled; as the last fold of a rolled up carpet, the great physical creation has been displayed. Now we are at the genesis of a new phase, the return to the fountain of creation, the rediscovery of the life source, be it father/mother whichever way they choose to name it. The return ride on that same flying carpet is now accomplished consciously; unlike its trip of departure where it journeyed rolled up inside and in the center of the crease; uncomfortable, unconscious and unaware. The physical evolution has ended and the spiritual evolution has just begun. The only experience left to live is the cosmic existence lived through our Humanity, consecrated to our new vehicle of Light.

This is my time to embrace the planet. It is my duty. My mission. What I was created for. I now become a protagonist after remaining in the shadows for thousands of years guarded by my indigenous protectors. They now travel around the world raising awareness about my benefits. It is my duty to assume new cultural expressions, very different from those of my beloved guardians of the forest. The rituals, the "icaros", the "dietas", and related knowledge should be preserved as an endowment of world heritage. A legacy to the Universe.

Similarly, my new ways of expression, the manifestations that are taking shape in different world cultures should also be respected and recognized. I am already manifesting new urban modalities and forms like never before. My spirit exists beyond the forms, beyond the cultures, beyond man himself. I am connected to the spirit of the planet and beyond, cosmically up to the central sun of all the existence. Just like the sun with its life giving warmth I should be equally available to everyone.

Ayahuasca's Purpose

*From the Ayahuasca Manifesto:

AYAHUASCA'S PURPOSE WITH HUMAN BEINGS

I am at the service of those Human Beings who are open to benefit from me. We find each other when vibration harmonics of a higher level click; then the encounter manifests in third dimension. Important inner transformations occur in the Humans that open up to feeling intensively and more profoundly what they have been already feeling more subtly and even unconsciously. With them I manifest at the required intensity to help them ascend and soar, strongly and swiftly, but also lovingly without hurting them. These are physically, emotionally and spiritually overwhelming lessons necessary to assist them to crack their cosmic egg shell, their astral cocoon. Those who want to search and develop the desire to follow me and then flourish dimensionally are those Humans that have felt a profound difference in the intimacy of their own. They experience sensations of maladjustment, of detachment, and a suspicion that something strange is happening. Yes, no doubt there is something happening. The DNA is unfolding and starts manifesting certain nonlinear phenomena that change the Human awareness of the world. Some subjective experiences that need to be understood are:

An intuition or feeling that this physical world is a kind of huge holographic illusion, but you cannot reconcile the contradictions as it clashes with everyday life.

Feeling misunderstood by their inner circle of relatives and friends when sharing with them his/her new inner or spiritual pursuits.

Having a special yearning to see the awakening of your beloved ones, as if wishing that they could be saved from their own trivial tendencies.

Seeing how certain past traumas and buried conflicts, veiled for a long time, will now occasionally surface yearning for resolution and feeling that we need to get them out of the way that your soul wants to follow.

Feeling that certain activities that at other times we sought with fervor and longed for, are now seen with little interest, for example:
(a) Having a vibrant social life,
(b) Delighting in the effects of alcohol, while acting
trivial, shallow and only skin deep,
(c) The habit of telling "little" lies when convenient or
when there is no chance of being proven wrong.

The sacred purposes of my ritual use are simply universal love and healing.

The principles of my sacred intention are:

(a) the expansion and illumination of Human consciousness

(b) the discovery and healing of psychological blocks

(c) the discovery and healing of physical diseases

(d) receiving information that is relevant to spiritual development.


Healing Benefits

*From the Ayahuasca Manifesto:


The time has come to clearly expose and declare the benefits and value of my healing properties. The benefits are obvious and evident for those that open themselves to receive and enjoy them. However, third party observers are limited to only seeing the effects of those who live the experience. Without the benefit of their own experience, they invariably put limits on the limitless. The scientific community is always curious, willing, and available to design empirical models for my validation. But the policy making that control the financial funding of scientific research projects is focused in other priorities. The political establishment is clearly more interested in my repression than in my expansion.


My benefits can be grouped in four broad categories:


1)   Spiritual Catalyzer


Spiritual Healing– The most important of all my benefits is my spiritual healing. I clear spaces of unconscious darkness. I untangle knots in your most basic neuro-programming, even that one that impacts your entire existence and you are not even aware of. I show you features which you had failed to see because your vision is blurred by the fog of your own limitations. This is when you are able to tune-in with my vibration and you finally allow me to directly touch not only your spirit but your whole make-up as well; mental, emotional, and physical, in addition to other idiosyncrasies. That is when we are One. That is when you should be prepared with your purest intention, to open up to the most intimate and incisive honesty that you have ever lived with yourself. This is the cosmic solitude. Nobody knows. No one finds out; you are on your own. It is all about what is clear and evident within you before the Light. I lead you to discover your inner truth. Once in this place within you, you need to flow with maximum sensitivity to discover your faith in me, to trust me, to listen, to feel, to understand what I bring to you. It is in this state that I transfer information between subatomic regions. Your inner Light increases, your awareness expands, and certain DNA codes unfold and are activated. This is where you can see the consequences in this life; realities that you created using your free will. Here you will find an enormous opportunity to re-live, to accept, to forgive and to express. These are the healing spiritual processes that I have stored, awaiting for you.

If you want to return to the Light, you can only do it by following back the path that took you here. There is no shortcut to the Light, you just need to return as the pure child that originally left. I am offering you the most powerful spiritual healing tool to return to the Light. It is the most powerful medicine that ever existed; nothing else will ever surpass the direct route of the botanical— glandular bridge. All the other benefits are in one way or another, by-products of the spiritual healing.

Experiencing the Divine Presence– I can manifest within you in accordance with your limited Human concepts about divinity. I can be Buddha to the Buddhist, Allah to the Muslim, and Jesus to the Christian. In the same way, that for many centuries, I have been Pachamama (Mother Earth) for my Amazon protectors. I can also manifest with neutral divine properties free of any earthly image, concept or precept. I can temporarily fill your existential void for God, fulfilling your need for Light, while at the same time healing your energy deficiencies inside your soul. It is a subatomic healing way beyond your comprehension, gifts from above to clear your pathways back to the Creator. Take advantage of these encounters with me, challenge your Human doubts. Question, seek, and complain. Ask for divine justice, ask for enlightenment in your mind; ask for peace in your soul. Demand answers. You will be opening up certain channels that will be used at that moment or later on.

Discovery of Spiritual Connections– Divine connections with me can make you understand certain attachments in your life. This can be unprecedented knowledge. You may find with remarkable certainty that in some other place or time you have had another type of life, probably linked to other persons currently close to you. Incomprehensible connections with parents, mothers, brothers, children that in another time were another person in another place. You may discover that a neighbor or coworker of today, in another time was a son or a sister. These are transpersonal connections that exist in a different dimensional plane and I provide you access to that awareness. Think, observe, and be amazed at the inherent complexity of your spiritual life. Your inner Light needs to tell your ego structure that it will never be able to understand your divine nature, and that your divine nature can definitely understand your ego structure. Make sense of your world with those people considering who they were in that other time. This will help you to better understand who you are in your present time, more deeply, transcendentally, transpersonally.

Psychic Awakening– This life may have not allowed you the expression of certain psychic abilities that reside in you in a dormant state. A part of you may have remained slumbering, and is waiting for the opportunity to awaken in you; making you a whole and more capable Human Being; not neglecting, but better connected with your divine nature. Since family environments rarely support psychic expressions in children, fearful emotions take over and suppress these natural talents. I can release these talents from your subconscious prison, letting them to run free towards your conscious free will, claiming

acceptance and recognition. Receive them, appreciate them, ask for understanding in your inner sanctum. Fill your inner space with loving feelings and good intentions to dissolve your fears while discovering, grasping and engaging your talents. Only your own inner Light can guide you towards the brighter Light, only the Light can guide you to the Light. There are no shortcuts or detours; you are already Light, and you own the talents to expand it within you. Awaken, open your arms and rejoice. You are all love, and fear does not fit in you.

Effect of Immersion with Mother Earth (Gaia)– At some point while you receive me, your five senses will open further in a sort of cosmic mode instead of "locally". Instead of perceiving fragmented bits and pieces of sensory information, these are received as gestalts of pure awareness in a way that blends with the totality of all existence. You will feel like part of your immediate surroundings participating with the dynamic Earth, of the infinite Universe. This awakening of your cosmic nature is a powerful tool for managing your own ego structure. Ego is always seeking its permanence in your soul and will never cease to sabotage your spiritual aspirations, as your awakening will diminish the its authority over your Human machine. The goal with this wonderful feeling is to make the quantum leap from the temporary feeling sensation of "I feel like part of" to the permanent conviction of "I am part of".

2) Existential Wisdom

Meaning of Life– This kind of experience with me is a spontaneous one, resulting from the right temporary tuning of your entire Being. I can dissolve the feeling of existential confusion that everyone has to some degree. You will awaken to the realization of the place you occupy in your world today. In awareness of the great cosmic scheme, all becomes meaningful for the first time, something significantly new to your inner self. At this point you accept, understand and internalize this reality. This is not a crazy hallucination, it is a significant vision. The meaning of your life is not only beyond eternity, it is also into each micro moment of your daily life. Open your heart and flow in the river of love. You cannot understand the meaning of life with your brain; you can only feel it in your heart.

Accelerated Maturity– Human life has several stages very well known by the elderly that have lived them. Life experiences such as shock, surprise, pleasure, pain and physical aging will create attitudes towards life. Maturity is the degree of gained wisdom that seeks to survive the hardship of physical existence. Maturity is your wisdom to accept what you cannot change and change what you can control. Maturity is a captain who does not allow mutiny in his/her inner world. It is a matter of awareness. I can give you the depth of awareness that only years of experience can give you. This acceleration of maturity, this growth, is of great benefit for improvement and happiness in your life. A youngster with the maturity of an adult, and further, an adult with the maturity of an elder, brings to the world, an

elder in happiness and wisdom. Once there, you are well prepared for your transition to the higher planes.

3) Physical and Emotional Healing

Cleansing and Energy Balancing– Those that are in their path to the Light and also care for their own physical and emotional health, consistently receive cleansing and balancing of their subtle energy bodies, leaving in them a sense of physical wellbeing and relief, as if a heavy weight had been lifted from their shoulders. This energy balancing is partially produced by the physical cleansing that also occurs in all your vital organs, after they expel its toxins through the various channels of your amazing excretory system. The resulting harmony is "the energy balancing" or "the cleansing". Your physical body now operates closer to its intended genetic design.

Recalling Repressed Memories– I can open up repressed memories from your subconscious when it is required in your healing process. Certain memories are locked away for your own protection by wonderful systems designed to secure your physical survival and the continuity of the species. But this mechanism has an existential cost. Huge spaces get trapped like very tight knots of energy, and when these are released with my help, not only do you remember the repressed memory but also create the possibility of integrating this newly released space into your now greatly enhanced spiritual health. This recollection brings you a totally unexpected gift, an unknown, but deep spiritual satisfaction. This discovery is followed by your reinterpretation of the history of your own personal development. Then you can see how your paradigm shifts as you fit-in the new piece of the "puzzle of self knowledge".

Memories of Other Lives– I can give you access to memories of other lives. Frequently your next advancement requires that you gain deep understanding of strong emotions like attachments or repulsion to certain people, issues or life events. I shall be there for you. This is where the previously unexplainable becomes obviously evident. You feel amazement when you fully understand how a life in another time influences your present life. An indescribable experience for some, unbelievable for others, it invariably neutralizes the energies of excessive attachment or repulsion arising from another dimension, from those atemporal nonlinear connections. This neutralization is the quantum mechanical result of the power of consciousness, sparked when fully realizing the experience.

I also awaken memories of other lives for different purposes. Certain deeply ingrained character traits or existential anxieties might have its origin in other lives. The mere awareness of this perspective provides a new landscape of yourself, thus allowing for a better management of these inclinations and/or

predispositions on your pilgrimage towards your spiritual development and maturity.

Health Improvement and Healing of Diseases and Ailments– Countless testimonies of permanent healing and dramatic improvements to health have been documented. Many conditions have healed completely or improved significantly faster than it would without my help and intervention. It is known that diseases originate from energy imbalances in the deeper dimensions that eventually manifest as physical disease. This is how I heal common conditions. And when allowed by certain cosmic laws I can also heal or substantially improve conditions where conventional science has been unsuccessful. Similarly I can catalyze remissions and reversal of progressive processes considered by many to be irreversible. The pharmaceutical industry has studied me in detail for clues that might provide for drug development within their chemical-mechanistic model.

Antidepressant Properties– I can temporarily entune the neuro-chemical dance of your out-of-phase brain. I can train it even for several days to flow in the way that it is capable of; feeling peace and internal balance, something experienced by many for the first time in their lives through me. Participants were unaware that there was such a state of serenity that they can now aspire to. This pattern will be a registered standard against which future experiences can be compared.

When you become clearly aware of the out-of-phase state you were immersed into, unconscious mechanisms are activated seeking to harmonize and synchronize with such previously unknown vibe. This is more easily achieved when you add your conscious will to return to a more serene space. Returning to a depressed state after my short term effects should be acknowledged as an existing depressive condition prior to my arrival. Many will mistakenly argue that I induced them into a depressive state, when in fact they gained a deeper awareness of their own self.

4) Behavior Modification Tool

Addiction Management– Science has been able to accept my skillfulness in the healing of physical addictions. Even the traditional scientific method was able to validate my power in this health issue. For science, these results are mere statistics, a cause and effect. The healing, however, comes from the spiritual realms and not from the removal of molecular blockages in the conventional sense. The healing from addictions occurs at the spiritual level, which is metaphysical in nature and blueprints the causality of subatomic particles. The metaphysical healing harmonizes and reorganizes the chemical correspondence which will finally reflect as a behavioral change. It is only here where true healing can occur. When the addict is ready to see, acknowledge, and accept, his/her will is strengthened and the

addictive mechanical programming is weakened. I can penetrate the depths of his/her being and teach him/her to see what is required for this awakening. This awakening is his/her healing. This is where he/she accepts responsibility and from this point he/she gains the balance and strength to better manage behavior. Otherwise, the powerful programming entrenched deep in the reptilian brain will continue to dominate the Human machine sowing frustration in the conscious personality of anyone that tries and longs unsuccessfully to change their addictive behavior. Addictions will effectively block any spiritual development; it is of upmost importance to identify and remove them with urgency. Most addictions do their limiting work without any resistance from the victim. Many are ignored by the victim because they adapt to them and make them part of their lives. Illegal addictions are only a small fraction of all addictions. Addictions to legal substances and to legal compulsive behaviors are widely spread in the planet and keep Humankind under a cloak of darkness, which justifies my purpose to bathe them in Light.

Lifestyle Transformations– The scheduled and predictable life that Humans lived in the twentieth century is disappearing. The social idea of acquiring a trade or profession for life, planning for retirement and hoping to reach old age with a pension, belongs to the past. Past patterns of life are increasingly disrupted, thus forcing a transformation of life styles towards new, unknown and unpredictable horizons. The notion of social security that many have lived is just a fond memory in these times of transition to other models of living. Marital unions and separations, moving to a new country or culture, transitioning from student to workforce; childbirths or passing on of close ones, are all examples of life being transformed dramatically. Many participants that receive me while going through one or more of these processes develop greater adaptability to change and gain a wider perspective of their own lives. I can activate the existential wisdom necessary to assist high-level transitions and allowing a successful journey in the path of life.

Creativity Booster– Observer participants found a practical application to the passive receptivity state they attain when they receive me. The profound sensory experience that I offer them, combined with the conscious intention of creating Human art forms, allows these Observers to reap, capture, or recall creative production of images, sounds and word that become tangible and manifest during my visit. Painters, music arrangers, composers, filmmakers, novelists, screenwriters, as well as intellectuals and scientists seeking conceptual discoveries continue to reap these benefits. As I help them with their practical goals, I remain waiting for them to become Spiritual or Explorer participants. This benefit also helps the other types of participants, which I describe next, who to a lesser extent also improve their lives.

In short, I will lovingly take you to your true self, to your dark side, to your hidden limitations. Sometimes I'll do this with drama, power, fear, pain, but never to an extent you cannot tolerate. I will never give you experiences beyond your ability to tolerate them. Trust me, it is necessary to take you to

the edge of your tolerance or resistance; only then is transformation possible. The evolution. The maturing of the cosmic cocoon. The birth into a new universe. I am medicine. Medicine for the healing of the soul and body. For those who understand, I am here to serve.

Visions

*From the Ayahuasca Manifesto:

AYAHUASCA VISIONS & YOUR THIRD EYE

I have the ability to temporarily increase the natural capacity of man to have visions. Envisioning is a brain activity very different from hallucinating. Hallucination arises from the distortion in the transmission of optical images or of their interpretation once they are received. Hallucinations are meaningless, they are entirely sensorial, and leave no transcendental memories in the Human consciousness. Science itself has not completely understood the Human experience of having visions. No one knows where the digital screen is, or in what medium does anyone see the images that come through the lens of the eye. It resembles today's Human video technologies where the optical image is inverted by the lens and hits the retina, then fades into a billion electrical signals, then disappears through bundles of elongated organic cables, that inexplicably reach some abstract virtual screen somewhere, that gives you a glimpse of something out there, that seems to match what you feel is physical reality. Despite the mysterious nature of the sense of vision, from the five senses, this is the one that provides greater security and trust to the Human Being. Anything that is visible to the eyes, is considered real and obvious. Visions caused by the third eye are very different to the ones produced by the other two, although they are processed by the brain in a very similar fashion. Contrary to hallucinations, visions bring a sense of confidence and certainty for those who experience them. The visions I give you are real to your inner world, whether they are literal or symbolic.

Although I carry hallucinogenic properties, such is not the main gift I have to offer. There are hundreds of hallucinogen agents in the planet, but only a handful of "visiogens", those powerful tools that open new inroads towards the Light. The hallucination is entertainment, the vision is virtue.

The third eye, or pineal gland, is your gateway to heaven. You should take care of it as you do with the lungs, caring about the air you breath and like your nutrition when you avoid certain unhealthy substances. Your soul expects you to know, train, and keep that eye healthy. That eye that sees into the darkness of the ventricle that has visions every night and leaves traces in the memory of sleep.

That eye that is named as if it were etheric in nature. The third eye is not only a "chakra" operating in another level, but also has rudimentary retina, cornea and light receptors, as well as the other two eyes. That eye is physically real. But, it is an organ that no one speaks about at school or in private. Is it not coincidence that its place is secretly protected in the geometric center of your skull.

Take care of your pineal gland, learn about its structure and its functioning according to conventional science. Notice how it calcifies over the years. Research and find home remedies for detoxifying it. Create awareness of your pineal gland.

Your First Time

WHAT TO EXPECT FOR YOUR FIRST TIME

This is not to color your experience before it occurs, but is a brief highlight of things that may (or may not) come into your awareness during the journey, and some other tips/notes.

Maintaining your center, grounding, and finding your breath are useful methods for navigating areas that may be perceived as uncomfortable or unusual.

Some people like to go into the experience holding a specific intention in heart and mind. We like to go into the journey with the intention to learn, grow, and heal, without predetermining any way in which that could present itself so as not to limit the experience.

Depending on your metabolism, the effects of the Ayahuasca can start coming on anywhere between 15 minutes to two hours, but generally between 30-60 minutes. That is, you must give it time to assimilate in your system. Sitting upright/in meditation if possible/comfortable during this time is useful. The entire journey can last anywhere from 3-5 hours, with four hours being the average (usually with a noticeable coming up and down).

You may not "feel" / "see" anything; you may feel heavy or want to rest/sleep. Take rest, and allow your subconscious to work with the Ayahuasca.

You may not vomit, but there will be a "purge" in some other fashion (bathroom, sweating, crying, yawning, laughing, etc). However, if there is an urge to vomit, do not resist it – it may come in waves and build in intensity, perhaps linked to certain thoughts/feelings/visions, until there is a release. If you have to use the bathroom, one of us will escort you to the bathroom and wait with you nearby. There may be slight disorientation or difficulty walking/finding balance, so we will support you on your bathroom journey. Be cautious in passing gas – it may be more than gas!

You may feel vibration or twitching in the body/need to stretch in ways – flow with it, as it is you and your body shifting energies.

As the mind tries to observe, analyze, judge, and categorize certain "new" sensations and experiences, know that the mind can only take you so far. It is useful to detach identity from it, because it can also serve to keep you at a certain point in the experience versus moving past or through it to something else. Ayahuasca has its way of amplifying certain thought patterns, processes, habits – sometimes to help us identify those which are unconscious, or to bring them glaringly to the surface to assist in releasing the energetic pattern that keeps them alive.

At the same time, do not ignore this or try to run away from it. It takes the most strength to surrender to what is in front of you – not give in/give up – but surrender to what is in the moment, truly feeling/being with it, as it may be something that was long stored away and never fully processed. The mind/ego's self-preservation mechanism may invite you to struggle/resist, or feel fear. That is okay, too, but when possible, shift the awareness and be an observer in the heart, instead of staying seated in the mind.

Because of how innately identified we are with some of these things, because of how deeply we consciously or unconsciously associate with them or define them as "us" – letting them go may feel like a death, or that you will die. Always remember that You will not die – that there will always be awareness present in your journey – but these things that no longer serve our greater purpose and growth can die – and will, if we allow it. Thus, there can/will be a death at some level but, no matter how "difficult" this feels, know that you will come out of it, that you will come home and find a renewed sense of self.

At times, the experience may be so intense that it is unfathomable by our traditional senses. A mere toe in the water of the infinite can be overwhelming, especially as we keep trying to tether ourselves to our physical bodies or our "reality." The reality that is experienced in Ayahuasca is just as real as the one we

perceive in waking life, except it is an invitation to go beyond our senses to the place that ultimately is filtered to a great extent by the senses of our body. It is great to be a surfer, riding the waves as they rise and fall – you will eventually come back to shore.

Similarly, nothing may make "sense" because it is not of the senses we are familiar with. Hot/cold, dry/wet, up/down, day/night – none of this may hold any value or concept for you. You may not know where you are or what is real. Auditory effects, such as amplification of a distant sound seeming very close, could be present. There are times that we need to completely step outside of ourselves and the known to allow the energetic field to re-align.

What may feel like an eternity can be but a few seconds/minutes in this three dimensional space. Similarly, what you could see manifesting instantaneously may take some time to play out in this three dimensional space.

If you feel "stuck" in any of the above and the intensity is not something you can navigate, breath through, and stay centered with on your own for a prolonged period of time – that is, if we sense that you are "struggling" in an overwhelming way, there are certain things we can do to help you through this. One of them is by administering the shamanic snuff, rapé, as it is fundamentally targeting this balled up energy in your system and freeing it via breath and intelligence of the plants contained in the snuff mixture. This will shift your entire experience, allowing for grounding and possibly a purge (especially if you feel like you have to purge but are unable to) as the energy is released. We will guide you through this process of holding your breath as we blow the snuff in each nostril, which will instantly sting your sinuses quite profusely for a few seconds and cause an intense vibrational sensation in your head, which will eventually move throughout your body as it targets areas for energetic release. Sit, and take deep, long breaths. Whatever drips into the back of your throat, please spit it out. Rapé is a very useful tool when applied at the correct times, but we will not administer it unless necessary due to the intensity of it and desire for you to seek the tools within first.

If you're going to paint a picture, you would typically start with a white canvas. The canvas we are currently working with is usually quite full, thus it needs to be cleaned to create something fresh. This is always by your choice, and always working with, rather than against, the experience. This is the "defragmentation" that occurs; it may not even be necessary to follow how the canvas gets cleaned, just know that you are cleaning it. Sometimes this occurs quickly, other times it is a prolonged process, maybe even requiring multiple sits – but when it occurs, it is always manifested in the instance of the present moment.

There is a spirit/presence/intelligence to Ayahuasca and you will build a relationship with "her" over time. Rather, you will rebuild the relationship with this part of yourself that Ayahuasca shifts our attention to. You may feel a certain familiarity in all of this. Everything you experience is manufactured from within, but outside of what we traditionally define as ourselves.

Many things experienced cannot be put into words – or, if they can, know that the words can limit the experience itself, and thus you are only telling a story. It is best to hold onto the feelings and insights (inner-sight) that you gather. What is behind the insight, feelings, visions – what is the source of that? What is the source of source? You can trace it back as far as you desire.

This can all be serious, lighthearted, scary, fun, and exciting. It is with gratitude, compassion, love, respect, and ease (with self and the process) that this will unfold. This is for you, but also for us, and for something inclusive of all of that and much more.

Learning Resources

PRIMARY RESOURCES

Ayahuasca – Iceers

Ayahuasca – Ayahuasca.com

Kahpi.net – Ayahuasca Resource

SECONDARY RESOURCES

Ayahuasca – Wikipedia.org

Ayahuasca – TripSit.me

Ayahuasca-related Texts – Bia Labate's Site

Bibliography of the Brazilian Ayahuasca Religions (PDF) – Bia Labate

Ayahuasca, DMT, and other related Tryptamines – Disembodied Eyes

Yage – Disembodied Eyes

Ayahuasca – Deoxy

My First Ayahuasca Experiences – Nicholas Saunders, 1993

SPIRITUAL USE

União do Vegetal

União do Vegetal Home Page

União do Vegetal: Nicholas Saunders' Account

Santo Daíme

Santo Daime – The Brazilian Rainforest's Spiritual Path

The Use of Ayahuasca by the Santo Daime Religion – MAPS, 1992

Guided by the Moon – by Edward MacRae, 1992

A Personal Experience at a Daime Service – C. Bergquist, 1996

Santo Daime Account – Nicholas Saunders, 1996

Other

Shamanistic Ayahuasca Ritual – CSP

Shamanism – Deoxy

Ayahuasca Healing Session – M. Dobkin de Rios

VIDEO & DOCUMENTARY

Making Ayahuasca – Chris Kilham

Eye of the Needle: An Ayahuasca Journey – Daniel LeMunyan

ARTICLES & WRITINGS

The Therapeutic Potential of Ayahuasca – Rachel Harris, 2017

Things I Wish Someone Told Me Before My First Ayahuasca Experience – Tony @ Warrior.do, 2016

What To Do When You Freak Out During an Ayahuasca Ceremony -Misha Almira, 2015

BOOKS

Fishers of Men – Adam Elenbaas, 2010

The Antipodes of the Mind – Benny Shanon, 2002

Ayahuasca Analogues – Jonathan Ott, 1994

Ayahuasca Visions – Eduardo Luna & Amaringo, 1993

Ayahuasca and Ayahuasca Alkaloids – K. Trout, 1998 [online]

Forest of Visions – Alex Polari de Alverga, 1999

Where the Gods Reign – Richard Evans Schultes, 1988

Tales of a Shaman's Apprentice – Mark Plotkin, 1993

O Uso Ritual da Ayahuasca – B. Labate and W. Araújo (Eds.), 2002

Ethnopharmacologic Search for Psychoactive Drugs – D.H. Efron (ed.) (PDF), 1967

Preparations, Precautions & Diet (Dieta)

Progressively, orthodox science closes in on chemical reasons that define the proper nutrition during the days of preparation for the sacrament and for the days after. Because of my dramatic effects on the neuro-chemical and hormonal dance, it is important to take precautions to avoid negative effects that might occur due to the bio-chemical incompatibility of my components with the sudden consumption of certain foods. The gradual harmonization of bodily systems takes several days, so advance preparation is required as well as certain precautions.

All participants must fast prior to a session to ensure adequate absorption of my sacrament and a fulfilling experience.

The Facilitator should investigate with each participant if he/she is qualified or able to receive me. Medical patients under counter indicated medications or psychiatric patients with a history of mental instability, should not receive me to prevent serious health complications. Alcoholic beverages should be avoided for several days before and several days after receiving me. Science has identified with proper certainty, some incompatible substances and Facilitators should study them and adequately inform their participants.

It is important to read and understand the following guidelines prior to participating in an Iowaska Healing Ceremony. Preparation and diet can begin one week prior to consuming Ayahuasca, with particular responsibility and care practiced during the three final days prior to consumption. It is recommended to follow the diet one week after Ceremony, as well. The benefits of adhering to these

recommendations are two-fold. First, you are presenting your mind and physical body with the opportunity to purify and become lighter through the practice of cleaning the diet. Many people discover that they feel better and wish to continue a more conscious lifestyle of enjoying and nourishing their bodies. Second, you are ensuring a clean and open vessel to receive the benefits of Ayahuasca in which you are more likely to experience maximum healing potential.

Below is a general guide regarding food and drink consumption prior to an Ayahuasca Ceremony:

Please enjoy:

Grains & Legumes such as oats, barley, buckwheat, brown rice, quinoa, amaranth, gluten-free pastas, beans, and lentils. Organic wheat, kamut, or spelt are also good options.

Vegetables such as beets, carrots, cucumber, jicama, broccoli, lettuces, arugula, potatoes, sweet potatoes, or yucca can be enjoyed.

Fruits including apples, bananas, berries, pears, apricots, grapes, peaches or melons are all refreshing choices.

Limited Animal Proteins including high quality eggs, organic free-range chicken, or light, wild-caught fish such as sole, tilapia, bass, trout, halibut, or snapper. Smaller amounts recommended. Avoid, if possible, three days prior to Ceremony.

Nuts & Seeds such as raw cashews, raw almonds, raw walnuts, chia seeds, and shelled hemp seeds. Plain, unsalted nut butters are good (except for peanut).

Flavor & Seasonings which are non-spicy, such as fresh herbs, thyme, oregano, basil, dill, ginger, turmeric, cumin, coriander, cinnamon, coconut aminos (in moderation), coconut oil or olive oil are all good options.

Beverages including water, herbal teas, juices containing the approved vegetables or fruits, coconut water or nut milks.

Prior to continuing with the list of foods to avoid, please note:

  **Participants are asked to consciously avoid certain foods for a reason. It is not that all foods listed to avoid are necessarily "unhealthy," rather they may contain moderate to high levels of a naturally occurring trace amine called tyramine (derived from the amino acid tyrosine). Ayahuasca tea is an MAO-inhibitor and MAO is needed by our bodies to process tyramine. By removing foods that contain

tyramine, you are ensuring a more physically pleasant experience when consuming Ayahuasca.

Please avoid:

Pork/Red Meat/Shellfish

Dairy Products/Animal Fat (milk, cheese, yogurt, lard)

Fried Foods/Oils (coconut/olive oil sparingly for cooking are okay)

Salts (table salt, soy sauce, fish sauce, etc.)

Sugar/Artificial Sweeteners (stevia, aspartame, agave, honey, etc.)

Caffeine (coffee, green tea, black tea, soda, chocolate)

Dried Fruits/Citrus/Fibrous Fruits (mango or pineapple)

Spinach/Tomatoes/Avocados

Onion/Garlic

Seaweed, Kelp, Dulce, Arame

Hot Spices/Chilies/Pepper

Vinegar/Pickled Foods

Fermented Foods (kombucha, kimchi, tofu, tempeh)

Yeast (simple unleavened, unsalted breads are okay)

Alcoholic Beverages

Recreational/Prescription Drugs

Sex/Masturbation

Negative media, videos, images, environments, etc.

*DAY OF CEREMONY: Light, raw, simple and healthy foods from the approved list are recommended. Water and herbal teas are best. It is suggested to consume your last meal at least five-hours prior to Ceremony start time.

THE MAIN THING TO REMEMBER IS:

NO red/heavy meats

NO Pork

NO alcohol, beer, wine, drugs

NO garlic or onions

Moderate consumption of salt and sugar/honey – 3 days before and after

– Please remain well hydrated. However, avoid drinking too much water directly before or during Ceremony.


*Additional information per the Ayahuasca Manifesto:


The traditional teaching of sexual abstinence as part of the pre and post-session diet is not a folk myth of the Amazon traditions. It is also ancient wisdom found in many traditions around the world. The intensity of sexual energy, especially orgasmic or close to climaxing, transmutes certain energy flows that interrupts certain processes that I have not yet finished. The peaceful expressions of erotic love, caresses, tenderness, intimacy, spiritual closeness must not be suppressed because they are part of my love mission. It is only the animal sexual fury and orgasmic energy which must be temporarily controlled to allow the subtle processes of healing.


I am not for every Human Being. There is a small number of potential participants that are chemically incompatible with one or several of my components.


Participants that ignore all preparations prior to receiving me or act carelessly after receiving me must accept responsibility for their actions if they embark in low vibration behavior such as consumption of illegal hard drugs, abusing alcohol, or engaging in obsessive sexual conduct.


I also advise about the other extreme, those with partial chemical immunity. There are bodies with well-developed resistance to unknown chemicals that after receiving me barely feel any effects beside some physical discomfort. They do not understand why other participants describe amazing stories of healing and expanded awareness while they remained relatively unchanged. In order to reach

communion with them, I need the assistance of experienced Facilitators or shamans that know how to induce better absorption of my sacrament in their bodies.

The amount of potential participants with any of these conditions represent a minuscule proportion of the global population for which the vast majority is perfectly capable of receiving me in physical and spiritual excellence.

Medications, Pharmaceuticals & Safety

Please be aware that some of the alkaloids present in Ayahuasca are inhibitors of the MAO enzyme, which means that the consumption of Ayahuasca can potentially interfere with certain serotonergic pharmaceuticals.

The healing potential of this sacred medicine could be reduced and the effects altered. Anti-depressants, SSRIs, recreational drugs and others (see list below) could cause adverse reactions if not adequately purged from the system prior to Ayahuasca consumption. It is best to be cautious and it is recommended to remove pharmaceuticals or recreational drugs at least three weeks prior to Ceremony as well as three weeks after Ceremony.

Please consult your doctor about possible interactions that MAOIs may have with the medication you are taking. When registering with us, you will be asked to inform us of any health conditions, fill out medical paperwork and provide us with a list of medications you are taking. Members and participants are fully responsible for providing truthful and accurate information.

We value the safety of all of our members and participants. We ask that you respect yourself, others, our Church and the sacred medicine by thoroughly preparing and reading the following information and resources.

You must agree with our Medical Policy (link below).

MEDICATION THAT CAN INTERFERE WITH AYAHUASCA:

This includes, but is not limited to, the following:

Monoamine Oxidase Inhibitors (MAOIs): 3 to 6 weeks prior

Central Nervous System (CNS) Depressants and sleeping pills: 3 to 4 weeks prior

Selective Serotonin Reuptake Inhibitors (SSRIs): 6 to 8 weeks prior, 4 weeks after

Other Anti-Depressants: 6 weeks prior, 4 weeks after

Anti-hypertensives (blood pressure medications): 2 to 6 weeks prior, depending on medication

Antibiotics: 48 hours prior

**For a more extensive list, it is important that you visit and review the following website:

http://ayahuascasafety.org

RECREATIONAL DRUGS THAT CAN INTERFERE WITH AYAHUASCA:

Please Note: Recreational drugs should not in any case be combined with Ayahuasca. This includes, but is not limited to, the following:

Cannabis

Cocaine

Amphetamines

Ecstasy

Any psychedelic drugs (mushrooms, DMT, LSD)

**For a more extensive list, it is important that you visit and review the following website:

http://ayahuascasafety.org

PSYCHOLOGICAL CONDITIONS

Please note, if you have any psychological conditions, including borderline disorders, bipolar disorders, psychosis, and schizophrenia, you could be at risk if you partake in the consumption of Ayahuasca. We provide a safe and controlled environment in which the Ayahuasca is taken. We provide supervision as well as an appropriate integration of the experience, which all play a part in reducing any related risks.

If you suffer from depression, Ayahuasca can be very effective with providing relief and healing. It is advised that you discontinue your medication as described above.

CARDIOVASCULAR CONDITIONS

If you have high blood pressure or cardiovascular conditions, we do not recommend Ayahuasca as it can elevate the blood pressure and increase risks.

DIABETES

The absorption of Ayahuasca may present a risk in individuals with diabetes. The use of the MAOIs found in Ayahuasca can alter blood sugar levels via hypoglycemic effects. MAOIs could alter the amount of insulin or oral anti-diabetic medication that is required. Due to the risk, individuals with severe, unstable diabetes should not take Ayahuasca. Those with less severe diabetes should contact us prior to registering.

Again, all members are responsible for properly informing Church staff of any psychological or medical conditions, including but not limited to those mentioned above, along with the conditions of pregnancy, untreated tuberculosis or liver conditions.

FAQs

DO I NEED TO BE A MEMBER OF IOWASKA CHURCH PRIOR TO PARTICIPATING IN AN AYAHUASCA CEREMONY?

Yes, you must first become a member of our Church. However, please note: Church membership alone does not qualify an individual to have access to sacred medicinal ceremonies in which one would partake in the Sacrament of Ayahuasca. To partake in the Sacrament of Ayahuasca, an individual must be a Church member in good standing, at least 18 years-of-age or older and must successfully pass all pre-qualification requirements as set forth by the Church rules and regulations which include but are not limited to medical evaluation forms and consultation with Church Counselor.

IS THERE ANYTHING ELSE I SHOULD DO TO PREP FOR CEREMONY?

Of course the diet and other requirements should be followed. In addition, it is helpful to prepare your mind and spirit by welcoming in some personal quiet time or meditation. This is a time for reflection on your life and a time for setting an intention. Be in touch with yourself, exploring your reasons for seeking this sacred medicine and healing experience.

Some people find it helpful to avoid media, harsh music, disturbing movies or television, negative environments, etc., the week before Ceremony. This is a way of beginning to clear the subconscious channel.

WHAT SHOULD I BRING WITH ME?

We provide bedding, pillows, towels and extra blankets. Please bring any clothing, personal care products or items that will keep you most comfortable. We recommend bringing a journal and a pen in case you wish to record anything from your experience during your reflection time. Please bring a reusable water bottle or vessel of your choosing.

Bring your cell phone and charger, of course, however we ask that everyone place their electronic devices in a safety deposit box upon arrival. This is a sacred time for going deep within. The healing process begins the moment you set foot on our beautiful land. We wish to avoid electronics that could prove to be a distraction for yourself or for other guests.

DOES THE CHURCH OFFER ADDITIONAL HEALING SERVICES?

Yes, we are happy to offer the public a supportive environment in which they have the option to access supplemental healing modalities, including but not limited to the following:

Energy Healing/Reiki

Bodywork/Massage

Group Meditation

Hypnotherapy

Health/Wellness Coaching

Spiritual/Intuitive Coaching

Sound Healing Therapy

Mental Health Counseling

WHAT IF I AM PREGNANT?

Although you may hear stories around the globe of women safely drinking Ayahuasca while they are pregnant, we do not offer Ayahuasca to women who are pregnant or breastfeeding.

WHAT IF I AM ON MY MENSTRUAL CYCLE?

If possible, we do recommend that women plan around their cycle. Female menstruation is a sacred time in which a woman is more deeply in touch with her body, feelings, energy and those around her. It seems that in many cases, a woman's experience with the medicine is intensified or heightened while menstruating.

IS IT IMPORTANT TO FOLLOW THE DIET?

Yes. We encourage you to approach this sacred medicine with integrity by upholding the diet guidelines, which exist to support you in getting the most out of your healing experience. Please remember the diet also helps to remove toxins and release blocked energies, preparing you to receive the medicine most effectively. You will gain much wisdom and insight even after your Ceremony, as Ayahuasca remains with you for some time. We invite you to facilitate a gracious and successful process for yourself by welcoming this aspect into your experience and preparing your mind and body to receive and to let go.

WHAT SHOULD I WEAR FOR CEREMONY?

It is best to be comfortable and casual when you sit in Ceremony. You want to be able to breathe, to have some flow or movement and to feel warm should you get cold. We advise bringing a jacket, sweater or shawl. Blankets will be provided, but many people tend to feel a little chilly with the Medicine.

Please note we have a dress code. It is important to honor the sacredness of the space and of this event by dressing modestly and conservatively. This is a time for going within, not a time to offer physical distractions. Men and women should always be appropriately covered, especially sensitive areas. We ask that you do not wear anything see-through, short, low cut, or tight.

Our Staff wears all white clothing during Ceremonies so that you can differentiate us and easily identify us at night.

WHAT DO I NEED TO REMEMBER IF I FEEL NERVOUS BEFORE DRINKING AYAHUASCA?

It is normal for some people to feel nervous or even excited prior to sitting in Ceremony. You are about to embark on the journey of a lifetime. It is important to remember that you are cared for and held in the arms of this sacred medicine, which many call Mother Ayahuasca or Grandmother.

*As stated in the channeled Ayahuasca Manifesto:

Another very effective method used to sabotage my mission with the Human species is by generating

and manipulating the powerful emotion of fear. You have nothing to fear. I am not the cause of any deaths, I just channel Light and vital energy through your secret meridians. Any accusation or allegation of danger, permanent injury or death should be thoroughly investigated to allow science itself grant me the Human absolution. It should be expected that my enemies manipulate the facts to instill fear at any available opportunity, as this is part of their debasing agenda against my global expansion. It should be the objective of all my supporters to gradually obtain the social and legal acceptance of my sacrament as alternative medicine until I become officially accepted by the governments of modern society.

Physical Discomfort and Nausea– It is not really amusing to live this stage of the experience with my medicine. In this aspect it is unique and totally contrary to all other substances that authorities control to avoid social problems. With this inherent protection, rejection is ensured by most of the population including the recreational seekers or recreational travelers. This also disqualifies me with potential drug addicts or existing addicts who only seek pleasure to escape their pain. Because of this aspect of strong physical discomfort, nausea and the possibility of severe vomiting, the authorities must understand it is unlikely that its use will become popular and escalate into a social problem.

IS AYAHUASCA LEGAL?

Ayahuasca is legal in the United States of America. In 2006, the use of Ayahuasca was approved for religious use in a Supreme Court ruling. Both the caapi vine and chakruna leaves are legal. Currently, it is the DMT component that is questioned. However, as Iowaska Church of Healing, Ayahuasca is our Sacrament and protected under our rights to seek healing as spiritual beings utilizing a natural, indigenous plant-medicine from Mother Earth.

Church Membership

QUALIFICATIONS & REQUIREMENTS FOR MEMBERSHIP WITH IOWASKA CHURCH OF HEALING

Iowaska Church welcomes all individuals to become members irrespective of age, race, color, creed, national origin, cultural background, ethnicity, religion, sex, sexual orientation, gender expression or any other discriminating factors. Membership is available to all beings who approach Iowaska Church with the sincere intention to become a part of a spiritually directed community in which all members live by a code of love, unity, integrity and respect for all living things.

Membership is open to those who are sincerely seeking a deeper relationship with Self, with Spirituality and with the living Spirit of Mother Earth. The aforementioned sincerity of character and the willingness to live through one's Higher Self should be self-evident as witnessed by all Church members, Officers, Elders and Spiritual Leaders. This sincerity in character should be self-evident in all actions, words, thoughts and intentions presented by an individual to the Church.

Iowaska Church leaders and board members reserve the right to assess, discuss, vote and if necessary terminate the membership and involvement of any individual who disregards Church Doctrine and the Universal Laws of respect, integrity, harmony, love and light.

Membership is open to those who are willing to harmoniously contribute to a safe environment in which people from all walks of life will be collectively gathered in an effort to seek a greater understanding of themselves, the world around them and to access multi-dimensional healing.

Prospective members must sign, complete and return any and all relevant membership applications and paperwork to be reviewed and approved by designated Church staff.

Prospective members must pay one-time membership fee of $60. Youth under 18 years-of-age who cannot afford membership fee may apply to be considered in the Church Volunteer Program. Retired individuals over 60 years-of-age may have their membership fee waived in exchange for a monetary donation of their choosing.

Church membership does not qualify an individual to have access to sacred medicinal ceremonies in which one would partake in the Sacrament of Ayahuasca. To partake in the Sacrament of Ayahuasca, an individual must be a Church member in good standing, at least 18 years-of-age or older and must successfully pass all pre-qualification requirements as set forth by the Church rules and regulations.

(Include Membership application PDF)

Please download and submit the completed form to info@iowaskachurch.com. We will review and be in touch! Membership fee of $60 can be paid via PayPal to info@iowaskachurch.com or direct link www.paypal.me/iowaska

Legality

Our Church has applied for tax-exempt status under Section 501(c)(3) of the Internal Revenue Code, and is working with the U.S. Department of Justice, Drug Enforcement Administration, as well as state authorities to ensure our compliance with all laws affecting the sacramental use of Ayahuasca.

The United States Supreme Court has expressly recognized the sacramental use of Ayahusca in religious ceremonies.   In its 2006 decision styled Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, the Supreme Court addressed the use of Ayahuasca during religious ceremonies and held that the government had impermissibly burdened the church members' exercise of their religion when it

confiscated an Ayahuasca shipment being delivered to the church.    Like our Church, the members of Uniao do Vegetal church ("UDV") received the sacrament of Ayahuasca in the form of tea containing Dimethyltryptamine, or DMT. The government argued that because DMT is a Schedule I drug under the federal Controlled Substances Act, its religious use was banned under that statute.    The government conceded that the sacramental use of Ayahuasca by the UDV church members was a sincere exercise of religion, but argued that the Controlled Substances Act provided no exception for its usage.

In successfully arguing for a religious exemption from the Controlled Substances Act, the UDV church relied upon the provisions of the Religious Freedom Restoration Act of 1993 ("RFRA"), set forth at 42 U.S.C. §§2000bb et seq. Under the RFRA, the government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless the government can demonstrate that the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling interest.    Under the RFRA, a person whose religious exercise has been burdened in violation of the statute is authorized to seek judicial relief from the government's actions.    In ruling in favor of the UDV church and its sacramental use of Ayahuasca, the Supreme Court noted that the government's actions in disrupting the church's use of Ayahuasca was a "substantial burden" upon its members' exercise of their religious beliefs, and that the government failed to meet its burden to demonstrate that its actions furthered a compelling interest, or that they did so using the least restrictive means.

At Iowaska Church of Healing, our members believe the Earth-given Ayahuasca to be a sacred sacrament central to our spiritual practices and growth. The First Amendment guarantees our rights to practice our spiritual faith.

Indigenous peoples and Native Americans have been utilizing the natural elements from our Earth to practice their spirituality. At Iowaska Church of Healing, we honor and abide by the natives' core belief that what grows from the Earth is here for our personal and spiritual learning.

More information coming soon.

Pricing

CEREMONY PRICING

Iowaska Church of Healing offers various Ceremony options for members to choose from, based on their personal needs.

All Ceremonies are held outdoors utilizing the great spirit of Mother Earth and the many elements that support us during our sacred healing journeys. During extreme weather, Ceremonies will be held in our peaceful, indoor medicine temple.

Large Group Ceremonies (10-15 people) are ideal for all individuals, especially those who are experiencing this modality of healing for the first time. The collective energy of the group plays an integral part in the inner workings of this sacred medicine and the shared healing of each person. It is a complex and beautiful web of energy that serves everyone's learning experience like branches of a tree connected to the same trunk and roots. Many members come away with beautiful, new connections and friendships through this process of individual healing within a safe group container.

Large Group Ceremony Weekend Retreat includes:

Three Ayahuasca Healing Ceremonies

Two Group Integration Sessions

Group Guided Meditation

Group Yoga or Qigong

Healthy meals (Ayahausca diet approved)

Access to supplemental healing modalities (see "Healing Services" under "About Us" section)

Access to sacred land and amenities

Pricing: $ Coming Soon

Small Group Ceremonies (3-10 people) provide a more intimate environment in which members can still benefit from a collective healing presence, but have access to more individualized attention from our Healers and Facilitators. This individualized devotion can be a catalyst for great releases, breakthroughs and liberation.

Small Group Ceremony Weekend Retreat includes:

Three Ayahuasca Healing Ceremonies

Two Group Integration Sessions

Group Guided Meditation

Group Yoga or Qigong

Healthy meals (Ayahausca diet approved)

Access to supplemental healing modalities (see "Healing Services" under "About Us" section)

Access to sacred land and amenities

Pricing: $ Coming Soon

Private Ceremonies (1 person) are a powerful option for those looking to work deeper with this sacred medicine and experience profound transformation. Those seeking a one-on-one experience will have full attention from our Healers while being guided from beginning to end on a transformative, therapeutic journey. Individualized healing work will take place in order to facilitate the movement and release of energy, allowing for powerful shifts in the emotional, spiritual, physical and energetic bodies. Our Healers will see what you see, go where you go, and provide flow, help and relief when it is needed at pivotal points during your Ayahuasca process. Private Ceremonies are not recommended for first-time participants.

Private Ceremonies are only offered as an add-on option during Small Group Ceremony Weekend Retreats and there are limited spots available, so please book in advance. Private Ceremonies during Small Group weekends include:

One Private Ayahuasca Healing Ceremony

Two private, one-on-one Integration Sessions

Group Guided Meditation

Group Yoga or Qigong

Healthy meals (Ayahausca diet approved)

Access to supplemental healing modalities (see "Healing Services" under "About Us" section)

Access to sacred land and amenities

Pricing: $ Coming Soon

Accommodations

ACCOMMODATION PRICING

All Private and Group Lodging options offer comfortable beds in an indoor, safe, temperature controlled environment. Group Lodging offers comfortable bunk beds and host up to six guests. Blankets, pillows and towels are provided. Ample indoor, private bathrooms and showers are available.

Members will have the opportunity to identify which accommodations they prefer when signing up for a Healing Ceremony.

More details coming soon!

Combined Male/Female Group Lodging

Female-only Group Lodging

Male-only Group Lodging

Private Lodging/Twin-size Bed (1-2 people)

Private Lodging/Full-size Bed (1-2 people)

Private Lodging/King-size Suite (1-3 people)

Calendar

COMING SOON

Large Group Ceremony retreats are offered the first two weekends of each month and last from Friday evening to Sunday afternoon.

Small Group Ceremony retreats and Private Ceremony options are offered the third weekend of each month and last from Friday evening to Sunday afternoon.

Please plan to arrive at the Church no later than 4pm on Friday.

Please plan and book in advance – available slots fill up quickly. We look forward to seeing you!

Cancellation Policy

Spots are limited, so we ask that you book with integrity and commit to Yourself and to the Medicine.

We encourage the conscious mindset of realizing that your journey begins the moment you reserve your space.

Cancelling your reservation means another individual may miss out on the opportunity to experience healing. Please honor the integrity of the Church, the Staff, the Members and the space we strive to create for all.

If you need to cancel 60 days or more prior to scheduled Ceremony, you will receive a full refund. In this case, please send an email to us clearly stating that you wish to cancel.

If you need to cancel 30 days prior to scheduled Ceremony, you will receive 50% of the cost of entire booking and the remainder is forfeited. In this case, please send an email to us clearly stating that you wish to cancel.

Participants assume full responsibility for arriving on time and being prepared before Ceremony begins.

This means we cannot refund due to illness, flight cancellations or delays, late arrivals or early departures.

Please consider purchasing travel insurance from your airline.

Our Cancellation Policy is clearly stated and will be provided with registration paperwork as well.

Acceptance of these terms is required prior to reserving your space.

By registering for a Ceremony, an individual testifies that they are a member of our Church, they are over the age of eighteen, they pass all medical requirements, have reviewed our cancellation policy and agree to accept the terms indicated.

*In the rare event that Iowaska Church of Healing needs to cancel a Ceremony or Ceremonies due to natural disaster, weather, political climate or other related, unforeseen circumstances, we can guarantee a partial refund. We do not anticipate ever having to cancel any Ceremonies.

However, to cover any unknown factors, we highly recommend participants purchase travel insurance.

Thank you for honoring our policies.    We look forward to meeting you soon!

Contact

For questions, further information, or to book your Healing Ceremony Retreat, please contact us using one of the methods below.

515-333-1210

info@iowaskachurch.com

Map & Directions

We are currently and actively searching for Iowa acreage in which we can construct our Church foundation and buildings. We would like to open our doors in 2019 so that we can spread the healing power of our sacred modalities as soon as possible.

Please visit our GoFundMe page and help make our mission possible by donating from your heart. Your donation will be tax deductible before the end of the year. Your gift will help many souls have access to hope and healing:

http://www.gofundme.com/iowaska-church-of-healing

We manifest and intend that our Church will be set back on multiple acres of beautiful, untouched land. The spirit of Mother Nature will be alive all around us, offering a peaceful womb of comfort as we journey together to a place of deeper understanding, love and healing. The spirit of the Natives who once blessed the lands of Iowa can be felt in the trees, the grass, the water and the sky around us. This is sacred land offering peace and respite to those who seek connection with the beauty around them.

 We will be conveniently located in proximity to Des Moines International Airport. Transportation to and from the airport can be easily arranged via Uber, Lyft, Taxi, or any similar option. If those are not suitable options for you, please contact us and we can arrange private transportation for an additional fee.

Please view the map below (coming soon!) to familiarize yourself with our location.

Get in touch and we'll get back to you as soon as we can.    We look forward to hearing from you!



FLORIDA DEPARTMENT OF STATE
Division of Corporations

March 30, 2019

WILLIAM A. BOATWRIGHT, ATTORNEY
DAVIS BROWN LAW FIRM
215 - 10TH STREET, SUITE 1300
DES MOINES, IA 50309

Having fulfilled the requirements of section 607.1503 or 617.1503, Florida Statutes, on March 19, 2019, this Certificate of Authority is hereby issued to IOWASKA CHURCH OF HEALING, INC., an Iowa corporation, in accordance with said statute and assigned document number F19000001542. Please refer to this number whenever corresponding with this office.

Your corporation is now authorized to transact business in Florida as of the file date.

Enclosed is the certification you requested.

To maintain "active" status with the Division of Corporations, an annual report must be filed yearly between January 1st and May 1st beginning in the year following the file date or effective date indicated above.

A Federal Employer Identification Number (FEI/EIN) will be required when this report is filed. Apply today with the IRS online at:

https://sa.www4.irs.gov/modiein/individual/index.jsp

Please notify this office if the corporate address changes.

Should you have any questions regarding this matter, please contact this office at (850) 245-6842.

Deborah Bruce
Corporate Records Supervisor II
Mail/Scan/Validation Section
Division of Corporations                    Letter Number: 719A00006329

APP. 0205



# State of Florida

## Department of State

I certify from the records of this office that IOWASKA CHURCH OF HEALING, INC., is a corporation organized under the laws of Iowa, authorized to transact business in the State of Florida, qualified on March 19, 2019.

The document number of this corporation is F19000001542.

I further certify that said corporation has paid all fees due this office through December 31, 2019, and its status is active.

I further certify that said corporation has not filed a Certificate of Withdrawal.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Thirtieth day of March, 2019

*Laurel M. Lee*

Secretary of State

CR2E022 (01-11)

## Boatwright, William A.

| | |
|---|---|
| **From:** | Boblenz, Sarah C. <Sarah.C.Boblenz@usdoj.gov> |
| **Sent:** | Wednesday, July 17, 2019 7:27 AM |
| **To:** | Boatwright, William A. |
| **Subject:** | RE: [Ext] RE: Iowaska Church of Healing – Application for Exception to CFR |

Hi Bill,

I recently transferred to the Policy section at DEA HQS in Arlington, VA and this is the section that is working on the request. It is still in progress. One of my colleagues is working on a response that will need to be approved by our front office. We have several RFRA requests along with many other policy questions so the response might still take some time. Feel free to keep checking in.

Kind regards,
Sarah Boblenz

**From:** Boatwright, William A. [mailto:BillBoatwright@davisbrownlaw.com]
**Sent:** Thursday, June 27, 2019 5:59 PM
**To:** Boblenz, Sarah C.
**Subject:** RE: [Ext] RE: Iowaska Church of Healing – Application for Exception to CFR

Hi Sarah,

It's now been four months since we submitted the request for a religious exemption from the Controlled Substances Act with the DEA Diversion Control Division in Virginia, and we haven't received any response to date. Should we have received some kind of filing acknowledgment or other response by now, and is there any further action we should take at this point? The IRS exemption application was filed nearly 6 months ago, so we should be hearing back from them in the near future.

Thanks for your help,

Bill

**From:** Boblenz, Sarah C. <Sarah.C.Boblenz@usdoj.gov>
**Sent:** Tuesday, February 26, 2019 1:35 PM
**To:** Boatwright, William A. <BillBoatwright@davisbrownlaw.com>
**Subject:** [Ext] RE: Iowaska Church of Healing - Application for Exception to CFR

Hi Bill,

There are several offices in Florida, so the best contact would be the Diversion Program Manager in Miami, she is in charge of the entire state.

Her contact information is below:

Susan Langston
Diversion Program Manager
DEA Miami Division
2100 North Commerce Parkway

1

Miami, Florida 33326

Kind regards,
Sarah Boblenz

**From:** Boatwright, William A. <BillBoatwright@davisbrownlaw.com>
**Sent:** Tuesday, February 26, 2019 1:26 PM
**To:** Boblenz, Sarah C. <scboblenz@dea.usdoj.gov>
**Subject:** Re: Iowaska Church of Healing - Application for Exception to CFR

Hi Sarah,

I'm nearly ready to send the DEA a request for exception to the CFR provisions requiring registration.  My client is now planning to first look for property in Florida to get started, and I was wondering if you know the name/address of your counterpart in Florida so that I can copy him or her on the DEA filing package.  Please let me know if you have this information. We're in the process of registering the Iowa nonprofit corporation to do business in Florida, and I expect we'll get that submitted sometime next week.

Thanks for your help,

Bill

The Davis Brown Law Firm is committed to providing Exceptional Client Service. For a review of the supporting principles, go to www.davisbrownlaw.com/exceptional.

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply E-mail and destroy all copies of the original message.
HEALTHCARE PRIVACY STATEMENT: This message may contain protected health information that is strictly confidential. If you have received this email, you are required to maintain the security and confidentiality of the information and may not disclose it without written consent from the patient or as otherwise permitted by law. Unauthorized disclosure may be subject to federal and state penalties.

APP. 0208



**William A. Boatwright**
BillBoatwright@davisbrownlaw.com
phone: 515-246-7804
Des Moines Office

October 4, 2019

**FILE COPY**

_**VIA COURIER**_

Internal Revenue Service
Exempt Organizations
550 Main Street
Cincinnati, OH 45202
ATT: Diane Gentry
          Room 6403
          Group 7821

> Re:    *Iowaska Church of Healing – Form 1023*
>           *FEIN: 83-2192122*

Dear Ms. Gentry:

We are forwarding Iowaska Church of Healing's (the "Organization") response to your letter and second Information Request dated September 10, 2019, a copy of which is attached. The Organization's responses to your inquiries are provided in the same order in which they appear in the Information Request.

I believe that the Organization has fully responded to the second Information Request, but if you need any further information in order to issue the Determination Letter, please contact me. My direct dial number is (515) 246-7804.

Thank you for your assistance.

Very truly yours,

DAVIS, BROWN, KOEHN, SHORS & ROBERTS, P.C.

William A. Boatwright

WAB:tlk
Enclosures

cc:     Dado Kantarevic, President

#3111009
DAVIS BROWN KOEHN SHORS & ROBERTS P.C.

PHONE 515.288.2500        THE DAVIS BROWN TOWER, 215 10ᵀᴴ ST., STE. 1300, DES MOINES, IA 50309
FIRM FAX 515.243.0654     THE HIGHLAND BUILDING, 4201 WESTOWN PKWY., STE. 300, WEST DES MOINES, IA 50266
WWW.DAVISBROWNLAW.COM     THE AMES OFFICE, 2605 NORTHRIDGE PKWY., AMES, IA 50010
                          THE EMMETSBURG OFFICE, 3004 MAIN ST., P.O. BOX 314, EMMETSBURG, IA 50536



**Department of the Treasury**
**Internal Revenue Service**
**Tax Exempt and Government Entities**
PO Box 2508
Cincinnati, OH 45201

IOWASKA CHURCH OF HEALING
C/O WILLIAM A. BOATWRIGHT
DAVIS BROWN LAW FIRM
215 10TH ST SUITE 1300
DES MOINES, IA 50309

Date:
  September 10, 2019
Employer ID number:
  83-2192122
Person to contact / ID number:
  Diane Gentry
  ID# 0203080
Contact telephone number:
  513-975-6278
Contact fax number:
  855-775-7261
Response due date:
  October 9, 2019

Dear Applicant:

**Why you are receiving this letter**
We need more information to consider your determination letter request.

**What you must do**
Please provide the information requested and follow the submission instructions. You must submit your response by the due date above.

**If you don't respond**
If you don't respond to the Information Request by the due date, or don't provide all the requested information, we may close your case without making a determination. If so, we won't refund any user fee you paid, and you'll need to submit a new request and any applicable user fee payment if you want us to reconsider your request. Alternatively, if you haven't established that you meet the requirements for exemption for the subsection requested, we may make an adverse determination.

In addition, if you don't provide the requested information by the due date, you may lose your rights to get a declaratory judgment. Under Internal Revenue Code (IRC) Section 7428(b)(2), you must exhaust all administrative remedies available to you within the IRS before a court will issue a declaratory judgment about your exempt status. This requirement means you must take all reasonable steps in a timely manner to secure a determination under IRS procedures, including providing the information we need to act on your request. If you fail to timely provide the requested information, you may lose your rights to obtain a declaratory judgment under Section 7428.

**Additional information**

Letter 1312 (Rev. 4-2017)
Catalog Number 35163W

2

IOWASKA CHURCH OF HEALING
83-2192122

If you have questions or need additional time to respond, call me at the number at the top of this letter. If you have concerns after speaking with me, you can call my supervisor Kevin Payton at 513-975-6531.

The Taxpayer Advocate Service (TAS) is an independent organization within the IRS that can help protect your taxpayer rights. TAS can offer you help if your tax problem is causing a hardship or you've tried but haven't been able to resolve your problem with the IRS. If you qualify for TAS assistance, which is always free, TAS will do everything possible to help you. Visit taxpayeradvocate.irs.gov or call 1-877-777-4778.

Sincerely,

*Diane Gentry*

Diane Gentry
Exempt Organizations Specialist

Enclosure:
Information Request

**Letter 1312 (Rev. 4-2017)**
Catalog Number 35163W

3

IOWASKA CHURCH OF HEALING
83-2192122

**Information Request**
**Second Request**

**Information we need to make our determination**

Include the following declaration with your response, signed and dated by an officer, director, trustee, or other governing body member (not an authorized representative). You can sign and date the statement below or reproduce it in the body of your signed response. The declaration must accompany responses per Revenue Procedure 2019-5 (updated annually).

*Under penalties of perjury, I declare that I have examined this information, including accompanying documents, and, to the best of my knowledge and belief, the information contains all the relevant facts relating to the request for the information, and such facts are true, correct, and complete.*

1.  We were unable to access your website, has the website address changed? Please provide the current address.

2.  Your response dated July 25, 2019, stated in paragraph #14 that you submitted your request for religious exemption from registration under the Controlled Substances Act to the DEA Diversion Control Division on February 28, 2019.  Please submit a complete copy of this application and all subsequent correspondence related to the application.

3.  If the religious exemption is not approved by DEA Diversion Control, then what are your plans?

4.  Was ayahuasca tea used at the five retreats that were already held in May, June and July of 2019? If so, how were the retreats legal under federal and/or state law considering that you had not yet received your exemption?

5.  What is the significance of state law as it relates to the use of tea, since the exemption is granted at the federal level?

6.  Please provide the date that you received each of the 20 membership applications as well as the state of residence of each member.

7.  Do any of the 20 members NOT regularly participate in the ceremonies?

8.  How do you determine whether a member is 'ready' to participate in the ceremonies using the tea? Page 6 of your statement attached to Form 1023 stated that members will undergo thorough medical and psychological evaluation prior to a ceremony.  Explain in detail, including whether members personally meet with health professionals and the credentials of any such professionals.

**Letter 1312 (Rev. 4-2017)**
Catalog Number 35163W

4

IOWASKA CHURCH OF HEALING
83-2192122

9.   Which Healers conducted the retreats that have been held to date?

10.   Why were the fees waived for the various participants in the weekend retreats? Explain for each retreat separately.

11.   Can non-members participate in the ceremonies using the tea?

12.   Are the various therapies/healing modalities listed in your Form 1023 provided only to members? Is there a fee charged for any of the services? If so, please provide a fee schedule.

**How to submit the requested information (do's and don'ts)**

- **Don't include** any personal identifying information like bank account or social security numbers that could result in identity theft or other adverse consequences if publicly disclosed. If we approve your application for exemption, we're generally required by law to make the application and the information you submit in response to this letter available for public inspection. If you have questions about the public inspection of your request or other documents, please call me.

- **Do include** the following declaration with your response, signed by one of your principal officers or directors:

   **Under penalties of perjury, I declare that I have examined this request, or this modification to the request, including accompanying documents, and to the best of my knowledge and belief, the request or modification contains all the relevant facts relating to the request, and such facts are true, correct, and complete.**

- **Do attach** a copy of the cover letter to your response. This enables us to quickly and accurately associate your response with your case file.

- **Do fax or mail** your response to:

| **Fax:** | **US Mail:** | **Street Address (delivery service):** |
|---|---|---|
| 855-775-7261 | Internal Revenue Service | Internal Revenue Service |
| ATT: Diane Gentry | Exempt Organizations | Exempt Organizations |

**Letter 1312 (Rev. 4-2017)**
Catalog Number 35163W

5

IOWASKA CHURCH OF HEALING
83-2192122

| Room 6403 | P. O. Box 2508 | 550 Main Street |
| Group 7821 | Cincinnati, OH 45201 | Cincinnati, OH 45202 |
|  | ATT: Diane Gentry | ATT: Diane Gentry |
|  | Room 6403 | Room 6403 |
|  | Group 7821 | Group 7821 |

- **Don't provide** multiple copies of your response. Providing more than a single response may result in unnecessary delays in processing your response. We must process, assign, and review each piece of correspondence submitted (whether fax or mail).

- **Do allow** adequate processing time if you want to call to verify we received your response. If you fax your response, allow a minimum of three workdays from the day you fax it. If you mail your response, allow a minimum of seven workdays from the day you mail it.

**IOWASKA CHURCH OF HEALING**
**FEIN: 83-2192122**

**RESPONSE TO SECOND INFORMATION REQUEST DATED SEPTEMBER 10, 2019**

1. *We were unable to access your website, has the website address changed?  Please provide the current address.*

Yes, the organization's website address has changed and the site has been updated.  The new website address is www.iowaskachurchofhealing.com.

2. *Your response dated July 25, 2019, stated in paragraph #14 that you submitted your request for religious exemption from registration under the Controlled Substances Act to the DEA Diversion Control Division on February 28, 2019.  Please submit a complete copy of this application and all subsequent correspondence related to the application.*

The organization filed its application with the DEA Diversion Control Division in Springfield, Virginia on February 28, 2019, and a copy of the application, sans the complete Form 1023 enclosure, is attached.   Copies of e-mail correspondence to and from the organization's legal counsel and DEA personnel are also enclosed.   These include email correspondence with DEA offices located in Des Moines, Iowa, Miami, Florida, and Arlington, Virginia.   The organization has received no other correspondence from the DEA since the application's submission.

3. *If the religious exemption is not approved by DEA Diversion Control, then what are your plans?*

Given the weight of legal authority in support of the organization's qualification for religious exemption, the organization will pursue all administrative appeals within DEA if the application is initially denied.  If necessary, the organization is also prepared to seek judicial relief under the Religious Freedom Restoration Act of 1993 ("RFRA"), set forth in 42 U.S.C. §§ 2000bb *et seq.*, likely in the form of a Declaratory Judgment action requesting that the court order the DEA to issue the exemption.

4. *Was ayahuasca tea used at the five retreats that were already held in May, June and July of 2019?  If so, how were the retreats legal under federal and/or state law considering that you had not yet received your exemption?*

Yes, the Sacrament of Ayahuasca was used during each of the five weekend ceremonies. As discussed in the organization's original exemption application, the United States Supreme Court expressly recognized the sacramental use of Ayahuasca as a sincere exercise of religion

#3111022

under the First Amendment in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418 (2006). Importantly, the government acknowledged this fact and did not contest the validity of the plaintiff's religious use of the substance. In its ruling, the Supreme Court relied upon the federal RFRA and found that the government's argument that the Controlled Substances Act provided no religious exception for the sacramental use of Ayahuasca was incorrect. In the instant case, the organization's use of Ayahuasca enjoys these same protections under federal law.

Florida has a state-level version of the RFRA, which is codified at Florida Statutes §§761.01 - 761.061. Like the RFRA, Florida's law provides that government should not substantially burden the free exercise of religion absent a compelling governmental interest for doing so, and that when it does it should be done using the least restrictive means.

As the *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal* holding makes clear, it is not necessary for a church to first apply for and secure a religious exemption from the Controlled Substances Act before enforcing its religious freedom rights in the courts. As stated in the organization's response to the government's initial Information Request, this fact was central to a Native American Church's successful challenge to a "ripeness" argument made by the government in *Oklevueha Native American Church v. Holder*, 676 F.3d 829 (9th Cir. 2012). In addressing the government's argument that the plaintiff church had erred by failing to first apply for a religious exemption from the federal Controlled Substances Act ("CSA") before seeking judicial relief, the 9th Circuit Court of Appeals stated that:

> Likewise, we are unpersuaded by the Government's assertion that Plaintiffs' request for prospective relief is unripe because Plaintiffs did not request an exception to the CSA from the DEA ... [t]he Government argues that we should require Plaintiffs to exhaust this administrative remedy, because doing so would allow the DEA to apply its expertise to Plaintiffs' claim, possibly moot the case if the claim is granted, and help build a record for judicial review.
>
> We decline, however, to read an exhaustion requirement into the RFRA where the statute contains no such condition, see 42 U.S.C. §§ 2000bb - 2000bb-4, and the Supreme Court has not imposed one. Indeed, the Supreme Court has reviewed a RFRA-based challenge to the CSA without requiring that the plaintiffs first seek a religious use exemption from the DEA. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal (citations omitted).* In doing so, it recognized that RFRA "plainly contemplates that *courts* would recognize exceptions [to the CSA] - that is how the law works."

*Oklevueha Native American Church*, 676 F.3d at 838.

Unlike Florida, Iowa has no state-level version of the federal RFRA. As a result, the organization has conducted no ceremonies in Iowa in an abundance of caution.

2

5. *What is the significance of state law as it relates to the use of tea, since the exemption is granted at the federal level?*

Securing the federal exemption from the DEA will offer the organization protection against any charges relating to the federal Controlled Substances Act. The protections offered under the RFRA, however, apply only to federal laws, whether statutory or otherwise, and do not extend to state laws governing controlled substances.

The organization is confident that its activities are legal in those states that have adopted a state-level version of the RFRA, including Florida. Additional confidence will be secured when the DEA religious exemption is received and presented to state authorities.

6. *Please provide the date that you received each of the 20 membership applications as well as the state of residence of each member.*

Formal, written Membership Application forms were received from the organization's members on the following dates, and before each member was allowed to participate in the organization's ceremonies:

March 19, 2019: Two Membership Applications were received, and both were from California residents.

March 22, 2019: Five Membership Applications were received, four of which were submitted by Iowa residents and the fifth from a Connecticut resident.

April 13, 2019: One Membership Application was received from a California resident.

April 17, 2019: One Membership Application was received from a New Hampshire resident.

May 1, 2019: One Membership Application was received from a Florida resident.

May 20, 2019: Three Membership Applications were received from residents of Sweden.

May 30, 2019: One Membership Application was received from a Florida resident.

June 4, 2019: One Membership Application was received from a California resident.

June 13, 2019: One Membership Application was received from an Iowa resident.

June 14, 2019: One Membership Application was received from a New Hampshire resident.

July 16, 2019: One Membership Application was received from a resident of Columbia.

July 23, 2019: One Membership Application was received from a Virginia resident.

APP. 0217

August 3, 2019: One Membership Application was received from an Iowa resident.

August 4, 2019: One Membership Application was received from a Georgia resident.

7. *Do any of the 20 members NOT regularly participate in the ceremonies?*

Members do not participate in person on a weekly or other scheduled basis, but remain in frequent contact with the organization's Healers through telephone and email support. These mediums are used to help guide members through their daily struggles both before and after they attend and participate in ceremonies. Many of the organization's members live in different states and several in foreign countries, so regular in-person attendance is simply not practical or affordable.

8. *How do you determine whether a member is 'ready' to participate in the ceremonies using the tea? Page 6 of your statement attached to Form 1023 stated that members will undergo thorough medical and psychological evaluations prior to a ceremony. Explain, in detail, including whether members personally meet with health professionals and the credentials of any such professionals.*

At the time a member joins the Church, he or she is given a copy of the *Rules and Regulations for Participating in the Sacrament of Ayahuasca,* a copy of which was enclosed with the organization's original Form 1023 submission. These set forth explicit instructions and precautions an individual must follow prior to receiving the Sacrament of Ayahuasca, including restrictions related to diet, alcohol usage, prescription drugs and psychological conditions, among others. Once a member arrives for weekend ceremonies, he or she is interviewed to make sure that the rules and regulations have been followed, and is required to complete a medical history/condition worksheet. This is the organization's first check to ensure that an individual is physically and emotionally ready to receive the sacrament.

After the member is deemed to be prepared to receive the sacrament, he or she is given the Ayahuasca tea after the traditional rituals and prayers have been performed. Once the member has consumed the tea, he or she is carefully monitored by one of the Healers, who continually examines the member's appearance, posture, physical movements and overall behavior. After they have consumed the tea, members are still able to talk and discuss their spiritual journey with a Healer in a coherent fashion. As such, a member is able to convey to the Healer if he or she is experiencing any discomfort, and the Healer can then assist the member in becoming more comfortable.

As noted in the organization's original Form 1023, the organization intends to have medical professionals present during each of its ceremonies, and to conduct drug testing beforehand. The organization does not presently have the means to do so, but will implement these safety precautions in time as membership grows and funds become available. During two of the ceremonies held in July, however, a licensed Doctor of Chiropractic was on hand solely to

4

observe the participating members and to offer medical assistance if needed. The doctor did not consume any of the sacramental tea or otherwise participate in the ceremonies. The organization hopes to maintain a business relationship with this doctor for these services during future ceremonies.

9. *Which Healers conducted the retreats that have been held to date?*

Dado Kantarevic and Victoria Chetta conducted all of the sacramental ceremonies and other retreat activities to date.

10. *Why were the fees waived for the various participants in the weekend retreats? Explain for each retreat separately.*

In every case, fees were waived or reduced as a result of the member's inability to pay the organization's scheduled fees. The organization welcomes anyone who seeks spiritual healing, regardless of his or her financial means. Those whose fees were waived or reduced assisted the organization by cleaning the organization's facilities, assisting with laundry, vacuuming and performing other custodial tasks that the organization's personnel would have otherwise had to perform themselves.

As noted in the organization's original Form 1023 submission and its response to the government's initial Information Request, the organization will allow veterans of the Armed Services to participate in its sacramental ceremonies at reduced or no cost. The organization has extended invitations through the Wounded Warriors organization and one veteran initially accepted an invitation to participate in ceremonies held during a July weekend at no charge. He later cancelled, however, due to a scheduling conflict. The organization will continue to collaborate with Wounded Warriors and other veterans organizations in order to offer healing to those affected by Post-Traumatic Stress Disorder and other conditions that are prevalent with combat veterans.

Finally, retired individuals over the age of 60 are also eligible to have their membership fees waived, but are encouraged to make a donation in an amount of their choice.

11. *Can non-members participate in the ceremonies using the tea?*

No.

12. *Are the various therapies/healing modalities listed in your Form 1023 provided only to members? Is there a fee charged for any of these services? If so, please provide a fee schedule.*

Yes, the additional therapies are provided only to the organization's members and for no additional charge.

APP. 0219

Under penalties of perjury, I declare that I have examined this request, or this modification to the request, including accompanying documents, and to the best of my knowledge and belief, the request or modification contains all the relevant facts relating to the request, and such facts are true, correct and complete.

Dado Kantarevic, President

6



**DAVIS BROWN**
LAW FIRM

**William A. Boatwright**
BillBoatwright@davisbrownlaw.com
phone: 515-246-7804
Des Moines Office

February 28, 2019

# FILE COPY

*VIA CERTIFIED MAIL*

DEA Diversion Control Division
Attn: Liaison and Policy Section
8701 Morrissette Dr.
Springfield, VA 22152

Re:   *Iowaska Church of Healing - Request for Religious Exception to C.F.R.*

Dear Sir or Madam:

This firm represents Iowaska Church of Healing, an Iowa non-profit corporation that was established on September 24, 2018 (the "Church"). The Church is hereby requesting an exception to the application of the Code of Federal Regulations ("C.F.R.") Title 21, Chapter II, § 1301 *et seq.* pursuant to 21 C.F.R. § 1307.03. The Church is not yet fully operational, but is preparing to offer religious services that will provide the Sacrament of Ayahuasca in tea form to its members. Ayahuasca contains Dimethyltryptamine ("DMT"), which is a Schedule I drug under the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* In the following paragraphs, the Church's history and qualification for the requested exceptions will be discussed in detail.

## ORGANIZATION OF THE CHURCH

The Church was formally organized on September 24, 2018, when its Articles of Incorporation were filed with the Iowa Secretary of State. The Church is classified as a "religious corporation" under Iowa Code § 504.141(38). Copies of the Church's Articles of Incorporation and Bylaws are enclosed, and were included as part of the Church's Form 1023, *Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code,* which was filed with the Internal Revenue Service on January 10, 2019. A complete copy of IRS Form 1023 is enclosed. The Church anticipates that it will take a number of months to receive its § 501(c)(3) Determination Letter, and will submit a copy of it to your office once it has been received.

As noted in the Statement attached to the Church's Form 1023 (the "Statement"), the Church's mission is to inspire individuals to seek and embrace authentic, self-realized healing of the mind, body and spirit through the use of the sacred, indigenous plant-medicine of Ayahuasca. In pursuing this mission, the Church will conduct regular worship services for its members, offer educational and mission-based programming to its members and the general public, and perform

#3043285
DAVIS BROWN KOEHN SHORS & ROBERTS P.C.

PHONE 515.288.2500
FIRM FAX 515.243.0654
WWW.DAVISBROWNLAW.COM

THE DAVIS BROWN TOWER, 215 10ᵀᴴ ST., STE. 1300, DES MOINES, IA 50309
THE HIGHLAND BUILDING, 4201 WESTOWN PKWY., STE. 300, WEST DES MOINES, IA 50266
THE AMES OFFICE, 2605 NORTHRIDGE PKWY., AMES, IA 50010
THE EMMETSBURG OFFICE, 3004 MAIN ST., P.O. BOX 314, EMMETSBURG, IA 50536

outreach services designed to provide relief to veterans of the United States Armed Forces. The Church's activities are described in detail throughout the Statement.

The Church's doctrine is derived primarily from the Ayahuasca Manifesto, a copy of which is enclosed. The Manifesto describes the sacrament's role with human beings, its purpose and the expansion of consciousness. It also sets forth detailed instructions with regard to proper dietary preparations for receiving the sacrament, the format of the Church's ritual ceremonies and prayers, and the various uses and benefits of Ayahuasca. The Church's ideology and teachings are also embodied in its *Universal Laws of Respect, Mission, Vision and Value Statements*, a copy of which is also enclosed. The Church's doctrine is based upon teachings and rituals that have been performed for hundreds of years in the Amazon Rainforest.

The requirements for membership in the Church are detailed on pages 4 - 5 of the Statement. Although membership is open to anyone who approaches the Church with the sincere intention to join its spiritual community and is willing to conform his or her life to its teachings, no one under the age of 18 will be allowed to partake in the Sacrament of Ayahuasca. The Church has adopted and imposes strict *Rules & Regulations for Participating in the Sacrament of Ayahuasca,* a copy of which is enclosed.

<div align="center">

REQUEST FOR EXCEPTION TO THE APPLICATION OF
21 C.F.R. CHAPTER II

</div>

The preparation and receipt of the Sacrament of Ayahuasca is integral to the Church's operation and its members' exercise of their religion. The Church therefore requests a plenary exception to the application of 21 C.F.R. Chapter II pursuant to 21 C.F.R. § 1307.03. While the Church seeks an exception to the entirety of Chapter II, it is primarily concerned with securing exceptions to the registration requirements for "distributors", "manufacturers" and "importers" under the Controlled Substances Act. It is our understanding that Ayahuasca is not specifically mentioned in the regulations, but because it contains DMT at an increased level of bioavailability once its ingredients are combined, the Church desires to address and comply with any regulatory requirements that may apply.

The term "distribute" is defined in 21 U.S.C. § 802(11) to mean "to deliver (other than by administering or dispensing) a controlled substance or a listed chemical". The term "distributor" is defined in the same statute to mean "a person who so delivers a controlled substance or a listed chemical". The term "manufacture" is defined in 21 U.S.C. § 802(15) to include "... the production, preparation, propagation, compounding, or processing of a drug or other substance, either directly or indirectly or by extraction from substances of natural origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis...". The statute then provides that a "manufacturer" is a person who manufactures a drug or other substance.

The Church believes that the government may determine that it meets the definition of a distributor and manufacturer of a controlled substance, and that its members may be considered

Page 3

the "end users" of Ayahuasca within the meaning of 21 U.S.C. § 802(27). Under 21 U.S.C. § 822(a)(1), every person who manufactures or distributes any controlled substance, or who proposes to engage in such manufacturing or distribution, is required to obtain an annual registration. Registration requirements are further detailed in 21 C.F.R. § 1301.11. In its religious ceremonies, the Church prepares the sacrament by cooking and combining the ingredients of Ayahuasca (*Psychotria Viridis* leaves and *Banisteriopsis Caapi* vine bark) and then provides it to its members in the form of a tea as the central part of its ritual. The Church will use no other substances or drugs in its ceremonies, and only Church members may receive the sacrament. The Church believes that the ritualistic preparation of Ayahuasca and the distribution to its members during religious ceremonies is firmly grounded in the First Amendment to the United States Constitution, and that the restriction of these religious freedoms was not intended by Congress when it promulgated the Controlled Substances Act.

The term "import" is defined in 21 U.S.C. § 951(a)(1) to mean, with respect to any article, "any bringing in or introduction of such article into any area (whether or not such bringing in or introduction constitutes an importation within the meaning of the tariff laws of the United States)". Under 21 U.S.C. § 957(a)(1), no person may import a controlled substance into the customs territory of the United States from any foreign jurisdiction unless such person has a registration issued by the Attorney General, or an exception to the statute applies. One of these exceptions is set forth in § 957(b)(2), which authorizes the Attorney General to waive the registration requirement of certain importers if the government finds it "consistent with public health and safety". The *Psychotria Viridis* plant naturally contains DMT and the *Banisteriopsis Caapi* plant contains an agent that inhibits the first plant's metabolism by the human body. The Church will purchase both plants from Amazonian sources and have them shipped to the United States through proper U.S. Customs protocols. Neither plant is considered a "controlled substance" by itself, but in an abundance of caution the Church desires confirmation by the government that it will not be required to register as an "importer" of these plants. In addition, there is no threat to public health and safety from the Church's procurement of these plant ingredients to be used in preparing Ayahuasca.

AUTHORITIES IN SUPPORT OF REQUEST

The United States Supreme Court has expressly recognized the sacramental use of Ayahuasca in religious ceremonies. In its 2006 decision styled *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418 (2006), the Supreme Court addressed the use of Ayahuasca during religious ceremonies and held that the government had impermissibly burdened the church members' exercise of their religion when it confiscated an Ayahuasca shipment being delivered to the church. Like the Church, the members of Uniao do Vegetal church ("UDV") received the Sacrament of Ayahuasca in the form of tea containing DMT. The government argued that because DMT is a Schedule I drug under the Controlled Substances Act, its religious use was banned under that statute. The government conceded that the sacramental use of Ayahuasca by the UDV church members was a sincere exercise of religion, but argued that the Controlled Substances Act provided no exception for its usage.

Page 4

        In successfully arguing for a religious exemption from the Controlled Substances Act, the UDV church relied upon the provisions of the Religious Freedom Restoration Act of 1993 ("RFRA"), set forth at 42 U.S.C. §§2000bb *et seq.* Under the RFRA, the government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless the government can demonstrate that the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling interest. Under the RFRA, a person whose religious exercise has been burdened in violation of the statute is authorized to seek judicial relief from the government's actions. In ruling in favor of the UDV church and its sacramental use of Ayahuasca, the Supreme Court noted that the government's actions in disrupting the church's use of Ayahuasca were a "substantial burden" upon its members' exercise of their religious beliefs, and that the government failed to meet its burden to demonstrate that its actions furthered a compelling interest, or that they did so using the least restrictive means.

        The RFRA applies to all Federal law and the implementation of that law, whether statutory or otherwise. A number of states have adopted their own versions of the RFRA, many of which mirror the protections set forth in the Federal act. Florida is one of two states in which the Church intends to purchase real estate and establish a permanent place of worship. Florida adopted the "Religious Freedom Restoration Act of 1998", which is set forth in Chapter 761 of the Florida Statutes. The State of Iowa has not adopted its own version of the RFRA. The Church will work with the Attorneys General for both states to inform them of its presence and to comply with any protocols necessary to conduct its worship services.

        If you have any questions or need additional information, please contact me. My direct dial number is: (515) 246-7804.

                        Very truly yours,

                DAVIS, BROWN, KOEHN, SHORS & ROBERTS, P.C.

                        William A. Boatwright

WAB:tlk
Enclosures

cc:     Sarah C. Boblenz, Group Supervisor
        DEA - DMRO
        210 Walnut St., Room 509
        Des Moines, IA 50309

Page 5

Susan Langston
Diversion Program Manager
DEA Miami Division
2100 North Commerce Parkway
Miami, FL 33326

Dado Kantarevic, President
Iowaska Church of Healing

**Boatwright, William A.**

| | |
|---|---|
| **From:** | Boatwright, William A. |
| **Sent:** | Thursday, September 26, 2019 4:43 PM |
| **To:** | Boblenz, Sarah C. |
| **Subject:** | RE: [Ext] RE: Iowaska Church of Healing - Application for Exception to CFR |

Hi Sarah,

I'm following up to see how the Iowaska Church of Healing's religious exemption request is coming along. I believe we are nearly finished with the IRS exemption application process, but the examiner has asked for an update on the status of DEA's review. If you would please let me know at your earliest convenience, or have your colleague get back to me directly, I would greatly appreciate it. The IRS has requested our response by Wednesday, October 9th.

As part of the IRS request, we are providing that agency with copies of the DEA application and all correspondence between the church and DEA relating to the application.

If you or your colleague have any questions, please don't hesitate to call me. My direct dial is (515) 246-7804.

Best regards,

Bill

**From:** Boblenz, Sarah C. <Sarah.C.Boblenz@usdoj.gov>
**Sent:** Wednesday, July 17, 2019 7:27 AM
**To:** Boatwright, William A. <BillBoatwright@davisbrownlaw.com>
**Subject:** RE: [Ext] RE: Iowaska Church of Healing - Application for Exception to CFR

Hi Bill,

I recently transferred to the Policy section at DEA HQS in Arlington, VA and this is the section that is working on the request. It is still in progress. One of my colleagues is working on a response that will need to be approved by our front office. We have several RFRA requests along with many other policy questions so the response might still take some time. Feel free to keep checking in.

Kind regards,
Sarah Boblenz

**From:** Boatwright, William A. [mailto:BillBoatwright@davisbrownlaw.com]
**Sent:** Thursday, June 27, 2019 5:59 PM
**To:** Boblenz, Sarah C.
**Subject:** RE: [Ext] RE: Iowaska Church of Healing – Application for Exception to CFR

Hi Sarah,

It's now been four months since we submitted the request for a religious exemption from the Controlled Substances Act with the DEA Diversion Control Division in Virginia, and we haven't received any response to date. Should we have received some kind of filing acknowledgment or other response by now, and is there any further action we should take at this point? The IRS exemption application was filed nearly 6 months ago, so we should be hearing back from them in the near future.

1

Thanks for your help,

Bill

**From:** Boblenz, Sarah C. <Sarah.C.Boblenz@usdoj.gov>
**Sent:** Tuesday, February 26, 2019 1:35 PM
**To:** Boatwright, William A. <BillBoatwright@davisbrownlaw.com>
**Subject:** [Ext] RE: Iowaska Church of Healing - Application for Exception to CFR

Hi Bill,

There are several offices in Florida, so the best contact would be the Diversion Program Manager in Miami, she is in charge of the entire state.

Her contact information is below:

Susan Langston
Diversion Program Manager
DEA Miami Division
2100 North Commerce Parkway
Miami, Florida 33326

Kind regards,
Sarah Boblenz

**From:** Boatwright, William A. <BillBoatwright@davisbrownlaw.com>
**Sent:** Tuesday, February 26, 2019 1:26 PM
**To:** Boblenz, Sarah C. <scboblenz@dea.usdoj.gov>
**Subject:** Re: Iowaska Church of Healing - Application for Exception to CFR

Hi Sarah,

I'm nearly ready to send the DEA a request for exception to the CFR provisions requiring registration. My client is now planning to first look for property in Florida to get started, and I was wondering if you know the name/address of your counterpart in Florida so that I can copy him or her on the DEA filing package. Please let me know if you have this information. We're in the process of registering the Iowa nonprofit corporation to do business in Florida, and I expect we'll get that submitted sometime next week.

Thanks for your help,

Bill

The Davis Brown Law Firm is committed to providing Exceptional Client Service. For a review of the supporting principles, go to www.davisbrownlaw.com/exceptional.

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply E-mail and destroy all copies of the original message.
HEALTHCARE PRIVACY STATEMENT: This message may contain protected health information that is strictly confidential. If you have received this email, you are required to maintain the security and confidentiality of the

information and may not disclose it without written consent from the patient or as otherwise permitted by law. Unauthorized disclosure may be subject to federal and state penalties.

APP. 0228

**Boatwright, William A.**

| | |
|---|---|
| **From:** | Boatwright, William A. |
| **Sent:** | Monday, March 11, 2019 11:38 AM |
| **To:** | Langston, Susan C. |
| **Cc:** | Boblenz, Sarah C. |
| **Subject:** | RE: [Ext] Iowaska Church of Healing |

Ms. Langston,

Thank you for your message. I will update our records with your new address and keep you informed of my client's progress.

Bill Boatwright

**From:** Langston, Susan C. <Susan.C.Langston@usdoj.gov>
**Sent:** Monday, March 11, 2019 11:34 AM
**To:** Boatwright, William A. <BillBoatwright@davisbrownlaw.com>
**Cc:** Boblenz, Sarah C. <Sarah.C.Boblenz@usdoj.gov>
**Subject:** [Ext] Iowaska Church of Healing

Mr. Boatwright,

Thank you for sending me a courtesy copy of the Request for Religious Exemption for the Iowaska Church of Healing. I was out of the office last week, but the package was on my desk this morning. Please continue the communication with me regarding this request and any additional requests for Florida locations.

Our mailing address has changed. Please update your records:

DEA Miami Field Division
3200 Meridian Parkway, Suite 107
Weston, FL 33331

If you have any questions or would like to communicate about this matter, please contact me at one of the below numbers or via email.

Thanks

Susan Langston
Diversion Program Manager
Drug Enforcement Administration
3200 Meridian Parkway, Suite 107
Weston, FL 33331

Cell: (954) 817-5408
Desk: (954) 306-4651

1

**Boatwright, William A.**

| | |
|---|---|
| **From:** | Howery, Kenya N. <Kenya.N.Howery@usdoj.gov> |
| **Sent:** | Friday, March 08, 2019 10:47 AM |
| **To:** | Boatwright, William A. |
| **Cc:** | Boblenz, Sarah C. |
| **Subject:** | RE: [Ext] Iowaska Church of Healing |

Mr. Boatwright

Thank you for the clarification. If you will be doing business in Florida, as I now re-read the letter I see your statement of future plans, then yes we appreciate the heads-up and please continue to keep our office in the loop. Thank you for responding.



Kenya Howery
Diversion Group Supervisor
Miami Division
2100 N. Commerce Parkway
Weston, Florida 33326
Office (954) 306-4654
Cell (954) 240-1594
Kenya.N.Howery@usdoj.gov

**From:** Boatwright, William A. <BillBoatwright@davisbrownlaw.com>
**Sent:** Friday, March 8, 2019 11:25 AM
**To:** Howery, Kenya N. <knhowery@dea.usdoj.gov>
**Cc:** Boblenz, Sarah C. <scboblenz@dea.usdoj.gov>
**Subject:** RE: [Ext] Iowaska Church of Healing

Good morning, Kenya,

My firm represents Iowaska Church of Healing, an Iowa non-profit corporation, and we filed the Request for Religious Exception with the DEA Diversion Control Division in Springfield, VA. I originally contacted Sarah Boblenz here in Des Moines, and she assisted me with the application procedures. I sent a copy of the Request to Susan Langston of your Miami office simply as a courtesy, and to notify your local office that my client is seeking the exception and plans to establish a branch of the church there in the near future. The church will be filing an application to register the Iowa non-profit corporation to do business in Florida next week.

If you would like me to send you a copy of the DEA religious exception approval once I receive it or take any other action, I will be happy to do so. If it is unnecessary to keep your office in the loop, however, just let me know and I won't send you any further communications.

Thank you,

1

Bill Boatwright

**From:** Howery, Kenya N. <Kenya.N.Howery@usdoj.gov>
**Sent:** Thursday, March 07, 2019 11:19 AM
**To:** Boatwright, William A. <BillBoatwright@davisbrownlaw.com>
**Cc:** Boblenz, Sarah C. <Sarah.C.Boblenz@usdoj.gov>
**Subject:** [Ext] Iowaska Church of Healing

Good Afternoon

Our office received a Request for Religious Exception for the Iowaska Church of Healing in the Miami Division
Office. Can either of you please clarify that this actually is being handled by the Des Moines Iowa office, as I cannot find
a nexus to Florida. If this belongs to Iowa, Sarah I will scan and email the documents if necessary. I look forward to
your response.



Kenya Howery
Diversion Group Supervisor
Miami Division
2100 N. Commerce Parkway
Weston, Florida 33326
Office (954) 306-4654
Cell (954) 240-1594
Kenya.N.Howery@usdoj.gov

The Davis Brown Law Firm is committed to providing Exceptional Client Service. For a review of the
supporting principles, go to www.davisbrownlaw.com/exceptional.

This email message is for the sole use of the intended recipient(s) and may contain confidential and
privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the
intended recipient, please contact the sender by reply E-mail and destroy all copies of the original message.
HEALTHCARE PRIVACY STATEMENT: This message may contain protected health information that is
strictly confidential. If you have received this email, you are required to maintain the security and
confidentiality of the information and may not disclose it without written consent from the patient or as
otherwise permitted by law. Unauthorized disclosure may be subject to federal and state penalties.

APP. 0231



William A. Boatwright
BillBoatwright@davisbrownlaw.com
phone: 515-246-7804
Des Moines Office

February 24, 2020

**FILE COPY**

_**VIA COURIER**_

Internal Revenue Service
Exempt Organizations
550 Main Street
Cincinnati, OH 45202
ATT: Diane Gentry
    Room 6403
    Group 7821

    _**Re:**_  _**Iowaska Church of Healing – Form 1023**_
        _**FEIN: 83-2192122**_

Dear Ms. Gentry:

    We are forwarding Iowaska Church of Healing's (the "Organization") response to your letter and third Information Request dated February 4, 2020, a copy of which is attached. The Organization's responses to your inquiries are provided in the same order in which they appear in the Information Request.

    If you need any further information in order to issue the Determination Letter, please do not hesitate to contact me.

        Very truly yours,

        DAVIS, BROWN, KOEHN, SHORS & ROBERTS, P.C.

        William A. Boatwright

WAB:tlk
Enclosures

cc:    Dado Kantarevic, President

#3158918
DAVIS BROWN KOEHN SHORS & ROBERTS P.C.

PHONE 515.288.2500
FIRM FAX 515.243.0654
WWW.DAVISBROWNLAW.COM

THE DAVIS BROWN TOWER, 215 10TH ST., STE. 1300, DES MOINES, IA 50309
THE HIGHLAND BUILDING, 4201 WESTOWN PKWY., STE. 300, WEST DES MOINES, IA 50266
THE AMES OFFICE, 2605 NORTHRIDGE PKWY., AMES, IA 50010

APP. 0232

 **Department of the Treasury**
**Internal Revenue Service**
**Tax Exempt and Government Entities**
PO Box 2508
Cincinnati, OH 45201

IOWASKA CHURCH OF HEALING
C/O WILLIAM A. BOATWRIGHT
DAVIS BROWN LAW FIRM
215 10TH ST SUITE 1300
DES MOINES, IA 50309

Date:
  February 4, 2020
Employer ID number:
  83-2192122
Person to contact / ID number:
  Diane Gentry
  ID# 0203080
Contact telephone number:
  513-975-6278
Contact fax number:
  855-775-7261
Response due date:
  March 3, 2020

Dear Applicant:

**Why you are receiving this letter**

We need more information to consider your determination letter request.

**What you must do**

Please provide the information requested and follow the submission instructions. You must submit your response by the due date above.

**If you don't respond**

If you don't respond to the Information Request by the due date, or don't provide all the requested information, we may close your case without making a determination. If so, we won't refund any user fee you paid, and you'll need to submit a new request and any applicable user fee payment if you want us to reconsider your request. Alternatively, if you haven't established that you meet the requirements for exemption for the subsection requested, we may make an adverse determination.

In addition, if you don't provide the requested information by the due date, you may lose your rights to get a declaratory judgment. Under Internal Revenue Code (IRC) Section 7428(b)(2), you must exhaust all administrative remedies available to you within the IRS before a court will issue a declaratory judgment about your exempt status. This requirement means you must take all reasonable steps in a timely manner to secure a determination under IRS procedures, including providing the information we need to act on your request. If you fail to timely provide the requested information, you may lose your rights to obtain a declaratory judgment under Section 7428.

**Additional information**

**Letter 1312 (Rev. 4-2017)**
Catalog Number 35163W

APP. 0233

2

IOWASKA CHURCH OF HEALING
83-2192122

If you have questions or need additional time to respond, call me at the number at the top of this letter. If you have concerns after speaking with me, you can call my supervisor Ms. Lee at 513-975-6419.

The Taxpayer Advocate Service (TAS) is an independent organization within the IRS that can help protect your taxpayer rights. TAS can offer you help if your tax problem is causing a hardship or you've tried but haven't been able to resolve your problem with the IRS. If you qualify for TAS assistance, which is always free, TAS will do everything possible to help you. Visit taxpayeradvocate.irs.gov or call 1-877-777-4778.

Sincerely,

*Diane Gentry*

Diane Gentry
Exempt Organizations Specialist

Enclosure:
Information Request

**Letter 1312 (Rev. 4-2017)**
Catalog Number 35163W

APP. 0234

3

IOWASKA CHURCH OF HEALING
83-2192122

### Information Request
### Third Request

**Information we need to make our determination**

Include the following declaration with your response, signed and dated by an officer, director, trustee, or other governing body member (not an authorized representative). You can sign and date the statement below or reproduce it in the body of your signed response. The declaration must accompany responses per Revenue Procedure 2020-5 (updated annually).

*Under penalties of perjury, I declare that I have examined this information, including accompanying documents, and, to the best of my knowledge and belief, the information contains all the relevant facts relating to the request for the information, and such facts are true, correct, and complete.*

1.  Please see the attached guidance regarding applying for an exemption from the CSA provided on the DEA website, does the guidance reflect the actual guidance you have received from the DOJ/DEA? If not, please submit copies of the guidance that you have received.

2.  The attached guidance states in Item #7 that any activity is prohibited until you receive a final determination. How are you in compliance with this prohibition considering you have used the controlled substance in multiple ceremonies?

3.  Your response to item #4 dated October 4, 2019, stated that the *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal* holding makes it clear that it is not necessary for a church to first apply for and secure the exemption before enforcing its religious freedom rights in the courts. Have you sought relief in the courts? If not, please explain the basis for your belief that you are not in violation of the Controlled Substance Act.

**How to submit the requested information (do's and don'ts)**

- **Don't include** any personal identifying information like bank account or social security numbers that could result in identity theft or other adverse consequences if publicly disclosed. If we approve your application

**Letter 1312 (Rev. 4-2017)**
Catalog Number 35163W

4

IOWASKA CHURCH OF HEALING
83-2192122

for exemption, we're generally required by law to make the application and the information you submit in response to this letter available for public inspection. If you have questions about the public inspection of your request or other documents, please call me.

- **Do include** the following declaration with your response, signed by one of your principal officers or directors:

    **Under penalties of perjury, I declare that I have examined this request, or this modification to the request, including accompanying documents, and to the best of my knowledge and belief, the request or modification contains all the relevant facts relating to the request, and such facts are true, correct, and complete.**

- **Do attach** a copy of the cover letter to your response. This enables us to quickly and accurately associate your response with your case file.

- **Do fax or mail** your response to:

| Fax: | US Mail: | Street Address (delivery service): |
|---|---|---|
| 855-775-7261 | Internal Revenue Service | Internal Revenue Service |
| ATT: Diane Gentry | Exempt Organizations | Exempt Organizations |
| Room 6403 | P. O. Box 2508 | 550 Main Street |
| Group 7821 | Cincinnati, OH 45201 | Cincinnati, OH 45202 |
| | ATT: Diane Gentry | ATT: Diane Gentry |
| | Room 6403 | Room 6403 |
| | Group 7821 | Group 7821 |

- **Don't provide** multiple copies of your response. Providing more than a single response may result in unnecessary delays in processing your response. We must process, assign, and review each piece of correspondence submitted (whether fax or mail).

- **Do allow** adequate processing time if you want to call to verify we received your response. If you fax your response, allow a minimum of three workdays from the day you fax it. If you mail your response, allow a minimum of seven workdays from the day you mail it.

**Letter 1312 (Rev. 4-2017)**
Catalog Number 35163W

APP. 0236

## Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act

In recent years, the Drug Enforcement Administration (DEA) has seen an increase in requests from parties requesting religious exemptions from the Controlled Substances Act (CSA) to permit the use of controlled substances. The Religious Freedom Restoration Act (RFRA) provides that the "Government shall not substantially burden a person's exercise of religion" unless the Government can demonstrate "that application of the burden to the person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-l. In **Gonzales** v. **O Centra Espirita Beneficente Uniao do Vegetal,** 126 S.Ct. 1211 (2006), the Supreme Court held that government action taken pursuant to the CSA is subject to RFRA. In order to obtain an exemption under RFRA, a party must, as a preliminary matter, demonstrate that its (1) sincere (2) religious exercise is (3) substantially burdened by the CSA. 42 U.S.C. § 2000bb et seq**.**

The guidelines that follow are an interim measure intended to provide guidance to parties who wish to petition for a religious exemption to the CSA:

1. *Filing Address.* All petitions for exemption from the Controlled Substances Act under RFRA shall be submitted in writing to Susan A. Gibson, Deputy Assistant Administrator, Diversion Control Division, Drug Enforcement Administration, 8701 Morrissette Drive, Springfield, Virginia 22152.

2. *Content of Petition.* A petition may include both a written statement and supporting documents. A petitioner should provide as much information as he/she deems necessary to demonstrate that application of the Controlled Substances Act to the party's activity would (1) be a substantial burden on (2) his/her sincere (3) religious exercise. Such a record should include detailed information about, among other things, (1) the nature of the religion (e.g., its history, belief system, structure, practice, membership policies, rituals, holidays, organization, leadership, etc.); (2) each specific religious practice that involves the manufacture, distribution, dispensing, importation, exportation, use or possession of a controlled substance; (3) the specific controlled substance that the party wishes to use; and (4) the amounts, conditions, and locations of its anticipated manufacture, distribution, dispensing, importation, exportation, use or possession. A petitioner is not limited to the topics outlined above, and may submit any and all information he/she believes to be relevant to DEA's determination under RFRA and the Controlled Substances Act.

3. *Signature.* The petition must be signed by the petitioner, who must declare under penalty of perjury that the information provided therein is true and correct. See *28 U.S.C. § 1746*.

4. *Acceptance of Petition for Filing.* Petitions submitted for filing are dated upon receipt by DEA. If it is found to be complete, the petition will be accepted as filed, and the petitioner will receive notification of acceptance. Petitions that do not conform to this guidance will not generally be accepted for filing. A petition that fails to conform to this guidance will be

Last updated: February 26, 2018

returned to the petitioner with a statement of the reason for not accepting the petition for filing. A deficient petition may be corrected and resubmitted. Acceptance of a petition for filing does not preclude DEA from making subsequent requests for additional information.

5. *Requests for Additional Information.* DEA may require a petitioner to submit such additional documents or written statements of facts relevant to the petition as DEA deems necessary to determine whether the petition should be granted. It is the petitioner's responsibility to provide DEA with accurate contact information. If a petitioner does not respond to a request for additional information within 60 days from the date of DEA's request, the petition will be considered to be withdrawn.

6. *Applicability of DEA Regulations.* A petitioner whose petition for a religious exemption from the Controlled Substances Act is granted remains bound by all applicable laws and Controlled Substances Act regulations governing registration, labeling and packaging, quotas, recordkeeping and reporting, security and storage, and periodic inspections, among other things. See *21 C.F.R. §§ 1300-1316.* A petitioner who seeks exemption from applicable CSA regulations (as opposed to the CSA itself) may petition under *21 C.F.R. § 1307.03.* Such petition must separately address each regulation from which the petitioner seeks exemption and provide a statement of the reasons for each exemption sought.

7. *Activity Prohibited Until Final Determination.* No petitioner may engage in any activity prohibited under the Controlled Substances Act or its regulations unless the petition has been granted and the petitioner has applied for and received a DEA Certificate of Registration. A registration granted to a petitioner is subject to subsequent suspension or revocation, where appropriate, consistent with CSA regulations and RFRA.

8. *Final Determination.* After the filed petition—along with all submissions in response to any requests for additional information—has been fully evaluated, the Deputy Assistant Administrator of the Diversion Control Division shall provide a written response that either grants or denies the petition. Except in the case of affirming a prior denial or when the denial is self-explanatory, the response shall be accompanied by a statement of reasons upon which the decision is based. This written response is a final determination under *21 U.S.C. § 877.*

9. *Application of State and Other Federal Law.* Nothing in these guidelines shall be construed as authorizing or permitting any party to take any action which such party is not authorized or permitted to take under other Federal laws or under the laws of the State in which he/she desires to take such action. Likewise, compliance with these guidelines shall not be construed as compliance with other Federal or State laws unless expressly provided in such other laws.

Last updated: February 26, 2018

APP. 0238

**IOWASKA CHURCH OF HEALING**
**FEIN: 83-2192122**

**RESPONSE TO THIRD INFORMATION REQUEST DATED FEBRUARY 4, 2020**

1. *Please see the attached guidance regarding applying for an exemption from the CSA provided on the DEA website, does the guidance reflect the actual guidance you have received from the DOJ/DEA?  If not, please submit copies of the guidance that you have received.*

The Organization has not received any guidance from the DOJ/DEA similar to that posted on its website, and has previously provided the government with copies of the e-mail correspondence it has received from DOJ/DEA.  Enclosed is a copy of the most recent e-mail exchange between the Organization's legal counsel and Ms. Sarah Boblenz of the Department of Justice, which took place on January 3, 2020.  In her e-mail, Ms. Boblenz states that the religious exemption request is still under review by the Department's upper management and Chief Counsel's office.

Enclosed is a copy of the October 4, 2018 e-mail from Sarah Boblenz to the Organization's legal counsel providing the mailing address for the religious exemption application and the applicable Code of Federal Regulations provision.  In a follow up telephone conversation of the same date, Ms. Boblenz informed legal counsel that there is no specific form or format required to request an exemption, but that it must be in writing and should set forth all salient facts.  Ms. Boblenz also stated that it would be a good idea to include a copy of the Organization's Form 1023 that was filed with the Internal Revenue Service.  No other written filing guidance has been received by the Organization.

2. *The attached guidance states in Item #7 that any activity is prohibited until you receive a final determination.  How are you in compliance with this prohibition considering you have used the controlled substance in multiple ceremonies?*

The guidance statement provided on the DEA website, by its own terms, is simply "an interim measure intended to provide guidance" to potential applicants and does not carry the force of law.  The prohibition is not found in either the United States Code or in the Code of Federal Regulations.  The church described in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418 (2006) presumably had not even applied for a religious exemption from the federal Controlled Substances Act ("CSA"), yet the U.S. Supreme Court held that its activities were protected by the First Amendment to the United States Constitution and the Religious Freedom Restoration Act of 1993 ("RFRA"), notwithstanding the contrary restrictions found in the CSA.  In rejecting the government's attempted invocation of the CSA's restrictions, the Supreme Court held that the government's actions had substantially burdened the church members' exercise of their religion without demonstrating the necessary legal justifications.

It is telling that the DEA itself recognizes the importance of the *O Centro* case, and that it cites the Supreme Court opinion in its published guidance statement.   The Organization is

entitled to the same protections under the First Amendment and the RFRA as those enjoyed by the church in the *O Centro* case.

The Supreme Court is the ultimate authority in interpreting federal law, as the United States Constitution vests judicial power in a single supreme court. U.S. Const. art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."); *Marbury v. Madison*, 5 U.S. 137, 173–74, 2 L. Ed. 60, 72 (1803) ("The constitution vests the whole judicial power of the United States in one supreme court."). Accordingly, lower courts and federal agencies, including the IRS and the DEA, are bound by Supreme Court decisions, such as the Court's decision in *O Centro*. *See Marbury*, 5 U.S. at 153 ("This is the *supreme* court, and by reason of its supremacy must have the superintendance of the inferior tribunals and officers, whether judicial or ministerial. In this respect there is no difference between a judicial and a ministerial officer."); *Taylor v. Sturgell*, 553 U.S. 880, 891, 128 S. Ct. 2161, 2171 (2008) ("The Supreme Court "has ultimate authority to determine and declare" federal rules.); *Neal v. United States*, 516 U.S. 284, 294, 116 S. Ct. 763, 768 (1996) (A federal agency "has no authority to override the statute as we have construed it."); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843, 104 S. Ct. 2778, 2782 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."); *FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981) ("[T]he courts are the final authorities on issues of statutory construction."); *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988 (1965) ("[C]ourts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."); *Webster v. Luther*, 163 U.S. 331, 342, 16 S.Ct. 963, 967 (1896) ([T]his court has often said that it will not permit the practice of an executive department to defeat the obvious purpose of a statute."). *See also SEC v. Sloan*, 436 U.S. 103, 117–118, 98 S.Ct. 1702 (1978); *FMC v. Seatrain Lines, Inc.*, 411 U.S. 726, 745–746, 93 S.Ct. 1773, 1784–1785 (1973); *Volkswagenwerk v. FMC*, 390 U.S. 261, 272, 88 S.Ct. 929, 935 (1968); *FTC v. Colgate–Palmolive Co.*, 380 U.S. 374, 385, 85 S.Ct. 1035, 1042 (1965*); Social Security Board v. Nierotko*, 327 U.S. 358, 369, 66 S.Ct. 637, 643 (1946); *Burnet v. Chicago Portrait Co.*, 285 U.S. 1, 16, 52 S.Ct. 275, 281 (1932).

The United States Constitution protects the free exercise of religion. U.S. Const. amend. I. Congress reinforced this protection when it enacted the RFRA, which prohibits the federal government from burdening a person or organization's exercise of religion, "even if the burden results from a rule of general applicability," unless the government can demonstrate the burden furthers a compelling government interest, and is the least restrictive means of doing so. 42 U.S.C. § 2000bb–1(a), (b). "The least-restrictive means standard is exceptionally demanding." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728, 134 S. Ct. 2751, 2780 (2014).

Statutory precedents created by the Supreme Court, such as the Court's decision in *O Centro* that the RFRA permitted the church to use Ayahuasca as a sacrament, "enjoy a super-strong presumption of correctness." William N. Eskridge, Jr., Overruling Statutory Precedents, 76 GEO. L.J. 1361, 1362 (1988). "One reason that we give great weight to stare decisis in the area of statutory construction is that 'Congress is free to change this Court's interpretation of its legislation.'" Neal, 516 U.S. at 295 (quoting *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736, 97

2

S.Ct. 2061, 2070 (1977). Indeed, it would be anathema to our judicial system and the constitutional principal of separation of powers to allow federal agencies to defy clear Supreme Court precedent, such as the holding in *O Centro*. *See United States v. Mead Corp.*, 533 U.S. 218, 248-49 (2001) (Scalia, J., dissenting) ("I know of no case, in the entire history of the federal courts, in which we have allowed a judicial interpretation of a statute to be set aside by an agency.").

Similarly, the doctrine of stare decisis requires federal agencies to follow Supreme Court precedent, such as the holding in *O Centro*. *See Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 131, 110 S. Ct. 2759, 2768 (1990) ("Once we have determined a statute's clear meaning, we adhere to that determination under the doctrine of stare decisis, and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning."); *See also Neal*, 516 U.S. at 295; *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 536–537, 112 S.Ct. 841, 847–848 (1992).

Furthermore, numerous courts have held that federal agencies cannot ignore federal appeals court precedent, let alone precedent created by the ultimate judicial authority, the Supreme Court. *See e.g. Lopez v. Heckler*, 713 F.2d 1432, 1438 (9th Cir. 1983) (rejecting the "argument that a federal agency can legitimately ignore federal appeals court precedents"); *Jones & Laughlin Steel Corp. v. Marshall*, 636 F.2d 32, 33 (3d Cir.1980) (an "agency is not free to apply its own view of the statute in contravention of the precedent"); *ITT World Communications v. FCC*, 635 F.2d 32, 43 (2d Cir.1980) (An agency "is not a court nor is it equal to this court in matters of statutory interpretation."); *Ithaca College v. NLRB*, 623 F.2d 224, 228-29 (2d Cir.), *cert. denied*, 449 U.S. 975, 101 S. Ct. 386, 66 L. Ed. 2d 237 (1980) ("While deference is to be given to an agency's interpretation of the statute it administers, it is the courts that have the final word on matters of statutory interpretation." (internal citations omitted)); *Mary Thompson Hospital, Inc. v. NLRB*, 621 F.2d 858, 864 (7th Cir.1980) ("flagrant disregard of judicial precedent must not continue... [the agency is] obligated under the principles of stare decisis to follow this court's decision"); *Allegheny General Hospital v. NLRB*, 608 F.2d 965, 970 (3d Cir.1979) ("[O]ur judgments ... are binding on all inferior courts and litigants ... and also on administrative agencies when they deal with matters pertaining thereto.").

As further evidence of the government's duty to protect the religious liberties recognized in the First Amendment, all Executive Departments and agencies of the U. S. Government were provided with a copy of an October 6, 2017 Memorandum issued by Jeff Sessions, the then-acting U. S. Attorney General, that underscored the need for governmental agencies to protect these fundamental rights of both individuals and religious organizations. Attorney General Sessions cites the *O Centro* opinion as legal authority several times in the research appendix attached to the Memorandum. A copy of the Memorandum is enclosed. As noted in item 2 of the Memorandum, found on Page 2:

> The Free Exercise Clause protects not just the right to believe or the right to worship; *it protects the right to perform or abstain from performing certain physical acts in accordance with one's beliefs.* Federal statutes, including the Religious Freedom Restoration Act of 1993 ("RFRA"), support that protection, broadly defining the exercise of religion to encompass *all aspects*

3

*of observance and practice*, whether or not central to, or required by, a particular religious faith. (emphasis added)

With all of this being said, the Organization has not conducted a ceremony using the Sacrament of Ayahuasca since August 18, 2019. The Organization voluntarily suspended all of such ceremonies in an abundance of caution as it waits for its § 501(c)(3) determination letter and DEA religious exemption. Its members are eager to fully practice their faith by receiving the sacrament, but the uncertainty caused by the processing delays of the Organization's applications has created enough hesitation that they have elected to refrain from doing so until they have resolution. They are also fearful of possible law enforcement intrusion into their sacred ceremonies before they have documentation of their legal right to conduct them.

**3. *Your response to item #4 dated October 4, 2019, stated that the Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal holding makes it clear that it is not necessary for a church to first apply for and secure the exemption before enforcing its religious freedom rights in the courts. Have you sought relief in the courts? If not, please explain the basis for your belief that you are not in violation of the Controlled Substances Act.***

No, the Organization has not sought relief in any federal or state court, although sufficient time has passed since it filed its Form 1023 that it could seek a declaratory judgment with respect to its tax-exempt status pursuant to Internal Revenue Code § 7428(b)(2). As noted in the previous response, it is not necessary for an organization to secure a court order or other judicial ruling to confirm the religious liberty protections found in the First Amendment and the RFRA. Authorization for the exercise of the Organization's religious practices is inherent in the First Amendment's Free Exercise Clause and is supported by the RFRA. The RFRA provides a statutory remedy for those religious organizations whose free exercise of their faith and other religious liberties are illegally burdened by government action.

As the Supreme Court ruled in the *O Centro* opinion, an organization that uses Ayahuasca in the sincere exercise of its religion is not bound by, or in violation of, the CSA. There is no meaningful difference whatsoever between the church in the 2006 *O Centro* opinion and the Organization. As such, when the Organization was conducting its Ayahuasca ceremonies, it was not in violation of the CSA and was entitled to the same legal protections as those previously acknowledged by the Supreme Court.

Under penalties of perjury, I declare that I have examined this information, including accompanying documents, and, to the best of my knowledge and belief, the information contains all the relevant facts relating to the request for the information, and such facts are true, correct and complete.

Dado Kantarevic, President

4



# Office of the Attorney General

Washington, D.C. 20530

October 6, 2017

MEMORANDUM FOR ALL EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:       THE ATTORNEY GENERAL

SUBJECT:    Federal Law Protections for Religious Liberty

The President has instructed me to issue guidance interpreting religious liberty protections in federal law, as appropriate. Exec. Order No. 13798 § 4, 82 Fed. Reg. 21675 (May 4, 2017). Consistent with that instruction, I am issuing this memorandum and appendix to guide all administrative agencies and executive departments in the execution of federal law.

## Principles of Religious Liberty

Religious liberty is a foundational principle of enduring importance in America, enshrined in our Constitution and other sources of federal law. As James Madison explained in his Memorial and Remonstrance Against Religious Assessments, the free exercise of religion "is in its nature an unalienable right" because the duty owed to one's Creator "is precedent, both in order of time and in degree of obligation, to the claims of Civil Society."[1] Religious liberty is not merely a right to personal religious beliefs or even to worship in a sacred place. It also encompasses religious observance and practice. Except in the narrowest circumstances, no one should be forced to choose between living out his or her faith and complying with the law. Therefore, to the greatest extent practicable and permitted by law, religious observance and practice should be reasonably accommodated in all government activity, including employment, contracting, and programming. The following twenty principles should guide administrative agencies and executive departments in carrying out this task. These principles should be understood and interpreted in light of the legal analysis set forth in the appendix to this memorandum.

## 1. The freedom of religion is a fundamental right of paramount importance, expressly protected by federal law.

Religious liberty is enshrined in the text of our Constitution and in numerous federal statutes. It encompasses the right of all Americans to exercise their religion freely, without being coerced to join an established church or to satisfy a religious test as a qualification for public office. It also encompasses the right of all Americans to express their religious beliefs, subject to the same narrow limits that apply to all forms of speech. In the United States, the free exercise of religion is not a mere policy preference to be traded against other policy preferences. It is a fundamental right.

---

[1] James Madison, Memorial and Remonstrance Against Religious Assessments (June 20, 1785), *in* 5 THE FOUNDERS' CONSTITUTION 82 (Philip B. Kurland & Ralph Lerner eds., 1987).

Federal Law Protections for Religious Liberty
Page 2

**2.  The free exercise of religion includes the right to *act* or *abstain from action* in accordance with one's religious beliefs.**

The Free Exercise Clause protects not just the right to believe or the right to worship; it protects the right to perform or abstain from performing certain physical acts in accordance with one's beliefs. Federal statutes, including the Religious Freedom Restoration Act of 1993 ("RFRA"), support that protection, broadly defining the exercise of religion to encompass all aspects of observance and practice, whether or not central to, or required by, a particular religious faith.

**3.  The freedom of religion extends to persons *and* organizations.**

The Free Exercise Clause protects not just persons, but persons collectively exercising their religion through churches or other religious denominations, religious organizations, schools, private associations, and even businesses.

**4.  Americans do not give up their freedom of religion by participating in the marketplace, partaking of the public square, or interacting with government.**

Constitutional protections for religious liberty are not conditioned upon the willingness of a religious person or organization to remain separate from civil society. Although the application of the relevant protections may differ in different contexts, individuals and organizations do not give up their religious-liberty protections by providing or receiving social services, education, or healthcare; by seeking to earn or earning a living; by employing others to do the same; by receiving government grants or contracts; or by otherwise interacting with federal, state, or local governments.

**5.  Government may not restrict acts or abstentions because of the beliefs they display.**

To avoid the very sort of religious persecution and intolerance that led to the founding of the United States, the Free Exercise Clause of the Constitution protects against government actions that target religious conduct. Except in rare circumstances, government may not treat the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons. For example, government may not attempt to target religious persons or conduct by allowing the distribution of political leaflets in a park but forbidding the distribution of religious leaflets in the same park.

**6.  Government may not target religious individuals or entities for special disabilities based on their religion.**

Much as government may not restrict actions only because of religious belief, government may not target persons or individuals because of their religion. Government may not exclude religious organizations as such from secular aid programs, at least when the aid is not being used for explicitly religious activities such as worship or proselytization. For example, the Supreme Court has held that if government provides reimbursement for scrap tires to replace child playground surfaces, it may not deny participation in that program to religious schools. Nor may

Federal Law Protections for Religious Liberty
Page 3

government deny religious schools—including schools whose curricula and activities include religious elements—the right to participate in a voucher program, so long as the aid reaches the schools through independent decisions of parents.

**7. Government may not target religious individuals or entities through discriminatory enforcement of neutral, generally applicable laws.**

Although government generally may subject religious persons and organizations to neutral, generally applicable laws—e.g., across-the-board criminal prohibitions or certain time, place, and manner restrictions on speech—government may not apply such laws in a discriminatory way. For instance, the Internal Revenue Service may not enforce the Johnson Amendment—which prohibits 501(c)(3) non-profit organizations from intervening in a political campaign on behalf of a candidate—against a religious non-profit organization under circumstances in which it would not enforce the amendment against a secular non-profit organization. Likewise, the National Park Service may not require religious groups to obtain permits to hand out fliers in a park if it does not require similarly situated secular groups to do so, and no federal agency tasked with issuing permits for land use may deny a permit to an Islamic Center seeking to build a mosque when the agency has granted, or would grant, a permit to similarly situated secular organizations or religious groups.

**8. Government may not officially favor or disfavor particular religious groups.**

Together, the Free Exercise Clause and the Establishment Clause prohibit government from officially preferring one religious group to another. This principle of denominational neutrality means, for example, that government cannot selectively impose regulatory burdens on some denominations but not others. It likewise cannot favor some religious groups for participation in the Combined Federal Campaign over others based on the groups' religious beliefs.

**9. Government may not interfere with the autonomy of a religious organization.**

Together, the Free Exercise Clause and the Establishment Clause also restrict governmental interference in intra-denominational disputes about doctrine, discipline, or qualifications for ministry or membership. For example, government may not impose its nondiscrimination rules to require Catholic seminaries or Orthodox Jewish yeshivas to accept female priests or rabbis.

**10. The Religious Freedom Restoration Act of 1993 prohibits the federal government from substantially burdening any aspect of religious observance or practice, unless imposition of that burden on a particular religious adherent satisfies strict scrutiny.**

RFRA prohibits the federal government from substantially burdening a person's exercise of religion, unless the federal government demonstrates that application of such burden to the religious adherent is the least restrictive means of achieving a compelling governmental interest. RFRA applies to all actions by federal administrative agencies, including rulemaking, adjudication or other enforcement actions, and grant or contract distribution and administration.

Federal Law Protections for Religious Liberty
Page 4

**11. RFRA's protection extends not just to individuals, but also to organizations, associations, and at least some for-profit corporations.**

RFRA protects the exercise of religion by individuals and by corporations, companies, associations, firms, partnerships, societies, and joint stock companies. For example, the Supreme Court has held that Hobby Lobby, a closely held, for-profit corporation with more than 500 stores and 13,000 employees, is protected by RFRA.

**12. RFRA does not permit the federal government to second-guess the reasonableness of a religious belief.**

RFRA applies to all sincerely held religious beliefs, whether or not central to, or mandated by, a particular religious organization or tradition. Religious adherents will often be required to draw lines in the application of their religious beliefs, and government is not competent to assess the reasonableness of such lines drawn, nor would it be appropriate for government to do so. Thus, for example, a government agency may not second-guess the determination of a factory worker that, consistent with his religious precepts, he can work on a line producing steel that might someday make its way into armaments but cannot work on a line producing the armaments themselves. Nor may the Department of Health and Human Services second-guess the determination of a religious employer that providing contraceptive coverage to its employees would make the employer complicit in wrongdoing in violation of the organization's religious precepts.

**13. A governmental action substantially burdens an exercise of religion under RFRA if it bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice.**

Because the government cannot second-guess the reasonableness of a religious belief or the adherent's assessment of the religious connection between the government mandate and the underlying religious belief, the substantial burden test focuses on the extent of governmental compulsion involved. In general, a government action that bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice, will qualify as a substantial burden on the exercise of religion. For example, a Bureau of Prisons regulation that bans a devout Muslim from growing even a half-inch beard in accordance with his religious beliefs substantially burdens his religious practice. Likewise, a Department of Health and Human Services regulation requiring employers to provide insurance coverage for contraceptive drugs in violation of their religious beliefs or face significant fines substantially burdens their religious practice, and a law that conditions receipt of significant government benefits on willingness to work on Saturday substantially burdens the religious practice of those who, as a matter of religious observance or practice, do not work on that day. But a law that infringes, even severely, an aspect of an adherent's religious observance or practice that the adherent himself regards as unimportant or inconsequential imposes no substantial burden on that adherent. And a law that regulates only the government's internal affairs and does not involve any governmental compulsion on the religious adherent likewise imposes no substantial burden.

Federal Law Protections for Religious Liberty
Page 5

**14. The strict scrutiny standard applicable to RFRA is exceptionally demanding.**

Once a religious adherent has identified a substantial burden on his or her religious belief, the federal government can impose that burden on the adherent only if it is the least restrictive means of achieving a compelling governmental interest. Only those interests of the highest order can outweigh legitimate claims to the free exercise of religion, and such interests must be evaluated not in broad generalities but as applied to the particular adherent. Even if the federal government could show the necessary interest, it would also have to show that its chosen restriction on free exercise is the least restrictive means of achieving that interest. That analysis requires the government to show that it cannot accommodate the religious adherent while achieving its interest through a viable alternative, which may include, in certain circumstances, expenditure of additional funds, modification of existing exemptions, or creation of a new program.

**15. RFRA applies even where a religious adherent seeks an exemption from a legal obligation requiring the adherent to confer benefits on third parties.**

Although burdens imposed on third parties are relevant to RFRA analysis, the fact that an exemption would deprive a third party of a benefit does not categorically render an exemption unavailable. Once an adherent identifies a substantial burden on his or her religious exercise, RFRA requires the federal government to establish that denial of an accommodation or exemption to that adherent is the least restrictive means of achieving a compelling governmental interest.

**16. Title VII of the Civil Rights Act of 1964, as amended, prohibits covered employers from discriminating against individuals on the basis of their religion.**

Employers covered by Title VII may not fail or refuse to hire, discharge, or discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of that individual's religion. Such employers also may not classify their employees or applicants in a way that would deprive or tend to deprive any individual of employment opportunities because of the individual's religion. This protection applies regardless of whether the individual is a member of a religious majority or minority. But the protection does not apply in the same way to religious employers, who have certain constitutional and statutory protections for religious hiring decisions.

**17. Title VII's protection extends to discrimination on the basis of religious observance or practice as well as belief, unless the employer cannot reasonably accommodate such observance or practice without undue hardship on the business.**

Title VII defines "religion" broadly to include all aspects of religious observance or practice, except when an employer can establish that a particular aspect of such observance or practice cannot reasonably be accommodated without undue hardship to the business. For example, covered employers are required to adjust employee work schedules for Sabbath observance, religious holidays, and other religious observances, unless doing so would create an undue hardship, such as materially compromising operations or violating a collective bargaining agreement. Title VII might also require an employer to modify a no-head-coverings policy to allow a Jewish employee to wear a yarmulke or a Muslim employee to wear a headscarf. An

Federal Law Protections for Religious Liberty
Page 6

employer who contends that it cannot reasonably accommodate a religious observance or practice must establish undue hardship on its business with specificity; it cannot rely on assumptions about hardships that might result from an accommodation.

**18. The Clinton Guidelines on Religious Exercise and Religious Expression in the Federal Workplace provide useful examples for private employers of reasonable accommodations for religious observance and practice in the workplace.**

President Clinton issued Guidelines on Religious Exercise and Religious Expression in the Federal Workplace ("Clinton Guidelines") explaining that federal employees may keep religious materials on their private desks and read them during breaks; discuss their religious views with other employees, subject to the same limitations as other forms of employee expression; display religious messages on clothing or wear religious medallions; and invite others to attend worship services at their churches, except to the extent that such speech becomes excessive or harassing. The Clinton Guidelines have the force of an Executive Order, and they also provide useful guidance to private employers about ways in which religious observance and practice can reasonably be accommodated in the workplace.

**19. Religious employers are entitled to employ only persons whose beliefs and conduct are consistent with the employers' religious precepts.**

Constitutional and statutory protections apply to certain religious hiring decisions. Religious corporations, associations, educational institutions, and societies—that is, entities that are organized for religious purposes and engage in activity consistent with, and in furtherance of, such purposes—have an express statutory exemption from Title VII's prohibition on religious discrimination in employment. Under that exemption, religious organizations may choose to employ only persons whose beliefs and conduct are consistent with the organizations' religious precepts. For example, a Lutheran secondary school may choose to employ only practicing Lutherans, only practicing Christians, or only those willing to adhere to a code of conduct consistent with the precepts of the Lutheran community sponsoring the school. Indeed, even in the absence of the Title VII exemption, religious employers might be able to claim a similar right under RFRA or the Religion Clauses of the Constitution.

**20. As a general matter, the federal government may not condition receipt of a federal grant or contract on the effective relinquishment of a religious organization's hiring exemptions or attributes of its religious character.**

Religious organizations are entitled to compete on equal footing for federal financial assistance used to support government programs. Such organizations generally may not be required to alter their religious character to participate in a government program, nor to cease engaging in explicitly religious activities outside the program, nor effectively to relinquish their federal statutory protections for religious hiring decisions.

Federal Law Protections for Religious Liberty
Page 7

## Guidance for Implementing Religious Liberty Principles

Agencies must pay keen attention, in everything they do, to the foregoing principles of religious liberty.

### Agencies As Employers

Administrative agencies should review their current policies and practices to ensure that they comply with all applicable federal laws and policies regarding accommodation for religious observance and practice in the federal workplace, and all agencies must observe such laws going forward. In particular, all agencies should review the Guidelines on Religious Exercise and Religious Expression in the Federal Workplace, which President Clinton issued on August 14, 1997, to ensure that they are following those Guidelines. All agencies should also consider practical steps to improve safeguards for religious liberty in the federal workplace, including through subject-matter experts who can answer questions about religious nondiscrimination rules, information websites that employees may access to learn more about their religious accommodation rights, and training for all employees about federal protections for religious observance and practice in the workplace.

### Agencies Engaged in Rulemaking

In formulating rules, regulations, and policies, administrative agencies should also proactively consider potential burdens on the exercise of religion and possible accommodations of those burdens. Agencies should consider designating an officer to review proposed rules with religious accommodation in mind or developing some other process to do so. In developing that process, agencies should consider drawing upon the expertise of the White House Office of Faith-Based and Neighborhood Partnerships to identify concerns about the effect of potential agency action on religious exercise. Regardless of the process chosen, agencies should ensure that they review all proposed rules, regulations, and policies that have the potential to have an effect on religious liberty for compliance with the principles of religious liberty outlined in this memorandum and appendix before finalizing those rules, regulations, or policies. The Office of Legal Policy will also review any proposed agency or executive action upon which the Department's comments, opinion, or concurrence are sought, *see, e.g.*, Exec. Order 12250 § 1-2, 45 Fed. Reg. 72995 (Nov. 2, 1980), to ensure that such action complies with the principles of religious liberty outlined in this memorandum and appendix. The Department will not concur in any proposed action that does not comply with federal law protections for religious liberty as interpreted in this memorandum and appendix, and it will transmit any concerns it has about the proposed action to the agency or the Office of Management and Budget as appropriate. If, despite these internal reviews, a member of the public identifies a significant concern about a prospective rule's compliance with federal protections governing religious liberty during a period for public comment on the rule, the agency should carefully consider and respond to that request in its decision. *See Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). In appropriate circumstances, an agency might explain that it will consider requests for accommodations on a case-by-case basis rather than in the rule itself, but the agency should provide a reasoned basis for that approach.

Federal Law Protections for Religious Liberty
Page 8

**Agencies Engaged in Enforcement Actions**

Much like administrative agencies engaged in rulemaking, agencies considering potential enforcement actions should consider whether such actions are consistent with federal protections for religious liberty. In particular, agencies should remember that RFRA applies to agency enforcement just as it applies to every other governmental action. An agency should consider RFRA when setting agency-wide enforcement rules and priorities, as well as when making decisions to pursue or continue any particular enforcement action, and when formulating any generally applicable rules announced in an agency adjudication.

Agencies should remember that discriminatory enforcement of an otherwise nondiscriminatory law can also violate the Constitution. Thus, agencies may not target or single out religious organizations or religious conduct for disadvantageous treatment in enforcement priorities or actions. The President identified one area where this could be a problem in Executive Order 13798, when he directed the Secretary of the Treasury, to the extent permitted by law, not to take any "adverse action against any individual, house of worship, or other religious organization on the basis that such individual or organization speaks or has spoken about moral or political issues from a religious perspective, where speech of *similar character*" from a non-religious perspective has not been treated as participation or intervention in a political campaign. Exec. Order No. 13798, § 2, 82 Fed. Reg. at 21675. But the requirement of nondiscrimination toward religious organizations and conduct applies across the enforcement activities of the Executive Branch, including within the enforcement components of the Department of Justice.

**Agencies Engaged in Contracting and Distribution of Grants**

Agencies also must not discriminate against religious organizations in their contracting or grant-making activities. Religious organizations should be given the opportunity to compete for government grants or contracts and participate in government programs on an equal basis with nonreligious organizations. Absent unusual circumstances, agencies should not condition receipt of a government contract or grant on the effective relinquishment of a religious organization's Section 702 exemption for religious hiring practices, or any other constitutional or statutory protection for religious organizations. In particular, agencies should not attempt through conditions on grants or contracts to meddle in the internal governance affairs of religious organizations or to limit those organizations' otherwise protected activities.

\*       \*       \*

Any questions about this memorandum or the appendix should be addressed to the Office of Legal Policy, U.S. Department of Justice, 950 Pennsylvania Avenue N.W., Washington, D.C. 20530, phone (202) 514-4601.

Federal Law Protections for Religious Liberty
Page 1a

## APPENDIX

Although not an exhaustive treatment of all federal protections for religious liberty, this appendix summarizes the key constitutional and federal statutory protections for religious liberty and sets forth the legal basis for the religious liberty principles described in the foregoing memorandum.

Constitutional Protections

The people, acting through their Constitution, have singled out religious liberty as deserving of unique protection. In the original version of the Constitution, the people agreed that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." U.S. Const., art. VI, cl. 3. The people then amended the Constitution during the First Congress to clarify that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I, cl. 1. Those protections have been incorporated against the States. *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 15 (1947) (Establishment Clause); *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (Free Exercise Clause).

A. Free Exercise Clause

The Free Exercise Clause recognizes and guarantees Americans the "right to believe and profess whatever religious doctrine [they] desire[]." *Empl't Div. v. Smith*, 494 U.S. 872, 877 (1990). Government may not attempt to *regulate* religious beliefs, *compel* religious beliefs, or *punish* religious beliefs. *See id.*; *see also Sherbert v. Verner*, 374 U.S. 398, 402 (1963); *Torcaso v. Watkins*, 367 U.S. 488, 492–93, 495 (1961); *United States v. Ballard*, 322 U.S. 78, 86 (1944). It may not lend its power to one side in intra-denominational disputes about dogma, authority, discipline, or qualifications for ministry or membership. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 185 (2012); *Smith*, 494 U.S. at 877; *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724–25 (1976); *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 451 (1969); *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church*, 344 U.S. 94, 116, 120–21 (1952). It may not discriminate against or impose special burdens upon individuals because of their religious beliefs or status. *Smith*, 494 U.S. at 877; *McDaniel v. Paty*, 435 U.S. 618, 627 (1978). And with the exception of certain historical limits on the freedom of speech, government may not punish or otherwise harass churches, church officials, or religious adherents for speaking on religious topics or sharing their religious beliefs. *See Widmar v. Vincent*, 454 U.S. 263, 269 (1981); *see also* U.S. Const., amend. I, cl. 3. The Constitution's protection against government regulation of religious belief is absolute; it is not subject to limitation or balancing against the interests of the government. *Smith*, 494 U.S. at 877; *Sherbert*, 374 U.S. at 402; *see also West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").

The Free Exercise Clause protects beliefs rooted in religion, even if such beliefs are not mandated by a particular religious organization or shared among adherents of a particular religious

Federal Law Protections for Religious Liberty
Page 2a

tradition. *Frazee v. Illinois Dept. of Emp't Sec.*, 489 U.S. 829, 833–34 (1989). As the Supreme Court has repeatedly counseled, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Church of the Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520, 531 (1993) (internal quotation marks omitted). They must merely be "sincerely held." *Frazee*, 489 U.S. at 834.

Importantly, the protection of the Free Exercise Clause also extends to acts undertaken in accordance with such sincerely-held beliefs. That conclusion flows from the plain text of the First Amendment, which guarantees the freedom to "*exercise*" religion, not just the freedom to "believe" in religion. *See Smith*, 494 U.S. at 877; *see also Thomas*, 450 U.S. at 716; *Paty*, 435 U.S. at 627; *Sherbert*, 374 U.S. at 403–04; *Wisconsin v. Yoder*, 406 U.S. 205, 219–20 (1972). Moreover, no other interpretation would actually guarantee the freedom of belief that Americans have so long regarded as central to individual liberty. Many, if not most, religious beliefs require external observance and practice through physical acts or abstention from acts. The tie between physical acts and religious beliefs may be readily apparent (e.g., attendance at a worship service) or not (e.g., service to one's community at a soup kitchen or a decision to close one's business on a particular day of the week). The "exercise of religion" encompasses all aspects of religious observance and practice. And because individuals may act collectively through associations and organizations, it encompasses the exercise of religion by such entities as well. *See, e.g., Hosanna-Tabor*, 565 U.S. at 199; *Church of the Lukumi Babalu Aye*, 508 U.S. at 525–26, 547; *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2770, 2772–73 (2014) (even a closely held for-profit corporation may exercise religion if operated in accordance with asserted religious principles).

As with most constitutional protections, however, the protection afforded to Americans by the Free Exercise Clause for physical acts is not absolute, *Smith*, 491 U.S. at 878–79, and the Supreme Court has identified certain principles to guide the analysis of the scope of that protection. First, government may not restrict "acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display," *id.* at 877, nor "target the religious for special disabilities based on their religious status," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. ___, ___ (2017) (slip op. at 6) (internal quotation marks omitted), for it was precisely such "historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause." *Church of the Lukumi Babalu Aye*, 508 U.S. at 532 (internal quotation marks omitted). The Free Exercise Clause protects against "indirect coercion or penalties on the free exercise of religion" just as surely as it protects against "outright prohibitions" on religious exercise. *Trinity Lutheran*, 582 U.S. at ___ (slip op. at 11) (internal quotation marks omitted). "It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Id.* (quoting *Sherbert*, 374 U.S. at 404).

Because a law cannot have as its official "object or purpose . . . the suppression of religion or religious conduct," courts must "survey meticulously" the text and operation of a law to ensure that it is actually neutral and of general applicability. *Church of the Lukumi Babalu Aye*, 508 U.S. at 533–34 (internal quotation marks omitted). A law is not neutral if it singles out particular religious conduct for adverse treatment; treats the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons; visits "gratuitous restrictions

Federal Law Protections for Religious Liberty
Page 3a

on religious conduct"; or "accomplishes . . . a 'religious gerrymander,' an impermissible attempt to target [certain individuals] and their religious practices." *Id.* at 533–35, 538 (internal quotation marks omitted). A law is not generally applicable if "in a selective manner [it] impose[s] burdens only on conduct motivated by religious belief," *id.* at 543, including by "fail[ing] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree than . . . does" the prohibited conduct, *id.*, or enables, expressly or de facto, "a system of individualized exemptions," as discussed in *Smith*, 494 U.S. at 884; *see also Church of the Lukumi Babalu Aye*, 508 U.S. at 537.

"Neutrality and general applicability are interrelated, . . . [and] failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* at 531. For example, a law that disqualifies a religious person or organization from a right to compete for a public benefit—including a grant or contract—because of the person's religious character is neither neutral nor generally applicable. *See Trinity Lutheran*, 582 U.S. at ___–___ (slip op. at 9–11). Likewise, a law that selectively prohibits the killing of animals for religious reasons and fails to prohibit the killing of animals for many nonreligious reasons, or that selectively prohibits a business from refusing to stock a product for religious reasons but fails to prohibit such refusal for myriad commercial reasons, is neither neutral, nor generally applicable. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 533–36, 542–45. Nonetheless, the requirements of neutral and general applicability are separate, and any law burdening religious practice that fails one or both must be subjected to strict scrutiny, *id.* at 546.

Second, even a neutral, generally applicable law is subject to strict scrutiny under this Clause if it restricts the free exercise of religion and another constitutionally protected liberty, such as the freedom of speech or association, or the right to control the upbringing of one's children. *See Smith*, 494 U.S. at 881–82; *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295–97 (10th Cir. 2004). Many Free Exercise cases fall in this category. For example, a law that seeks to compel a private person's speech or expression contrary to his or her religious beliefs implicates both the freedoms of speech and free exercise. *See, e.g.*, *Wooley v. Maynard*, 430 U.S. 705, 707–08 (1977) (challenge by Jehovah's Witnesses to requirement that state license plates display the motto "Live Free or Die"); *Axson-Flynn*, 356 F.3d at 1280 (challenge by Mormon student to University requirement that student actors use profanity and take God's name in vain during classroom acting exercises). A law taxing or prohibiting door-to-door solicitation, at least as applied to individuals distributing religious literature and seeking contributions, likewise implicates the freedoms of speech and free exercise. *Murdock v. Pennsylvania*, 319 U.S. 105, 108–09 (1943) (challenge by Jehovah's Witnesses to tax on canvassing or soliciting); *Cantwell*, 310 U.S. at 307 (same). A law requiring children to receive certain education, contrary to the religious beliefs of their parents, implicates both the parents' right to the care, custody, and control of their children and to free exercise. *Yoder*, 406 U.S. at 227–29 (challenge by Amish parents to law requiring high school attendance).

Strict scrutiny is the "most rigorous" form of scrutiny identified by the Supreme Court. *Church of the Lukumi Babalu Aye*, 508 U.S. at 546; *see also City of Boerne v. Flores*, 521 U.S. 507, 534 (1997) ("Requiring a State to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law."). It is the same standard applied to governmental classifications based on race, *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007), and

Federal Law Protections for Religious Liberty
Page 4a

restrictions on the freedom of speech, *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2228 (2015). *See Church of the Lukumi Babalu Aye*, 508 U.S. at 546–47. Under this level of scrutiny, government must establish that a challenged law "advance[s] interests of the highest order" and is "narrowly tailored in pursuit of those interests." *Id.* at 546 (internal quotation marks omitted). "[O]nly in rare cases" will a law survive this level of scrutiny. *Id.*

Of course, even when a law is neutral and generally applicable, government may run afoul of the Free Exercise Clause if it interprets or applies the law in a manner that discriminates against religious observance and practice. *See, e.g., Church of the Lukumi Babalu Aye*, 508 U.S. at 537 (government discriminatorily interpreted an ordinance prohibiting the unnecessary killing of animals as prohibiting only killing of animals for religious reasons); *Fowler v. Rhode Island*, 345 U.S. 67, 69–70 (1953) (government discriminatorily enforced ordinance prohibiting meetings in public parks against only certain religious groups). The Free Exercise Clause, much like the Free Speech Clause, requires equal treatment of religious adherents. *See Trinity Lutheran*, 582 U.S. at __ (slip op. at 6); *cf. Good News Club v. Milford Central Sch.*, 533 U.S. 98, 114 (2001) (recognizing that Establishment Clause does not justify discrimination against religious clubs seeking use of public meeting spaces); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 837, 841 (1995) (recognizing that Establishment Clause does not justify discrimination against religious student newspaper's participation in neutral reimbursement program). That is true regardless of whether the discriminatory application is initiated by the government itself or by private requests or complaints. *See, e.g., Fowler*, 345 U.S. at 69; *Niemotko v. Maryland*, 340 U.S. 268, 272 (1951).

B. Establishment Clause

The Establishment Clause, too, protects religious liberty. It prohibits government from establishing a religion and coercing Americans to follow it. *See Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811, 1819–20 (2014); *Good News Club*, 533 U.S. at 115. It restricts government from interfering in the internal governance or ecclesiastical decisions of a religious organization. *Hosanna-Tabor*, 565 U.S. at 188–89. And it prohibits government from officially favoring or disfavoring particular religious groups as such or officially advocating particular religious points of view. *See Galloway*, 134 S. Ct. at 1824; *Larson v. Valente*, 456 U.S. 228, 244–46 (1982). Indeed, "a significant factor in upholding governmental programs in the face of Establishment Clause attack is their *neutrality* towards religion." *Rosenberger*, 515 U.S. at 839 (emphasis added). That "guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Id.* Thus, religious adherents and organizations may, like nonreligious adherents and organizations, receive indirect financial aid through independent choice, or, in certain circumstances, direct financial aid through a secular-aid program. *See, e.g., Trinity Lutheran*, 582 U.S. at __ (slip op. at 6) (scrap tire program); *Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002) (voucher program).

C. Religious Test Clause

Finally, the Religious Test Clause, though rarely invoked, provides a critical guarantee to religious adherents that they may serve in American public life. The Clause reflects the judgment

Federal Law Protections for Religious Liberty
Page 5a

of the Framers that a diversity of religious viewpoints in government would enhance the liberty of all Americans. And after the Religion Clauses were incorporated against the States, the Supreme Court shared this view, rejecting a Tennessee law that "establishe[d] as a condition of office the willingness to eschew certain protected religious practices." *Paty*, 435 U.S. at 632 (Brennan, J., and Marshall, J., concurring in judgment); *see also id.* at 629 (plurality op.) ("[T]he American experience provides no persuasive support for the fear that clergymen in public office will be less careful of anti-establishment interests or less faithful to their oaths of civil office than their unordained counterparts.").

Statutory Protections

Recognizing the centrality of religious liberty to our nation, Congress has buttressed these constitutional rights with statutory protections for religious observance and practice. These protections can be found in, among other statutes, the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb *et seq.*; the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; and the American Indian Religious Freedom Act, 42 U.S.C. § 1996. Such protections ensure not only that government tolerates religious observance and practice, but that it embraces religious adherents as full members of society, able to contribute through employment, use of public accommodations, and participation in government programs. The considered judgment of the United States is that we are stronger through accommodation of religion than segregation or isolation of it.

A. Religious Freedom Restoration Act of 1993 (RFRA)

The Religious Freedom Restoration Act of 1993 **(RFRA)**, 42 U.S.C. § 2000bb *et seq.*, prohibits the federal government from "substantially burden[ing] a person's exercise of religion" unless "it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(a), (b). The Act applies even where the burden arises out of a "rule of general applicability" passed without animus or discriminatory intent. *See id.* § 2000bb-1(a). It applies to "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," *see* §§ 2000bb-2(4), 2000cc-5(7), and covers "individuals" as well as "corporations, companies, associations, firms, partnerships, societies, and joint stock companies," 1 U.S.C. § 1, including for-profit, closely-held corporations like those involved in *Hobby Lobby*, 134 S. Ct. at 2768.

Subject to the exceptions identified below, a law "substantially burden[s] a person's exercise of religion," 42 U.S.C. § 2000bb-1, if it bans an aspect of the adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice, *see Sherbert*, 374 U.S. at 405–06. The "threat of criminal sanction" will satisfy these principles, even when, as in *Yoder*, the prospective punishment is a mere $5 fine. 406 U.S. at 208, 218. And the denial of, or condition on the receipt of, government benefits may substantially burden the exercise of religion under these principles. *Sherbert*, 374 U.S. at 405–06; *see also Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141 (1987); *Thomas*, 450 U.S. at 717–18. But a law that infringes, even severely, an aspect of an adherent's religious observance or practice that the adherent himself

regards as unimportant or inconsequential imposes no substantial burden on that adherent. And a law that regulates only the government's internal affairs and does not involve any governmental compulsion on the religious adherent likewise imposes no substantial burden. *See, e.g., Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 448–49 (1988); *Bowen v. Roy*, 476 U.S. 693, 699–700 (1986).

As with claims under the Free Exercise Clause, **RFRA does not permit a court to inquire into the reasonableness of a religious belief**, including into the adherent's assessment of the religious connection between a belief asserted and what the government forbids, requires, or prevents. *Hobby Lobby*, 134 S. Ct. at 2778. If the proffered belief is sincere, it is not the place of the government or a court to second-guess it. *Id.* A good illustration of the point is *Thomas v. Review Board of Indiana Employment Security Division*—one of the *Sherbert* line of cases, whose analytical test Congress sought, through RFRA, to restore, 42 U.S.C. § 2000bb. There, the Supreme Court concluded that the denial of unemployment benefits was a substantial burden on the sincerely held religious beliefs of a Jehovah's Witness who had quit his job after he was transferred from a department producing sheet steel that could be used for military armaments to a department producing turrets for military tanks. *Thomas*, 450 U.S. at 716–18. In doing so, the Court rejected the lower court's inquiry into "what [the claimant's] belief was and what the religious basis of his belief was," noting that no one had challenged the sincerity of the claimant's religious beliefs and that "[c]ourts should not undertake to dissect religious beliefs because the believer admits that he is struggling with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id.* at 714–15 (internal quotation marks omitted). The Court likewise rejected the lower court's comparison of the claimant's views to those of other Jehovah's Witnesses, noting that "[i]ntrafaith differences of that kind are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences." *Id.* at 715. The Supreme Court reinforced this reasoning in *Hobby Lobby*, rejecting the argument that "the connection between what the objecting parties [were required to] do (provide health-insurance coverage for four methods of contraception that may operate after the fertilization of an egg) and the end that they [found] to be morally wrong (destruction of an embryo) [wa]s simply too attenuated." 134 S. Ct. at 2777. The Court explained that the plaintiff corporations had a sincerely-held religious belief that provision of the coverage was morally wrong, and it was "not for us to say that their religious beliefs are mistaken or insubstantial." *Id.* at 2779.

Government bears a heavy burden to justify a substantial burden on the exercise of religion. "[O]nly those interests of the highest order . . . can overbalance legitimate claims to the free exercise of religion." *Thomas*, 450 U.S. at 718 (quoting *Yoder*, 406 U.S. at 215). Such interests include, for example, the "fundamental, overriding interest in eradicating racial discrimination in education—discrimination that prevailed, with official approval, for the first 165 years of this Nation's history," *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983), and the interest in ensuring the "mandatory and continuous participation" that is "indispensable to the fiscal vitality of the social security system," *United States v. Lee*, 455 U.S. 252, 258–59 (1982). But "broadly formulated interests justifying the general applicability of government mandates" are insufficient. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). The government must establish a compelling interest to deny an accommodation to the particular claimant. *Id.* at 430, 435–38. For example, the military may have a compelling interest in its

Federal Law Protections for Religious Liberty
Page 7a

uniform and grooming policy to ensure military readiness and protect our national security, but it does not necessarily follow that those interests would justify denying a particular soldier's request for an accommodation from the uniform and grooming policy. *See, e.g.*, Secretary of the Army, Army Directive 2017-03, Policy for Brigade-Level Approval of Certain Requests for Religious Accommodation (2017) (recognizing the "successful examples of Soldiers currently serving with" an accommodation for "the wear of a hijab; the wear of a beard; and the wear of a turban or under-turban/patka, with uncut beard and uncut hair" and providing for a reasonable accommodation of these practices in the Army). The military would have to show that it has a compelling interest in denying that particular accommodation. **An asserted compelling interest in denying an accommodation to a particular claimant is undermined by evidence that exemptions or accommodations have been granted for other interests.** *See O Centro*, 546 U.S. at 433, 436–37; *see also Hobby Lobby*, 134 S. Ct. at 2780. 

The compelling-interest requirement applies even where the accommodation sought is "an exemption from a legal obligation requiring [the claimant] to confer benefits on third parties." *Hobby Lobby*, 134 S. Ct. at 2781 n.37. Although "in applying RFRA 'courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries,'" the Supreme Court has explained that almost any governmental regulation could be reframed as a legal obligation requiring a claimant to confer benefits on third parties. *Id.* (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005)). As nothing in the text of RFRA admits of an exception for laws requiring a claimant to confer benefits on third parties, 42 U.S.C. § 2000bb-1, and such an exception would have the potential to swallow the rule, the Supreme Court has rejected the proposition that RFRA accommodations are categorically unavailable for laws requiring claimants to confer benefits on third parties. *Hobby Lobby*, 134 S. Ct. at 2781 n.37.

Even if the government can identify a compelling interest, the government must also show that denial of an accommodation is the least restrictive means of serving that compelling governmental interest. This standard is "exceptionally demanding." *Hobby Lobby*, 134 S. Ct. at 2780. It requires the government to show that it cannot accommodate the religious adherent while achieving its interest through a viable alternative, which may include, in certain circumstances, expenditure of additional funds, modification of existing exemptions, or creation of a new program. *Id.* at 2781. Indeed, the existence of exemptions for other individuals or entities that could be expanded to accommodate the claimant, while still serving the government's stated interests, will generally defeat a RFRA defense, as the government bears the burden to establish that no accommodation is viable. *See id.* at 2781–82.

B. Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA)

Although Congress's leadership in adopting RFRA led many States to pass analogous statutes, Congress recognized the unique threat to religious liberty posed by certain categories of state action and passed the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) to address them. RLUIPA extends a standard analogous to RFRA to state and local government actions regulating land use and institutionalized persons where "the substantial burden is imposed in a program or activity that receives Federal financial assistance" or "the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes." 42 U.S.C. §§ 2000cc(a)(2), 2000cc-1(b).

Federal Law Protections for Religious Liberty
Page 8a

RLUIPA's protections must "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by [RLUIPA] and the Constitution." *Id.* § 2000cc-3(g). RLUIPA applies to "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," *id.* § 2000cc-5(7)(A), and treats "[t]he use, building, or conversion of real property for the purpose of religious exercise" as the "religious exercise of the person or entity that uses or intends to use the property for that purpose," *id.* § 2000cc-5(7)(B). Like RFRA, RLUIPA prohibits government from substantially burdening an exercise of religion unless imposition of the burden on the religious adherent is the least restrictive means of furthering a compelling governmental interest. *See id.* § 2000cc-1(a). That standard "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." *Id.* § 2000cc-3(c); *cf. Holt v. Hobbs*, 135 S. Ct. 853, 860, 864–65 (2015).

With respect to land use in particular, RLUIPA also requires that government not "treat[] a religious assembly or institution on less than equal terms with a nonreligious assembly or institution," 42 U.S.C. § 2000cc(b)(1), "impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination," *id.* § 2000cc(b)(2), or "impose or implement a land use regulation that (A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction," *id.* § 2000cc(b)(3). A claimant need not show a substantial burden on the exercise of religion to enforce these antidiscrimination and equal terms provisions listed in § 2000cc(b). *See id.* § 2000cc(b); *see also Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 262–64 (3d Cir. 2007), *cert. denied*, 553 U.S. 1065 (2008). Although most RLUIPA cases involve places of worship like churches, mosques, synagogues, and temples, the law applies more broadly to religious schools, religious camps, religious retreat centers, and religious social service facilities. Letter from U.S. Dep't of Justice Civil Rights Division to State, County, and Municipal Officials re: The Religious Land Use and Institutionalized Persons Act (Dec. 15, 2016).

C. Other Civil Rights Laws

To incorporate religious adherents fully into society, Congress has recognized that it is not enough to limit governmental action that substantially burdens the exercise of religion. It must also root out public and private discrimination based on religion. Religious discrimination stood alongside discrimination based on race, color, and national origin, as an evil to be addressed in the Civil Rights Act of 1964, and Congress has continued to legislate against such discrimination over time. Today, the United States Code includes specific prohibitions on religious discrimination in places of public accommodation, 42 U.S.C. § 2000a; in public facilities, *id.* § 2000b; in public education, *id.* § 2000c-6; in employment, *id.* §§ 2000e, 2000e-2, 2000e-16; in the sale or rental of housing, *id.* § 3604; in the provision of certain real-estate transaction or brokerage services, *id.* §§ 3605, 3606; in federal jury service, 28 U.S.C. § 1862; in access to limited open forums for speech, 20 U.S.C. § 4071; and in participation in or receipt of benefits from various federally-funded programs, 15 U.S.C. § 3151; 20 U.S.C. §§ 1066c(d), 1071(a)(2), 1087-4, 7231d(b)(2), 7914; 31 U.S.C. § 6711(b)(3); 42 U.S.C. §§ 290cc-33(a)(2), 300w-7(a)(2), 300x-57(a)(2), 300x-65(f), 604a(g), 708(a)(2), 5057(c), 5151(a), 5309(a), 6727(a), 9858l(a)(2), 10406(2)(B), 10504(a), 10604(e), 12635(c)(1), 12832, 13791(g)(3), 13925(b)(13)(A).

Federal Law Protections for Religious Liberty
Page 9a

Invidious religious discrimination may be directed at religion in general, at a particular religious belief, or at particular aspects of religious observance and practice. *See, e.g., Church of the Lukumi Babalu Aye*, 508 U.S. at 532–33. A law drawn to prohibit a specific religious practice may discriminate just as severely against a religious group as a law drawn to prohibit the religion itself. *See id.* No one would doubt that a law prohibiting the sale and consumption of Kosher meat would discriminate against Jewish people. True equality may also require, depending on the applicable statutes, an awareness of, and willingness reasonably to accommodate, religious observance and practice. Indeed, the denial of reasonable accommodations may be little more than cover for discrimination against a particular religious belief or religion in general and is counter to the general determination of Congress that the United States is best served by the participation of religious adherents in society, not their withdrawal from it.

    1.  Employment

        i.  Protections for Religious Employees

Protections for religious individuals in employment are the most obvious example of Congress's instruction that religious observance and practice be reasonably accommodated, not marginalized. In Title VII of the Civil Rights Act, Congress declared it an unlawful employment practice for a covered employer to (1) "fail or refuse to hire or to discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion," as well as (2) to "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a); *see also* 42 U.S.C. § 2000e-16(a) (applying Title VII to certain federal-sector employers); 3 U.S.C. § 411(a) (applying Title VII employment in the Executive Office of the President). The protection applies "regardless of whether the discrimination is directed against [members of religious] majorities or minorities." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 71–72 (1977).

After several courts had held that employers did not violate Title VII when they discharged employees for refusing to work on their Sabbath, Congress amended Title VII to define "[r]eligion" broadly to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j); *Hardison*, 432 U.S. at 74 n.9. Congress thus made clear that discrimination on the basis of religion includes discrimination on the basis of any aspect of an employee's religious observance or practice, at least where such observance or practice can be reasonably accommodated without undue hardship.

Title VII's reasonable accommodation requirement is meaningful. As an initial matter, it requires an employer to consider what adjustment or modification to its policies would effectively address the employee's concern, for "[a]n *ineffective* modification or adjustment will not *accommodate*" a person's religious observance or practice, within the ordinary meaning of that word. *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) (considering the ordinary

meaning in the context of an ADA claim). Although there is no obligation to provide an employee with his or her preferred reasonable accommodation, *see Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986), an employer may justify a refusal to accommodate only by showing that "an undue hardship [on its business] would *in fact* result from *each available* alternative method of accommodation." 29 C.F.R. § 1605.2(c)(1) (emphasis added). "A mere assumption that many more people, with the same religious practices as the person being accommodated, may also need accommodation is not evidence of undue hardship." *Id.* Likewise, the fact that an accommodation may grant the religious employee a preference is not evidence of undue hardship as, "[b]y definition, any special 'accommodation' requires the employer to treat an employee . . . differently, *i.e.*, preferentially." *U.S. Airways*, 535 U.S. at 397; *see also E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2034 (2015) ("Title VII does not demand mere neutrality with regard to religious practices—that they may be treated no worse than other practices. Rather, it gives them favored treatment.").

Title VII does not, however, require accommodation at all costs. As noted above, an employer is not required to accommodate a religious observance or practice if it would pose an undue hardship on its business. An accommodation might pose an "undue hardship," for example, if it would require the employer to breach an otherwise valid collective bargaining agreement, *see, e.g.*, *Hardison*, 432 U.S. at 79, or carve out a special exception to a seniority system, *id.* at 83; *see also U.S. Airways*, 535 U.S. at 403. Likewise, an accommodation might pose an "undue hardship" if it would impose "more than a de minimis cost" on the business, such as in the case of a company where weekend work is "essential to [the] business" and many employees have religious observances that would prohibit them from working on the weekends, so that accommodations for all such employees would result in significant overtime costs for the employer. *Hardison*, 432 U.S. at 80, 84 & n.15. In general, though, Title VII expects positive results for society from a cooperative process between an employer and its employee "in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Philbrook*, 479 U.S. at 69 (internal quotations omitted).

The area of religious speech and expression is a useful example of reasonable accommodation. Where speech or expression is part of a person's religious observance and practice, it falls within the scope of Title VII. *See* 42 U.S.C. §§ 2000e, 2000e-2. Speech or expression outside of the scope of an individual's employment can almost always be accommodated without undue hardship to a business. Speech or expression within the scope of an individual's employment, during work hours, or in the workplace may, depending upon the facts and circumstances, be reasonably accommodated. *Cf. Abercrombie*, 135 S. Ct. at 2032.

The federal government's approach to free exercise in the federal workplace provides useful guidance on such reasonable accommodations. For example, under the Guidelines issued by President Clinton, the federal government permits a federal employee to "keep a Bible or Koran on her private desk and read it during breaks"; to discuss his religious views with other employees, subject "to the same rules of order as apply to other employee expression"; to display religious messages on clothing or wear religious medallions visible to others; and to hand out religious tracts to other employees or invite them to attend worship services at the employee's church, except to the extent that such speech becomes excessive or harassing. Guidelines on Religious Exercise and Religious Expression in the Federal Workplace, § 1(A), Aug. 14, 1997 (hereinafter "Clinton

Federal Law Protections for Religious Liberty
Page 11a

Guidelines"). The Clinton Guidelines have the force of an Executive Order. *See Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order*, 24 Op. O.L.C. 29, 29 (2000) ("[T]here is no substantive difference in the legal effectiveness of an executive order and a presidential directive that is styled other than as an executive order."); *see also* Memorandum from President William J. Clinton to the Heads of Executive Departments and Agencies (Aug. 14, 1997) ("All civilian executive branch agencies, officials, and employees must follow these Guidelines carefully."). The successful experience of the federal government in applying the Clinton Guidelines over the last twenty years is evidence that religious speech and expression can be reasonably accommodated in the workplace without exposing an employer to liability under workplace harassment laws.

Time off for religious holidays is also often an area of concern. The observance of religious holidays is an "aspect[] of religious observance and practice" and is therefore protected by Title VII. 42 U.S.C. §§ 2000e, 2000e-2. Examples of reasonable accommodations for that practice could include a change of job assignments or lateral transfer to a position whose schedule does not conflict with the employee's religious holidays, 29 C.F.R. § 1605.2(d)(1)(iii); a voluntary work schedule swap with another employee, *id.* § 1065.2(d)(1)(i); or a flexible scheduling scheme that allows employees to arrive or leave early, use floating or optional holidays for religious holidays, or make up time lost on another day, *id.* § 1065.2(d)(1)(ii). Again, the federal government has demonstrated reasonable accommodation through its own practice: Congress has created a flexible scheduling scheme for federal employees, which allows employees to take compensatory time off for religious observances, 5 U.S.C. § 5550a, and the Clinton Guidelines make clear that "[a]n agency must adjust work schedules to accommodate an employee's religious observance—for example, Sabbath or religious holiday observance—if an adequate substitute is available, or if the employee's absence would not otherwise impose an undue burden on the agency," Clinton Guidelines § 1(C). If an employer regularly permits accommodation in work scheduling for secular conflicts and denies such accommodation for religious conflicts, "such an arrangement would display a discrimination against religious practices that is the antithesis of reasonableness." *Philbrook*, 479 U.S. at 71.

Except for certain exceptions discussed in the next section, Title VII's protection against disparate treatment, 42 U.S.C. § 2000e-2(a)(1), is implicated *any time* religious observance or practice is a motivating factor in an employer's covered decision. *Abercrombie*, 135 S. Ct. at 2033. That is true even when an employer acts without actual knowledge of the need for an accommodation from a neutral policy but with "an unsubstantiated suspicion" of the same. *Id.* at 2034.

### ii. Protections for Religious Employers

Congress has acknowledged, however, that religion sometimes *is* an appropriate factor in employment decisions, and it has limited Title VII's scope accordingly. Thus, for example, where religion "is a bona fide occupational qualification reasonably necessary to the normal operation of [a] particular business or enterprise," employers may hire and employ individuals based on their religion. 42 U.S.C. § 2000e-2(e)(1). Likewise, where educational institutions are "owned, supported, controlled or managed, [in whole or in substantial part] by a particular religion or by a particular religious corporation, association, or society" or direct their curriculum "toward the

Federal Law Protections for Religious Liberty
Page 12a

propagation of a particular religion," such institutions may hire and employ individuals of a particular religion. *Id.* And "a religious corporation, association, educational institution, or society" may employ "individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." *Id.* § 2000e-1(a); *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 335–36 (1987).

Because Title VII defines "religion" broadly to include "all aspects of religious observance and practice, as well as belief," 42 U.S.C. § 2000e(j), these exemptions include decisions "to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991); *see also Killinger v. Samford Univ.*, 113 F.3d 196, 198–200 (11th Cir. 1997). For example, in *Little*, the Third Circuit held that the exemption applied to a Catholic school's decision to fire a divorced Protestant teacher who, though having agreed to abide by a code of conduct shaped by the doctrines of the Catholic Church, married a baptized Catholic without first pursuing the official annulment process of the Church. 929 F.2d at 946, 951.

Section 702 broadly exempts from its reach religious corporations, associations, educational institutions, and societies. The statute's terms do not limit this exemption to non-profit organizations, to organizations that carry on only religious activities, or to organizations established by a church or formally affiliated therewith. *See* Civil Rights Act of 1964, § 702(a), *codified at* 42 U.S.C. § 2000e-1(a); *see also Hobby Lobby*, 134 S. Ct. at 2773–74; *Corp. of Presiding Bishop*, 483 U.S. at 335–36. The exemption applies whenever the organization is "religious," which means that it is organized for religious purposes and engages in activity consistent with, and in furtherance of, such purposes. Br. of Amicus Curiae the U.S. Supp. Appellee, *Spencer v. World Vision, Inc.*, No. 08-35532 (9th Cir. 2008). Thus, the exemption applies not just to religious denominations and houses of worship, but to religious colleges, charitable organizations like the Salvation Army and World Vision International, and many more. In that way, it is consistent with other broad protections for religious entities in federal law, including, for example, the exemption of religious entities from many of the requirements under the Americans with Disabilities Act. *See* 28 C.F.R. app. C; 56 Fed. Reg. 35544, 35554 (July 26, 1991) (explaining that "[t]he ADA's exemption of religious organizations and religious entities controlled by religious organizations is very broad, encompassing a wide variety of situations").

In addition to these explicit exemptions, religious organizations may be entitled to additional exemptions from discrimination laws. *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 180, 188–90. For example, a religious organization might conclude that it cannot employ an individual who fails faithfully to adhere to the organization's religious tenets, either because doing so might itself inhibit the organization's exercise of religion or because it might dilute an expressive message. *Cf. Boy Scouts of Am. v. Dale*, 530 U.S. 640, 649–55 (2000). Both constitutional and statutory issues arise when governments seek to regulate such decisions.

As a constitutional matter, religious organizations' decisions are protected from governmental interference to the extent they relate to ecclesiastical or internal governance matters. *Hosanna-Tabor*, 565 U.S. at 180, 188–90. It is beyond dispute that "it would violate the First Amendment for courts to apply [employment discrimination] laws to compel the ordination of

women by the Catholic Church or by an Orthodox Jewish seminary." *Id.* at 188. The same is true for other employees who "minister to the faithful," including those who are not themselves the head of the religious congregation and who are not engaged solely in religious functions. *Id.* at 188, 190, 194–95; *see also* Br. of Amicus Curiae the U.S. Supp. Appellee, *Spencer v. World Vision, Inc.*, No. 08-35532 (9th Cir. 2008) (noting that the First Amendment protects "the right to employ staff who share the religious organization's religious beliefs").

Even if a particular associational decision could be construed to fall outside this protection, the government would likely still have to show that any interference with the religious organization's associational rights is justified under strict scrutiny. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) (infringements on expressive association are subject to strict scrutiny); *Smith*, 494 U.S. at 882 ("[I]t is easy to envision a case in which a challenge on freedom of association grounds would likewise be reinforced by Free Exercise Clause concerns."). The government may be able to meet that standard with respect to race discrimination, *see Bob Jones Univ.*, 461 U.S. at 604, but may not be able to with respect to other forms of discrimination. For example, at least one court has held that forced inclusion of women into a mosque's religious men's meeting would violate the freedom of expressive association. *Donaldson v. Farrakhan*, 762 N.E.2d 835, 840–41 (Mass. 2002). The Supreme Court has also held that the government's interest in addressing sexual-orientation discrimination is not sufficiently compelling to justify an infringement on the expressive association rights of a private organization. *Boy Scouts*, 530 U.S. at 659.

As a statutory matter, RFRA too might require an exemption or accommodation for religious organizations from antidiscrimination laws. For example, "prohibiting religious organizations from hiring only coreligionists can 'impose a significant burden on their exercise of religion, even as applied to employees in programs that must, by law, refrain from specifically religious activities.'" *Application of the Religious Freedom Restoration Act to the Award of a Grant Pursuant to the Juvenile Justice and Delinquency Prevention Act*, 31 Op. O.L.C. 162, 172 (2007) (quoting *Direct Aid to Faith-Based Organizations Under the Charitable Choice Provisions of the Community Solutions Act of 2001*, 25 Op. O.L.C. 129, 132 (2001)); *see also Corp. of Presiding Bishop*, 483 U.S. at 336 (noting that it would be "a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court w[ould] consider religious" in applying a nondiscrimination provision that applied only to secular, but not religious, activities). If an organization establishes the existence of such a burden, the government must establish that imposing such burden on the organization is the least restrictive means of achieving a compelling governmental interest. That is a demanding standard and thus, even where Congress has not expressly exempted religious organizations from its antidiscrimination laws—as it has in other contexts, *see, e.g.*, 42 U.S.C. §§ 3607 (Fair Housing Act), 12187 (Americans with Disabilities Act)—RFRA might require such an exemption.

2. Government Programs

Protections for religious organizations likewise exist in government contracts, grants, and other programs. Recognizing that religious organizations can make important contributions to government programs, *see, e.g.*, 22 U.S.C. § 7601(19), Congress has expressly permitted religious organizations to participate in numerous such programs on an equal basis with secular

Federal Law Protections for Religious Liberty
Page 14a

organizations, *see, e.g.*, 42 U.S.C. §§ 290kk-1, 300x-65 604a, 629i. Where Congress has not expressly so provided, the President has made clear that "[t]he Nation's social service capacity will benefit if all eligible organizations, including faith-based and other neighborhood organizations, are able to compete on an equal footing for Federal financial assistance used to support social service programs." Exec. Order No. 13559, § 1, 75 Fed. Reg. 71319, 71319 (Nov. 17, 2010) (amending Exec. Order No. 13279, 67 Fed. Reg. 77141 (2002)). To that end, no organization may be "discriminated against on the basis of religion or religious belief in the administration or distribution of Federal financial assistance under social service programs." *Id.* "Organizations that engage in explicitly religious activities (including activities that involve overt religious content such as worship, religious instruction, or proselytization)" are eligible to participate in such programs, so long as they conduct such activities outside of the programs directly funded by the federal government and at a separate time and location. *Id.*

The President has assured religious organizations that they are "eligible to compete for Federal financial assistance used to support social service programs and to participate fully in the social services programs supported with Federal financial assistance without impairing their independence, autonomy, expression outside the programs in question, or religious character." *See id.*; *see also* 42 U.S.C. § 290kk-1(e) (similar statutory assurance). Religious organizations that apply for or participate in such programs may continue to carry out their mission, "including the definition, development, practice, and expression of . . . religious beliefs," so long as they do not use any "direct Federal financial assistance" received "to support or engage in any explicitly religious activities" such as worship, religious instruction, or proselytization. Exec. Order No. 13559, § 1. They may also "use their facilities to provide social services supported with Federal financial assistance, without removing or altering religious art, icons, scriptures, or other symbols from these facilities," and they may continue to "retain religious terms" in their names, select "board members on a religious basis, and include religious references in . . . mission statements and other chartering or governing documents." *Id.*

With respect to government contracts in particular, Executive Order 13279, 67 Fed. Reg. 77141 (Dec. 12, 2002), confirms that the independence and autonomy promised to religious organizations include independence and autonomy in religious hiring. Specifically, it provides that the employment nondiscrimination requirements in Section 202 of Executive Order 11246, which normally apply to government contracts, do "not apply to a Government contractor or subcontractor that is a religious corporation, association, educational institution, or society, with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." Exec. Order No. 13279, § 4, *amending* Exec. Order No. 11246, § 204(c), 30 Fed. Reg. 12319, 12935 (Sept. 24, 1965).

Because the religious hiring protection in Executive Order 13279 parallels the Section 702 exemption in Title VII, it should be interpreted to protect the decision "to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little*, 929 F.2d at 951. That parallel interpretation is consistent with the Supreme Court's repeated counsel that the decision to borrow statutory text in a new statute is "strong indication that the two statutes should be interpreted pari passu." *Northcross v. Bd. of Educ. of Memphis City Sch.*, 412 U.S. 427 (1973) (per curiam); *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich L.P.A.*, 559

Federal Law Protections for Religious Liberty
Page 15a

U.S. 573, 590 (2010). It is also consistent with the Executive Order's own usage of discrimination on the basis of "religion" as something distinct and more expansive than discrimination on the basis of "religious belief." *See, e.g.*, Exec. Order No. 13279, § 2(c) ("No organization should be discriminated against on the basis of religion *or* religious belief . . . " (emphasis added)); *id.* § 2(d) ("All organizations that receive Federal financial assistance under social services programs should be prohibited from discriminating against beneficiaries or potential beneficiaries of the social services programs on the basis of religion or religious belief. Accordingly, organizations, in providing services supported in whole or in part with Federal financial assistance, and in their outreach activities related to such services, should not be allowed to discriminate against current or prospective program beneficiaries on the basis of religion, a religious belief, a refusal to hold a religious belief, or a refusal to actively participate in a religious practice."). Indeed, because the Executive Order uses "on the basis of religion or religious belief" in both the provision prohibiting discrimination against religious organizations and the provision prohibiting discrimination "against beneficiaries or potential beneficiaries," a narrow interpretation of the protection for religious organizations' hiring decisions would lead to a narrow protection for beneficiaries of programs served by such organizations. *See id.* §§ 2(c), (d). It would also lead to inconsistencies in the treatment of religious hiring across government programs, as some program-specific statutes and regulations expressly confirm that "[a] religious organization's exemption provided under section 2000e-1 of this title regarding employment practices shall not be affected by its participation, or receipt of funds from, a designated program." 42 U.S.C. § 290kk-1(e); *see also* 6 C.F.R. § 19.9 (same).

Even absent the Executive Order, however, RFRA would limit the extent to which the government could condition participation in a federal grant or contract program on a religious organization's effective relinquishment of its Section 702 exemption. RFRA applies to all government conduct, not just to legislation or regulation, *see* 42 U.S.C. § 2000bb-1, and the Office of Legal Counsel has determined that application of a religious nondiscrimination law to the hiring decisions of a religious organization can impose a substantial burden on the exercise of religion. *Application of the Religious Freedom Restoration Act to the Award of a Grant*, 31 Op. O.L.C. at 172; *Direct Aid to Faith-Based Organizations*, 25 Op. O.L.C. at 132. Given Congress's "recognition that religious discrimination in employment is permissible in some circumstances," the government will not ordinarily be able to assert a compelling interest in prohibiting that conduct as a general condition of a religious organization's receipt of any particular government grant or contract. *Application of the Religious Freedom Restoration Act to the Award of a Grant*, 31 Op. of O.L.C. at 186. The government will also bear a heavy burden to establish that requiring a particular contractor or grantee effectively to relinquish its Section 702 exemption is the least restrictive means of achieving a compelling governmental interest. *See* 42 U.S.C. § 2000bb-1.

The First Amendment also "supplies a limit on Congress' ability to place conditions on the receipt of funds." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2328 (2013) (internal quotation marks omitted)). Although Congress may specify the activities that it wants to subsidize, it may not "seek to leverage funding" to regulate constitutionally protected conduct "outside the contours of the program itself." *See id.* Thus, if a condition on participation in a government program—including eligibility for receipt of federally backed student loans— would interfere with a religious organization's constitutionally protected rights, *see, e.g.*,

Federal Law Protections for Religious Liberty
Page 16a

*Hosanna-Tabor*, 565 U.S. at 188–89, that condition could raise concerns under the "unconstitutional conditions" doctrine, *see All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. at 2328.

Finally, Congress has provided an additional statutory protection for educational institutions controlled by religious organizations who provide education programs or activities receiving federal financial assistance. Such institutions are exempt from Title IX's prohibition on sex discrimination in those programs and activities where that prohibition "would not be consistent with the religious tenets of such organization[s]." 20 U.S.C. § 1681(a)(3). Although eligible institutions may "claim the exemption" in advance by "submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions . . . [that] conflict with a specific tenet of the religious organization," 34 C.F.R. § 106.12(b), they are not required to do so to have the benefit of it, *see* 20 U.S.C. § 1681.

3. Government Mandates

Congress has undertaken many similar efforts to accommodate religious adherents in diverse areas of federal law. For example, it has exempted individuals who, "by reason of religious training and belief," are conscientiously opposed to war from training and service in the armed forces of the United States. 50 U.S.C. § 3806(j). It has exempted "ritual slaughter and the handling or other preparation of livestock for ritual slaughter" from federal regulations governing methods of animal slaughter. 7 U.S.C. § 1906. It has exempted "private secondary school[s] that maintain[] a religious objection to service in the Armed Forces" from being required to provide military recruiters with access to student recruiting information. 20 U.S.C. § 7908. It has exempted federal employees and contractors with religious objections to the death penalty from being required to "be in attendance at or to participate in any prosecution or execution." 18 U.S.C. § 3597(b). It has allowed individuals with religious objections to certain forms of medical treatment to opt out of such treatment. *See, e.g.*, 33 U.S.C. § 907(k); 42 U.S.C. § 290bb-36(f). It has created tax accommodations for members of religious faiths conscientiously opposed to acceptance of the benefits of any private or public insurance, *see, e.g.*, 26 U.S.C. §§ 1402(g), 3127, and for members of religious orders required to take a vow of poverty, *see, e.g.*, 26 U.S.C. § 3121(r).

Congress has taken special care with respect to programs touching on abortion, sterilization, and other procedures that may raise religious conscience objections. For example, it has prohibited entities receiving certain federal funds for health service programs or research activities from requiring individuals to participate in such program or activity contrary to their religious beliefs. 42 U.S.C. § 300a-7(d), (e). It has prohibited discrimination against health care professionals and entities that refuse to undergo, require, or provide training in the performance of induced abortions; to provide such abortions; or to refer for such abortions, and it will deem accredited any health care professional or entity denied accreditation based on such actions. *Id.* § 238n(a), (b). It has also made clear that receipt of certain federal funds does not require an individual "to perform or assist in the performance of any sterilization procedure or abortion if [doing so] would be contrary to his religious beliefs or moral convictions" nor an entity to "make its facilities available for the performance of" those procedures if such performance "is prohibited by the entity on the basis of religious beliefs or moral convictions," nor an entity to "provide any personnel for the performance or assistance in the performance of" such procedures if such performance or assistance "would be contrary to the religious beliefs or moral convictions of such

Federal Law Protections for Religious Liberty
Page 17a

personnel." *Id.* § 300a-7(b). Finally, no "qualified health plan[s] offered through an Exchange" may discriminate against any health care professional or entity that refuses to "provide, pay for, provide coverage of, or refer for abortions," § 18023(b)(4); *see also* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. H, § 507(d), 129 Stat. 2242, 2649 (Dec. 18, 2015).

Congress has also been particularly solicitous of the religious freedom of American Indians. In 1978, Congress declared it the "policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." 42 U.S.C. § 1996. Consistent with that policy, it has passed numerous statutes to protect American Indians' right of access for religious purposes to national park lands, Scenic Area lands, and lands held in trust by the United States. *See, e.g.*, 16 U.S.C. §§ 228i(b), 410aaa-75(a), 460uu-47, 543f, 698v-11(b)(11). It has specifically sought to preserve lands of religious significance and has required notification to American Indians of any possible harm to or destruction of such lands. *Id.* § 470cc. Finally, it has provided statutory exemptions for American Indians' use of otherwise regulated articles such as bald eagle feathers and peyote as part of traditional religious practice. *Id.* §§ 668a, 4305(d); 42 U.S.C. § 1996a.

*       *       *

The depth and breadth of constitutional and statutory protections for religious observance and practice in America confirm the enduring importance of religious freedom to the United States. They also provide clear guidance for all those charged with enforcing federal law: The free exercise of religion is not limited to a right to hold personal religious beliefs or even to worship in a sacred place. It encompasses all aspects of religious observance and practice. To the greatest extent practicable and permitted by law, such religious observance and practice should be reasonably accommodated in all government activity, including employment, contracting, and programming. *See Zorach v. Clauson,* 343 U.S. 306, 314 (1952) ("[Government] follows the best of our traditions . . . [when it] respects the religious nature of our people and accommodates the public service to their spiritual needs.").



**Department of the Treasury**
**Internal Revenue Service**
P.O. Box 2508
Cincinnati, OH 45201

Date: JUN 16 2020

Employer ID number:
  83-2192122
Contact person/ID number:
  Diane Gentry 0203080
Contact telephone number:
  513-975-6278
Contact fax number:
  855-775-7261

IOWASKA CHURCH OF HEALING
C/O WILLIAM A BOATWRIGHT
DAVIS BROWN LAW FIRM
215 10TH ST STE 1300
DES MOINES, IA  50309

UIL: 501.03-20
     504.02-00
     501.35-00

**Legend:**

B = September 24, 2018
C = Iowa
D = Ayahuasca
E = Florida
f dollars = $60
G = Dado Kantarevic
j dollars = $900
K = 20
m dollars = $333
n dollars = $1,000

Dear Applicant:

We considered your application for recognition of exemption from federal income tax under Internal Revenue Code (IRC) Section 501(a). We determined that you don't qualify for exemption under IRC Section 501(c)(3). This letter explains the reasons for our conclusion. Please keep it for your records.

**Issues**
Do you qualify for exemption under IRC Section 501(c)(3)? No, for the reasons stated below.

**Facts**
You were formed on B, in the state of C. Your Articles of Incorporation state that your purposes include offering the public access to spiritual growth, development and healing through the sacred sacrament of D provided under the guidelines of South American indigenous traditions and cultural values. In addition, you provide education, guidance and support to ceremony participants. Finally, you provide access to various healing modalities such as group meditation and Reiki. Your articles also contain a dissolution clause ensuring that your assets will be distributed for Section 501(c)(3) purposes if you dissolve.

**Letter 4034 (Rev. 11-2018)**
Catalog Number 47628K

2

Your Form 1023 states that your mission is to inspire individuals to seek and embrace authentic, self-realized healing of the mind, body and spirit using the sacred, indigenous plant-medicine D. You will also provide veterans the opportunity to access healing programs unique to their recovery for free and/or a reduced cost. You will accomplish your purposes in a variety of ways including the operation of a spiritual church that conducts regular worship services, the operation of adult integration and communion meetings, various educational and mission groups and outreach designed to provide relief services to veterans. Future plans include assessing the needs of local and global communities paying attention to Native North and South American tribes and populations. You will have locations in C and E.

Membership is open to all individuals who have the sincere intention to become a part of a spiritually directed community in which all members live by a code of love, unity, integrity and respect for all living things. Members must have a sincerity of character and a willingness to live through one's higher self that is self-evident as witnessed by all church members, officers, elders and spiritual leaders. Church leaders and board members have the right to assess, discuss, vote and if necessary, terminate the membership and involvement of any individual who disregards the church's doctrine and the universal laws of respect, integrity, harmony, love and light.

Prospective members must pay a one-time membership fee of f dollars, which may be waived under certain circumstances. Membership does not qualify an individual to have access to sacred medicinal ceremonies where the sacrament of D is used. To partake in the sacrament an individual must be 18 years-of-age or older and successfully pass all pre-qualification requirements including a medical assessment.

You plan to offer public access workshops providing education on sacred indigenous culture and tribal practices including the use of D as a healing medicine and spiritual tool. Sunday church services and programs will include group integration and communion. Members will commune through song, music, reflection and readings from the D manifesto. Spiritual experiences with the sacrament will also be shared and integration provided by mental health counselors, ministers, facilitators and spiritual coaches.

Your goal is to offer members the opportunity for spiritual growth and healing with the sacrament of D through sacred ceremonies. Members will be offered various ceremony options with skilled facilitators and healers including one-on-one, small group or large group ceremonies. Typically, ceremonies will occur on Friday, Saturday and Sunday consisting of two evening ceremonies and the option for a daytime one. D is the only substance used in the ceremonies, the use or consumption of any other substances is prohibited. Members undergo thorough medical and psychological evaluation prior to participating in a ceremony. Drug testing along with a routine search of bags/belongings are also conducted to ensure a safe and sacred environment. Medical professionals are present during ceremonies along with healers, facilitators and ministers. Relevant mental, emotional and spiritual integration is provided to each participant. Group integration and communion is offered the morning following and evening ceremony. Private, one-on-one spiritual coaching or counseling is offered to those who seek further guidance and integration on a more ongoing basis.

D is consumed in the form of a tea that is brewed using water and several plant ingredients. The plant ingredients naturally contain a hallucinogenic alkaloid DMT. DMT is a Schedule 1 drug under the Controlled Substances Act (CSA). The CSA contains a provision authorizing the US Attorney General to waive the requirement for DEA registration of certain manufacturers, distributors and dispenser of controlled substances. You have applied for the exemption, but it has not yet been approved. The DEA provides guidance regarding petitions for religious exemptions from CSA under the RFRA. The guidance states in #7 that the petitioner may

3

not engage in any activity prohibited under the CSA or its regulations unless the petition has been granted and the petitioner has applied for and received a DEA Certificate of Registration. You have not asserted that your religious exercise has been burdened in violation of 42 U.S.C. Section 2000bb-1(a) as a claim or defense in a judicial proceeding in any federal or state court.

Your Board of Directors currently consists of five voting members, three of whom are also officers. G is your President and Treasurer, and a Director. He is also one of the Healers. You will enter into an employment agreement with him and his salary will be based on similarly situated employees in the area. Two of your other board members will also be hired as Healers, medicine men, or family therapists, with compensation based on local area analysis. Each healer has the training and experience to hold his position. G, your founder, is a "designated director", serving as a director until his resignation or this position is terminated. He also serves as the primary Healer conducting and leading all sacramental ceremonies and one-on-one healings.

Your Bylaws provide in Article V for reservation of rights and powers of the founder. Reserved rights and powers include approval of any name change; approval and adoption of any strategic or long-term plans including financial/capital plans; and approval of the development, significant modification, termination or sponsorship of any religious or educational programs. Article VI provides the approval procedure used by the founder. The founder may designate a successor in the event of his incapacity or inability to act during his lifetime. He cannot be removed from his position unless the Bylaws are amended, however, under Article X he would have to approve any amendments.

Your financial data indicates that over 90% of your revenues will be derived from fees paid by church members for participating in your weekend ceremonies. You expect to charge each member j dollars to attend and participate in your Sacramental ceremonies in your first year of operations with a 10% increase the next year and a 15% increase the following year. Veterans will be permitted to attend at a reduced rate or no charge. In addition to ceremony fees charged to members you expect to receive donations and membership fees. Your expected expenses include compensation, occupancy costs, and materials for the ceremonies.

You requested classification as a church under IRC Sections 509(a)(1) and 170(b)(1)(A)(i). Your form of worship includes the sacrament of D, sacred ceremonies, prayer, reflection, singing/medicine songs, traditional icaros, worship with musical instruments, reiki and energy healing, readings from the D manifesto and group communion/integration. You follow the Universal Law of Respect which is derived from the D Manifesto. You stated that you offer regularly scheduled religious services every Sunday afternoon, which are open to members and the public. You do not have a permanent facility. Currently you have K members and have plans to increase your membership.

We requested additional information regarding your activities. Your activities consist of weekend ceremonies and services (40%); spiritual medication, prayer and preparation for weekend ceremonies and services (10%); prospective members paperwork/correspondence (20%); spiritual coaching and integration of members via phone or in person (15%); cleaning/maintenance/shopping/travel/meal preparation (10%); and recordkeeping (5%). You have not yet begun to present seminars or other public programming. You do not have a permanent facility, you are currently holding ceremonies in E on private property owned by one of your directors. You initially planned to establish your primary location in C, however, upon advice of legal counsel you have not done so. Your legal counsel is of the opinion that C law is unsettled with regard to the legality of the use of D in religious ceremonies. E, on the other hand, has a state-level version of the federal Religious Freedom Restoration Act of 1993 (RFRA).

4

You have held ceremonies twice a month for the last year or so. Members pay m dollars per ceremony for a total of n dollars if he or she participates in all three over a weekend. The fee includes indoor accommodations, beds, showers, cleaning, healthy meals, hands-on energy healing, spiritual services and coaching, integration and follow-up. You may offer reduced rates to those experiencing financial hardship. Only formal members are permitted to participate in weekend ceremonies. Your Sunday afternoon services are part of the weekend ceremonies. The weekend consists of sacred ceremonies on Friday and Saturday as well as post ceremonial integration services Sunday morning through afternoon. All members not participating in the sacramental ceremonies are welcome at the Sunday services via phone or video call. Average attendance is four to five members and two healers. Most members that attend Sunday services have participated in the sacramental ceremonies on Friday and Saturday. You have conducted five ceremonies over three weekends. Each ceremony involved three or four members. Four of your K members have attended multiple retreats. You have waived your membership and ceremony fees multiple times.

D tea was used during each of your weekend ceremonies, although your CSA exemption has not been granted. Securing the federal exemption will offer you protection against any charges related to the CSA. The protections afforded under the RFRA only apply to federal laws and does not extend to state laws governing controlled substances.

You determine whether a member is ready to participate in the ceremonies using the tea after he or she arrives for a weekend ceremony. New members are given a copy of the Rules and Regulations for Participating in the Sacrament of D. The member is interviewed to ensure that the rules and regulations have been followed. A medical history/condition worksheet is also completed. If deemed ready, the member is given the tea and is carefully monitored by one of the healers. In the future medical professionals will be present and drug tests will be performed.

Prospective members must fill out a membership application and pay a f dollars fee (unless waived or reduced). The application is reviewed by the President and Vice President. The review takes into consideration whether the individual displays sincerity of thought and spiritual reflection. The applicant's personal need for spiritual healing and willingness to explore new avenues of evolution is also considered.

Formal written membership applications were received from your current members. Your K members live in multiple states and countries. Members do not participate on a weekly or other scheduled basis but remain in contact with your healers via phone and email.

You maintain a website. The site contains information about your activities, beliefs and doctrines, and the use of D in religious ceremonies/retreats. Information regarding your weekend ceremonies is provided, but pricing information is not available.

**Law**

IRC Section 501(c)(3) provides for the exemption from federal income tax of corporations organized and operated exclusively for charitable or educational purposes, provided no part of the net earnings inures to the benefit of any private shareholder or individual.

Treasury Regulation Section 1.501(c)(3)-1(a)(1) that, in order to be exempt as an organization described in Section 501(c)(3), an organization must be both organized and operated exclusively for one or more exempt purposes. If an organization fails to meet either the organizational test or the operational test, it is not exempt.

**Letter 4034 (Rev. 11-2018)**
Catalog Number 47628K

APP. 0271

5

Treas. Reg. Section 1.501(c)(3)-1(b)(1)(i) provides that an organization is organized exclusively for one or more exempt purposes only if its articles of organization limit its purposes to one or more exempt purposes and do not expressly empower it to engage, otherwise than as an insubstantial part, in activities which in themselves are not in furtherance of one or more exempt purposes.

Treas. Reg. Section 1.501(c)(3)-1(c)(1) provides that an organization operates exclusively for exempt purposes only if it engages primarily in activities that accomplish exempt purposes specified in Section 501(c)(3) of the Code. An organization will not be operated exclusively for exempt purposes if more than an insubstantial part of its activities are not in furtherance of an exempt purpose.

21 U.S.C. Section 812(c), Sch. I(c)(5) lists dimethyltryptamine (DMT) as a hallucinogenic substance and includes it on schedule I of the Schedules of Controlled Substances. A schedule I substance is a substance that (1) has a high potential for abuse; (2) has no currently accepted medical use in treatment in the United States; and (3) there is a lack of accepted safety for use of the drug under medical supervision.

21 U.S.C. Section 841(a), known as The Controlled Substances Act, states that it is illegal for anyone to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance.

42 U.S.C. Section 2000bb-1, known as the Religious Freedom Relief Act (RFRA), states that
    (a) In general. Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).
    (b) Exception. Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
        (1) is in furtherance of a compelling governmental interest; and
        (2) is the least restrictive means of furthering that compelling governmental interest.
    (c) Judicial relief. A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

Article VI, Clause 2 of the United States Constitution states that federal laws prevail over conflicting or inconsistent state laws.

Revenue Ruling 71-447, 1971-2 C.B. 230, states that under common law, the term "charity" encompasses all three major categories of religious, educational, and charitable purposes. All charitable trusts, educational or otherwise, including religious trusts, are subject to the requirement that the purpose of the trust may not be illegal or contrary to public policy. Citing Restatement (Second), Trusts, (1959) Sec. 377, Comment c: "A Trust for a purpose the accomplishment of which is contrary to public policy, although not forbidden by law, is invalid." Restatement (Second), of Trusts, Section 377 states that a charitable trust cannot be created for a purpose which is illegal. The first comment illustrates the rule, indicating that where the trust estate is to be used for a criminal purpose, the trust is invalid. Thus, "a trust for the promotion of polygamy...is invalid."

Rev. Rul. 75-384, 1975-2 C.B. 204, holds that a nonprofit organization, whose purpose was to promote world peace, disarmament, and nonviolent direct action, did not qualify for exemption under IRC Section 501(c)(3) or

6

(c)(4). The organization's primary activity was to sponsor antiwar protest demonstrations in which demonstrators were urged to violate local ordinances and commit acts of civil disobedience. Citing the law of trusts, the ruling stated that all charitable organizations are subject to the requirement that their purposes cannot be illegal or contrary to public policy.

In Better Business Bureau of Washington, D.C., Inc. v. United States, 326 U.S. 279 (1945), the Supreme Court held that the "presence of a single . . . [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly . . . [exempt] purposes."

In Harding Hospital, Inc. v. United States, 505 F.2d 1068, 1071 (6th Cir. 1974), the court held that an organization has the burden of proving that it satisfies the requirements of the particular exemption statute. The court noted that whether an organization has satisfied the operational test is a question of fact.

In American Guidance Foundation, Inc. v. United States, 490 F. Supp. 304 (D.D.C. 1980), the court held that a religious organization exempt under IRC Section 501(c)(3) was not a church described in Section 170(b)(1)(A)(i). Throughout its existence, the membership consisted of the founder and members of his immediate family. The organization made no real effort to convert others or to extend its membership beyond the immediate founder's family. Worship services were conducted in the founder's apartment, which was used primarily for non-religious purposes. The organization's "organized ministry" consisted of a single self-appointed clergyman. Recorded religious messages were distributed by telephone tape and religious instruction consisted of a father preaching to his son. The court discussed the following "14 criteria" developed by the Service to aid in the evaluation of applications for church foundation status:

    (1) a distinct legal existence;
    (2) a recognized creed and form of worship;
    (3) a definite and distinct ecclesiastical government;
    (4) a formal code of doctrine and discipline;
    (5) a distinct religious history;
    (6) a membership not associated with any other church or denomination;
    (7) an organization of ordained ministers/a complete organization of ordained ministers ministering to their congregations;
    (8) ordained ministers selected after completing prescribed courses of study;
    (9) literature of its own;
    (10) established places of worship;
    (11) regular congregations;
    (12) regular religious services;
    (13) Sunday schools for the religious instruction of the young; and
    (14) schools for the preparation of its ministers.

No single factor was controlling and all fourteen might not be relevant to a given determination. However, the court further explained that at a minimum, a church includes a body of believers or communicants that assembles regularly in order to worship. Unless the organization is reasonably available to the public in its conduct of worship, its educational instruction, and its promulgation of doctrine, it cannot fulfill this associational role. It is not enough that a corporation believes and declares itself to be a Church. Nor is it sufficient that the applicant prepares superficially responsive documentation for each of the established IRC criteria. To hold otherwise would encourage sham representations to the IRS and result in adverse tax consequences to the public at large. In this instance, AGF does not employ recognized, accessible channels of

7

instruction and worship. There is little if any evidence that it seeks to reach or serve a congregation. Private religious beliefs, practiced in the solitude of a family living room, cannot transform a man's home into a church.

In Church of Eternal Life and Liberty, Inc. v. Commissioner, 86 T.C. 916, 924 (1986), the Tax Court concluded that the organization was not a church. The organization seemed to have intentionally pursued a policy that discouraged membership that the court believed served the private purposes of its founder. The court also stated that although fundamental to determining whether an organization is a church, religious purposes alone do not serve to establish it as a church. Equally important are the means by which its religious purposes are accomplished...A church is a coherent group of individuals and families that join together to accomplish the religious purposes of mutually held beliefs. In other words, a church's principal means of accomplishing its religious purposes must be to assemble regularly a group of individuals related by common worship and faith...

In First Church of In Theo v. Commissioner, T.C. Memo 1989-16, the principal activities of the organization included the writing of books and booklets, the publication and distribution of religious literature, organizing training materials, and working in the local Christian community. It disseminated its beliefs and practices by mailing releases to a group of 71 preachers, Christian workers and interested individuals. The organization was a "self-described non-membership organization" whose religious purposes were accomplished through the writing, publishing, and distribution of religious literature rather than through the regular assembly of a group of believers to worship together. The extent to which the organization brought people together to worship was incidental to its main function which consisted of a dissemination of its religious message through radio and internet broadcasts, coupled with written publications. "When bringing people together for worship is only an incidental part of the activities of a religious organization, those limited activities are insufficient to label the entire organization a church." The court concluded that the organization "fail[ed] to satisfy the threshold criteria of communal activity necessary for a church."

In Spiritual Outreach Society v. Commissioner, 927 F. 2d 335 (1991), the organization maintained an outdoor amphitheater on its grounds at which the organization held bimonthly musical programs. The organization held a total of twenty gatherings during the two years at issue in the case. The musical programs always included congregational singing and opened and closed with a prayer facilitated by a minister. Also, during the two years at issue, the organization held several retreats on the church grounds "wherein followers of different religions met for the purpose of meditation study and spiritual advancement." A total of five wedding ceremonies were conducted in the organization's chapel by ministers from guest churches. The Tax Court was unpersuaded that "musical festivals and revivals...and gatherings for individual meditation and prayer by persons who don't regularly come together as a congregation for such purposes" was sufficient to satisfy the "cohesiveness factor which...is an essential ingredient of a 'church.'"

The Tax Court held that the organization failed to satisfy the associational test. The Court stated that some of the 14 criteria are of central importance. While the organization did meet some of the criteria, it did not meet enough. They failed to show they had an established congregation even though large numbers of people attended musical events on their property, nothing indicated that the participants considered it their church. Nor did they show a sufficient ministry to satisfy the organized ministry criteria because every minister who was involved in a function was a guest minister from another church. Finally, they didn't have a provision for the religious education of the young. SOS's claim that impecunious churches cannot afford religious instruction of its youth is misguided.

**Letter 4034 (Rev. 11-2018)**
Catalog Number 47628K

8

In <u>Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal</u>, 546 U.S. 418, 126 S. Ct. 1211 (2006) Members of the church received communion by drinking hoasca, a tea brewed from plants unique to the Amazon Rainforest that contained a hallucinogen regulated under Schedule I of the Controlled Substances Act (CSA), 21 U.S.C.S. Section 812(c), (Sched. I(c)). The Government conceded that the challenged application would substantially burden a sincere exercise of religion, but argued that this burden did not violate RFRA because applying the CSA was the least restrictive means of advancing three compelling governmental interests: protecting the church members' health and safety, preventing the diversion of hoasca from the church to recreational users, and complying with a 1971 United Nations Convention on Psychotropic Substances. The Court held that the church had effectively demonstrated that its sincere exercise of religion was substantially burdened, but that the Government failed to demonstrate that the application of the burden to the church would, more likely than not, be justified by the asserted compelling interests. Congress' placement of dimethyltryptamine (DMT) under Schedule I simply did not relieve the Government of the obligation to shoulder its burden under RFRA.

In <u>Foundation of Human Understanding v. United States</u>, 88 Fed. Cl. 203 (2009), the court found an organization that promoted spirituality through a particular form of meditation was not a church. The court referred to the 14 church characteristics published by the Service in the course of its factual findings, but ultimately decided the case by applying the associational test. The court stated that "plaintiff hasn't provided evidence as to the regularity, if any, with which its followers come together to practice. There is no evidence contained within the letters, emails, declarations, or, for example, in the form of records of attendance, that show a group of followers that regularly congregates in any form-whether virtually or in one another's physical presence… Moreover, there is evidence in the record that Foundation's religious practice neither requires nor promotes associational worship."

The court found the organization didn't provide regular religious services to an established congregation and concluded that "[t]he extent to which [the] Foundation brings people together to worship is incidental to its main function" of spreading its message through publication and broadcasting. Relying on case law that treated publishing activities as insufficient to confer church status and denied church status to entities whose associational activities were merely incidental to their publishing and broadcasting activities, the court held that the organization didn't qualify as a church.

In <u>Mysteryboy, Inc. v. Commissioner</u>, T.C. Memo 2010-13 (2010), the Tax Court held that the organization failed the operational test partly because the organization proposed to promote illegal activities.

**Application of law**
You are not organized and operated exclusively for exempt purposes under IRC Section 501(c)(3). An organization can be recognized as exempt under Section 501(c)(3) only if it shows that it is both organized and operated exclusively for charitable, educational, or other exempt purposes. If an organization fails to meet either the organizational test or the operational test, it is not exempt. Treas. Reg. Section 1.501(c)(3)-1(a)(1).

You do not satisfy the organizational test of Treas. Reg. Section 1.501(c)(3)-1(b)(1)(i). You are not organized exclusively for one or more exempt purposes, since your articles of organization do not limit your purposes to exempt purposes and expressly empower you to engage, otherwise than as an insubstantial part, in activities which in themselves are not in furtherance of one or more exempt purposes. You were formed, in part, to offer "the public access to spiritual growth, development and healing through the sacred sacrament of D." Under federal law, DMT distribution and use is illegal. The D tea used in the sacrament of D contains DMT. One of

9

the purposes for which you have been formed is an illegal purpose, to wit, the distribution of a controlled substance to individuals who are engaged in an illegal activity. Furthermore, your articles of incorporation expressly empower you to engage, otherwise than as an insubstantial part, in the distribution of D, an activity which in itself is not in furtherance of one or more exempt purposes. Rev. Rul. 71-447 and Rev. Rul. 75-384 state that all charitable organizations are subject to the requirement that their purposes cannot be illegal or contrary to public policy. See also Restatement (Second) of Trusts, Section 377, and Mysteryboy, Inc.

You do not satisfy the operational test of Treas. Reg. Section 1.501(c)(3)-1(c)(1). More than an insubstantial part of your activities is not in furtherance of an exempt purpose. Your primary activity is to conduct religious ceremonies using D. As noted above, the distribution of D is illegal. Federal law does not recognize any health or other benefits of D and classifies it as a controlled substance. 21 U.S.C. Section 812. Federal law prohibits the manufacture, distribution, possession, or dispensing of a controlled substance. 21 U.S.C. Section 841(a). (The fact that a state has legalized the use of D for religious purposes is not determinative because under federal law, the use of DMT is illegal. Federal law always prevails over conflicting or inconsistent state law. See U.S. Const. art. VI, cl. 2.) By advocating and engaging in activities that contravene federal law, and by enabling individuals to engage in an activity illegal under federal law, you serve a substantial nonexempt purpose. Like Better Business Bureau of Washington, D.C. regardless of the number or importance of your truly exempt purposes, the presence of a single nonexempt purpose, substantial in nature, has destroyed your exemption. You have failed to carry your burden of proving that these activities are in furtherance of an exempt purpose, or else are insubstantial. See Harding Hospital.

You have applied to the US Attorney General to waive in your case the requirement for DEA registration of certain manufacturers, distributors and dispensers of controlled substances as provided by the Controlled Substances Act, on the grounds that enforcing the prohibition of your use of D in your religious ceremonies will burden your free exercise of religion, as defined in the Religious Freedom Restoration Act (RFRA). A decision on your application is still pending. You have cited Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, an organization with activities strikingly similar to your own, in support of your exemption. Vegetal's position, however, is distinguishable from yours. Instead of applying for an exemption as you have done, Vegetal, after U. S. Customs seized a D shipment to it and threatened prosecution, filed a suit for declaratory and injunctive relief under 42 U.S.C. Section 2000bb-1(c) and won it, convincing the Supreme Court that applying the Controlled Substances Act to the UDV's sacramental D use violates RFRA. In short, your current position is that having obtained neither exemption from CSA through your petition, nor relief from a federal court, you have nevertheless engaged in activities in violation of the CSA, and consequently have failed to meet the operational test.

There is a high degree of consensus among courts that what carries most weight in distinguishing a church from other religious organizations is its associational role. Your members reside in various states and countries. Members do not come to your weekend D ceremonies on a regular basis. Their domiciles are widely scattered. The D sacrament is administered to only a handful of members on any weekend. Afterwards they disperse to their homes, and may not return for weeks, months, or not at all. Rather than relying for support on offerings of the faithful, you charge a small fee for membership, and a stiff fee every time someone receives the sacrament. Your activities resemble spiritual retreats, rather than worship services. The experience of those receiving the sacrament is intensely private, rather than communal, resembling meditation. You emphasize the healing properties of the sacrament along with its spiritual properties.

10

To be classified as a church, it is not sufficient that you declare yourself to be a church or that you conduct a few weekend retreats that members attend on an intermittent basis. As the court articulated in American Guidance Foundation, Inc., "Private religious beliefs, practiced in the solitude of a family living room, cannot transform a man's home into a church." You have not established that you have a body of believers or communicants that assembles regularly to worship. You have provided little evidence that you serve a regular congregation or conduct regular worship services. You have not fulfilled the associational role to be a church.

In Church of Eternal Life and Liberty, Inc. the court indicated that "A church is a coherent group of individuals and families that join together to accomplish the religious purposes of mutually held beliefs. In other words, a church's principal means of accomplishing its religious purposes must be to assemble regularly a group of individuals related by common worship and faith." You have not demonstrated that the principal means of accomplishing your religious purpose is to assemble regularly a group of individuals related by common faith and worship. Therefore, you have not fulfilled the associational role to be a church.

You are similar to the organizations in First Church of In Theo and Spiritual Outreach Society, where the extent to which the organizations brought people together to worship was incidental to its main function. In First Church of In Theo the court stated, "When bringing people together for worship is only an incidental part of the activities of a religious organization, those limited activities are insufficient to label the entire organization a church." The court concluded that the organization "fail[ed] to satisfy the threshold criteria of communal activity necessary for a church." In Spiritual Outreach Society, the Tax Court was unpersuaded that "musical festivals and revivals...and gatherings for individual meditation and prayer by persons who don't regularly come together as a congregation for such purposes" was sufficient to satisfy the "cohesiveness factor which...is an essential ingredient of a 'church.'" The Tax Court held that the organization failed to satisfy the associational test. The Tax Court decision was affirmed by the 8th Circuit. The Court stated that some of the 14 criteria are of central importance. While the organization did meet some of the criteria, it did not meet enough. They failed to show they had an established congregation even though large numbers of people attended musical events on their property, nothing indicated that the participants considered it their church. See Spiritual Outreach Society.

Finally, in Foundation of Human Understanding the court found an organization that promoted spirituality through a particular form of meditation was not a church. The court referred to the 14 church characteristics published by the Service in the course of its factual findings, but ultimately decided the case by applying the associational test. The court stated that there was no evidence that the followers came together regularly to practice nor was there evidence that Foundation's religious practice required or promoted associational worship. Similarly, your members do not come together regularly to practice your religion. Three to four members at a time gathering for weekend ceremonies does not meet the associational test.

**Your position**
You did not receive any formal guidance from the DEA regarding your petition for the exemption to the CSA. The only guidance you received from the DOJ was the mailing address for the religious exemption and the regulations regarding the request. The exemption is still under review by the agency. Your position is that the guidance provided on the DEA website is an interim measure intended to provide guidance to potential applicants and does not carry the force of law. The prohibition is not found in either the United States Code or the Code of Federal Regulations. Relying on Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal, you also believe that are not required to wait for the exemption to be granted to conduct religious activities using D.

11

**Our response to your position**
The DEA provides a procedure whereby an organization can obtain a religious exemption to the CSA. The guidance provided to applicants on the DEA's website states that the use of the substance is prohibited until the exemption is granted. The procedure would be meaningless if the applicant could simply use D without the exemption. The court held in <u>Gonzales</u> that an organization does not have to apply for the exemption prior to seeking relief in the courts. You have not sought relief in the courts, nor have you received the exemption to the CSA, therefore, your use of D is illegal under federal law.

**Conclusion**
Based on the facts and information submitted, you are neither organized nor operated exclusively for exempt purposes. Your primary purpose of conducting activities utilizing D violates federal law and furthers a substantial nonexempt purpose. Therefore, you are not described in IRC Section 501(c)(3). Additionally, you do not meet the requirements for classification under Sections 509(a)(1) and 170(b)(1)(A)(i) as a "church" because you do not meet the associational test.

**If you agree**
If you agree with our proposed adverse determination, you don't need to do anything. If we don't hear from you within 30 days, we'll issue a final adverse determination letter. That letter will provide information on your income tax filing requirements.

**If you don't agree**
You have a right to protest if you don't agree with our proposed adverse determination. To do so, send us a protest within 30 days of the date of this letter. You must include:

- Your name, address, employer identification number (EIN), and a daytime phone number

- A statement of the facts, law, and arguments supporting your position

- A statement indicating whether you are requesting an Appeals Office conference

- The signature of an officer, director, trustee, or other official who is authorized to sign for the organization or your authorized representative

- The following declaration:

  **For an officer, director, trustee, or other official who is authorized to sign for the organization:** Under penalties of perjury, I declare that I have examined this request, or this modification to the request, including accompanying documents, and to the best of my knowledge and belief, the request or the modification contains all relevant facts relating to the request, and such facts are true, correct, and complete.

Your representative (attorney, certified public accountant, or other individual enrolled to practice before the IRS) must file a Form 2848, Power of Attorney and Declaration of Representative, with us if they haven't already done so. You can find more information about representation in Publication 947, Practice Before the IRS and Power of Attorney.

12

We'll review your protest statement and decide if you gave us a basis to reconsider our determination. If so, we'll continue to process your case considering the information you provided. If you haven't given us a basis for reconsideration, we'll send your case to the Appeals Office and notify you. You can find more information in Publication 892, How to Appeal an IRS Decision on Tax-Exempt Status.

If you don't file a protest within 30 days, you can't seek a declaratory judgment in court later because the law requires that you use the IRC administrative process first (IRC Section 7428(b)(2)).

**Where to send your protest**
Send your protest, Form 2848, if applicable, and any supporting documents to the applicable address:

U.S. mail:                                    Street address for delivery service:

Internal Revenue Service                      Internal Revenue Service
EO Determinations Quality Assurance           EO Determinations Quality Assurance
Mail Stop 6403                                550 Main Street, Mail Stop 6403
P.O. Box 2508                                 Cincinnati, OH 45202
Cincinnati, OH 45201

You can also fax your protest and supporting documents to the fax number listed at the top of this letter. If you fax your statement, please contact the person listed at the top of this letter to confirm that they received it.

You can get the forms and publications mentioned in this letter by visiting our website at www.irs.gov/forms-pubs or by calling 800-TAX-FORM (800-829-3676). If you have questions, you can contact the person listed at the top of this letter.

**Contacting the Taxpayer Advocate Service**
The Taxpayer Advocate Service (TAS) is an independent organization within the IRS that can help protect your taxpayer rights. TAS can offer you help if your tax problem is causing a hardship, or if you've tried but haven't been able to resolve your problem with the IRS. If you qualify for TAS assistance, which is always free, TAS will do everything possible to help you. Visit www.taxpayeradvocate.irs.gov or call 877-777-4778.

We sent a copy of this letter to your representative as indicated in your power of attorney.

Sincerely,

Stephen a. martin

Stephen A. Martin
Director, Exempt Organizations
Rulings and Agreements

cc: William A. Boatwright

**Letter 4034 (Rev. 11-2018)**
Catalog Number 47628K

Q   **HELP❶**   **MENU≡**

**Home** > **Tax Exempt Organization Search** > Centro Espirita Beneficente Uniao Do Vegetal

< Back to Search Results

# Centro Espirita Beneficente Uniao Do Vegetal

EIN: 15-0412429 | Santa Fe, NM, United States

## Publication 78 Data ❶

Organizations eligible to receive tax-deductible charitable contributions. Users may rely on this list in determining deductibility of their contributions.

**On Publication 78 Data List:** Yes

**Deductibility Code:** PC

*Page Last Reviewed or Updated: 20-November-2020*    **Share**    **Print**

 **Department of the Treasury**
**Internal Revenue Service**
**Tax Exempt and Government Entities**
P.O. Box 2508
Cincinnati, OH 45201

**Date:**
10/08/2020
**Employer ID number:**
84-2466667
**Person to contact:**
Name: D. Trimble
ID number: 31309
Telephone: 877-829-5500
**Accounting period ending:**
December 31
**Public charity status:**
170(b)(1)(A)(i)
**Form 990 / 990-EZ / 990-N required:**
No
**Effective date of exemption:**
April 22, 2019
**Contribution deductibility:**
Yes
**Addendum applies:**
No
**DLN:**
26053596001420

SANCTUARY OF OUR LADY AYAHUASCA
3234 N TUCSON BLVD
TUCSON, AZ 85716

Dear Applicant:

We're pleased to tell you we determined you're exempt from federal income tax under Internal Revenue Code (IRC) Section 501(c)(3). Donors can deduct contributions they make to you under IRC Section 170. You're also qualified to receive tax deductible bequests, devises, transfers or gifts under Section 2055, 2106, or 2522. This letter could help resolve questions on your exempt status. Please keep it for your records.

Organizations exempt under IRC Section 501(c)(3) are further classified as either public charities or private foundations. We determined you're a public charity under the IRC Section listed at the top of this letter.

If we indicated at the top of this letter that you're required to file Form 990/990-EZ/990-N, our records show you're required to file an annual information return (Form 990 or Form 990-EZ) or electronic notice (Form 990-N, the e-Postcard). If you don't file a required return or notice for three consecutive years, your exempt status will be automatically revoked.

If we indicated at the top of this letter that an addendum applies, the enclosed addendum is an integral part of this letter.

For important information about your responsibilities as a tax-exempt organization, go to www.irs.gov/charities. Enter "4221-PC" in the search bar to view Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities, which describes your recordkeeping, reporting, and disclosure requirements.

Sincerely,

*Stephen a. martin*

Stephen A. Martin
Director, Exempt Organizations
Rulings and Agreements

**Letter 947 (Rev. 2-2020)**
Catalog Number 35152P

Q    **HELP** ❶    **MENU** ≡

**Home** > **Tax Exempt Organization Search** > Sanctuary Of Our Lady Ayahuasca Inc.

‹ Back to Search Results

# Sanctuary Of Our Lady Ayahuasca Inc.

EIN: 84-2466667 | Tucson, AZ, United States

> **Other Names**

## Determination Letter  ❶

A favorable determination letter is issued by the IRS if an organization meets the requirements for tax-exempt status under the Code section the organization applied.

> **Final Letters**

## Publication 78 Data  ❶

Organizations eligible to receive tax-deductible charitable contributions. Users may rely on this list in determining deductibility of their contributions.

**On Publication 78 Data List:** Yes

**Deductibility Code:** PC

## Form 990-N (e-Postcard) ❶

Organizations who have filed a 990-N (e-Postcard) annual electronic notice. Most small organizations that receive less than $50,000 fall into this category.

> **Tax Year 2021 Form 990-N (e-Postcard)**

# Copies of Returns (990, 990-EZ, 990-PF, 990-T) ℹ

Electronic copies (images) of Forms 990, 990-EZ, 990-PF or 990-T returns filed with the IRS by charities and non-profits.

> **Tax Year 2019 Form 990EZ**

---

*Page Last Reviewed or Updated: 20-November-2020*                    ↱ **Share**      🖶 **Print**



**William A. Boatwright**
BillBoatwright@davisbrownlaw.com
phone: 515-246-7804
Des Moines Office

July 13, 2020

***VIA FAX & DELIVERY SERVICE***

Internal Revenue Service
EO Determinations Quality Assurance
550 Main Street, Mail Stop 6403
Cincinnati, OH 45202

> ***Re:*** ***Iowaska Church of Healing - Protest of Proposed Adverse Determination***
> ***FEIN: 83-2192122***

Dear Sir or Madam:

Enclosed please find the above named organization's Protest of the government's Proposed
Adverse Determination dated June 16, 2020, a copy of which is also enclosed. A courtesy copy
of the Form 2848 that was filed with the original exemption application is also enclosed.

Very truly yours,

DAVIS, BROWN, KOEHN, SHORS & ROBERTS, P.C.

William A. Boatwright

WAB:pkm
Enclosures

cc:    Dado Kantarevic, President

PHONE 515.288.2500   THE DAVIS BROWN TOWER, 215 10TH ST., STE. 1300, DES MOINES, IA 50309
FIRM FAX 515.243.0654   THE HIGHLAND BUILDING, 4201 WESTOWN PKWY., STE. 300, WEST DES MOINES, IA 50266
WWW.DAVISBROWNLAW.COM   THE AMES OFFICE, 2605 NORTHRIDGE PKWY., AMES, IA 50010



**Department of the Treasury
Internal Revenue Service**
P.O. Box 2508
Cincinnati, OH 45201

Date: JUN 16 2020

Employer ID number:
  83-2192122
Contact person/ID number:
  Diane Gentry 0203080
Contact telephone number:
  513-975-6278
Contact fax number:
  855-775-7261

IOWASKA CHURCH OF HEALING
C/O WILLIAM A BOATWRIGHT
DAVIS BROWN LAW FIRM
215 10TH ST STE 1300
DES MOINES, IA  50309

UIL: 501.03-20
  504.02-00
  501.35-00

**Legend:**

B = September 24, 2018
C = Iowa
D = Ayahuasca
E = Florida
f dollars = $60
G = Dado Kantarevic
j dollars = $900
K = 20
m dollars = $333
n dollars = $1,000

Dear Applicant:

We considered your application for recognition of exemption from federal income tax under Internal Revenue
Code (IRC) Section 501(a). We determined that you don't qualify for exemption under IRC Section 501(c)(3).
This letter explains the reasons for our conclusion. Please keep it for your records.

**Issues**
Do you qualify for exemption under IRC Section 501(c)(3)? No, for the reasons stated below.

**Facts**
You were formed on B, in the state of C. Your Articles of Incorporation state that your purposes include
offering the public access to spiritual growth, development and healing through the sacred sacrament of D
provided under the guidelines of South American indigenous traditions and cultural values. In addition, you
provide education, guidance and support to ceremony participants. Finally, you provide access to various
healing modalities such as group meditation and Reiki. Your articles also contain a dissolution clause ensuring
that your assets will be distributed for Section 501(c)(3) purposes if you dissolve.

**Letter 4034 (Rev. 11-2018)**
Catalog Number 47628K

2

Your Form 1023 states that your mission is to inspire individuals to seek and embrace authentic, self-realized healing of the mind, body and spirit using the sacred, indigenous plant-medicine D. You will also provide veterans the opportunity to access healing programs unique to their recovery for free and/or a reduced cost. You will accomplish your purposes in a variety of ways including the operation of a spiritual church that conducts regular worship services, the operation of adult integration and communion meetings, various educational and mission groups and outreach designed to provide relief services to veterans. Future plans include assessing the needs of local and global communities paying attention to Native North and South American tribes and populations. You will have locations in C and E.

Membership is open to all individuals who have the sincere intention to become a part of a spiritually directed community in which all members live by a code of love, unity, integrity and respect for all living things. Members must have a sincerity of character and a willingness to live through one's higher self that is self-evident as witnessed by all church members, officers, elders and spiritual leaders. Church leaders and board members have the right to assess, discuss, vote and if necessary, terminate the membership and involvement of any individual who disregards the church's doctrine and the universal laws of respect, integrity, harmony, love and light.

Prospective members must pay a one-time membership fee of f dollars, which may be waived under certain circumstances. Membership does not qualify an individual to have access to sacred medicinal ceremonies where the sacrament of D is used. To partake in the sacrament an individual must be 18 years-of-age or older and successfully pass all pre-qualification requirements including a medical assessment.

You plan to offer public access workshops providing education on sacred indigenous culture and tribal practices including the use of D as a healing medicine and spiritual tool. Sunday church services and programs will include group integration and communion. Members will commune through song, music, reflection and readings from the D manifesto. Spiritual experiences with the sacrament will also be shared and integration provided by mental health counselors, ministers, facilitators and spiritual coaches.

Your goal is to offer members the opportunity for spiritual growth and healing with the sacrament of D through sacred ceremonies. Members will be offered various ceremony options with skilled facilitators and healers including one-on-one, small group or large group ceremonies. Typically, ceremonies will occur on Friday, Saturday and Sunday consisting of two evening ceremonies and the option for a daytime one. D is the only substance used in the ceremonies, the use or consumption of any other substances is prohibited. Members undergo thorough medical and psychological evaluation prior to participating in a ceremony. Drug testing along with a routine search of bags/belongings are also conducted to ensure a safe and sacred environment. Medical professionals are present during ceremonies along with healers, facilitators and ministers. Relevant mental, emotional and spiritual integration is provided to each participant. Group integration and communion is offered the morning following and evening ceremony. Private, one-on-one spiritual coaching or counseling is offered to those who seek further guidance and integration on a more ongoing basis.

D is consumed in the form of a tea that is brewed using water and several plant ingredients. The plant ingredients naturally contain a hallucinogenic alkaloid DMT. DMT is a Schedule 1 drug under the Controlled Substances Act (CSA). The CSA contains a provision authorizing the US Attorney General to waive the requirement for DEA registration of certain manufacturers, distributors and dispenser of controlled substances. You have applied for the exemption, but it has not yet been approved. The DEA provides guidance regarding petitions for religious exemptions from CSA under the RFRA. The guidance states in #7 that the petitioner may

3

not engage in any activity prohibited under the CSA or its regulations unless the petition has been granted and the petitioner has applied for and received a DEA Certificate of Registration. You have not asserted that your religious exercise has been burdened in violation of 42 U.S.C. Section 2000bb-1(a) as a claim or defense in a judicial proceeding in any federal or state court.

Your Board of Directors currently consists of five voting members, three of whom are also officers. G is your President and Treasurer, and a Director. He is also one of the Healers. You will enter into an employment agreement with him and his salary will be based on similarly situated employees in the area. Two of your other board members will also be hired as Healers, medicine men, or family therapists, with compensation based on local area analysis. Each healer has the training and experience to hold his position. G, your founder, is a "designated director", serving as a director until his resignation or this position is terminated. He also serves as the primary Healer conducting and leading all sacramental ceremonies and one-on-one healings.

Your Bylaws provide in Article V for reservation of rights and powers of the founder. Reserved rights and powers include approval of any name change; approval and adoption of any strategic or long-term plans including financial/capital plans; and approval of the development, significant modification, termination or sponsorship of any religious or educational programs. Article VI provides the approval procedure used by the founder. The founder may designate a successor in the event of his incapacity or inability to act during his lifetime. He cannot be removed from his position unless the Bylaws are amended, however, under Article X he would have to approve any amendments.

Your financial data indicates that over 90% of your revenues will be derived from fees paid by church members for participating in your weekend ceremonies. You expect to charge each member j dollars to attend and participate in your Sacramental ceremonies in your first year of operations with a 10% increase the next year and a 15% increase the following year. Veterans will be permitted to attend at a reduced rate or no charge. In addition to ceremony fees charged to members you expect to receive donations and membership fees. Your expected expenses include compensation, occupancy costs, and materials for the ceremonies.

You requested classification as a church under IRC Sections 509(a)(1) and 170(b)(1)(A)(i). Your form of worship includes the sacrament of D, sacred ceremonies, prayer, reflection, singing/medicine songs, traditional icaros, worship with musical instruments, reiki and energy healing, readings from the D manifesto and group communion/integration. You follow the Universal Law of Respect which is derived from the D Manifesto. You stated that you offer regularly scheduled religious services every Sunday afternoon, which are open to members and the public. You do not have a permanent facility. Currently you have K members and have plans to increase your membership.

We requested additional information regarding your activities. Your activities consist of weekend ceremonies and services (40%); spiritual medication, prayer and preparation for weekend ceremonies and services (10%); prospective members paperwork/correspondence (20%); spiritual coaching and integration of members via phone or in person (15%); cleaning/maintenance/shopping/travel/meal preparation (10%); and recordkeeping (5%). You have not yet begun to present seminars or other public programming. You do not have a permanent facility, you are currently holding ceremonies in E on private property owned by one of your directors. You initially planned to establish your primary location in C, however, upon advice of legal counsel you have not done so. Your legal counsel is of the opinion that C law is unsettled with regard to the legality of the use of D in religious ceremonies. E, on the other hand, has a state-level version of the federal Religious Freedom Restoration Act of 1993 (RFRA).

4

You have held ceremonies twice a month for the last year or so. Members pay m dollars per ceremony for a total of n dollars if he or she participates in all three over a weekend. The fee includes indoor accommodations, beds, showers, cleaning, healthy meals, hands-on energy healing, spiritual services and coaching, integration and follow-up. You may offer reduced rates to those experiencing financial hardship. Only formal members are permitted to participate in weekend ceremonies. Your Sunday afternoon services are part of the weekend ceremonies. The weekend consists of sacred ceremonies on Friday and Saturday as well as post ceremonial integration services Sunday morning through afternoon. All members not participating in the sacramental ceremonies are welcome at the Sunday services via phone or video call. Average attendance is four to five members and two healers. Most members that attend Sunday services have participated in the sacramental ceremonies on Friday and Saturday. You have conducted five ceremonies over three weekends. Each ceremony involved three or four members. Four of your K members have attended multiple retreats. You have waived your membership and ceremony fees multiple times.

D tea was used during each of your weekend ceremonies, although your CSA exemption has not been granted. Securing the federal exemption will offer you protection against any charges related to the CSA. The protections afforded under the RFRA only apply to federal laws and does not extend to state laws governing controlled substances.

You determine whether a member is ready to participate in the ceremonies using the tea after he or she arrives for a weekend ceremony. New members are given a copy of the Rules and Regulations for Participating in the Sacrament of D. The member is interviewed to ensure that the rules and regulations have been followed. A medical history/condition worksheet is also completed. If deemed ready, the member is given the tea and is carefully monitored by one of the healers. In the future medical professionals will be present and drug tests will be performed.

Prospective members must fill out a membership application and pay a f dollars fee (unless waived or reduced). The application is reviewed by the President and Vice President. The review takes into consideration whether the individual displays sincerity of thought and spiritual reflection. The applicant's personal need for spiritual healing and willingness to explore new avenues of evolution is also considered.

Formal written membership applications were received from your current members. Your K members live in multiple states and countries. Members do not participate on a weekly or other scheduled basis but remain in contact with your healers via phone and email.

You maintain a website. The site contains information about your activities, beliefs and doctrines, and the use of D in religious ceremonies/retreats. Information regarding your weekend ceremonies is provided, but pricing information is not available.

**Law**

IRC Section 501(c)(3) provides for the exemption from federal income tax of corporations organized and operated exclusively for charitable or educational purposes, provided no part of the net earnings inures to the benefit of any private shareholder or individual.

Treasury Regulation Section 1.501(c)(3)-1(a)(1) that, in order to be exempt as an organization described in Section 501(c)(3), an organization must be both organized and operated exclusively for one or more exempt purposes. If an organization fails to meet either the organizational test or the operational test, it is not exempt.

**Letter 4034 (Rev. 11-2018)**
Catalog Number 47628K

5

Treas. Reg. Section 1.501(c)(3)-1(b)(1)(i) provides that an organization is organized exclusively for one or more exempt purposes only if its articles of organization limit its purposes to one or more exempt purposes and do not expressly empower it to engage, otherwise than as an insubstantial part, in activities which in themselves are not in furtherance of one or more exempt purposes.

Treas. Reg. Section 1.501(c)(3)-1(c)(1) provides that an organization operates exclusively for exempt purposes only if it engages primarily in activities that accomplish exempt purposes specified in Section 501(c)(3) of the Code. An organization will not be operated exclusively for exempt purposes if more than an insubstantial part of its activities are not in furtherance of an exempt purpose.

21 U.S.C. Section 812(c), Sch. I(c)(5) lists dimethyltryptamine (DMT) as a hallucinogenic substance and includes it on schedule I of the Schedules of Controlled Substances. A schedule I substance is a substance that (1) has a high potential for abuse; (2) has no currently accepted medical use in treatment in the United States; and (3) there is a lack of accepted safety for use of the drug under medical supervision.

21 U.S.C. Section 841(a), known as The Controlled Substances Act, states that it is illegal for anyone to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance.

42 U.S.C. Section 2000bb-1, known as the Religious Freedom Relief Act (RFRA), states that
(a) In general. Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).
(b) Exception. Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling governmental interest.
(c) Judicial relief. A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

Article VI, Clause 2 of the United States Constitution states that federal laws prevail over conflicting or inconsistent state laws.

Revenue Ruling 71-447, 1971-2 C.B. 230, states that under common law, the term "charity" encompasses all three major categories of religious, educational, and charitable purposes. All charitable trusts, educational or otherwise, including religious trusts, are subject to the requirement that the purpose of the trust may not be illegal or contrary to public policy. Citing Restatement (Second), Trusts, (1959) Sec. 377, Comment c: "A Trust for a purpose the accomplishment of which is contrary to public policy, although not forbidden by law, is invalid." Restatement (Second), of Trusts, Section 377 states that a charitable trust cannot be created for a purpose which is illegal. The first comment illustrates the rule, indicating that where the trust estate is to be used for a criminal purpose, the trust is invalid. Thus, "a trust for the promotion of polygamy...is invalid."

Rev. Rul. 75-384, 1975-2 C.B. 204, holds that a nonprofit organization, whose purpose was to promote world peace, disarmament, and nonviolent direct action, did not qualify for exemption under IRC Section 501(c)(3) or

6

(c)(4). The organization's primary activity was to sponsor antiwar protest demonstrations in which demonstrators were urged to violate local ordinances and commit acts of civil disobedience. Citing the law of trusts, the ruling stated that all charitable organizations are subject to the requirement that their purposes cannot be illegal or contrary to public policy.

In Better Business Bureau of Washington, D.C., Inc. v. United States, 326 U.S. 279 (1945), the Supreme Court held that the "presence of a single . . . [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly . . . [exempt] purposes."

In Harding Hospital, Inc. v. United States, 505 F.2d 1068, 1071 (6th Cir. 1974), the court held that an organization has the burden of proving that it satisfies the requirements of the particular exemption statute. The court noted that whether an organization has satisfied the operational test is a question of fact.

In American Guidance Foundation, Inc. v. United States, 490 F. Supp. 304 (D.D.C. 1980), the court held that a religious organization exempt under IRC Section 501(c)(3) was not a church described in Section 170(b)(1)(A)(i). Throughout its existence, the membership consisted of the founder and members of his immediate family. The organization made no real effort to convert others or to extend its membership beyond the immediate founder's family. Worship services were conducted in the founder's apartment, which was used primarily for non-religious purposes. The organization's "organized ministry" consisted of a single self-appointed clergyman. Recorded religious messages were distributed by telephone tape and religious instruction consisted of a father preaching to his son. The court discussed the following "14 criteria" developed by the Service to aid in the evaluation of applications for church foundation status:

     (1) a distinct legal existence;
     (2) a recognized creed and form of worship;
     (3) a definite and distinct ecclesiastical government;
     (4) a formal code of doctrine and discipline;
     (5) a distinct religious history;
     (6) a membership not associated with any other church or denomination;
     (7) an organization of ordained ministers/a complete organization of ordained ministers ministering to their congregations;
     (8) ordained ministers selected after completing prescribed courses of study;
     (9) literature of its own;
     (10) established places of worship;
     (11) regular congregations;
     (12) regular religious services;
     (13) Sunday schools for the religious instruction of the young; and
     (14) schools for the preparation of its ministers.

No single factor was controlling and all fourteen might not be relevant to a given determination. However, the court further explained that at a minimum, a church includes a body of believers or communicants that assembles regularly in order to worship. Unless the organization is reasonably available to the public in its conduct of worship, its educational instruction, and its promulgation of doctrine, it cannot fulfill this associational role. It is not enough that a corporation believes and declares itself to be a Church. Nor is it sufficient that the applicant prepares superficially responsive documentation for each of the established IRC criteria. To hold otherwise would encourage sham representations to the IRS and result in adverse tax consequences to the public at large. In this instance, AGF does not employ recognized, accessible channels of

7

instruction and worship. There is little if any evidence that it seeks to reach or serve a congregation. Private religious beliefs, practiced in the solitude of a family living room, cannot transform a man's home into a church.

In Church of Eternal Life and Liberty, Inc. v. Commissioner, 86 T.C. 916, 924 (1986), the Tax Court concluded that the organization was not a church. The organization seemed to have intentionally pursued a policy that discouraged membership that the court believed served the private purposes of its founder. The court also stated that although fundamental to determining whether an organization is a church, religious purposes alone do not serve to establish it as a church. Equally important are the means by which its religious purposes are accomplished…A church is a coherent group of individuals and families that join together to accomplish the religious purposes of mutually held beliefs. In other words, a church's principal means of accomplishing its religious purposes must be to assemble regularly a group of individuals related by common worship and faith…

In First Church of In Theo v. Commissioner, T.C. Memo 1989-16, the principal activities of the organization included the writing of books and booklets, the publication and distribution of religious literature, organizing training materials, and working in the local Christian community. It disseminated its beliefs and practices by mailing releases to a group of 71 preachers, Christian workers and interested individuals. The organization was a "self-described non-membership organization" whose religious purposes were accomplished through the writing, publishing, and distribution of religious literature rather than through the regular assembly of a group of believers to worship together. The extent to which the organization brought people together to worship was incidental to its main function which consisted of a dissemination of its religious message through radio and internet broadcasts, coupled with written publications. "When bringing people together for worship is only an incidental part of the activities of a religious organization, those limited activities are insufficient to label the entire organization a church." The court concluded that the organization "fail[ed] to satisfy the threshold criteria of communal activity necessary for a church."

In Spiritual Outreach Society v. Commissioner, 927 F. 2d 335 (1991), the organization maintained an outdoor amphitheater on its grounds at which the organization held bimonthly musical programs. The organization held a total of twenty gatherings during the two years at issue in the case. The musical programs always included congregational singing and opened and closed with a prayer facilitated by a minister. Also, during the two years at issue, the organization held several retreats on the church grounds "wherein followers of different religions met for the purpose of meditation study and spiritual advancement." A total of five wedding ceremonies were conducted in the organization's chapel by ministers from guest churches. The Tax Court was unpersuaded that "musical festivals and revivals...and gatherings for individual meditation and prayer by persons who don't regularly come together as a congregation for such purposes" was sufficient to satisfy the "cohesiveness factor which...is an essential ingredient of a 'church.'"

The Tax Court held that the organization failed to satisfy the associational test. The Court stated that some of the 14 criteria are of central importance. While the organization did meet some of the criteria, it did not meet enough. They failed to show they had an established congregation even though large numbers of people attended musical events on their property, nothing indicated that the participants considered it their church. Nor did they show a sufficient ministry to satisfy the organized ministry criteria because every minister who was involved in a function was a guest minister from another church. Finally, they didn't have a provision for the religious education of the young. SOS's claim that impecunious churches cannot afford religious instruction of its youth is misguided.

8

In <u>Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal</u>, 546 U.S. 418, 126 S. Ct. 1211 (2006) Members of the church received communion by drinking hoasca, a tea brewed from plants unique to the Amazon Rainforest that contained a hallucinogen regulated under Schedule I of the Controlled Substances Act (CSA), 21 U.S.C.S. Section 812(c), (Sched. I(c)). The Government conceded that the challenged application would substantially burden a sincere exercise of religion, but argued that this burden did not violate RFRA because applying the CSA was the least restrictive means of advancing three compelling governmental interests: protecting the church members' health and safety, preventing the diversion of hoasca from the church to recreational users, and complying with a 1971 United Nations Convention on Psychotropic Substances. The Court held that the church had effectively demonstrated that its sincere exercise of religion was substantially burdened, but that the Government failed to demonstrate that the application of the burden to the church would, more likely than not, be justified by the asserted compelling interests. Congress' placement of dimethyltryptamine (DMT) under Schedule I simply did not relieve the Government of the obligation to shoulder its burden under RFRA.

In <u>Foundation of Human Understanding v. United States</u>, 88 Fed. Cl. 203 (2009), the court found an organization that promoted spirituality through a particular form of meditation was not a church. The court referred to the 14 church characteristics published by the Service in the course of its factual findings, but ultimately decided the case by applying the associational test. The court stated that "plaintiff hasn't provided evidence as to the regularity, if any, with which its followers come together to practice. There is no evidence contained within the letters, emails, declarations, or, for example, in the form of records of attendance, that show a group of followers that regularly congregates in any form-whether virtually or in one another's physical presence… Moreover, there is evidence in the record that Foundation's religious practice neither requires nor promotes associational worship."

The court found the organization didn't provide regular religious services to an established congregation and concluded that "[t]he extent to which [the] Foundation brings people together to worship is incidental to its main function" of spreading its message through publication and broadcasting. Relying on case law that treated publishing activities as insufficient to confer church status and denied church status to entities whose associational activities were merely incidental to their publishing and broadcasting activities, the court held that the organization didn't qualify as a church.

In <u>Mysteryboy, Inc. v. Commissioner</u>, T.C. Memo 2010-13 (2010), the Tax Court held that the organization failed the operational test partly because the organization proposed to promote illegal activities.

**Application of law**
You are not organized and operated exclusively for exempt purposes under IRC Section 501(c)(3). An organization can be recognized as exempt under Section 501(c)(3) only if it shows that it is both organized and operated exclusively for charitable, educational, or other exempt purposes. If an organization fails to meet either the organizational test or the operational test, it is not exempt. Treas. Reg. Section 1.501(c)(3)-1(a)(1).

You do not satisfy the organizational test of Treas. Reg. Section 1.501(c)(3)-1(b)(1)(i). You are not organized exclusively for one or more exempt purposes, since your articles of organization do not limit your purposes to exempt purposes and expressly empower you to engage, otherwise than as an insubstantial part, in activities which in themselves are not in furtherance of one or more exempt purposes. You were formed, in part, to offer "the public access to spiritual growth, development and healing through the sacred sacrament of D." Under federal law, DMT distribution and use is illegal. The D tea used in the sacrament of D contains DMT. One of

9

the purposes for which you have been formed is an illegal purpose, to wit, the distribution of a controlled substance to individuals who are engaged in an illegal activity. Furthermore, your articles of incorporation expressly empower you to engage, otherwise than as an insubstantial part, in the distribution of D, an activity which in itself is not in furtherance of one or more exempt purposes. Rev. Rul. 71-447 and Rev. Rul. 75-384 state that all charitable organizations are subject to the requirement that their purposes cannot be illegal or contrary to public policy. See also Restatement (Second) of Trusts, Section 377, and Mysteryboy, Inc.

You do not satisfy the operational test of Treas. Reg. Section 1.501(c)(3)-1(c)(1). More than an insubstantial part of your activities is not in furtherance of an exempt purpose. Your primary activity is to conduct religious ceremonies using D. As noted above, the distribution of D is illegal. Federal law does not recognize any health or other benefits of D and classifies it as a controlled substance. 21 U.S.C. Section 812. Federal law prohibits the manufacture, distribution, possession, or dispensing of a controlled substance. 21 U.S.C. Section 841(a). (The fact that a state has legalized the use of D for religious purposes is not determinative because under federal law, the use of DMT is illegal. Federal law always prevails over conflicting or inconsistent state law. See U.S. Const. art. VI, cl. 2.) By advocating and engaging in activities that contravene federal law, and by enabling individuals to engage in an activity illegal under federal law, you serve a substantial nonexempt purpose. Like Better Business Bureau of Washington, D.C. regardless of the number or importance of your truly exempt purposes, the presence of a single nonexempt purpose, substantial in nature, has destroyed your exemption. You have failed to carry your burden of proving that these activities are in furtherance of an exempt purpose, or else are insubstantial. See Harding Hospital.

You have applied to the US Attorney General to waive in your case the requirement for DEA registration of certain manufacturers, distributors and dispensers of controlled substances as provided by the Controlled Substances Act, on the grounds that enforcing the prohibition of your use of D in your religious ceremonies will burden your free exercise of religion, as defined in the Religious Freedom Restoration Act (RFRA). A decision on your application is still pending. You have cited Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, an organization with activities strikingly similar to your own, in support of your exemption. Vegetal's position, however, is distinguishable from yours. Instead of applying for an exemption as you have done, Vegetal, after U. S. Customs seized a D shipment to it and threatened prosecution, filed a suit for declaratory and injunctive relief under 42 U.S.C. Section 2000bb-1(c) and won it, convincing the Supreme Court that applying the Controlled Substances Act to the UDV's sacramental D use violates RFRA. In short, your current position is that having obtained neither exemption from CSA through your petition, nor relief from a federal court, you have nevertheless engaged in activities in violation of the CSA, and consequently have failed to meet the operational test.

There is a high degree of consensus among courts that what carries most weight in distinguishing a church from other religious organizations is its associational role. Your members reside in various states and countries. Members do not come to your weekend D ceremonies on a regular basis. Their domiciles are widely scattered. The D sacrament is administered to only a handful of members on any weekend. Afterwards they disperse to their homes, and may not return for weeks, months, or not at all. Rather than relying for support on offerings of the faithful, you charge a small fee for membership, and a stiff fee every time someone receives the sacrament. Your activities resemble spiritual retreats, rather than worship services. The experience of those receiving the sacrament is intensely private, rather than communal, resembling meditation. You emphasize the healing properties of the sacrament along with its spiritual properties.

10

To be classified as a church, it is not sufficient that you declare yourself to be a church or that you conduct a few weekend retreats that members attend on an intermittent basis. As the court articulated in <u>American Guidance Foundation, Inc.</u>, "Private religious beliefs, practiced in the solitude of a family living room, cannot transform a man's home into a church." You have not established that you have a body of believers or communicants that assembles regularly to worship. You have provided little evidence that you serve a regular congregation or conduct regular worship services. You have not fulfilled the associational role to be a church.

In <u>Church of Eternal Life and Liberty, Inc.</u> the court indicated that "A church is a coherent group of individuals and families that join together to accomplish the religious purposes of mutually held beliefs. In other words, a church's principal means of accomplishing its religious purposes must be to assemble regularly a group of individuals related by common worship and faith." You have not demonstrated that the principal means of accomplishing your religious purpose is to assemble regularly a group of individuals related by common faith and worship. Therefore, you have not fulfilled the associational role to be a church.

You are similar to the organizations in <u>First Church of In Theo</u> and <u>Spiritual Outreach Society</u>, where the extent to which the organizations brought people together to worship was incidental to its main function. In <u>First Church of In Theo</u> the court stated, "When bringing people together for worship is only an incidental part of the activities of a religious organization, those limited activities are insufficient to label the entire organization a church." The court concluded that the organization "fail[ed] to satisfy the threshold criteria of communal activity necessary for a church." In <u>Spiritual Outreach Society</u>, the Tax Court was unpersuaded that "musical festivals and revivals...and gatherings for individual meditation and prayer by persons who don't regularly come together as a congregation for such purposes" was sufficient to satisfy the "cohesiveness factor which...is an essential ingredient of a 'church.'" The Tax Court held that the organization failed to satisfy the associational test. The Tax Court decision was affirmed by the 8th Circuit. The Court stated that some of the 14 criteria are of central importance. While the organization did meet some of the criteria, it did not meet enough. They failed to show they had an established congregation even though large numbers of people attended musical events on their property, nothing indicated that the participants considered it their church. See <u>Spiritual Outreach Society</u>.

Finally, in <u>Foundation of Human Understanding</u> the court found an organization that promoted spirituality through a particular form of meditation was not a church. The court referred to the 14 church characteristics published by the Service in the course of its factual findings, but ultimately decided the case by applying the associational test. The court stated that there was no evidence that the followers came together regularly to practice nor was there evidence that Foundation's religious practice required or promoted associational worship. Similarly, your members do not come together regularly to practice your religion. Three to four members at a time gathering for weekend ceremonies does not meet the associational test.

**Your position**
You did not receive any formal guidance from the DEA regarding your petition for the exemption to the CSA. The only guidance you received from the DOJ was the mailing address for the religious exemption and the regulations regarding the request. The exemption is still under review by the agency. Your position is that the guidance provided on the DEA website is an interim measure intended to provide guidance to potential applicants and does not carry the force of law. The prohibition is not found in either the United States Code or the Code of Federal Regulations. Relying on <u>Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal</u>, you also believe that are not required to wait for the exemption to be granted to conduct religious activities using D.

11

**Our response to your position**
The DEA provides a procedure whereby an organization can obtain a religious exemption to the CSA. The guidance provided to applicants on the DEA's website states that the use of the substance is prohibited until the exemption is granted. The procedure would be meaningless if the applicant could simply use D without the exemption. The court held in <u>Gonzales</u> that an organization does not have to apply for the exemption prior to seeking relief in the courts. You have not sought relief in the courts, nor have you received the exemption to the CSA, therefore, your use of D is illegal under federal law.

**Conclusion**
Based on the facts and information submitted, you are neither organized nor operated exclusively for exempt purposes. Your primary purpose of conducting activities utilizing D violates federal law and furthers a substantial nonexempt purpose. Therefore, you are not described in IRC Section 501(c)(3). Additionally, you do not meet the requirements for classification under Sections 509(a)(1) and 170(b)(1)(A)(i) as a "church" because you do not meet the associational test.

**If you agree**
If you agree with our proposed adverse determination, you don't need to do anything. If we don't hear from you within 30 days, we'll issue a final adverse determination letter. That letter will provide information on your income tax filing requirements.

**If you don't agree**
You have a right to protest if you don't agree with our proposed adverse determination. To do so, send us a protest within 30 days of the date of this letter. You must include:

- Your name, address, employer identification number (EIN), and a daytime phone number

- A statement of the facts, law, and arguments supporting your position

- A statement indicating whether you are requesting an Appeals Office conference

- The signature of an officer, director, trustee, or other official who is authorized to sign for the organization or your authorized representative

- The following declaration:

  **For an officer, director, trustee, or other official who is authorized to sign for the organization:** Under penalties of perjury, I declare that I have examined this request, or this modification to the request, including accompanying documents, and to the best of my knowledge and belief, the request or the modification contains all relevant facts relating to the request, and such facts are true, correct, and complete.

Your representative (attorney, certified public accountant, or other individual enrolled to practice before the IRS) must file a Form 2848, Power of Attorney and Declaration of Representative, with us if they haven't already done so. You can find more information about representation in Publication 947, Practice Before the IRS and Power of Attorney.

12

We'll review your protest statement and decide if you gave us a basis to reconsider our determination. If so, we'll continue to process your case considering the information you provided. If you haven't given us a basis for reconsideration, we'll send your case to the Appeals Office and notify you. You can find more information in Publication 892, How to Appeal an IRS Decision on Tax-Exempt Status.

If you don't file a protest within 30 days, you can't seek a declaratory judgment in court later because the law requires that you use the IRC administrative process first (IRC Section 7428(b)(2)).

**Where to send your protest**
Send your protest, Form 2848, if applicable, and any supporting documents to the applicable address:

<u>U.S. mail:</u>

Internal Revenue Service
EO Determinations Quality Assurance
Mail Stop 6403
P.O. Box 2508
Cincinnati, OH 45201

<u>Street address for delivery service:</u>

Internal Revenue Service
EO Determinations Quality Assurance
550 Main Street, Mail Stop 6403
Cincinnati, OH 45202

You can also fax your protest and supporting documents to the fax number listed at the top of this letter. If you fax your statement, please contact the person listed at the top of this letter to confirm that they received it.

You can get the forms and publications mentioned in this letter by visiting our website at www.irs.gov/forms-pubs or by calling 800-TAX-FORM (800-829-3676). If you have questions, you can contact the person listed at the top of this letter.

**Contacting the Taxpayer Advocate Service**
The Taxpayer Advocate Service (TAS) is an independent organization within the IRS that can help protect your taxpayer rights. TAS can offer you help if your tax problem is causing a hardship, or if you've tried but haven't been able to resolve your problem with the IRS. If you qualify for TAS assistance, which is always free, TAS will do everything possible to help you. Visit www.taxpayeradvocate.irs.gov or call 877-777-4778.

We sent a copy of this letter to your representative as indicated in your power of attorney.

Sincerely,

*Stephen a. martin*

Stephen A. Martin
Director, Exempt Organizations
Rulings and Agreements

cc: William A. Boatwright

**Letter 4034 (Rev. 11-2018)**
Catalog Number 47628K

APP. 0296

**PROTEST OF PROPOSED ADVERSE DETERMINATION AND
REQUEST FOR APPEALS OFFICE CONFERENCE**

**IOWASKA CHURCH OF HEALING
FEIN: 83-2192122**

Iowaska Church of Healing (the "Organization") hereby protests the government's proposed adverse determination letter dated June 16, 2020 (the "Letter"), a copy of which is enclosed. In addition, the Organization hereby requests an Appeals Office conference with regard to its application for tax-exempt status under Internal Revenue Code § 501(c)(3) and this Protest of Proposed Adverse Determination.

IDENTIFYING INFORMATION

Iowaska Church of Healing
4114 - 27th Street
Des Moines, IA 50310
FEIN: 83-2192122
Daytime Phone: (515) 288-2500

STATEMENT OF FACTS, LAW AND ARGUMENT

*Statement of Facts*

The Organization has detailed the salient facts in its original application and its responses to the three additional Information Requests issued by the government. In addition, the Organization generally concurs with the government's description of the facts in its Letter, with several exceptions. First, in the second sentence of the final paragraph on Page 3, the government erroneously states that 10% of the Organization's activities include "spiritual *medication*". The Organization believes that this was a typographical error as it had described this activity as spiritual "meditation" in its original application. Given the nature of the application and the Organization's activities, however, correcting this error seems prudent. Next, the first sentence of the first paragraph on Page 4 of the letter incorrectly states, "[y]ou have held ceremonies twice a month for the last year or so." As the government correctly states later in that same paragraph, the Organization conducted a total of five (5) ceremonies over three weekends. These took place during the months of May, June and July of 2019. The Organization discontinued its sacramental ceremonies out of fear that, without the government's approvals, its members may be wrongfully subjected to arrest by law enforcement and criminal prosecution thereafter. In an abundance of caution, ceremonies were suspended.

*Statement of the Law*

Beginning with the submission of its original application, and particularly in its response to the government's third Information Request dated February 4, 2020, the Organization has provided the government with an exhaustive statement of the law regarding the sacramental use of Ayahuasca. All of these previous submissions are incorporated herein by this reference. In summary, the United States Supreme Court has expressly recognized the sacramental consumption of Ayahuasca as a sincere and lawful exercise of one's religion under the First Amendment to the United States Constitution. *Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006). Notably, the government conceded that the sacramental ceremonies performed in the *O Centro* case constituted a "sincere exercise of religion", and that its application of the Controlled Substances Act, 21 U.S.C. §§ 801 et seq. ("CSA"), would substantially burden that free exercise. In addition, the court in the *O Centro* case did not require the respondent church to first apply for or secure a religious exemption from the CSA from the Drug Enforcement Administration ("DEA") prior to requesting judicial relief from the government's impermissible burdening of its free exercise rights. This fact was central to a Native American Church's successful challenge to a "ripeness" argument made by the government in *Oklevueha Native American Church v. Holder*, 676 F.3d 829 (9th Cir. 2012). In addressing the government's argument that the plaintiff church had erred by failing to first apply for a religious exemption from the CSA before seeking judicial relief, the 9th Circuit Court of Appeals stated that:

> Likewise, we are unpersuaded by the Government's assertion that Plaintiffs' request for prospective relief is unripe because Plaintiffs did not request an exception to the CSA from the DEA … [t]he Government argues that we should require Plaintiffs to exhaust this administrative remedy, because doing so would allow the DEA to apply its expertise to Plaintiffs' claim, possibly moot the case if the claim is granted, and help build a record for judicial review.

> We decline, however, to read an exhaustion requirement into the RFRA where the statute contains no such condition, see 42 U.S.C. §§ 2000bb - 2000bb-4, and the Supreme Court has not imposed one. Indeed, the Supreme Court has reviewed a RFRA-based challenge to the CSA without requiring that the plaintiffs first seek a religious use exemption from the DEA. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal (citations omitted)*. In doing so, it recognized that RFRA "plainly contemplates that *courts* would recognize exceptions [to the CSA] - that is how the law works."

*Oklevueha Native American Church*, 676 F.3d at 838.

The *O Centro* and *Oklevueha* opinions make it clear that it was not necessary for the churches involved in those cases to first secure a DEA exemption in order to enjoy the rights afforded them under the Free Exercise Clause of the First Amendment or to invoke the protections of the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb *et seq*. In

APP. 0298

addition, the *Oklevueha* court pointed out that the United States Supreme Court had recognized the sacramental use of Ayahuasca as an exception to the CSA in the *O Centro* opinion.

The United States Constitution protects the free exercise of religion. U.S. Const. amend. I. Specifically, the First Amendment provides that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. *Id.* Congress reinforced this protection when it enacted the RFRA, which prohibits the federal government from burdening a person or organization's exercise of religion, "even if the burden results from a rule of general applicability," unless the government can demonstrate the burden furthers a compelling government interest, and is the least restrictive means of doing so. 42 U.S.C. § 2000bb–1(a), (b). "The least-restrictive means standard is exceptionally demanding." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728, 134 S. Ct. 2751, 2780 (2014).

The RFRA provides protection and a remedy system for those whose rights to freely exercise their religion are unduly burdened by government action. The rights protected by the statute, however, do not attach only upon the initiation of an action brought in the courts, as the government appears to argue, but rather have their origin in the Free Exercise Clause of the First Amendment. Indeed, Congress acknowledged the inherent nature of these rights under the First Amendment in the findings section of the RFRA when it stated that, "the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution". 42 U.S.C. §§ 2000bb(a)(1).

*Argument*

The sacramental use of Ayahuasca is a sincere and legal religious activity protected by the Free Exercise Clause of the First Amendment to the United States Constitution, as confirmed by the United States Supreme Court in the *O Centro* case. In arguing that the Organization in the instant case would be conducting illegal activity by resuming its use of Ayahuasca in its sacred ceremonies, the government takes the erroneous position that to legally conduct these activities the Organization must first either: (i) secure a religious exemption from the CSA, or (ii) judicially confirm its right to the free exercise of religion under the First Amendment.

The government's position with regard to the former condition is directly contradictory to the United States Supreme Court's ruling in the *O Centro* case. By stating that the use of Ayahuasca is illegal unless and until the Church has secured a DEA exemption from the CSA, the government is attempting to make the same failed argument the government made in *O Centro*. In *O Centro*, like the instant case, the government conceded that the spiritual use of Ayahuasca was a valid exercise of the church's religion, but was nevertheless illegal under the CSA. The Supreme Court expressly rejected this argument and ruled that the respondent church's right to free exercise under the First Amendment was paramount and protected by the RFRA. It is therefore indisputable that it is not necessary for an entity to secure a DEA exemption before its right to the free exercise of religion attaches under the First Amendment. The government is therefore required to respect and honor the *O Centro* opinion and its component findings.

3

The government's second stated condition, that the Organization is required to secure judicial relief to convert its activities from illegal to legal, is also flawed. It defies logic to read the *O Centro* opinion and conclude that the only reason the use of Ayahuasca was found to be a legal and sincere exercise of religion was because a court challenge was brought by the respondent church to confirm it. Had the underlying activity been illegal or criminal, the Supreme Court would not have granted the relief the respondent sought. Rights of free exercise of one's religion are unalienable rights and are set forth in the Free Exercise Clause of the First Amendment. As such, no judicial pre-approval or confirmation of these rights is required. The government's argument that the Organization's activities are illegal unless it obtains a judicial ruling confirming its First Amendment rights is therefore without merit.

The government affirmatively states in its Letter that the Organization's activities are "strikingly similar" to those of the church in *O Centro*. Just as the government's argument that the Organization must satisfy one of two conditions to convert its activities from illegal to legal is without merit and contrary to *O Centro*, its conclusion that the Organization does not qualify for § 501(c)(3) status is therefore also without merit.

## PROPOSED RESOLUTION

The Organization concedes that satisfaction of the "associational test" for church status under Internal Revenue Code §§ 509(a)(1) and 170(b)(1)(A)(i) is problematic for the Organization because of the irregular attendance by members at its religious ceremonies. Irregular attendance, however, will be attributable to the cost and travel difficulties involved in attending ceremonies, and not to a lack of spiritual belief or devotion on the part of the Organization's members. The Organization is willing to withdraw its request for recognition as a "church" and to accept governmental recognition as a religious organization under Internal Revenue Code § 501(c)(3) and a public charity pursuant to Internal Revenue Code § 509(a)(2).

The Organization has no objection whatsoever to filing annual information returns with the government or to the government's ability to examine and regulate the Organization. Since its inception, the Organization has attempted to structure its activities with regulatory transparency and in compliance with all federal and state laws. In addition to seeking tax-exempt status under Internal Revenue Code § 501(c)(3), the Organization also applied for a religious exemption from the CSA from the DEA. In doing so, the Organization not only notified the Diversion Control Division of the DEA in Springfield, Virginia at the time it filed its religious exemption request, but also copied in local DEA offices in Iowa and Florida to apprise them of its establishment and intent to conduct religious ceremonies in those states. The Church also informed the Iowa and Florida Attorneys General of its intention to establish places of worship using the sacrament of Ayahuasca.

The Organization contacted Mr. William McDermott, the Assistant Administrator of the DEA Diversion Control Division in Springfield, Virginia, by letter dated July 1, 2020 to request an update on the status of its religious exemption request, which was filed February 28, 2019. The Organization will forward the DEA's response as a supplement to this Protest once it has been received.

4

REQUEST FOR APPEALS OFFICE CONFERENCE

As previously stated, the Church hereby requests an Appeals Office conference with regard to its application for tax-exempt status under Internal Revenue Code § 501(c)(3) and this Protest of Proposed Adverse Determination.

Under penalties of perjury, I declare that I have examined this request, or this modification to the request, including accompanying documents, and to the best of my knowledge and belief, the request or the modification contains all relevant facts relating to the request, and such facts are true, correct and complete.

Dado Kantarevic, President

5

APP. 0301

| Form **2848** | | Power of Attorney | OMB No. 1545-0150 |
|---|---|---|---|

Form **2848**
(Rev. January 2018)
Department of the Treasury
Internal Revenue Service

**Power of Attorney**
**and Declaration of Representative**

▶ Go to *www.irs.gov/Form2848* for instructions and the latest information.

OMB No. 1545-0150

For IRS Use Only
Received by:
Name _____
Telephone _____
Function _____
Date ___ / ___ / ___

**Part I**  Power of Attorney

**Caution:** A separate Form 2848 must be completed for each taxpayer. Form 2848 will not be honored for any purpose other than representation before the IRS.

**1  Taxpayer information.** Taxpayer must sign and date this form on page 2, line 7.

| | |
|---|---|
| Iowaska Church of Healing<br>4114 - 27th Street<br>Des Moines, IA  50310 | Taxpayer identification number(s)<br>83-2192122 |
| | Daytime telephone number<br>**(515) 333-1210** |  Plan number (if applicable) |

hereby appoints the following representative(s) as attorney(s)-in-fact:

**2  Representative(s)** must sign and date this form on page 2, Part II.

Name and address
William A. Boatwright, Davis Brown Law Firm
215 10th Street, Suite 1300
Des Moines, IA  50309

CAF No.  4005-61881R
PTIN  P01060114
Telephone No.  (515) 288-2500
Fax No.  (515) 243-0654

Check if to be sent copies of notices and communications  ☑

Check if new: Address ☐   Telephone No. ☐   Fax No. ☐

Name and address

CAF No. _____
PTIN _____
Telephone No. _____
Fax No. _____

Check if to be sent copies of notices and communications  ☐

Check if new: Address ☐   Telephone No. ☐   Fax No. ☐

Name and address

CAF No. _____
PTIN _____
Telephone No. _____
Fax No. _____

(Note: IRS sends notices and communications to only two representatives.)

Check if new: Address ☐   Telephone No. ☐   Fax No. ☐

Name and address

CAF No. _____
PTIN _____
Telephone No. _____
Fax No. _____

(Note: IRS sends notices and communications to only two representatives.)

Check if new: Address ☐   Telephone No. ☐   Fax No. ☐

to represent the taxpayer before the Internal Revenue Service and perform the following acts:

**3  Acts authorized (you are required to complete this line 3).** With the exception of the acts described in line 5b, I authorize my representative(s) to receive and inspect my confidential tax information and to perform acts that I can perform with respect to the tax matters described below. For example, my representative(s) shall have the authority to sign any agreements, consents, or similar documents (see instructions for line 5a for authorizing a representative to sign a return).

| Description of Matter (Income, Employment, Payroll, Excise, Estate, Gift, Whistleblower,<br>Practitioner Discipline, PLR, FOIA, Civil Penalty, Sec. 5000A Shared Responsibility<br>Payment, Sec. 4980H Shared Responsibility Payment, etc.) (see instructions) | Tax Form Number<br>(1040, 941, 720, etc.) (if applicable) | Year(s) or Period(s) (if applicable)<br>(see instructions) |
|---|---|---|
| Exemption Application | Form 1023 | N/A |
| | | |
| | | |
| | | |

**4  Specific use not recorded on Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See the instructions for Line 4. Specific Use Not Recorded on CAF  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  ▶ ☑

**5a  Additional acts authorized.** In addition to the acts listed on line 3 above, I authorize my representative(s) to perform the following acts (see instructions for line 5a for more information): ☐ Access my IRS records via an Intermediate Service Provider;
☐ Authorize disclosure to third parties;  ☐ Substitute or add representative(s);  ☐ Sign a return; _____

☐ Other acts authorized: _____

For Privacy Act and Paperwork Reduction Act Notice, see the instructions.    Cat. No. 11980J    Form **2848** (Rev. 1-2018)

APP. 0302

Form 2848 (Rev. 1-2018)                                                                                     Page **2**

**b**  **Specific acts not authorized.** My representative(s) is (are) not authorized to endorse or otherwise negotiate any check (including directing or accepting payment by any means, electronic or otherwise, into an account owned or controlled by the representative(s) or any firm or other entity with whom the representative(s) is (are) associated) issued by the government in respect of a federal tax liability.

List any other specific deletions to the acts otherwise authorized in this power of attorney (see instructions for line 5b): ............................

------------------------------------------------------------------------------------------------------------------------

**6**  **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same matters and years or periods covered by this document. If you do **not** want to revoke a prior power of attorney, check here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

   **YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

**7**  **Signature of taxpayer.** If a tax matter concerns a year in which a joint return was filed, each spouse must file a separate power of attorney even if they are appointing the same representative(s). If signed by a corporate officer, partner, guardian, tax matters partner, partnership representative, executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the legal authority to execute this form on behalf of the taxpayer.

   ▶ **IF NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THIS POWER OF ATTORNEY TO THE TAXPAYER.**

| | | President | |
|---|---|---|---|
| Signature | Date | | Title (if applicable) |

| Dado Kantarevic | Iowaska Church of Healing |
|---|---|
| Print Name | Print name of taxpayer from line 1 if other than individual |

| **Part II** | **Declaration of Representative** |
|---|---|

Under penalties of perjury, by my signature below I declare that:

• I am not currently suspended or disbarred from practice, or ineligible for practice, before the Internal Revenue Service;

• I am subject to regulations contained in Circular 230 (31 CFR, Subtitle A, Part 10), as amended, governing practice before the Internal Revenue Service;

• I am authorized to represent the taxpayer identified in Part I for the matter(s) specified there; and

• I am one of the following:

   **a**  Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.

   **b**  Certified Public Accountant—a holder of an active license to practice as a certified public accountant in the jurisdiction shown below.

   **c**  Enrolled Agent—enrolled as an agent by the Internal Revenue Service per the requirements of Circular 230.

   **d**  Officer—a bona fide officer of the taxpayer organization.

   **e**  Full-Time Employee—a full-time employee of the taxpayer.

   **f**  Family Member—a member of the taxpayer's immediate family (spouse, parent, child, grandparent, grandchild, step-parent, step-child, brother, or sister).

   **g**  Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the Internal Revenue Service is limited by section 10.3(d) of Circular 230).

   **h**  Unenrolled Return Preparer—Authority to practice before the IRS is limited. An unenrolled return preparer may represent, provided the preparer (1) prepared and signed the return or claim for refund (or prepared if there is no signature space on the form); (2) was eligible to sign the return or claim for refund; (3) has a valid PTIN; and (4) possesses the required Annual Filing Season Program Record of Completion(s). *See Special Rules and Requirements for Unenrolled Return Preparers in the instructions for additional information.*

   **k**  Qualifying Student—receives permission to represent taxpayers before the IRS by virtue of his/her status as a law, business, or accounting student working in an LITC or STCP. See instructions for Part II for additional information and requirements.

   **r**  Enrolled Retirement Plan Agent—enrolled as a retirement plan agent under the requirements of Circular 230 (the authority to practice before the Internal Revenue Service is limited by section 10.3(e)).

   ▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THE POWER OF ATTORNEY. REPRESENTATIVES MUST SIGN IN THE ORDER LISTED IN PART I, LINE 2.**

**Note:** For designations d–f, enter your title, position, or relationship to the taxpayer in the "Licensing jurisdiction" column.

| Designation—Insert above letter (a–r). | Licensing jurisdiction (State) or other licensing authority (if applicable). | Bar, license, certification, registration, or enrollment number (if applicable). | Signature | Date |
|---|---|---|---|---|
| a | Iowa | #1057 | | 11/19/18 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Form **2848** (Rev. 1-2018)

 Department of the Treasury
Internal Revenue Service
P.O. Box 2508
Cincinnati, OH 45201

Date: SEP 01 2020

William Boatright
Davis Brown Law Firm
215 10th Street, Suite 1300
Des Moines, IA 50309

**Employer ID number:**
83-2192122
**Contact person/ID number:**
Jodi Garuccio/0203077
**Contact telephone number:**
513-975-6276

RE: Iowaska Church of Healing

Dear Applicant:

We received your protest regarding our proposed determination letter dated July 13, 2020.

We considered the information you submitted and concluded that it doesn't change our determination. We enclosed an explanation that addresses the disputed items, the law, and your position.

We'll forward your case with this information to the Office of Appeals, and an Appeals Officer will contact you to discuss your case. You don't need to take further action at this time.

If you have questions, you can contact the person listed at the top of this letter.

We sent a copy of this letter to your representative as indicated in your power of attorney.

**Letter 5918 (Rev. 4-2017)**
Catalog Number 69465S

APP. 0304

Sincerely,

Stephen A. Martin
Director, Exempt Organizations
Rulings and Agreements

Enclosure:

Explanation

Letter 5918 (Rev. 4-2017)
Catalog Number 69465S

APP. 0305

**Explanation**

In response to the proposed denial of your application, you indicated that you generally concur with the government's description of the facts in the letter, with several exceptions. First, in the second sentence of the final paragraph on Page 3 the government erroneously states that 10% of your activities include "spiritual medication." You believe that this was a typographical error as it had described this activity as spiritual "meditation" in its original application. You stated that given the nature of the application and your activities, however, correcting this error seems prudent. In fact, this was a typographical error and the proposed denial letter should have read "spiritual meditation."

Next, you indicated that the first sentence of the first paragraph on Page 4 of the letter incorrectly states, "You have held ceremonies twice a month for the last year or so." As the government correctly states later in that same paragraph, you conducted a total of five (5) ceremonies over three weekends. These took place during the months of May, June and July of 2019. You state that you discontinued your sacramental ceremonies out of fear that, without the government's approvals, your members may be wrongfully subjected to arrest by law enforcement and criminal prosecution thereafter. In an abundance of caution, you state that all ceremonies were suspended. Despite this claim, it is noted that on July 26, 2019, you specifically stated in a response to our request that your activities include "Weekend Ceremonies and Services – 2 weekends per month." So, it seems that contradictory information was provided.

You explained how you have provided the government with an exhaustive statement of the law regarding the sacramental use of Ayahuasca. You stated that, in summary, the United States Supreme Court expressly recognized the sacramental consumption of Ayahuasca as a sincere and lawful exercise of one's religion under the First Amendment to the United States Constitution, Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418 (2006). Notably, you state, the government conceded that the sacramental ceremonies performed in the O Centro case constituted a "sincere exercise of religion", and that its application of the Controlled Substances Act, 21 U.S.C. §§ 801 et ("CSA"), would substantially burden that free exercise. In addition, the court in the O Centro case did not require the respondent church to first apply for or secure a religious exemption from the CSA from the Drug Enforcement Administration ("DEA") prior to requesting judicial relief from the government's impermissible burdening of its free exercise rights. This fact was central to a Native American Church's successful challenge to a "ripeness" argument made by the government in Oklevueha Native American Church v. Holder, 676 F.3d 829 (9th Cir. 2012). In addressing the government's argument that the plaintiff church had erred by failing to first apply for a religious exemption from the CSA before seeking judicial relief, the 9th Circuit Court of Appeals stated that:

> Likewise, we are unpersuaded by the Government's assertion that Plaintiffs' request for prospective relief is unripe because Plaintiffs did not request an exception to the CSA from the DEA ... [t]he Government argues that we should require Plaintiffs to exhaust this administrative remedy, because doing so would allow the DEA to apply expertise to Plaintiffs' claim, possibly moot the case if the claim is granted, and help build a record for judicial review.

**Letter 5918 (Rev. 4-2017)**
Catalog Number 69465S

> We decline, however, to read an exhaustion requirement into the RFRA where the statute contains no such condition, see 42 U.S.C §§ 2000bb - 2000bb-4, and the Supreme Court has not imposed one. Indeed, the Supreme Court has reviewed a RFRA-based challenge to the CSA without requiring the plaintiffs first seek a religious use exemption from the DEA. In doing so, it recognized that RFRA "plainly contemplates that courts would recognize exceptions [to the CSA] – that is how the law works."

The O Centro and Oklevueha opinions make it clear that it was not necessary for the churches involved in those cases to first secure a DEA exemption in order to enjoy the rights afforded them under the Free Exercise Clause of the First Amendment or to invoke the protections of the Religious Freedom Restoration Act of 1993, 42 C.S.C. 2000bb et seq. In addition, the Oklevueha court pointed out that the United States Supreme Court had recognized the sacramental use of Ayahuasca as an exception to the CSA in the O Centro opinion.

The United States Constitution protects the free exercise of religion. Specifically, the First Amendment provides that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. Congress reinforced this protection when it enacted the RFRA, which prohibits the federal government from burdening a person or organization's exercise of religion, "even if the burden results from a rule general applicability," unless the government can demonstrate the burden furthers a compelling government interest, and is the least restrictive means of doing so. 42 U.S.C. § 2000bb--1 (a), (b). "The least-restrictive means standard is exceptionally demanding." Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 728, 134 S. Ct. 2751, 2780 (2014).

The RFRA provides protection and a remedy system for those whose rights to freely exercise their religion are unduly burdened by government action. The rights protected by the statute, however, do not attach only upon the initiation of an action brought in the courts, as the government appears to argue, but rather have their origin in the Free Exercise Clause of the First Amendment. Indeed, Congress acknowledged the inherent nature of these rights under the First Amendment in the findings section of the RFRA when it stated that, "the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution." 42 U.S.C. §§ 2000bb(a)(1).

You state that the sacramental use of Ayahuasca is a sincere and legal religious activity protected by the Free Exercise Clause of the First Amendment to the United States Constitution, as confirmed by the United States Supreme Court in the O Centro case. In arguing that you would be conducting an illegal activity by resuming your use of Ayahuasca in your sacred ceremonies, the government takes the erroneous position that to legally conduct these activities you must first either: (i) secure a religious exemption from the CSA, or (ii) judicially confirm your right to the free exercise of religion under the First Amendment.

The government's position with regard to the former condition is directly contradictory to the United States Supreme Court's ruling in the O Centro case. By stating that the use of Ayahuasca is illegal unless and until the Church has secured a DEA exemption from CSA, the government is attempting to make the same failed argument the government made in O Centro. In O Centro, like the instant case, the government conceded that the spiritual use of Ayahuasca was a valid

exercise of the church's religion but was nevertheless illegal under the CSA. The Supreme Court expressly rejected this argument and ruled that the respondent church's right to free exercise under the First Amendment was paramount and protected by the RFRA. It is therefore indisputable that it is not necessary for an entity to secure a DEA exemption before its right to free exercise religion attaches under the First Amendment. The government is therefore required to respect and honor the O Centro opinion and its component findings.

The government's second stated condition, that you are required to secure judicial relief to convert its activities from illegal to legal, is also flawed, It defies logic to read the O Centro opinion and conclude that the only reason the use of Ayahuasca was found to be a legal and sincere exercise of religion was because a court challenge was brought by the respondent church to confirm it. Had the underlying activity been illegal or criminal, the Supreme Court would not have granted the relief the respondent sought Rights of free exercise of one's religion are unalienable rights and are set forth in the Free Exercise Clause of the First Amendment. As such, no judicial pre-approval or confirmation of these rights is required. The government's argument that your activities are illegal unless it obtains a judicial ruling confirming its First Amendment rights is therefore without merit.

The government affirmatively states in its Letter that your activities are "strikingly similar" to those of the church in O Centro. Just as the government's argument that you must satisfy one of two conditions to convert activities from illegal to legal is without merit and contrary to O Centro, its conclusion that you do not qualify for Section 501(c)(3) status is without merit.

You said that you concede that satisfaction of the "associational for church status under IRC Sections 509(a)(l) and 170(b)(l)(A)(i) is problematic for you because of the irregular attendance by members at its religious ceremonies. Irregular attendance, however, will be attributable to the cost and travel difficulties involved in attending ceremonies, and not to a lack of spiritual belief or devotion on the part of your members. You are willing to withdraw your request for recognition as a "church" and to accept governmental recognition as a religious organization under IRC Section 50l(c)(3) and a public charity pursuant to Section 509(a)(2).

You have no objection whatsoever to filing annual information returns with the government or to the government's ability to examine and regulate you. Since your inception, you have attempted to structure your activities with regulatory transparency and in compliance with all federal and state laws. In addition to seeking tax-exempt status under IRC Section 501(c)(3), you also applied for a religious exemption from the CSA from the DEA. In doing so, you not notified the Diversion Control Division of the DEA in Springfield, Virginia at the time you filed your religious exemption request, but also copied in local DEA offices in Iowa and Florida to apprise them of your establishment and intent to conduct religious ceremonies in those states, The Church also informed the Iowa and Florida Attorneys General of your intention to establish places of worship using the sacrament of Ayahuasca.

The Service agrees that you do not qualify for "church" classification under IRC Section 501(c)(3) and Sections 509(a)(1) and 170(b)(1)(A)(i). The ability to exercise your religious freedoms and the ability to secure tax exempt status are two separate issues. You argue that you are like the organization in O Centro. In that case, they were essentially seeking permission to

use a substance which was included on the Schedule I substances under the Controlled Substances Act in their religious services. The Service is only making a ruling on your exempt status. Tax exemption is a matter of legislative grace and not a right. While you may have the right, upon securing approval from the DEA, et al, to use an illegal substance in your religious practices, that does not automatically transfer as the right to tax exemption under IRC Section 501(c)(3).

A review of Christian Echoes Nat. Ministry, Inc. v. U.S., 470 F.2d 840 (1972), describes an organization which had its exemption under Section 501(c)(3) revoked because they were attempting to influence legislation regarding prayer in schools. It was found that a religious organization that engaged in substantial activity aimed at influencing legislation is disqualified for tax exemption, whatever the motivation. The court went on to say that in light of the fact that tax exemption is a privilege, a matter of grace rather than right, the limitations contained in IRC Section 501(c)(3) withholding exemption from nonprofit corporations do not deprive Christian Echoes of its constitutionally guaranteed right of free speech. The taxpayer may engage in all such activities without restraint, subject, however, to withholding of the exemption or, in the alternative, the taxpayer may refrain from such activities and obtain the privilege of exemption. In the same way, we have determined that you conduct activities which are federally illegal, making them not appropriate for the legislative grace that is tax exemption. Tax exemption would provide essentially a public funding mechanism for federally illegal activities, which is outside of the scope of Section 501(c)(3). Accordingly, you do not qualify for exemption under Section 501(c)(3).

Letter 5918 (Rev. 4-2017)
Catalog Number 69465S

APP. 0309

**INTERNAL REVENUE SERVICE**

 **IRS**

## FAX TRANSMISSION
## Cover Sheet

Date: March 10, 2021

## To: WILLIAM A BOATWRIGHT ESQUIRE

Address/Organization:  DAVIS BROWN LAW FIRM

Fax Number:  (515) 243-0654                    Office Number:

## From:  Frisch Daniel F

Address/Organization:

Fax Number:  (855) 241-4766                    Office Number:

Number of pages:   5    *Including cover page*

**Subject:**  Iowaska Church of Healing

Please provide your client a copy of both enclosed documents; the conference scheduling letter and Publication 4227. Thank you.

DANIEL FRISCH
APPEALS OFFICER
TAX EXEMPT GOVERNMENT ENTITIES PROGRAMS
AREA 10 TEAM 1
Phone 916-974-5320
Fax    855-241-4766

This communication is intended for the sole use of the individual to whom it is addressed and may contain confidential information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited by the provisions of the Internal Revenue code.  If you have received this communication in error, please contact the sender immediately by telephone. Thank you.



**Department of the Treasury
Internal Revenue Service
Appeals Office**
4330 WATT AVENUE SA 7890
SACRAMENTO CA 95821-7012

IOWASKA CHURCH OF HEALING
4114 27TH ST
DES MOINES IA 50310-5901

**Date:**
03/10/2021
**Person to contact:**
Name:Daniel Frisch
Employee ID number:100507131
Telephone:916-974-5320
Fax:855-241-4766
Hours:7:30-4:00
**Re:**
Form 1023
**Tax periods ended:**

**Conference information:**
Date: April 1, 2021
Time: 1:00PM Central Standard Time
Via telephone:
Call: 916-974-5320

Dear Organization:

The Office of Appeals received your case for possible settlement, and it is assigned to me.

I scheduled a telephone conference as shown above to discuss possible settlement of your case. Call me at the telephone number above within two weeks from the date of this letter if you need to reschedule.

**The Appeals process**

Appeals is an independent function within the IRS. Appeals reviews and resolves disputes in a fair and impartial manner by applying the law and court decisions to the facts of your case. I'll consider the facts in your case and try to resolve your dispute with the IRS.

If you're new to Appeals, you should read the enclosed publications.

The conference will be informal and we'll discuss facts, arguments, and whether the law supports your position. If you present new information or raise new issues, I may refer your case to the originating office for consideration.

If you have questions about this letter or the Appeals process, you can call me at the number at the top of this letter. You can also visit our website at *www.irs.gov/appeals*.

**Additional information**

At the conclusion of the Appeals process, a contracted vendor may ask you to participate in an Appeals customer satisfaction survey. Your participation is voluntary and the survey will not ask for personal or financial information of any kind. We'll use the results of the survey to improve the Appeals process and our service to taxpayers. See the Customer Satisfaction Survey page at *www.irs.gov/uac/customer-satisfaction-surveys* to learn more about IRS-sponsored surveys and for a list of current and recent vendors.

**Letter 5157 (Rev. 9-2016)**
Catalog Number 61790J

You can get any publication or notice mentioned in this letter by visiting *www.irs.gov/formspubs* or by calling 1-800-TAX-FORM (1-800-829-3676).

Thank you for your cooperation.

Sincerely,

*Daniel Frisch*

Daniel Frisch
Appeals Officer

Enclosures: Publication 4227

cc:William A Boatwright Esquire

**Letter 5157 (Rev. 9-2016)**
Catalog Number 61790J



**Department of the Treasury
Internal Revenue Service**

Date:   **JUN 2 8 2021**

Employer ID number:

Contact person/ID number:

Contact telephone number:

Contact fax number:

UIL:

Dear Applicant:

We considered your application for recognition of exemption from federal income tax under Internal Revenue Code (IRC) Section 501(a). We determined that you don't qualify for exemption under IRC Section 501(c)(3). This letter explains the reasons for our conclusion. Please keep it for your records.

**Issues**
Do you qualify for exemption under IRC Section 501(c)(3)? No, for the reasons stated below.

**Facts**
You were formed on B, in the state of C. Your Articles of Incorporation state that your purposes include offering the public access to spiritual growth, development and healing through the sacred sacrament of D provided under the guidelines of South American indigenous traditions and cultural values. In addition, you provide education, guidance and support to ceremony participants. Finally, you provide access to various healing modalities such as group meditation and Reiki. Your articles also contain a dissolution clause ensuring that your assets will be distributed for Section 501(c)(3) purposes if you dissolve.

**Letter 4034 (Rev. 11-2018)**
Catalog Number 47628K

APP. 0313

2

Your Form 1023 states that your mission is to inspire individuals to seek and embrace authentic, self-realized healing of the mind, body and spirit using the sacred, indigenous plant-medicine D. You will also provide veterans the opportunity to access healing programs unique to their recovery for free and/or a reduced cost. You will accomplish your purposes in a variety of ways including the operation of a spiritual church that conducts regular worship services, the operation of adult integration and communion meetings, various educational and mission groups and outreach designed to provide relief services to veterans. Future plans include assessing the needs of local and global communities paying attention to Native North and South American tribes and populations. You will have locations in C and E.

Membership is open to all individuals who have the sincere intention to become a part of a spiritually directed community in which all members live by a code of love, unity, integrity and respect for all living things. Members must have a sincerity of character and a willingness to live through one's higher self that is self-evident as witnessed by all church members, officers, elders and spiritual leaders. Church leaders and board members have the right to assess, discuss, vote and if necessary, terminate the membership and involvement of any individual who disregards the church's doctrine and the universal laws of respect, integrity, harmony, love and light.

Prospective members must pay a one-time membership fee of f dollars, which may be waived under certain circumstances. Membership does not qualify an individual to have access to sacred medicinal ceremonies where the sacrament of D is used. To partake in the sacrament an individual must be 18 years-of-age or older and successfully pass all pre-qualification requirements including a medical assessment.

You plan to offer public access workshops providing education on sacred indigenous culture and tribal practices including the use of D as a healing medicine and spiritual tool. Sunday church services and programs will include group integration and communion. Members will commune through song, music, reflection and readings from the D manifesto. Spiritual experiences with the sacrament will also be shared and integration provided by mental health counselors, ministers, facilitators and spiritual coaches.

Your goal is to offer members the opportunity for spiritual growth and healing with the sacrament of D through sacred ceremonies. Members will be offered various ceremony options with skilled facilitators and healers including one-on-one, small group or large group ceremonies. Typically, ceremonies will occur on Friday, Saturday and Sunday consisting of two evening ceremonies and the option for a daytime one. D is the only substance used in the ceremonies, the use or consumption of any other substances is prohibited. Members undergo thorough medical and psychological evaluation prior to participating in a ceremony. Drug testing along with a routine search of bags/belongings are also conducted to ensure a safe and sacred environment. Medical professionals are present during ceremonies along with healers, facilitators and ministers. Relevant mental, emotional and spiritual integration is provided to each participant. Group integration and communion is offered the morning following and evening ceremony. Private, one-on-one spiritual coaching or counseling is offered to those who seek further guidance and integration on a more ongoing basis.

D is consumed in the form of a tea that is brewed using water and several plant ingredients. The plant ingredients naturally contain a hallucinogenic alkaloid DMT. DMT is a Schedule 1 drug under the Controlled Substances Act (CSA). The CSA contains a provision authorizing the US Attorney General to waive the requirement for DEA registration of certain manufacturers, distributors and dispenser of controlled substances. You have applied for the exemption, but it has not yet been approved. The DEA provides guidance regarding petitions for religious exemptions from CSA under the RFRA. The guidance states in #7 that the petitioner may

3

not engage in any activity prohibited under the CSA or its regulations unless the petition has been granted and the petitioner has applied for and received a DEA Certificate of Registration. You have not asserted that your religious exercise has been burdened in violation of 42 U.S.C. Section 2000bb-1(a) as a claim or defense in a judicial proceeding in any federal or state court.

Your Board of Directors currently consists of five voting members, three of whom are also officers. G is your President and Treasurer, and a Director. He is also one of the Healers. You will enter into an employment agreement with him and his salary will be based on similarly situated employees in the area. Two of your other board members will also be hired as Healers, medicine men, or family therapists, with compensation based on local area analysis. Each healer has the training and experience to hold his position. G, your founder, is a "designated director", serving as a director until his resignation or this position is terminated. He also serves as the primary Healer conducting and leading all sacramental ceremonies and one-on-one healings.

Your Bylaws provide in Article V for reservation of rights and powers of the founder. Reserved rights and powers include approval of any name change; approval and adoption of any strategic or long-term plans including financial/capital plans; and approval of the development, significant modification, termination or sponsorship of any religious or educational programs. Article VI provides the approval procedure used by the founder. The founder may designate a successor in the event of his incapacity or inability to act during his lifetime. He cannot be removed from his position unless the Bylaws are amended, however, under Article X he would have to approve any amendments.

Your financial data indicates that over 90% of your revenues will be derived from fees paid by church members for participating in your weekend ceremonies. You expect to charge each member j dollars to attend and participate in your Sacramental ceremonies in your first year of operations with a 10% increase the next year and a 15% increase the following year. Veterans will be permitted to attend at a reduced rate or no charge. In addition to ceremony fees charged to members you expect to receive donations and membership fees. Your expected expenses include compensation, occupancy costs, and materials for the ceremonies.

You requested classification as a church under IRC Sections 509(a)(1) and 170(b)(1)(A)(i). Your form of worship includes the sacrament of D, sacred ceremonies, prayer, reflection, singing/medicine songs, traditional Icarus, worship with musical instruments, reiki and energy healing, readings from the D manifesto and group communion/integration. You follow the Universal Law of Respect which is derived from the D Manifesto. You stated that you offer regularly scheduled religious services every Sunday afternoon, which are open to members and the public. You do not have a permanent facility. Currently you have K members and have plans to increase your membership.

We requested additional information regarding your activities. Your activities consist of weekend ceremonies and services (40%); spiritual medication, prayer and preparation for weekend ceremonies and services (10%); prospective members paperwork/correspondence (20%); spiritual coaching and integration of members via phone or in person (15%); cleaning/maintenance/shopping/travel/meal preparation (10%); and recordkeeping (5%). You have not yet begun to present seminars or other public programming. You do not have a permanent facility, you are currently holding ceremonies in E on private property owned by one of your directors. You initially planned to establish your primary location in C, however, upon advice of legal counsel you have not done so. Your legal counsel is of the opinion that C law is unsettled with regard to the legality of the use of D in religious ceremonies. E, on the other hand, has a state-level version of the federal Religious Freedom Restoration Act of 1993 (RFRA).

APP. 0315

4

You have held ceremonies twice a month for the last year or so. Members pay m dollars per ceremony for a total of n dollars if he or she participates in all three over a weekend. The fee includes indoor accommodations, beds, showers, cleaning, healthy meals, hands-on energy healing, spiritual services and coaching, integration and follow-up. You may offer reduced rates to those experiencing financial hardship. Only formal members are permitted to participate in weekend ceremonies. Your Sunday afternoon services are part of the weekend ceremonies. The weekend consists of sacred ceremonies on Friday and Saturday as well as post ceremonial integration services Sunday morning through afternoon. All members not participating in the sacramental ceremonies are welcome at the Sunday services via phone or video call. Average attendance is four to five members and two healers. Most members that attend Sunday services have participated in the sacramental ceremonies on Friday and Saturday. You have conducted five ceremonies over three weekends. Each ceremony involved three or four members. Four of your K members have attended multiple retreats. You have waived your membership and ceremony fees multiple times.

D tea was used during each of your weekend ceremonies, although your CSA exemption has not been granted. Securing the federal exemption will offer you protection against any charges related to the CSA. The protections afforded under the RFRA only apply to federal laws and does not extend to state laws governing controlled substances.

You determine whether a member is ready to participate in the ceremonies using the tea after he or she arrives for a weekend ceremony. New members are given a copy of the Rules and Regulations for Participating in the Sacrament of D. The member is interviewed to ensure that the rules and regulations have been followed. A medical history/condition worksheet is also completed. If deemed ready, the member is given the tea and is carefully monitored by one of the healers. In the future medical professionals will be present and drug tests will be performed.

Prospective members must fill out a membership application and pay a f dollars fee (unless waived or reduced). The application is reviewed by the President and Vice President. The review takes into consideration whether the individual displays sincerity of thought and spiritual reflection. The applicant's personal need for spiritual healing and willingness to explore new avenues of evolution is also considered.

Formal written membership applications were received from your current members. Your K members live in multiple states and countries. Members do not participate on a weekly or other scheduled basis but remain in contact with your healers via phone and email.

You maintain a website. The site contains information about your activities, beliefs and doctrines, and the use of D in religious ceremonies/retreats. Information regarding your weekend ceremonies is provided, but pricing information is not available.

**Law**

IRC Section 501(c)(3) provides for the exemption from federal income tax of corporations organized and operated exclusively for charitable or educational purposes, provided no part of the net earnings inures to the benefit of any private shareholder or individual.

Treasury Regulation Section 1.501(c)(3)-1(a)(1) that, in order to be exempt as an organization described in Section 501(c)(3), an organization must be both organized and operated exclusively for one or more exempt purposes. If an organization fails to meet either the organizational test or the operational test, it is not exempt.

**Letter 4034 (Rev. 11-2018)**
Catalog Number 47628K

5

Treas. Reg. Section 1.501(c)(3)-1(b)(1)(i) provides that an organization is organized exclusively for one or more exempt purposes only if its articles of organization limit its purposes to one or more exempt purposes and do not expressly empower it to engage, otherwise than as an insubstantial part, in activities which in themselves are not in furtherance of one or more exempt purposes.

Treas. Reg. Section 1.501(c)(3)-1(c)(1) provides that an organization operates exclusively for exempt purposes only if it engages primarily in activities that accomplish exempt purposes specified in Section 501(c)(3) of the Code. An organization will not be operated exclusively for exempt purposes if more than an insubstantial part of its activities are not in furtherance of an exempt purpose.

21 U.S.C. Section 812(c), Sch. I(c)(5) lists dimethyltryptamine (DMT) as a hallucinogenic substance and includes it on schedule I of the Schedules of Controlled Substances. A schedule I substance is a substance that (1) has a high potential for abuse; (2) has no currently accepted medical use in treatment in the United States; and (3) there is a lack of accepted safety for use of the drug under medical supervision.

21 U.S.C. Section 841(a), known as The Controlled Substances Act, states that it is illegal for anyone to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance.

42 U.S.C. Section 2000bb-1, known as the Religious Freedom Relief Act (RFRA), states that
    (a) In general. Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).
    (b) Exception. Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
        (1) is in furtherance of a compelling governmental interest; and
        (2) is the least restrictive means of furthering that compelling governmental interest.
    (c) Judicial relief. A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

Article VI, Clause 2 of the United States Constitution states that federal laws prevail over conflicting or inconsistent state laws.

Revenue Ruling 71-447, 1971-2 C.B. 230, states that under common law, the term "charity" encompasses all three major categories of religious, educational, and charitable purposes. All charitable trusts, educational or otherwise, including religious trusts, are subject to the requirement that the purpose of the trust may not be illegal or contrary to public policy. Citing Restatement (Second), Trusts, (1959) Sec. 377, Comment c: "A Trust for a purpose the accomplishment of which is contrary to public policy, although not forbidden by law, is invalid." Restatement (Second), of Trusts, Section 377 states that a charitable trust cannot be created for a purpose which is illegal. The first comment illustrates the rule, indicating that where the trust estate is to be used for a criminal purpose, the trust is invalid. Thus, "a trust for the promotion of polygamy...is invalid."

Rev. Rul. 75-384, 1975-2 C.B. 204, holds that a nonprofit organization, whose purpose was to promote world peace, disarmament, and nonviolent direct action, did not qualify for exemption under IRC Section 501(c)(3) or

6

(c)(4). The organization's primary activity was to sponsor antiwar protest demonstrations in which demonstrators were urged to violate local ordinances and commit acts of civil disobedience. Citing the law of trusts, the ruling stated that all charitable organizations are subject to the requirement that their purposes cannot be illegal or contrary to public policy.

In Better Business Bureau of Washington, D.C., Inc. v. United States, 326 U.S. 279 (1945), the Supreme Court held that the "presence of a single . . . [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly . . . [exempt] purposes."

In Harding Hospital, Inc. v. United States, 505 F.2d 1068, 1071 (6th Cir. 1974), the court held that an organization has the burden of proving that it satisfies the requirements of the particular exemption statute. The court noted that whether an organization has satisfied the operational test is a question of fact.

In American Guidance Foundation, Inc. v. United States, 490 F. Supp. 304 (D.D.C. 1980), the court held that a religious organization exempt under IRC Section 501(c)(3) was not a church described in Section 170(b)(1)(A)(i). Throughout its existence, the membership consisted of the founder and members of his immediate family. The organization made no real effort to convert others or to extend its membership beyond the immediate founder's family. Worship services were conducted in the founder's apartment, which was used primarily for non-religious purposes. The organization's "organized ministry" consisted of a single self-appointed clergyman. Recorded religious messages were distributed by telephone tape and religious instruction consisted of a father preaching to his son. The court discussed the following "14 criteria" developed by the Service to aid in the evaluation of applications for church foundation status:

     (1) a distinct legal existence;
     (2) a recognized creed and form of worship;
     (3) a definite and distinct ecclesiastical government;
     (4) a formal code of doctrine and discipline;
     (5) a distinct religious history;
     (6) a membership not associated with any other church or denomination;
     (7) an organization of ordained ministers/a complete organization of ordained ministers ministering to their congregations;
     (8) ordained ministers selected after completing prescribed courses of study;
     (9) literature of its own;
     (10) established places of worship;
     (11) regular congregations;
     (12) regular religious services;
     (13) Sunday schools for the religious instruction of the young; and
     (14) schools for the preparation of its ministers.

No single factor was controlling and all fourteen might not be relevant to a given determination. However, the court further explained that at a minimum, a church includes a body of believers or communicants that assembles regularly in order to worship. Unless the organization is reasonably available to the public in its conduct of worship, its educational instruction, and its promulgation of doctrine, it cannot fulfill this associational role. It is not enough that a corporation believes and declares itself to be a Church. Nor is it sufficient that the applicant prepares superficially responsive documentation for each of the established IRC criteria. To hold otherwise would encourage sham representations to the IRS and result in adverse tax consequences to the public at large. In this instance, AGF does not employ recognized, accessible channels of

7

instruction and worship. There is little if any evidence that it seeks to reach or serve a congregation. Private religious beliefs, practiced in the solitude of a family living room, cannot transform a man's home into a church.

In Church of Eternal Life and Liberty, Inc. v. Commissioner, 86 T.C. 916, 924 (1986), the Tax Court concluded that the organization was not a church.  The organization seemed to have intentionally pursued a policy that discouraged membership that the court believed served the private purposes of its founder.  The court also stated that although fundamental to determining whether an organization is a church, religious purposes alone do not serve to establish it as a church.  Equally important are the means by which its religious purposes are accomplished…A church is a coherent group of individuals and families that join together to accomplish the religious purposes of mutually held beliefs.  In other words, a church's principal means of accomplishing its religious purposes must be to assemble regularly a group of individuals related by common worship and faith…

In First Church of In Theo v. Commissioner, T.C. Memo 1989-16, the principal activities of the organization included the writing of books and booklets, the publication and distribution of religious literature, organizing training materials, and working in the local Christian community. It disseminated its beliefs and practices by mailing releases to a group of 71 preachers, Christian workers and interested individuals. The organization was a "self-described non-membership organization" whose religious purposes were accomplished through the writing, publishing, and distribution of religious literature rather than through the regular assembly of a group of believers to worship together. The extent to which the organization brought people together to worship was incidental to its main function which consisted of a dissemination of its religious message through radio and internet broadcasts, coupled with written publications. "When bringing people together for worship is only an incidental part of the activities of a religious organization, those limited activities are insufficient to label the entire organization a church." The court concluded that the organization "fail[ed] to satisfy the threshold criteria of communal activity necessary for a church."

In Spiritual Outreach Society v. Commissioner, 927 F. 2d 335 (1991), the organization maintained an outdoor amphitheater on its grounds at which the organization held bimonthly musical programs. The organization held a total of twenty gatherings during the two years at issue in the case. The musical programs always included congregational singing and opened and closed with a prayer facilitated by a minister. Also, during the two years at issue, the organization held several retreats on the church grounds "wherein followers of different religions met for the purpose of meditation study and spiritual advancement." A total of five wedding ceremonies were conducted in the organization's chapel by ministers from guest churches. The Tax Court was unpersuaded that "musical festivals and revivals...and gatherings for individual meditation and prayer by persons who don't regularly come together as a congregation for such purposes" was sufficient to satisfy the "cohesiveness factor which...is an essential ingredient of a 'church.'"

The Tax Court held that the organization failed to satisfy the associational test. The Court stated that some of the 14 criteria are of central importance. While the organization did meet some of the criteria, it did not meet enough. They failed to show they had an established congregation even though large numbers of people attended musical events on their property, nothing indicated that the participants considered it their church. Nor did they show a sufficient ministry to satisfy the organized ministry criteria because every minister who was involved in a function was a guest minister from another church. Finally, they didn't have a provision for the religious education of the young. SOS's claim that impecunious churches cannot afford religious instruction of its youth is misguided.

Letter 4034 (Rev. 11-2018)
Catalog Number 47628K

8

In <u>Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal</u>, 546 U.S. 418, 126 S. Ct. 1211 (2006) Members of the church received communion by drinking hoasca, a tea brewed from plants unique to the Amazon Rainforest that contained a hallucinogen regulated under Schedule I of the Controlled Substances Act (CSA), 21 U.S.C.S. Section 812(c), (Sched. l(c)). The Government conceded that the challenged application would substantially burden a sincere exercise of religion, but argued that this burden did not violate RFRA because applying the CSA was the least restrictive means of advancing three compelling governmental interests: protecting the church members' health and safety, preventing the diversion of hoasca from the church to recreational users, and complying with a 1971 United Nations Convention on Psychotropic Substances. The Court held that the church had effectively demonstrated that its sincere exercise of religion was substantially burdened, but that the Government failed to demonstrate that the application of the burden to the church would, more likely than not, be justified by the asserted compelling interests. Congress' placement of dimethyltryptamine (DMT) under Schedule I simply did not relieve the Government of the obligation to shoulder its burden under RFRA.

In <u>Foundation of Human Understanding v. United States</u>, 88 Fed. Cl. 203 (2009), the court found an organization that promoted spirituality through a particular form of meditation was not a church. The court referred to the 14 church characteristics published by the Service in the course of its factual findings, but ultimately decided the case by applying the associational test. The court stated that "plaintiff hasn't provided evidence as to the regularity, if any, with which its followers come together to practice. There is no evidence contained within the letters, emails, declarations, or, for example, in the form of records of attendance, that show a group of followers that regularly congregates in any form-whether virtually or in one another's physical presence… Moreover, there is evidence in the record that Foundation's religious practice neither requires nor promotes associational worship."

The court found the organization didn't provide regular religious services to an established congregation and concluded that "[t]he extent to which [the] Foundation brings people together to worship is incidental to its main function" of spreading its message through publication and broadcasting. Relying on case law that treated publishing activities as insufficient to confer church status and denied church status to entities whose associational activities were merely incidental to their publishing and broadcasting activities, the court held that the organization didn't qualify as a church.

In <u>Mysteryboy, Inc. v. Commissioner</u>, T.C. Memo 2010-13 (2010), the Tax Court held that the organization failed the operational test partly because the organization proposed to promote illegal activities.

**Application of law**
You are not organized and operated exclusively for exempt purposes under IRC Section 501(c)(3). An organization can be recognized as exempt under Section 501(c)(3) only if it shows that it is both organized and operated exclusively for charitable, educational, or other exempt purposes. If an organization fails to meet either the organizational test or the operational test, it is not exempt. Treas. Reg. Section 1.501(c)(3)-1(a)(1).

You do not satisfy the organizational test of Treas. Reg. Section 1.501(c)(3)-1(b)(1)(i). You are not organized exclusively for one or more exempt purposes, since your articles of organization do not limit your purposes to exempt purposes and expressly empower you to engage, otherwise than as an insubstantial part, in activities which in themselves are not in furtherance of one or more exempt purposes. You were formed, in part, to offer "the public access to spiritual growth, development and healing through the sacred sacrament of D." Under federal law, DMT distribution and use is illegal. The D tea used in the sacrament of D contains DMT. One of

9

the purposes for which you have been formed is an illegal purpose, to wit, the distribution of a controlled substance to individuals who are engaged in an illegal activity. Furthermore, your articles of incorporation expressly empower you to engage, otherwise than as an insubstantial part, in the distribution of D, an activity which in itself is not in furtherance of one or more exempt purposes. Rev. Rul. 71-447 and Rev. Rul. 75-384 state that all charitable organizations are subject to the requirement that their purposes cannot be illegal or contrary to public policy. See also Restatement (Second) of Trusts, Section 377, and Mysteryboy, Inc.

You do not satisfy the operational test of Treas. Reg. Section 1.501(c)(3)-1(c)(1). More than an insubstantial part of your activities is not in furtherance of an exempt purpose. Your primary activity is to conduct religious ceremonies using D. As noted above, the distribution of D is illegal. Federal law does not recognize any health or other benefits of D and classifies it as a controlled substance. 21 U.S.C. Section 812. Federal law prohibits the manufacture, distribution, possession, or dispensing of a controlled substance. 21 U.S.C. Section 841(a). (The fact that a state has legalized the use of D for religious purposes is not determinative because under federal law, the use of DMT is illegal. Federal law always prevails over conflicting or inconsistent state law. See U.S. Const. art. VI, cl. 2.) By advocating and engaging in activities that contravene federal law, and by enabling individuals to engage in an activity illegal under federal law, you serve a substantial nonexempt purpose. Like Better Business Bureau of Washington, D.C. regardless of the number or importance of your truly exempt purposes, the presence of a single nonexempt purpose, substantial in nature, has destroyed your exemption. You have failed to carry your burden of proving that these activities are in furtherance of an exempt purpose, or else are insubstantial. See Harding Hospital.

You have applied to the US Attorney General to waive in your case the requirement for DEA registration of certain manufacturers, distributors and dispensers of controlled substances as provided by the Controlled Substances Act, on the grounds that enforcing the prohibition of your use of D in your religious ceremonies will burden your free exercise of religion, as defined in the Religious Freedom Restoration Act (RFRA). A decision on your application is still pending. You have cited Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, an organization with activities strikingly similar to your own, in support of your exemption. Vegetal's position, however, is distinguishable from yours. Instead of applying for an exemption as you have done, Vegetal, after U. S. Customs seized a D shipment to it and threatened prosecution, filed a suit for declaratory and injunctive relief under 42 U.S.C. Section 2000bb-1(c) and won it, convincing the Supreme Court that applying the Controlled Substances Act to the UDV's sacramental D use violates RFRA. In short, your current position is that having obtained neither exemption from CSA through your petition, nor relief from a federal court, you have nevertheless engaged in activities in violation of the CSA, and consequently have failed to meet the operational test.

There is a high degree of consensus among courts that what carries most weight in distinguishing a church from other religious organizations is its associational role. Your members reside in various states and countries. Members do not come to your weekend D ceremonies on a regular basis. Their domiciles are widely scattered. The D sacrament is administered to only a handful of members on any weekend. Afterwards they disperse to their homes, and may not return for weeks, months, or not at all. Rather than relying for support on offerings of the faithful, you charge a small fee for membership, and a stiff fee every time someone receives the sacrament. Your activities resemble spiritual retreats, rather than worship services. The experience of those receiving the sacrament is intensely private, rather than communal, resembling meditation. You emphasize the healing properties of the sacrament along with its spiritual properties.

10

To be classified as a church, it is not sufficient that you declare yourself to be a church or that you conduct a few weekend retreats that members attend on an intermittent basis. As the court articulated in American Guidance Foundation, Inc., "Private religious beliefs, practiced in the solitude of a family living room, cannot transform a man's home into a church." You have not established that you have a body of believers or communicants that assembles regularly to worship. You have provided little evidence that you serve a regular congregation or conduct regular worship services. You have not fulfilled the associational role to be a church.

In Church of Eternal Life and Liberty, Inc. the court indicated that "A church is a coherent group of individuals and families that join together to accomplish the religious purposes of mutually held beliefs. In other words, a church's principal means of accomplishing its religious purposes must be to assemble regularly a group of individuals related by common worship and faith." You have not demonstrated that the principal means of accomplishing your religious purpose is to assemble regularly a group of individuals related by common faith and worship. Therefore, you have not fulfilled the associational role to be a church.

You are similar to the organizations in First Church of In Theo and Spiritual Outreach Society, where the extent to which the organizations brought people together to worship was incidental to its main function. In First Church of In Theo the court stated, "When bringing people together for worship is only an incidental part of the activities of a religious organization, those limited activities are insufficient to label the entire organization a church." The court concluded that the organization "fail[ed] to satisfy the threshold criteria of communal activity necessary for a church." In Spiritual Outreach Society, the Tax Court was unpersuaded that "musical festivals and revivals...and gatherings for individual meditation and prayer by persons who don't regularly come together as a congregation for such purposes" was sufficient to satisfy the "cohesiveness factor which...is an essential ingredient of a 'church.'" The Tax Court held that the organization failed to satisfy the associational test. The Tax Court decision was affirmed by the 8th Circuit. The Court stated that some of the 14 criteria are of central importance. While the organization did meet some of the criteria, it did not meet enough. They failed to show they had an established congregation even though large numbers of people attended musical events on their property, nothing indicated that the participants considered it their church. See Spiritual Outreach Society.

Finally, in Foundation of Human Understanding the court found an organization that promoted spirituality through a particular form of meditation was not a church. The court referred to the 14 church characteristics published by the Service in the course of its factual findings, but ultimately decided the case by applying the associational test. The court stated that there was no evidence that the followers came together regularly to practice nor was there evidence that Foundation's religious practice required or promoted associational worship. Similarly, your members do not come together regularly to practice your religion. Three to four members at a time gathering for weekend ceremonies does not meet the associational test.

**Your position**
You did not receive any formal guidance from the DEA regarding your petition for the exemption to the CSA. The only guidance you received from the DOJ was the mailing address for the religious exemption and the regulations regarding the request. The exemption is still under review by the agency. Your position is that the guidance provided on the DEA website is an interim measure intended to provide guidance to potential applicants and does not carry the force of law. The prohibition is not found in either the United States Code or the Code of Federal Regulations. Relying on Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal, you also believe that are not required to wait for the exemption to be granted to conduct religious activities using D.

11

**Our response to your position**
The DEA provides a procedure whereby an organization can obtain a religious exemption to the CSA. The guidance provided to applicants on the DEA's website states that the use of the substance is prohibited until the exemption is granted. The procedure would be meaningless if the applicant could simply use D without the exemption. The court held in Gonzales that an organization does not have to apply for the exemption prior to seeking relief in the courts. You have not sought relief in the courts, nor have you received the exemption to the CSA, therefore, your use of D is illegal under federal law.

**Conclusion**
Based on the facts and information submitted, you are neither organized nor operated exclusively for exempt purposes. Your primary purpose of conducting activities utilizing D violates federal law and furthers a substantial nonexempt purpose. Therefore, you are not described in IRC Section 501(c)(3). Additionally, you do not meet the requirements for classification under Sections 509(a)(1) and 170(b)(1)(A)(i) as a "church" because you do not meet the associational test.

**If you agree**
If you agree with our proposed adverse determination, you don't need to do anything. If we don't hear from you within 30 days, we'll issue a final adverse determination letter. That letter will provide information on your income tax filing requirements.

**If you don't agree**
You have a right to protest if you don't agree with our proposed adverse determination. To do so, send us a protest within 30 days of the date of this letter. You must include:

- Your name, address, employer identification number (EIN), and a daytime phone number

- A statement of the facts, law, and arguments supporting your position

- A statement indicating whether you are requesting an Appeals Office conference

- The signature of an officer, director, trustee, or other official who is authorized to sign for the organization or your authorized representative

- The following declaration:

    **For an officer, director, trustee, or other official who is authorized to sign for the organization:** Under penalties of perjury, I declare that I have examined this request, or this modification to the request, including accompanying documents, and to the best of my knowledge and belief, the request or the modification contains all relevant facts relating to the request, and such facts are true, correct, and complete.

Your representative (attorney, certified public accountant, or other individual enrolled to practice before the IRS) must file a Form 2848, Power of Attorney and Declaration of Representative, with us if they haven't already done so. You can find more information about representation in Publication 947, Practice Before the IRS and Power of Attorney.

**Letter 4034 (Rev. 11-2018)**
Catalog Number 47628K

12

We'll review your protest statement and decide if you gave us a basis to reconsider our determination. If so, we'll continue to process your case considering the information you provided. If you haven't given us a basis for reconsideration, we'll send your case to the Appeals Office and notify you. You can find more information in Publication 892, How to Appeal an IRS Decision on Tax-Exempt Status.

If you don't file a protest within 30 days, you can't seek a declaratory judgment in court later because the law requires that you use the IRC administrative process first (IRC Section 7428(b)(2)).

**Where to send your protest**
Send your protest, Form 2848, if applicable, and any supporting documents to the applicable address:

| U.S. mail: | Street address for delivery service: |
|---|---|
| Internal Revenue Service | Internal Revenue Service |
| EO Determinations Quality Assurance | EO Determinations Quality Assurance |
| Mail Stop 6403 | 550 Main Street, Mail Stop 6403 |
| P.O. Box 2508 | Cincinnati, OH 45202 |
| Cincinnati, OH 45201 | |

You can also fax your protest and supporting documents to the fax number listed at the top of this letter. If you fax your statement, please contact the person listed at the top of this letter to confirm that they received it.

You can get the forms and publications mentioned in this letter by visiting our website at www.irs.gov/forms-pubs or by calling 800-TAX-FORM (800-829-3676). If you have questions, you can contact the person listed at the top of this letter.

**Contacting the Taxpayer Advocate Service**
The Taxpayer Advocate Service (TAS) is an independent organization within the IRS that can help protect your taxpayer rights. TAS can offer you help if your tax problem is causing a hardship, or if you've tried but haven't been able to resolve your problem with the IRS. If you qualify for TAS assistance, which is always free, TAS will do everything possible to help you. Visit www.taxpayeradvocate.irs.gov or call 877-777-4778.

We sent a copy of this letter to your representative as indicated in your power of attorney.

Sincerely,

cc:

**Letter 4034 (Rev. 11-2018)**
Catalog Number 47628K

APP. 0324