## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **IOWASKA CHURCH OF HEALING** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CHARLES P. RETTIG,** | ) | |
| **in his Official Capacity as** | ) | |
| **Commissioner,** | ) | |
| **Internal Revenue Service;** | ) | **Civil Action No. 1:21-cv-02475-BAH** |
| | ) | |
| **and** | ) | |
| | ) | |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **a governmental entity,** | ) | |
| **c/o United States Attorney General** | ) | |
| **Department of Justice** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF CHURCH'S OPPOSITION TO DEFENDANTS'
## CROSS-MOTION FOR SUMMARY JUDGMENT
## AND
## REPLY TO DEFENDANTS' OPPOSITION TO
## PLAINTIFF CHURCH'S MOTION FOR SUMMARY JUDGMENT

#3381788

## TABLE OF CONTENTS

I.  THE DEFENDANTS HAVE FAILED TO REFUTE THE CHURCH'S ENTITLEMENT TO TAX-EXEMPT STATUS AND THE CHURCH'S MOTION FOR SUMMARY JUDGMENT SHOULD THEREFORE BE GRANTED; ACCORDINGLY, THE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT ON CLAIM ONE SHOULD BE DENIED ............................................. 1

   A.  The Defendants Cannot Reconcile Denying the Church Tax-Exempt Status When Other Churches Offering the Sacrament of Ayahuasca Currently Enjoy Exemption. ................................................................................................................................. 1

      1.  The Court Should Take Judicial Notice of Defendants' Own Decisions in Granting Tax-Exempt Status to the UDV Church in *O Centro* and Sanctuary of Our Lady Ayahuasca. ................................................................................................................. 2

   B.  The Defendants' Public Policy Argument Fails Because It Provides No Concrete Reasoning to Show Why They Did Not Preclude Other Organizations Using Ayahuasca in Religious Ceremonies from Obtaining Tax-Exempt Status. ................ 4

II.  THE CHURCH HAS STANDING TO BRING ITS RFRA CLAIM, HAS MADE ITS PRIMA FACIE CASE FOR RELIEF UNDER THAT STATUTE AND ITS MOTION FOR SUMMARY JUDGMENT SHOULD THEREFORE BE GRANTED; ACCORDINGLY, THE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT ON CLAIM TWO SHOULD BE DENIED ............................................. 9

   A.  The Church Meets the Three-Pronged Test to Establish Standing. ......................... 10

      1.  The Church Has Suffered Multiple "Injuries in Fact". ...................................... 10

      2.  The Church's Injuries in Fact are "Fairly Traceable" to the Service's Determination That its Activities Are Illegal. ....................................................... 13

      3.  A Favorable Decision for the Church Will Redress the Various Injuries in Fact it Suffered as a Result of the Defendants' Actions. .................................................. 15

   B.  The Church Does Not Misrepresent the *O Centro* Decision. .................................. 17

III.  CONCLUSION ................................................................................................................ 19

**COMES NOW**, Plaintiff Iowaska Church of Healing and for its Opposition to Defendants' Cross-Motion for Summary Judgment and Reply to Defendants' Opposition to its Motion for Summary Judgment states as follows:

**I.     THE DEFENDANTS HAVE FAILED TO REFUTE THE CHURCH'S ENTITLEMENT TO TAX-EXEMPT STATUS AND THE CHURCH'S MOTION FOR SUMMARY JUDGMENT SHOULD THEREFORE BE GRANTED; ACCORDINGLY, THE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT ON CLAIM ONE SHOULD BE DENIED**

In their Memorandum opposing the Church's Motion for Summary Judgment and supporting their own Cross-Motion for Summary Judgment (Docket No. 22), the Defendants offered no evidence or argument in support of their disparate treatment of the Church and other Ayahuasca churches that are presently recognized as both exempt under I. R.C. § 501(c)(3) and as churches under I.R.C. § 170(b)(1)(A)(i).  The Defendants' inability to reconcile the inconsistency of their own decisions makes their argument that the Church's sacramental use of Ayahuasca somehow violates public policy a hollow one, at best.

**A.     The Defendants Cannot Reconcile Denying the Church Tax-Exempt Status When Other Churches Offering the Sacrament of Ayahuasca Currently Enjoy Exemption.**

The Defendants' primary rationale for denying the Church's exemption application is that the Church's activities are "illegal".  They supplement that rationale with the argument that its activities also violate public policy.  In their Memorandum (Docket No. 22), Defendants have made a glaring omission in their analysis by completely ignoring the fact that the UDV church in the 2006 United States Supreme Court opinion styled *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006), was then, and continues to be, recognized as an I.R.C. § 501(c)(3) organization and a church within the meaning of I.R.C. § 170(b)(1)(A)(i).  They further

fail to address the fact that the Sanctuary of Our Lady Ayahuasca church, located in Arizona, was granted I.R.C. § 501(c)(3) status and recognized as a "church" under I.R.C. § 170(b)(1)(A)(i) in a determination letter issued as recently as October 8, 2020.

In the Defendants' proposed adverse determination letter to the Church dated June 16, 2020, they admitted that the church in the *O Centro* case was, "an organization with activities strikingly similar to your own" (J.A. Ex. 12 at 9), yet now offer no explanation for denying the Church the same tax-exempt status as that which the UDV church in *O Centro* enjoys to this day. In fact, in their Response to the Church's Statement of Material Facts, Defendants would have this Court disregard the tax-exempt status of both the UDV church in *O Centro* and Sanctuary of Our Lady Ayahuasca as matters falling outside of the Administrative Record. (Docket No. 22, Att. 1 at ##46 & 47)  As noted below, however, the administrative record can be supplemented for good cause shown in matters involving religion and religious practices, which is well founded in this case.

1.     **The Court Should Take Judicial Notice of Defendants' Own Decisions in Granting Tax-Exempt Status to the UDV Church in *O Centro* and Sanctuary of Our Lady Ayahuasca.**

Although the scope of review in cases involving IRS determination letters "is usually limited to the administrative record," it is not an exclusive rule "that matters outside the administrative record may not be taken into account by a court in special situations." *Easter House v. United States*, 12 Cl. Ct. 476 482 (Cl. Ct. 1987), *aff'd*, 846 F.2d 78 (Fed. Cir. 1988).  Because this case implicates the Free Exercise Clause and the Religious Freedom Restoration Act of 1993 ("RFRA"), the Church meets the "stringent 'good cause' standard" required for the Court to consider additional information relevant to this case. *Educ. Assistance Found. for the Descendants*

*of Hungarian Immigrants in the Perf. Arts, Inc. v. United States*, 904 F.Supp.2d 95, 99 (D.D.C. 2012).

When matters of religion are involved, "good cause to supplement the administrative record exists on the allegation that the Commissioner has erroneously interpreted or has redefined that religion's beliefs." *Bethel Conservative Mennonite Church v. Comm'r*, 746 F.2d 388, 392 (7th Cir. 1984). *Bethel Conservative Mennonite Church v. Comm'r.* involved a church that had a medical aid plan requiring its members "[t]o share and bear one another's burden." *Id.* at 389. The church had applied for tax exemption under § 501(c)(3) but was not approved because the Commissioner "concluded that [the church] was not operated exclusively for exempt purposes because [the church's] Aid Plan served the private interests of its members." *Id.* at 390. The Seventh Circuit concluded that the Commissioner "was incorrect in both of his determinations." *Id.* In reaching this decision, the court noted that it would not "completely be precluded from considering the other documents which [the church] asked the Tax Court to consider in its motion for reconsideration of findings of fact." *Id.* at 392. The Seventh Circuit held the church "should have been allowed to supplement the administrative record before the Tax Court with other church documents which add to [the church's] claim that its Aid Plan was established and operated to further a bona fide religious purpose and that the Commissioner's determination to the contrary was clearly erroneous." *Id.* Specifically, the court stated:

> That we should scrupulously guard the free exercise of religion weighs heavily in favor of supplementing the record here where, as a result of the Commissioner's determination [the church] discontinued its Medical Aid Plan, which on the administrative record was established as part of the church's belief that it must "[b]ear ye one another's burdens." *Gal.* 6:2.

*Id.* at 392.

Instead of remanding the case to the Tax Court or to the Commissioner to review church documents regarding mutual aid practices of the medical aid plan, the Seventh Circuit decided that "[t]hese documents are clearly the kind for which judicial notice by an appellate court is appropriate." *Id.*

In this case, the Defendants have erroneously interpreted the Church's doctrine requiring the consumption of Ayahuasca as central to its worship services to be illegal and violative of public policy.  The Church is not citing to the tax-exempt status of the UDV church in *O Centro* and that of Sanctuary of Our Lady Ayahuasca "solely for purposes of offering a broader context for the court's decision." *Fund for Study of Econ. Growth & Tax Reform v. I.R.S.*, 997 F.Supp. 15, 18 (D.D.C. 1998), aff'd sub nom.; *Fund for the Study of Econ. Growth & Tax Reform v. I.R.S.*, 161 F.3d 755 (D.C. Cir. 1998).  Rather, it is to ensure the Court has a full picture to determine "whether the agency's determination 'was proper *in light of the law* and facts in the record.'" *Airlie Found. v. I.R.S.*, 283 F.Supp.2d 58, 62 (D.D.C. 2003) (citing *Houston Lawyer Referral Serv., Inc. v. Comm'r*, 69 T.C. 570 (1978)) (emphasis added).  Moreover, to overlook the UDV church's tax-exempt status, as well as the tax-exempt status of Sanctuary of Our Lady Ayahuasca, would be to ignore the Defendants' own decisions on parallel matters.

> **B.    The Defendants' Public Policy Argument Fails Because It Provides No Concrete Reasoning to Show Why They Did Not Preclude Other Organizations Using Ayahuasca in Religious Ceremonies from Obtaining Tax-Exempt Status.**

In the *O Centro* case, the Defendant United States first attempted to justify its confiscation of the UDV church's hoasca (Ayahuasca) by arguing that the Controlled Substances Act ("CSA") barred all use of it because of its Schedule I designation.  *O Centro*, 546 U.S. at 423.  The Supreme Court later considered the United States' argument that it had a compelling governmental interest in applying the CSA to the UDV church, which included two public policy-based arguments: namely, that it was necessary to protect the health and safety of the UDV church members and to

prevent the diversion of hoasca from the church to recreational users.  *Id*. at 426.  The Supreme Court rejected both arguments as insufficient to demonstrate a compelling governmental interest under the RFRA.  *Id*. at 437.

In the instant case, the Defendants have provided no explanation as to how they consider the Church's use of Ayahuasca in its ceremonies to violate public policy, nor have they provided any concrete justification on why they rejected the Church's application for tax-exempt status but issued favorable determination letters to the UDV church in the *O Centro* case and to Sanctuary of our Lady Ayahuasca, recognizing both of them as § 501(c)(3) organizations and churches.  *See* SMF at ¶¶46 & 47; *see also* Defs.' Memorandum (Docket No. 22 at 16).  Instead, the Defendants continue to ignore the findings of the *O Centro* opinion and rely solely upon the blanket assertion that the use of illegal drugs violates public policy.

The Defendants' own decisions directly contradict their stated concern that the Church's activities violate public policy "because Congress has extensively legislated in the area of controlled substances" and "the use of illegal drugs, including DMT, violate public policy." *See* Defs.' Memorandum (Docket No. 22 at 10).[1]  The Supreme Court squarely rejected this overly broad argument in *O Centro*, stating that "Congress' determination that DMT should be listed under Schedule I does not provide a categorical answer that relieves the Government of the obligation to shoulder its burden under RFRA."  *O Centro,* 546 U.S. at 432. Furthermore, the United States unsuccessfully attempted to make a similar, general argument in the *O Centro* case that the need for uniform application of the CSA, without exception, barred all use of hoasca.  In rejecting this argument, the Supreme Court then stated as follows:

---

[1]    *See Sanctuary of Our Lady Ayahuasca Articles of Incorporation*, ARIZ. CORP. COMM'N, https://ecorp.azcc.gov/CommonHelper/GetFilingDocuments?barcode=19042214140565 (last visited July 14, 2022) (stating that the Character of Affairs of the Sanctuary of Our Lady Ayahuasca is "Religious fellowship including the sacramental use of Ayahuasca").

> We do not doubt that there may be instances in which a need for uniformity precludes the recognition of exceptions to generally applicable laws under RFRA. But it would have been surprising to find that this was such a case, given the longstanding exemption from the Controlled Substances Act for religious use of peyote, and the very reason Congress enacted RFRA was to respond to a decision denying a claimed right to sacramental use of a controlled substance.

*Id.* at 436-37.

Granting one church tax-exempt status but denying another "strikingly similar" church the same status shows the Defendants' proffered public policy argument has no merit. The Supreme Court rejected inconsistent policy arguments made by the United States in *O Centro* when the Court compared peyote to Ayahuasca, stating that Congress' concerns about a "high potential for abuse" and "lack of accepted safety for medical use" in Ayahuasca "*applies in equal measure to the mescaline in peyote*." *O Centro*, 546 U.S. at 433 (explaining that "[i]f such use is permitted in the face of congressional findings in [the Controlled Substances Act] for hundreds of thousands of Native Americans practicing their faith, it is difficult to see how those same findings alone can preclude any consideration of a similar exception for the 130 or so American members of the UDV who want to practice theirs.") (emphasis added). The inconsistency in the Defendants' position here is even more distinct than it was in the *O Centro* opinion, where the Supreme Court drew parallels between peyote and Ayahuasca as sacramental substances. In this case, the Defendants are treating churches differently even when they use the *same* sacramental drug. The Defendants' grant of tax-exempt status to the UDV Church in *O Centro* and Sanctuary of Our Lady Ayahuasca and its denial of exempt status for the Church is simply irreconcilable.

Moreover, Defendants undermine their own argument relying on public policy, because "a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye, Inc. v.*

*City of Hialeah*, 508 U.S. 520, 546–47 (1993) (quoting *Fla. Star v. B.J.F.*, 491 U.S. 524, 541–42 (1989) (Scalia, J., concurring in part and concurring in judgment)).

In the religious freedom context, public policy analysis must be applied specifically "to the person." *O Centro*, 546 U.S. at 423. The Defendants argue that public policy "is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *W.R. Grace & Co. v. Loc. Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766 (1983) (internal citations and quotations omitted); *see also* Defs.' Memorandum (Docket No. 22 at 10).   But general considerations of purported public interests are all that the Defendants have offered in this case.   The Court in *O Centro* explicitly rejected this approach.   *O Centro*, 546 U.S. at 430–32 (explaining that "the particular claimant whose sincere exercise of religion is being substantially burdened" was the UDV church and that this inquiry must be a "more focused" one).   The test to determine what constitutes a compelling interest "requires 'a high degree of necessity.'" *Korte v. Sebelius*, 735 F.3d 654, 685 (7th Cir. 2013) (quoting *Brown v. Entm't Merchs. Ass'n*, 131 S.Ct. 2729, 2741 (2011).  The Defendants have not identified "an 'actual problem' in need of solving." *Id.* Nor is the Defendants' adverse determination "actually necessary to the solution" that it cites. *Id.* Instead, the Defendants assert broad generalizations about DMT's "illegality and public policy," and do not explain how a compelling interest in preventing illegality and promoting public policy will be obstructed if they were to recognize the Church as a tax-exempt organization. *See Wisconsin v. Yoder*, 406 U.S. 205, 221 (1972) (stating, "Where fundamental claims of religious freedom are at stake, however, we cannot accept such a sweeping claim; despite its admitted validity in the generality of cases, we must searchingly examine the interests that the State seeks to promote by

its requirement for compulsory education to age 16, and the impediment to those objectives that would flow from recognizing the claimed Amish exemption.").

The Tax Court in *Golden Rule Church Ass'n v. Comm'r* analyzed whether the Ecclesiastical Society of Christ's Church of the Golden Rule's business activities specific to one taxable year were tax-exempt under I.R.C. § 501(c)(3). *Golden Rule Church Ass'n v. Comm'r*, 41 T.C. 719, 723 (1964). The Ecclesiastical Society's committee engaged in activities such as creating small businesses so their faith could be applied not only to one's "spiritual life, but also to the business, social and private sectors of his physical life." *Id.* The projects at issue before the court included a business where lumber would be purchased and used to build items for sale, laundry services, a hotel open to the public, and a nursery. *Id.* at 723–24. The committee was also responsible for student minister training and supplied the student ministers with food, clothing, and shelter. *Id.* at 722, 725. The Commissioner had denied tax exemption and concluded that "(1) the committee was not operated exclusively for religious purposes since its activities involved the operation of commercial enterprises and (2) expenditures for maintenance of the student ministers constituted inurement of net earnings to the benefit of individuals." *Id.* at 727. Although the court recognized that "religious organizations in this country do not normally run such business operations," it held this was not the proper standard for analyzing whether the Ecclesiastical Society's activities were exclusively for religious purposes. *Id.* at 729. The court stated:

> [W]e must always be guided by the character of the organization and its activities. Religion is not confined to a sect or a ritual. The symbols of religion to one are anathema to another. What one may regard as charity another may scorn foolish waste. And even education is to-day not free from divergence of view as to its validity. Congress left open the door of tax exemption to all corporations meeting the test, the restriction being not as to the species of religion, charity, science or education under which they might operate, but as to the use of its profits and the exclusive purpose of its existence.

*Id.*

In summary, the Defendants have failed to apply their public policy analysis under I.R.C. § 501(c)(3) "to the person" - that being the Church and its members - or to specifically identify the public policy goals they suggest drove their decision to deny the Church tax-exempt status.

II.   **THE CHURCH HAS STANDING TO BRING ITS RFRA CLAIM, HAS MADE ITS PRIMA FACIE CASE FOR RELIEF UNDER THAT STATUTE AND ITS MOTION FOR SUMMARY JUDGMENT SHOULD THEREFORE BE GRANTED; ACCORDINGLY, THE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT ON CLAIM TWO SHOULD BE DENIED**

In their Memorandum (Docket No. 22), the Defendants raise a new argument, claiming that the Church lacks standing to bring an RFRA claim in federal court because the Church "does not specifically allege that the Service's [adverse determination letter] would be binding on *DEA*, nor does Iowaska's Motion for Summary Judgment explain how that could be so, or cite any authority for that odd proposition." *See* Defs.' Memorandum (Docket No. 22 at 16). The Defendants' argument is misplaced.  Churches are expressly permitted to bring claims "to vindicate organizational interests protected by the free exercise clause of the First Amendment." *The Presbyterian Church (U.S.A.) v. U.S.*, 870 F.2d 518, 521 (9th Cir. 1989).  The true issue is whether the Defendants' explicit determination—that the religious practice of using Ayahuasca is illegal—has deterred and chilled the Church from engaging in its free exercise of religion. As witnessed by the Church's suspension of its worship services for nearly three years, it unquestionably has.  *See id.* at 522 (explaining that surveillance by the Immigration and Naturalization Service "has chilled *individual congregants* from attending worship services, and that this effect on the congregants has in turn interfered with the churches' ability to carry out their ministries."); *see also Singh v. Carter*, 168 F. Supp. 3d 216, 233–34 (D.D.C. 2016).

Finally, the Church concedes that a § 501(c)(3) determination letter from the Defendants would not be binding on the DEA, but a final adverse determination letter stating that the Church's

purposes and activities are illegal would likely put the Church's pending DEA religious exemption application at much higher risk of being denied.

### A.    The Church Meets the Three-Pronged Test to Establish Standing.

To establish standing to bring its Claim Two, the Church must show that: (1) it has suffered an "injury in fact"; (2) that the injury is "fairly traceable" to the Defendant's actions; and (3) that "a favorable decision" will "likely" redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).   The Church can demonstrate that it meets all three of these elements, and therefore has standing to bring its RFRA claim against the Defendants.

### 1.    The Church Has Suffered Multiple "Injuries in Fact".

An "injury in fact" is "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not 'conjectural' or hypothetical." *Id.* The RFRA provides that generally, the government "shall not burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb–1. The Church does not merely allege that the Defendants have caused a general chilling effect on its religious freedom—the primary "concrete and particularized" injury here is the Church's and its members' inability to exercise their religion after the Defendants' erroneous branding of their beliefs and practices as "illegal". *See Meese v. Keene*, 481 U.S. 465, 473–74 (1987) (explaining that a showing of "cognizable injury" helps establish standing). The Church and its members have been deprived of their rights under the First Amendment to the United States Constitution.  The United States Supreme Court has stated that "[i]t has long been established that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  The Church has not performed a religious ceremony using its central Sacrament of Ayahuasca in nearly three years.  The Defendants' actions in erroneously

determining that the Church's beliefs and practices are illegal is the direct reason for this, which is the most significant of all injuries suffered by the Church.

The Defendants argue that the final adverse determination letter issued in 2021 could not have had a chilling effect on the Church, since the Church had suspended its ceremonies two years before the determination letter was issued (Docket No. 22 at 19). The issuance of the final adverse determination letter, however, was simply the Defendants' final administrative ruling with respect to the Church's exemption application and its position on the legality of Ayahuasca. Until the final adverse determination letter was issued, the Defendants' position could have changed had it considered the *O Centro* opinion and its obligations under the RFRA. The chill actually began several weeks after the Church's final ceremony was conducted in 2019, when the Internal Revenue Service issued its second Information Request dated September 10, 2019. (J.A. Ex. 8). The Information Request began challenging the legality of using Ayahuasca in religious ceremonies, which caused the Church and its members to fear law enforcement intrusion into their ceremonies and potential prosecution under the CSA. (Docket No. 1, ##23, 24). No further ceremonies were held after the second Information Request was received.

In addition to suspending its religious ceremonies, the Church has also suffered injuries in fact in the form of reputational damage and economic loss. The Supreme Court's *Meese* opinion recognized reputational loss as injury in fact. In *Meese*, the appellee was an attorney and member of the California State Senate who sought a preliminary injunction to prohibit the federal government from categorizing the Canadian motion picture films he wanted to show as part of a public debate on nuclear weapons and emissions as "political propaganda." *Meese*, 481 U.S. at 467–68. The federal district court granted the injunction and held "that the risk of damage to [appellee's] reputation established his standing to challenge the constitutionality of the statute's

use of the term "propaganda," and that the appellee had established his entitlement to a preliminary injunction." *Id.* at 468. It then granted summary judgment because the use of the word "propaganda" was "a semantically slanted word of reprobation; that the use of such a denigrating term renders the regulated materials unavailable to American citizens who wish to use them as a means of personal expression; and that since there was no compelling state interest to justify the use of such a pejorative label, it was an unnecessary, and therefore invalid, abridgment of speech." *Id.* at 469. Although the Supreme Court reversed on the issue of summary judgment because it held the term "political propaganda" in the context of the challenged law was neutral and not in violation of the First Amendment, the key takeaway from *Meese* is that—like the appellee in that case—the Church has standing because it has "alleged and demonstrated more than a "subjective chill."" *Id.* at 473, 478–85. The Court stated that the appellee "establishe[d] that the term "political propaganda" threatene[d] to cause him cognizable injury" because he had claimed "if he were to exhibit the films while they bore such characterization, his personal, political, and professional reputation would suffer and his ability to obtain re-election and to practice his profession would be impaired." *Id.* at 473. The Defendants' adverse determination letter characterizing the Church's activities as "illegal" has the same effect here. Although Defendants claim that they cannot enforce the CSA, their very determination of illegality has "substantially harm[ed]" the Church and its members' ability to practice their religion. *Id.* at 474. This has not only caused the Church and its members to suspend their ceremonies in fear of law enforcement intrusion and possible prosecution, but it has also prevented the Church from moving forward in conducting educational workshops and the other charitable activities it intends to perform as part of its overall mission. *See* SMF ¶¶ 30 –31.  It is hard to imagine any governmental action more damning to a church's reputation than classifying its purposes and activities  as "illegal" in a binding ruling.

Economically, the Defendants' actions have also resulted in the current and future loss of income and profits for the Church, as it has had no membership income or contributions with which to carry on its programs for nearly three years. *See generally Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 152 (1970). These economic injuries and their redress are further detailed below.

>        **2.     The Church's Injuries in Fact are "Fairly Traceable" to the Service's Determination that its Activities are Illegal.**

Defendants cite generally to the Tenth Circuit case of *Alpenglow Botanicals, LLC v. United States*, 894 F.3d 1187 (10th Cir. 2018) as support for their argument that the Church's injuries are not fairly traceable to the Defendants because the Internal Revenue Service does not have sufficient authority with respect to the CSA or to determine whether a religious party is entitled to an exemption under the RFRA, and that its authority in this case is limited to determining as a matter of civil tax law that the Church does not qualify for exemption because its use of DMT is illegal. Traceability in the Article III standing context "is not equivalent to a requirement of tort causation." *Nader v. The Democratic Nat. Comm.*, 555 F.Supp.2d 137, 149–50 (D.D.C. 2008). "The "fairly traceable" requirement "is in large part designed to ensure that the injury complained of is 'not the result of the independent action of some third party not before the court.'" *Id.* (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000); *Defenders of Wildlife*, 504 U.S. at 560). The action the Church is challenging is the Defendants' denial of the Church's application for tax-exempt status. SMF ¶ 43, 44, 50, 52. Although the Defendants rely on the DEA's ability to enforce the penalties under the CSA to argue that the Church does not have standing, the Church meets the traceability threshold because its primary injury—the fear that it cannot practice its religion—stems from the Defendants' adverse determination letter and its actions leading up to it, beginning with its second Information Request.

13

*See Barbour v. Haley*, 471 F.3d 1222, 1226 (11th Cir. 2006) (stating that for purposes of satisfying Article III's causation requirement, "we are concerned with something less than the concept of 'proximate cause.'").

In *Nader v. The Democratic Nat. Comm.*, the plaintiffs were political candidates who claimed the defendants sought to benefit another political candidate's election by filing numerous lawsuits against them, requiring them "to spend their limited resources of time, talent, and money on the defense of unfounded lawsuits." *Nader*, 555 F.Supp.2d at 145. As an example, one of the candidates loaned funds to his campaign to cover litigation expenses. *Id*. The plaintiffs claimed "civil conspiracy, malicious prosecution, and abuse of process." *Id.* The defendants argued that these specific plaintiffs could not establish Article III standing because the campaign loan was a voluntary decision and that the plaintiffs did not show "that the amount and purpose of the loan was to compensate for costs imposed on the campaign by the defendants" and that they did not show "how the defendants prevented the . . . campaign from repaying the loan." *Id.* In response, the plaintiffs argued that they were not required "to meet the burden of production on the causation element of a tort claim." *Id.* This Court agreed, and it held that the plaintiffs "clearly allege[d] that but for the defendants' tortious activity he would not have been compelled to make the loan." *Id.* at 150.

Here, the Church sought governmental approvals to ensure it could practice its religion free from governmental interference and potential prosecution under the CSA. SMF ¶¶ 29–30 & 39. Its decision to cease ceremonies in 2019 and its inability to conduct its other charitable activities are immediate effects that stem from: (1) the Church's concern with delays related to the governmental applications and fear of possible law enforcement intrusion and potential criminal prosecution; (2) the Defendants' several information requests with regard to the Church's

application for tax-exempt status that suggested illegality on the Church's part; (3) the Defendants' proposed adverse determination letter dated June 16, 2020 stating that the Church's purposes and activities are illegal; and (4) the Defendants' reiteration that the Church's purposes and activities are illegal in its final adverse determination letter. SMF ¶¶ 29–30 & 36–45. This Court should conclude that the Church has shown that its decision to suspend religious ceremonies, and the barriers to conducting its other charitable programs, are "fairly traceable" to the Defendants' actions.

### 3.     A Favorable Decision for the Church Will Redress the Various Injuries in Fact it Suffered as a Result of the Defendants' Actions.

The Church also meets the final prong of the standing test, which requires a showing that the requested relief will likely redress the alleged injury. *Lujan*, 504 U.S. at 561; *Cal. v. Tex.*, 141 S. Ct. 2104, 2113 (2021). The RFRA sets limits with its "substantial burden" test and Defendants' adverse ruling is a "government action that bans an aspect of [the Church's] religious observance or practice."[2] The Defendants argue that even if they were to grant the Church's application for tax exemption, the DEA could still pursue criminal charges against the Church and its members. *See* Defs.' Memorandum (Docket No. 22 at 19). But even assuming, arguendo, that this were to happen, the DEA would also be subject to the Supreme Court's decision in *O Centro* and would equally be required to show that a decision to pursue criminal charges against the Church and its members is in furtherance of a compelling governmental interest. *O Centro*, 546 U.S. at 435–36.

If this Court grants the requested relief in this case and the Church is recognized as being exempt under I.R.C. § 501(c)(3) and a church within the meaning of I.R.C. § 107(b)(1)(A)(i), the Church's various injuries in fact will be redressed as fully as possible.  As an initial matter, the

---

[2] Federal Law Protections for Religious Liberty, U.S. Att'y Gen. (Oct. 6, 2017), 82 FR 49668-01, 2017 WL 4805663.

Church and its members will no longer live under the shadow of the "illegal" label the Defendants have applied to their religious beliefs and practices, making sacramental ceremonies virtually impossible.  In turn, the Church will be able to provide the DEA with proof of its exempt status to bolster its religious exemption application on file with that agency.  While the Defendants' designation of the Church's activities as illegal may not bind the DEA in its own decision-making, it would certainly leave a significant black mark on the application.  On the other hand, a favorable determination letter would no doubt be received by the DEA as strong evidence of the Church's integrity and willingness to comply with federal law.  In summary, if the requested relief is granted, the Church will be able to advance its intentions to comply with all federal and state laws while fully practicing its faith, including the consumption of the Sacrament of Ayahuasca.

Similarly, the injury in fact to the Church's and its members' reputations will be fully redressed if the Defendants issue a determination letter granting the Church tax-exempt status under I.R.C. §§ 501(c)(3) and 170(b)(1)(A)(i).  A reversal of the Defendants' final adverse determination letter will not only eliminate the stigma currently attached to the Church and its membership, but will also validate their belief systems and sacramental practices as sincere exercises of religion under the First Amendment.  Once these reputational injuries have been redressed, the Church anticipates that its membership will increase once again and outside perception of the Church will not be viewed through the lens of criminality.

Finally, the economic injury in fact that the Church has suffered as a result of Defendants' actions will be partially redressed by this Court's granting of the requested relief.  *See Meese*, 481 U.S. at 476 (explaining that partial redressability was sufficient to establish standing).  There is, of course, no way to replace the lost membership income and potential charitable contributions the Church would have received since filing its exemption application on January 10, 2019, but the

16

Church will be able to receive charitable contributions on a going-forward basis, providing it with operating funds to pursue its DEA exemption and conduct its other educational and charitable programs.

**B.     The Church Does Not Misrepresent the *O Centro* Decision.**

The Defendants claim that the Church misrepresents the *O Centro* decision in several ways. *See* Defs.' Memorandum (Docket No. 22 at 19-21).  As their initial argument in support of this claim, the Defendants erroneously state that the Church relies on *O Centro* for the proposition that the use of Ayahuasca is generally legal.  *Id*. at 20.  This has never been the Church's position and appears nowhere in the administrative record or the pleadings.  What the Church has argued from the time it filed its original exemption application is that the use of Ayahuasca *can be* legal under *O Centro* when used in the sincere exercise of religion, and that the Church's use of it in its own religious ceremonies is legal and deserving of protection under the RFRA.  The United States Supreme Court has expressly recognized, and the Defendant United States has conceded, that the sacramental consumption of Ayahuasca in religious ceremonies is a sincere exercise of religion under the First Amendment to the United States Constitution.  *O Centro*, 546 U.S. at 431.  To directly counter the Defendants' argument, the *O Centro* Court did not rule that the sacramental use of Ayahuasca is *illegal,* nor would it have proceeded to evaluate the UDV church's *prima facie* case under the RFRA if it had done so.

The Defendants next unpersuasively argue that the Supreme Court in *O Centro* did not rule on whether there was a violation of the RFRA.  *Id*.  While technically accurate, this minimizes the fact that once the UDV church made its *prima facie* claim for relief under the RFRA, the United States was unable to meet even the threshold requirement of showing a compelling governmental interest in substantially burdening the UDV church's exercise of religion.  As a result, the Court

ruled that the United States had not met its preliminary burden to defend against the UDV church's RFRA claims and that the UDV church's use of Ayahuasca therefore could not be barred.

The Defendants next suggest that because *O Centro* addressed matters at the preliminary injunction stage, the Court's rulings do not carry the same import as those in litigation at a more advanced stage. Although the case does address only matters at the preliminary injunction stage, that does not erase or even lessen the case's significance regarding the RFRA and its application. At the end of the day, the Supreme Court affirmed the United States Court of Appeals for the Tenth Circuit's decision that the government failed to prove a compelling interest in barring the UDV church's sacramental use of Ayahuasca. *Id.* at 439.

The Defendants next state that the *O Centro* Court did not find that there was *no* compelling governmental interest in that case, only that the United States failed to prove one "at that point in the litigation." (Docket No. 22 at 21). Presumably, the Defendants assume that other compelling interests existed but were overlooked or disregarded by the United States' legal counsel throughout the course of that litigation, which strains credibility. The United States unsuccessfully offered three possible compelling interests in its defense in *O Centro*: (1) protecting the health and safety of the UDV church's members; (2) preventing diversion of the controlled substance from the church to recreational users; and (3) compliance with a 1971 United Nations Convention. *O Centro*, 546 U.S. at 418. In the instant case, however, the Defendants have offered nothing more than the categorical statement that the use of Ayahuasca is illegal and violates public policy. Similar to the United States in the *O Centro* opinion, the Defendants have failed to identify a compelling governmental interest in defense of their denial of the Church's exemption application on the grounds of its "illegality," making it unnecessary for this Court to determine whether its actions were the least restrictive means of furthering such an interest.

### III.    CONCLUSION

The Church is entitled to summary judgment under both Claims One and Two.  With respect to its Claim One, the Church has established that it is both organized and operated for charitable purposes within the meaning of I.R.C. § 501(c)(3) and also qualifies as a church under I.R.C. § 170(b)(1)(A).  The Defendants have failed to rebut the Church's entitlement to this dual status.  As demonstrated, the Defendants cannot reconcile their decisions in granting the UDV Church in *O Centro* and Sanctuary of Our Lady Ayahuasca tax-exempt and church status with their denial of the same status to the Church, and the Court should take judicial notice of this glaring discrepancy.  Furthermore, the Defendants' argument that the Church's purposes and activities violate public policy lacks credibility when public policy issues did not stand as a bar to exemption and church status for the UDV Church and Sanctuary of Our Lady Ayahuasca.  Both of these organizations enjoy these statuses to this day.

The Church is also entitled to summary judgment with respect to its Claim Two, as the Defendants have failed to prove that the Church lacks standing to bring its RFRA claim.  The Church has proven it has suffered multiple injuries in fact as a result of the Defendants' actions, that those injuries are directly traceable to the Defendants and that the relief requested will, in fact, redress those injuries.  In addition, the Defendants cannot provide a specific, compelling governmental interest for substantially burdening the Church's and its members' exercise of their religion by deeming their purposes and activities to be illegal.  As a result, the Defendants have failed to meet their burdens under the RFRA and the Church's motion for summary judgment on Claim Two should therefore be granted.

Respectfully submitted,

/s/ William A. Boatwright
William A. Boatwright (*Pro Hac Vice*)
Michael A. Gilmer (*Pro Hac Vice*)
Dentons Davis Brown PC
215 10th Street, Ste. 1300
Des Moines, Iowa 50309
Telephone: (515) 288-2500
Facsimile: (515) 243-0654
Email: Bill.Boatwright@dentons.com
Date: August 1, 2022                      Email: Michael.Gilmer@dentons.com


/s/ Kenneth J. Pfaehler
Kenneth J. Pfaehler
D.C. Bar No. 461718
Dentons US LLP
1900 K Street, N.W.
Washington, D.C. 20006
Phone:   (202) 496-7500
Fax:       (202) 496-7756
Email:    Kenneth.Pfaehler@dentons.com

Date: August 1, 2022                      *Attorneys for Plaintiff*

Copies To:

MERRICK B. GARLAND
United States Attorney General

MATTHEW M. GRAVES
United States Attorney, District of Columbia

DAVID A. HUBBERT
Deputy Assistant Attorney General

EMILY K. MILLER        (KY #97725)
JOSEPH E. HUNSADER    (DC #453328)
KRISTINA M. PORTNER  (DC #1002793)
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 227
Washington, D.C. 20044
Phone:   202-353-7509
Fax:       202-514-6866
Email:    Emily.K.Miller@usdoj.gov
Email:    Joseph.E.Hunsader@usdoj.gov
Email:    Kristina.M.Portner@usdoj.gov
*Counsel for the United States of America*

| PROOF OF SERVICE | |
| --- | --- |
| The undersigned certifies that the foregoing instrument served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on August 1, 2022, by: | |
| ___ U.S. Mail | ___ Overnight Courier |
| ___ Hand Delivered | ___ Other |
| ___ Email | _X_ EDMS |
| Signature: /s/William A. Boatwright | |