<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

</div>

| | | |
|---|---|---|
| **IOWASKA CHURCH OF HEALING** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CHARLES P. RETTIG,** | ) | |
| **in his Official Capacity as** | ) | |
| **Commissioner,** | ) | |
| **Internal Revenue Service;** | ) | **Civil Action No. 1:21-cv-02475-BAH** |
| | ) | |
| **and** | ) | |
| | ) | |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **a governmental entity,** | ) | |
| **c/o United States Attorney General** | ) | |
| **Department of Justice** | ) | |
| | ) | |
| **Defendants.** | ) | |

<div align="center">

**PLAINTIFF'S AMENDED STATEMENT OF POINTS OF LAW AND AUTHORITY**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

</div>

COMES NOW, Plaintiff Iowaska Church of Healing and for its Amended Statement of

Points of Law and Authority in Support of its Motion for Summary Judgment states as follows:

<div align="center">

**TABLE OF CONTENTS**

</div>

I.       INTRODUCTION ........................................................................................... 3

II.      FACTS ............................................................................................................ 4

III.     ARGUMENT ................................................................................................ 11

      A.     Summary Judgment Standard ................................................................ 11

      B.     The Church Satisfies All Requirements for Recognition Under I.R.C. §§ 501(c)(3) and 170(b)(1)(A)(i); Accordingly, the Church is Entitled to Summary Judgment on its Claim One ................................................ 11

           1.    The Church Satisfies the Organizational and Operational Tests of Treasury Regulation §§ 1.501(c)(3)-1(b) and 1.501(c)(3)-1(c). ....................................... 12

        **a.   The Free Exercise Clause of the First Amendment to the United States Constitution Authorizes the Church's Exempt Purposes and Activities** ....................................................**14**

        **b.   *Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal* is Controlling and Sufficient Authority for the Church's Entitlement to § 501(c)(3) Recognition** ...................**18**

        **c.   The Church's Other Purposes and Activities Are Also Exempt Under I.R.C. § 501(c)(3)** ....................................................**24**

    **2.   The Church is a "Church" Within the Meaning of I.R.C. § 170(b)(1)(A)(i).  26**

**C.   The Church's Use of Ayahuasca During its Religious Ceremonies is a Sincere Exercise of Religion Under the First Amendment to the United States Constitution and is Therefore Entitled to Protection Under the Religious Freedom Restoration Act of 1993.** .....................................................**32**

**D.   The Defendants Violated the RFRA by Substantially Burdening the Church's and its Members' Free Exercise of Religion under the First Amendment Without Justification; Accordingly, the Church is Entitled to Summary Judgment on its Claim Two.** ...........................................**33**

    **1.   The Church has made a Prima Facie Claim for Protection Under the RFRA.** ...................................................................................................**34**

        **a.   Defendants' Erroneous Designation of the Church's Activities as "Illegal" has Chilled the Church's and its Members' Exercise of their Religion.** ..................................................................**36**

    **2.   Defendants Failed to Meet Their Burdens of Proof under the RFRA, Entitling the Church to Summary Judgment on its Claim Two.** ...................**38**

**IV.      CONCLUSION** ...................................................**41**

## I.    INTRODUCTION

Plaintiff Iowaska Church of Healing (the "Church") brings this action pursuant to I.R.C. § 7428 following the denial by Defendants of its application for recognition as an organization described in I.R.C. § 501(c)(3) and as a church within the meaning of I.R.C. § 170(b)(1)(A)(i). The Church was organized as an Iowa non-profit corporation in order to operate a church that provides the Sacrament of Ayahuasca to its members in tea form as the central element of its religious ceremonies. Ayahuasca contains Dimethyltryptamine, which is a hallucinogenic Schedule I drug under the Controlled Substances Act ("CSA"), 21. U.S.C. § 801-904 (2022). Defendants' primary rationale for denying the Church's application is the erroneous belief that the Church's use of Ayahuasca in its religious ceremonies violates the CSA and is therefore illegal. As a result, Defendants have determined that the Church does not satisfy the requirements of I.R.C. § 501(c)(3) and corresponding Treasury Regulations.

The Church's primary authority for the legality of its actions and its entitlement to recognition under I.R.C. §§ 501(c)(3) and 170(b)(1)(A)(i) is the 2006 United States Supreme Court opinion styled *Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006), which is controlling in this case. The church at issue in the *O Centro* case sued the government after United States Customs seized a shipment of *Hoasca* (Ayahuasca) tea that was destined for the church to be used in its religious ceremonies. *Id.* at 418. The Supreme Court found that in doing so, the government substantially burdened the church's rights under the First Amendment to the United States Constitution as well as its rights under the Religious Freedom Restoration Act of 1993 (RFRA). *Id.* at 439; 42 U.S.C. § 2000bb - 2000bb-4 (2022). Importantly, the Supreme Court recognized the use of Ayahuasca in religious ceremonies as a sincere exercise of one's right to the free exercise of religion under the First Amendment. *O Centro,* 546 U.S. at 423. The government conceded this fact in *O Centro* and did not contest the

sincerity of that church's religious use of the controlled substance. *Id.* The Supreme Court further ruled that the church had not violated the CSA, as it had made a prima facie case for protection under the RFRA, thus shifting the statutory burden of proof to the government. *Id.* at 428.

At the time of the 2006 litigation, the church in the *O Centro* case was recognized by Defendants as an organization described in I.R.C. § 501(c)(3) and as a church within the meaning of I.R.C. § 170(b)(1)(A)(i). In Defendants' final adverse determination letter regarding the Church's exemption application, Defendants stated that the church in the *O Centro* litigation was, "an organization with activities strikingly similar to your own", yet nevertheless ignored that controlling precedent in denying the Church's application. (J.A. Ex. 12 at 9).(APP. 0321, Final Adverse Det. P. 9). The New Mexico church at issue in the *O Centro* case is still operational and is recognized by Defendants as an I.R.C. § 501(c)(3) organization and a church to this day.

The Church is entitled to the same protections under the First Amendment to the United States Constitution and the RFRA as the church in the *O Centro* case. Defendants' denial of the Church's exemption application as a result of the so-called "illegality" of its purposes and activities is therefore without merit and the Church is entitled to summary judgment with respect to its tax-exempt status and the other claims set forth in its Amended Complaint for Declaratory Relief.

## II.   FACTS

The Church was incorporated as an Iowa non-profit corporation on September 24, 2018. *See* Statement of Material Facts ("SMF") at ¶ 1. The Church was organized as a religious corporation under section 504.141(38) of the Iowa Code. *See* SMF at ¶ 2. The Church has been registered to do business in the State of Florida since March 19, 2019. *See* SMF at ¶ 3.

4

The Church was organized to operate a church for its members, and its mission is to inspire individuals to seek and embrace authentic, self-realized healing of the mind, body and spirit through the ceremonial use of the sacred, indigenous plant-medicine of Ayahuasca.   *See* SMF at ¶ 4.  The Church wishes to offer the public access to spiritual growth, development and healing through the sacred Sacrament of Ayahuasca provided under the guidelines of North and South American Indigenous traditions and cultural values.  *See* SMF at ¶ 5.

The use of Ayahuasca originates from the Amazon and represents the basis of spiritual practice for at least 75 different indigenous tribes across the lower and upper Amazonian regions, who use Ayahuasca for medicinal, spiritual and divinatory purposes.   *See* SMF at ¶ 6.  The plants used in the preparation of Ayahuasca have been used for millennia, and official, representative religions began to appear 90 years ago, which are referred to under the Churches of Santo Daime, Uniao do Vegetal and Barquinha.   *See* SMF at ¶ 7.  Official Ayahuasca churches first appeared in Brazilian Amazonian cities and have since spread to Europe, the United States and Asia.   *See* SMF at ¶ 8.  The religious use of Ayahuasca within these churches blends different elements of Christianity, afro-Brazilian religions and indigenous shamanism. *See* SMF at ¶ 9.

Membership in the Church is available to all those who approach the church with the sincere intention to become part of a spiritually directed community in which all members live by a code of love, unity, integrity and respect for all living things, and who sincerely seek a deeper relationship with Self, with Spirituality and with the living Spirit of Mother Earth.  *See* SMF at ¶ 10.

Prospective members of the Church are required to complete and return an application form, which is reviewed by the Church's President and Vice President (the Church's lead

healers).   *See* SMF at ¶ 11. A prospective member's responses to the membership application must echo sincerity of thought and spiritual reflection, indicating an earnest desire to be a part of a growing spiritual community in which each member is seeking personal growth, and the applicant's personal need for spiritual healing is also considered.   *See* SMF at ¶ 12.   The Church's leaders and Board of Directors reserve the right to assess, discuss, vote and if necessary, terminate the membership and involvement of any individual who disregards Church Doctrine and the Universal Laws of respect, integrity, harmony, love and light.   *See* SMF at ¶ 13.

During the Church's religious ceremonies, the Sacrament of Ayahuasca is consumed by its members as communion in the form of a tea brewed using water and two plants that are indigenous to the Amazon Rainforest. *See* SMF at ¶ 14. One of the plants used to make Ayahuasca tea contains Dimethyltryptamine, which is a hallucinogenic Schedule I drug under the CSA. *See* SMF at ¶ 15.

In order to receive the Sacrament of Ayahuasca during the Church's religious ceremonies, individuals must be approved for membership, and agree to comply with the *Rules and Regulations for Participating in the Sacrament of Ayahuasca*. *See* SMF at ¶ 16.   Besides the receipt of the Sacrament of Ayahuasca, the Church's religious ceremonies also include sacred prayers, singing, music, smudging, reflections and readings from the *Ayahuasca Manifesto*, which is the foundation of the Church's religious doctrine.   *See* SMF at ¶ 17.   The Church's doctrine and literature also include the *Universal Laws of Respect*.   *See* SMF at ¶ 18.

The Church's ceremonies are generally held on weekends, taking place on Friday, Saturday and Sunday, and typically consist of two evening ceremonies and the option for a daytime ceremony.   *See* SMF at ¶ 19.   Sunday ceremonies also include member "Integration", which provides members the chance to openly share their spiritual experiences with the

Sacrament of Ayahuasca and to receive guidance from the mental health counselors, healers, facilitators and spiritual coaches present.  *See* SMF at ¶ 20.  Church Members who do not attend weekend ceremonies in person can still participate during Sunday Integration virtually through telephone or video call.   *See* SMF at ¶ 21.  The Church's members remain in frequent contact with its healers through telephone and e-mail support in order to help guide them through their daily struggles both before and after they attend and participate in ceremonies.  *See* SMF at ¶ 22.

The Church originally intended to purchase land in the State of Iowa upon which to build a permanent worship facility and related structures, with Florida as a potential secondary location.  *See* SMF at ¶ 23.  The Church and its counsel later determined, however, that it would be prudent to first establish a physical location in Florida until there is greater clarity with respect to Iowa law, which, unlike Florida, does not have a state-level version of the federal RFRA. *See* SMF at ¶ 24.

After its organization, the Church was growing and had as many as 20 members, four of whom attended ceremonies on multiple weekends.  *See* SMF at ¶ 25.  Many of the Church's members live in different states and several in foreign countries.  *See* SMF at ¶ 26.

The Church conducted weekend ceremonies at the same location in Florida during the months of May, June, July and August of 2019.  *See* SMF at ¶ 27.  No ceremonies have taken place in Florida, or elsewhere, since the last ceremony was held on August 18, 2019.  *See* SMF at ¶ 28.  The Church voluntarily suspended all of its ceremonies out of caution while it awaited its § 501(c)(3) Determination Letter and DEA religious exemption.  *See* SMF at ¶ 29.  The Church and its members were concerned with the delays related to the Church's governmental applications, and were fearful of possible law enforcement intrusion into their sacred ceremonies

and potential criminal prosecution under the CSA before receiving the respective approvals.  *See* SMF at ¶ 30.

In addition to the Church's religious ceremonies and ongoing Integration activities, it will conduct workshops providing education on sacred Indigenous cultures and practices involving the use of Ayahuasca as a healing medicine and spiritual tool, and offer educational events for the public including, but not limited to, group meditations, Mother Earth (Pachamama) devotionals, and spiritual, emotional and physical wellness events.  *See* SMF at ¶ 31.  The Church also intends to raise awareness of local Native American tribes as well as South American and Amazonian tribes. *See* SMF at ¶ 32.

The Church will offer veterans of the United States Armed Forces the ability to participate in its religious ceremonies, Integration, group therapy and other healing activities for free or at a reduced cost, and has contacted a number of veteran relief organizations to develop cooperative arrangements with them including Wounded Warrior Project, Veterans of Foreign Wars and the United States Department of Veterans Affairs.  *See* SMF at ¶ 33.

The Church also maintains a website which contains information about its activities, beliefs and doctrines, and the use of Ayahuasca in religious ceremonies, which is located at www.iowaskachurchofhealing.com.  *See* SMF at ¶ 34.

On January 10, 2019, the Church filed IRS Form 1023 requesting recognition as an organization described in I.R.C. § 501(c)(3) and, specifically, as a church within the meaning of I.R.C. § 170(b)(1)(A)(i).  *See* SMF at ¶ 35.

On February 28, 2019, the Church filed a request for a religious exemption from the CSA with the United States Drug Enforcement Administration's ("DEA") Diversion Control Division in Springfield, Virginia, which has not yet been granted.  *See* SMF at ¶ 36.

By their First Information Request dated July 3, 2019, Defendants requested additional information with respect to the Church's Form 1023.  *See* SMF at ¶ 37.  The Church timely responded to the First Information Request on July 25, 2019.  *See* SMF at ¶ 38.

Defendants issued a Second Information Request dated September 10, 2019, in which they questioned the legality of the Church's ceremonial use of Ayahuasca under federal and state law without first having received an exemption from the CSA by the Diversion Control Division of the DEA.  *See* SMF at ¶ 39.  In its October 4, 2019 response to the Second Information Request, the Church cited the *O Centro* opinion, in which both the Supreme Court and the government acknowledged that the sacramental use of Ayahuasca is a sincere exercise of religion under the First Amendment.  *See* SMF at ¶ 40.

Defendants issued a Third Information Request dated February 4, 2020, in which they again questioned the legality of the Church's ceremonial use of Ayahuasca without first having received an exemption from the CSA by the Diversion Control Division of the DEA.  *See* SMF at ¶ 41.  In its February 24, 2020 response to the Third Information Request, the Church reiterated the controlling precedent of *O Centro* and reminded Defendants that there was no evidence in the *O Centro* opinion suggesting that the church at issue had even applied for an exemption from the CSA.  *See* SMF at ¶ 42.

Defendants next issued a proposed adverse determination letter of June 16, 2020 to the Church, stating that they intended to deny its application for recognition as an I.R.C. § 501(c)(3) charitable organization and as a church within the meaning of I.R.C. § 170(b)(1)(A)(i).  *See* SMF at ¶ 43.  In the proposed adverse determination letter, Defendants stated that the Church's activities are illegal because it had not received a CSA exemption from the DEA or sought relief in the courts.  *See* SMF at ¶44.  Defendants did, however, affirmatively state that the church in

the *O Centro* case was, "an organization with activities strikingly similar to your own."  (J.A. Ex. 12 at 9); (APP. 0321, Final Adverse Det. P. 9).  *See* SMF at ¶ 45.

At the time of the *O Centro* litigation, the New Mexico church at issue was recognized by Defendants as an organization described in I.R.C. § 501(c)(3) and as a church within the meaning of I.R.C. § 170(b)(1)(A)(i), and it still maintains this status.  *See* SMF at ¶ 46.

On October 8, 2020, an Ayahuasca church named Sanctuary of Our Lady Ayahuasca, located in Arizona, was granted tax-exempt status under I.R.C. § 501(c)(3) and further classified as a church under I.R.C. § 170(b)(1)(A)(i), and still maintains this status.  *See* SMF at ¶ 47.

The tax-exempt status of the church in the *O Centro* opinion and Sanctuary of Our Lady Ayahuasca is a matter of public record, and can be searched using the Internal Revenue Service's website under the "Tax Exempt Organization Search" function located at https://apps.irs.gov/app/eos/.  *See* SMF at ¶ 48.

The Church timely filed its protest of Defendants' proposed adverse determination letter on July 13, 2020.  *See* SMF at ¶ 49.  By letter dated September 1, 2020, Defendants denied the Church's protest and notified the Church that its case was being forwarded to the IRS Office of Appeals.  *See* SMF at ¶ 50.

On April 1, 2021, a telephonic IRS Appeals conference was held between the Church, the Church's counsel and Daniel Frisch of the Internal Revenue Service.  *See* SMF at ¶ 51.

In their final adverse determination letter dated June 28, 2021, Defendants maintained their position that the Church's activities are illegal because it had not received a CSA exemption from the DEA or sought relief in the courts.  *See* SMF at ¶ 52.

### III.   ARGUMENT

**A.   Summary Judgment Standard.**

Summary judgment is appropriate if a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Battle v. Mineta*, No. 05-5413, 2006 WL 3093811, at *1 (D.C. Cir. 2006) (citing to *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). A dispute about a certain material fact is deemed "genuine," "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Waterhouse v. District of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (citing to *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). A party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).   Although the evidence is to be viewed in the light most favorable to the non-moving party, the Church need only point to the absence of evidence of an essential element of Defendants' claims to succeed on its motion for summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986); *see also Waterhouse*, 298 F.3d at 992. As the D.C. Circuit has explained, the Church is entitled to summary judgment if Defendants fail to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing to *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

**B.   The Church Satisfies All Requirements for Recognition Under I.R.C. §§ 501(c)(3) and 170(b)(1)(A)(i); Accordingly, the Church is Entitled to Summary Judgment on its Claim One.**

In order to qualify for exemption as a charitable organization under I.R.C. § 501(c)(3), an entity must satisfy a number of requirements set forth in the Internal Revenue Code of 1986, as amended, as well as corresponding Treasury Regulations.  These include the requirement that an

organization must be both organized and operated exclusively for one or more of the purposes specified in I.R.C. § 501(c)(3).  Treas. Reg. § 1.501(c)(3)-1(a)(1).  If an organization fails to meet either the organizational test or the operational test, it is not exempt.  *Id.*  Under I.R.C. § 501(a), organizations that meet the requirement of I.R.C. § 501(c)(3), "*shall be exempt* from taxation" and are therefore statutorily entitled to exemption.  I.R.C. § 501(a) (emphasis added).

The Church satisfies both the organizational and operational tests for exemption under I.R.C. § 501(c)(3) and is therefore entitled to recognition as such by the Defendants. Defendants' argument that the Church does not satisfy either test is based on the simple, erroneous position that its purposes and activities are illegal, and blatantly ignores controlling precedent provided by the United States Supreme Court in the *O Centro* opinion.

1. **The Church Satisfies the Organizational and Operational Tests of Treasury Regulation §§ 1.501(c)(3)-1(b) and 1.501(c)(3)-1(c).**

Treasury Regulation § 1.501(c)(3)-1(b) addresses the "organizational test" and provides that an organization is organized exclusively for one or more exempt purposes only if its articles of organization: (1) limit the purposes of the organization to one or more exempt purposes, and (2) do not expressly empower the organization to engage, other than as an insubstantial part of its activities, in activities which in themselves are not in furtherance of one or more exempt purposes.  Treas. Reg. § 1.501(c)(3)-1(b)(1).

Treasury Regulation § 1.501(c)(3)-1(c) then addresses the "operational test" and provides, in pertinent part, that an organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in § 501(c)(3).  Treas. Reg. § 1.501(c)(3)-1(c)(1).

Exempt purposes are thereafter defined to include religious, charitable, scientific, testing for public safety, literary, educational or prevention of cruelty to children or animals.  Treas.

Reg. § 1.501(c)(3)-1(d)(1).  Under the regulations, the term "charitable" is used in § 501(c)(3) in its generally accepted legal sense and is, therefore, not to be construed as limited by the separate enumeration in § 501(c)(3) of other tax-exempt purposes which may fall within the broad outlines of "charity" as developed by judicial decisions.  Treas. Reg. § 1.501(c)(3)-1(d)(2). Under this regulation, "charity" includes, among other things, the advancement of religion and education, the relief of the poor and distressed, and the promotion of social welfare.  *Id.*

In denying the Church's request for exemption, Defendants stated that the Church is not organized and operated exclusively for exempt purposes under I.R.C. § 501(c)(3).  (J.A. Ex. 12 at 8).(APP. 0320, Final Adverse P. 8).  The Defendants first make the claim that the Church fails the organizational test because it is not organized exclusively for one or more exempt purposes. (J.A. Ex. 12 at 8-9).(APP. 0320-321, Final Adverse Pp. 8-9).  According to Defendants, the Church's Articles of Incorporation do not limit its purposes to exempt purposes and expressly empower it to engage in activities which are illegal and therefore not in furtherance of one or more exempt purposes.  *Id.* In its final adverse determination letter, Defendants state as follows:

> Under federal law, DMT distribution and use is illegal.  The D (Ayahuasca) tea used in the sacrament of D contains DMT.  One of the purposes for which you have been formed is an illegal purpose, to wit, the distribution of a controlled substance to individuals who are engaged in an illegal activity.  Furthermore, your articles of incorporation expressly empower you to engage, otherwise than as an insubstantial part, in the distribution of D, an activity which in itself is not in furtherance of one or more exempt purposes.

(J.A. Ex. 12 at 8-9). (APP. 0320, 0321, Final Adverse Det. pp. 8-9).

Defendants then went on to state that the Church fails the operational test for similar reasons:

> You do not satisfy the operational test of Treas. Reg. Section 1.501(c)(3)-1(c)(1). More than an insubstantial part of your activities is not in furtherance of an exempt purpose.  Your primary activity is to conduct religious ceremonies using D.  As noted above, the distribution of D is illegal … [b]y advocating and

engaging in activities that contravene federal law, and by enabling individuals to engage in an activity illegal under federal law, you serve a substantial nonexempt purpose.

(J.A. Ex. 12 at 9). (APP. 0321, Final Adverse Det. P. 9).

The Church's primary purpose is to operate a church and allow its members to practice their religion.  Contrary to Defendants' claims, the Church's exempt purposes and religious activities are firmly grounded in the First Amendment to the United States Constitution and have been expressly affirmed by the United States Supreme Court.

> **a. The Free Exercise Clause of the First Amendment to the United States Constitution Authorizes the Church's Exempt Purposes and Activities.**

The United States Constitution protects the free exercise of religion. U.S. Const. amend. I.  Specifically, the First Amendment provides that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof.  *Id*.  In his October 6, 2017 Memorandum to all Executive Departments and agencies of the United States Government, then-acting United States Attorney General Jeff Sessions underscored the need for governmental agencies to protect these fundamental rights of both individuals and religious organizations.  §1-15.300, *Principles of Religious Liberty*, DOJML USAM 1-15.300; (J.A. Ex. 11 at 8-27).(APP. 243-267, J. Sessions Memo).  As noted in item 2 of the Memorandum:

> The Free Exercise Clause protects not just the right to believe or the right to worship; *it protects the right to perform or abstain from performing certain physical acts in accordance with one's beliefs*.  Federal statutes, including the Religious Freedom Restoration Act of 1993 ("RFRA"), support that protection, broadly defining the exercise of religion to encompass *all aspects of observance and practice*, whether or not central to, or required by, a particular religious faith.

(J.A. Ex. 11 at 9). (APP. 244, J. Sessions Memo P. 2) (emphasis added).

The United States Supreme Court has long held that the Free Exercise Clause "embraces two concepts - freedom to believe and freedom to act.  The first is absolute, but in the nature of

things, the second cannot be." *Cantwell v. Conn.,* 310 U.S. 296, 304 (1940).  Moreover, the

Court has also long held that, although laws "cannot interfere with mere religious beliefs and

opinions, they may with practices." *Reynolds v. United States,* 98 U.S. 145, 166 (1879).  Thus,

in light of these well-established principles, no matter how sincere an individual's religious

beliefs are, certain conduct is of such a nature that is so violative of "public safety, peace or

order" so as to render it impermissible. *See, Sherbert v. Verner*, 374 U.S. 398, 403 (1963).

An example of conduct held to be impermissible and therefore unprotected under the

RFRA can be found in *United States v. Stimler*, 864 F.3d 253 (3d Cir. 2017), *vacated in part by*

*United States v. Goldstein*, 902 F.2d 411 (3rd Cir. 2018).   In *Stimler*, the defendants

unsuccessfully attempted to argue that their prosecution for criminal offenses substantially

burdened their religious beliefs and practices, and thus violated the RFRA.  *Id.* at 261.  The

defendants were charged with a plethora of kidnapping-related offenses arising from their

involvement in a scheme to assist an Orthodox Jewish woman in obtaining a divorce from an

uncooperative husband.  *Id.* at 259.  The case noted that a married woman in the Orthodox

Jewish tradition cannot become divorced until her husband provides a contract called a "get",

which must be signed by a witness. *Id.* A woman who attempts to leave her husband without

obtaining a "get" is subject to severe social ostracism within the Jewish community.  *Id.*  In this

case, a woman sought relief in a quasi-tribunal presided over by a panel of three rabbis, called a

"beth din."  *Id.*  Here, the defendants consisted of the rabbis serving as the beth din. *Id.*  The

defendants, as part of the beth din process, worked with several "tough guys" who were tasked

with kidnapping and torturing the woman's husband in exchange for money. *Id.* at 260.  The

defendants were caught prior to the kidnapping by an undercover agent and charged with various

kidnapping offenses.  *Id.*  One of the Defendants' substantive claims was that their prosecution

for the offenses violated the RFRA. *Id.* at 267. In doing so, the Defendants asserted that their prosecution substantially burdened their religious beliefs and practices under the Free Exercise Clause. *Id.* The Third Circuit quickly dispelled this assertion and held that "the government has a compelling interest in uniform application of laws about violent crimes" and that "no other means of such uniformity existed" outside of enforcing the conduct through prosecution. *Id.* at 268. Moreover, the court referenced the complete lack of precedent "in which any court has allowed RFRA to shield individuals in the commission of violent crimes." *Id.*

The Eighth Circuit recently addressed the intersection of First Amendment religious rights and the restrictions of the CSA. *United States v. Anderson*, 854 F. 3d 1033 (8th Cir. 2017). In *Anderson,* the defendant argued that his drug-related indictment and the government's decision to prosecute him under the CSA violated his Free Exercise rights as protected by the RFRA. *Id.* at 1034. The defendant asserted that he was a student of Esoteric and Mysticism studies and, as such, created a religious non-profit organization to distribute heroin in accordance with the beliefs of these studies. *Id.* In ruling against the defendant, the Eighth Circuit Court succinctly distinguished the facts of the case from *O Centro,* as the government was prosecuting the defendant for distributing a Schedule I drug for non-religious uses rather than prosecuting him for engaging in a "circumscribed, sacramental use" of heroin. *Id.* at 1036.

On the other hand, in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), the United States Supreme Court ruled that a church's animal sacrifice practices were permissible conduct under the Free Exercise Clause of the First Amendment. In this case, the church practiced the Santeria religion, which uses animal sacrifice as one of its primary forms of devotion. *Id.* at 521. In the church's rituals, animals are sacrificed and eventually eaten by members of the congregation. *Id.* at 525. After the church leased land in the respondent city,

16

the city council passed ordinances which effectively banned the killing of animals as a result of the residents' moral and safety concerns.  *Id.* at 526.  However, in these ordinances, the city provided an exception for the killing of animals related to food establishments. *Id.*  The petitioning church was the only religion within the city practicing animal sacrifice.  *Id.* Undoubtedly, provided the timing and substance of the ordinances, the petitioning church was targeted. As a result, the church brought suit against the city and its officials contending that the city violated the church's rights under the Free Exercise Clause.  *Id.* at 528.

In ruling for the petitioner-church, the Supreme Court cited with approval its previous holding that, "although the practice of animal sacrifice may seem abhorrent to some, 'religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.'"[1] *Id.* at 531.  Additionally, the Court held that, "[g]iven the historical association between animal sacrifice and religious worship, petitioners' assertion that animal sacrifice is an integral part of their religion 'cannot be deemed bizarre or incredible.'"[2] *Id.* The Court went on to find that the goal of the ordinances was to suppress the Santeria religion and its well-established practices notwithstanding that an "adverse impact will not always lead to a finding of impermissible targeting." *Id.* at 535.  While the ordinances were designed to prevent the suffering and mistreatment of animals, the ordinances' overarching object was the ostracization of a religion from the community. *Id.* at 535-36.  Moreover, the Court found that the governmental interests could have been served in less restrictive manners. *Id.* at 546. Further, the ordinances failed to prohibit nonreligious conduct that endangered the asserted governmental interests (protecting the public health and preventing cruelty to animals).  *Id.*  In

---

[1] *See* Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707 (1981).
[2] *See* Frazee v. Ill. Dep't of Emp't Sec., 489 U.S. 829 (1989).

effect, through its invalidation of the city ordinances, the Court validated the practice of religious animal sacrifice.

Unlike examples found in the violent kidnapping of *Stimler* and the non-religious heroin distribution of *Anderson*, the Church's use of the Sacrament of Ayahuasca in its religious ceremonies is not so violative of "public safety, peace or order" so as to render it impermissible. *See, Sherbert*, 374 U.S. at 403.  To the contrary, the Church's activities, including its use of Ayahuasca in the practice of its religious beliefs, are virtually identical to those of the church at issue in the *O Centro* case, which the Defendants themselves concede.  ~~(J.A. Ex. 12 at 9).~~~~(APP. 0321, Final Adverse Det. P. 9).~~  As a result, the Church's use of Ayahuasca in its ceremonies is a permissible exercise of its First Amendment rights and those of its members, as explained further below.

> **b.  Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal is Controlling and Sufficient Authority for the Church's Entitlement to § 501(c)(3) Recognition.**

The United States Supreme Court has expressly recognized the sacramental consumption of Ayahuasca as a sincere and lawful exercise of one's religion under the First Amendment to the United States Constitution.  *O Centro*, 546 U.S. at 431. As previously noted, *O Centro* involved a challenge by a church ("UDV") that regularly used the Sacrament of "*Hoasca"* (Ayahuasca) in its religious ceremonies to the seizure by United States Customs of a shipment of Hoasca.  *Id.* at 418.  The UDV church claimed that the government's actions, including its threats of criminal prosecution under the CSA, violated the church's rights to the free exercise of religion under the First Amendment and the RFRA.  *Id.*  The government conceded that the UDV church's sacramental use of Hoasca is a "sincere exercise of religion", but nevertheless attempted to prohibit the church from using it in its ceremonies by arguing that the CSA barred all use of the Schedule I controlled substance.  *Id.* at 431.  The UDV church sued the government to block its

enforcement of the CSA and moved for a preliminary injunction by the District Court for the District of New Mexico. *Id.* at 423. The UDV church moved for the injunction so that it could continue to practice its faith pending trial on the merits. *Id.* The District Court entered a preliminary injunction prohibiting the government from enforcing the CSA with respect to the UDV church's importation and use of Hoasca. *Id.* The government then appealed the preliminary injunction to the Court of Appeals for the Tenth Circuit, which affirmed the District Court's ruling. *Id.* at 427. The government then appealed to the United States Supreme Court, which granted certiorari. *Id.*

In successfully arguing for a religious exemption from the CSA in *O Centro*, the UDV church relied upon the provisions of the RFRA. *Id.* at 436-39. Under the RFRA, the government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless the government can demonstrate that the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling interest. 42. U.S.C. §2000bb-1. Under the RFRA, a person whose religious exercise has been burdened in violation of the statute is authorized to seek judicial relief from the government's actions. *Id.* at §2000bb-1(c). In addition to conceding that the sacramental use of Hoasca is a sincere exercise of religion, the government further conceded that the application of the CSA would substantially burden the UDV church's sincere exercise of that religion. *O Centro* 546 U.S. at 423, 426.

In ruling in favor of the UDV church, the Supreme Court noted that the government's actions in disrupting the church's use of Ayahuasca was a "substantial burden" upon its members' exercise of their religious beliefs, and that the government failed to meet its burden to

demonstrate that its actions furthered a compelling interest, or that they did so using the least restrictive means.  *Id.* at 428.

In the final adverse determination letter denying the Church tax-exempt status, Defendants stated that the Church failed the operational test of Treasury Regulation § 1.501(c)(3)-1(c) because it had not received a religious exemption from the CSA, nor relief from a federal court.  (J.A. Ex. 12 at 9).  (APP. 0321, Final Adverse Det. P. 9).  With respect to the first condition, the court in the *O Centro* case did not require the UDV church to first apply for or secure a religious exemption from the CSA from the DEA prior to requesting judicial relief from the government's impermissible burdening of its free exercise rights.  This fact was central to a Native American Church's successful challenge to a "ripeness" argument made by the government in *Oklevueha Native American Church v. Holder*, 676 F.3d 829 (9th Cir. 2012). In addressing the government's argument that the plaintiff church had erred by failing to first apply for a religious exemption from the CSA before seeking judicial relief, the 9th Circuit Court of Appeals stated that:

> Likewise, we are unpersuaded by the Government's assertion that Plaintiffs' request for prospective relief is unripe because Plaintiffs did not request an exception to the CSA from the DEA … [t]he Government argues that we should require Plaintiffs to exhaust this administrative remedy, because doing so would allow the DEA to apply its expertise to Plaintiffs' claim, possibly moot the case if the claim is granted, and help build a record for judicial review.
>
> We decline, however, to read an exhaustion requirement into the RFRA where the statute contains no such condition, see 42 U.S.C. §§ 2000bb - 2000bb-4, and the Supreme Court has not imposed one.  Indeed, the Supreme Court has reviewed a RFRA-based challenge to the CSA without requiring that the plaintiffs first seek a religious use exemption from the DEA.  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal (citations omitted).*  In doing so, it recognized that RFRA "plainly contemplates that *courts* would recognize exceptions [to the CSA] - that is how the law works."

*Id.* at 838.

The Defendants' second stated condition, that the Plaintiff is required to secure judicial relief from a federal court to somehow convert its activities from illegal to legal, is also flawed. It defies logic to read the *O Centro* opinion and conclude that the only reason the use of Hoasca was found to be a legal and sincere exercise of religion was because a successful court challenge was brought by the UDV church to confirm it. Had the underlying activity been so violative of "public safety, peace or order" so as to render it impermissible, the Supreme Court would have found that the government met its burden of demonstrating a compelling interest for its confiscation of the tea and would not have granted the relief the UDV church sought. *See, Sherbert*, 374 U.S. at 403. In *O Centro*, the Court ruled that the government had not even met the threshold burden under the RFRA of demonstrating such a compelling governmental interest, and therefore did not even reach the subsequent inquiry of whether the government's actions amounted to the least restrictive means of addressing that interest.

The rights of free exercise of one's religion are inalienable rights and are set forth in the Free Exercise Clause of the First Amendment. U.S. Const. amend. I. No judicial pre-approval is required for these rights to attach. Indeed, Congress acknowledged the inherent nature of these rights in the findings section of the RFRA where it stated that, "the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution". 42 U.S.C. §§ 2000bb(a)(1).

Defendants are required to acknowledge and follow the rulings set forth in the *O Centro* opinion. The United States Supreme Court is the ultimate authority in interpreting federal law, as the United States Constitution vests judicial power in a single supreme court. U.S. Const. art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."); *Marbury v.*

*Madison*, 5 U.S. 137, 174 (1803) ("The constitution vests the whole judicial power of the United States in one supreme court."). Accordingly, lower courts and federal agencies, including the Internal Revenue Service, are bound by Supreme Court decisions, such as the Court's decision in *O Centro*. *See Marbury*, 5 U.S. at 153.

In addition to ignoring the *O Centro* opinion and its rulings, Defendants have turned a blind eye to the Church's right to protection under the RFRA, not even taking this into consideration when issuing the final adverse determination letter despite the Church's repeated pleas to do so.   In doing so, Defendants not only failed to acknowledge the Supreme Court's construction of the RFRA as applied to the sacramental use of Ayahuasca, but failed to acknowledge their obligations under the statute at all.   The Courts have long held that the judiciary is the final arbiter of statutory construction.   *See FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 32 (1981) ("[T]he courts are the final authorities on issues of statutory construction.");   *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."); *NLRB v. Brown*, 380 U.S. 278, 291 (1965) ("[C]ourts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."); *Webster v. Luther*, 163 U.S. 331, 342 (1896) ([T]his court has often said that it will not permit the practice of an executive department to defeat the obvious purpose of a statute.").

The doctrine of stare decisis requires federal agencies to follow Supreme Court precedent, such as the holding in *O Centro. See Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 131 (1990) ("Once we have determined a statute's clear meaning, we adhere to that

determination under the doctrine of stare decisis, and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning."); *See also  Neal*, 516 U.S. at 295; *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 536–37 (1992).  Indeed, it would be anathema to our judicial system and the constitutional principal of separation of powers to allow federal agencies to defy clear Supreme Court precedent, such as the holding in *O Centro*. *See United States v. Mead Corp.*, 533 U.S. 218, 248-49 (2001) (Scalia, J., dissenting) ("I know of no case, in the entire history of the federal courts, in which we have allowed a judicial interpretation of a statute to be set aside by an agency.").

Furthermore, numerous courts have held that federal agencies cannot ignore federal appeals court precedent, let alone precedent created by the ultimate judicial authority, the Supreme Court. *See e.g. Lopez v. Heckler*, 713 F.2d 1432, 1438 (9th Cir. 1983) (rejecting the "argument that a federal agency can legitimately ignore federal appeals court precedents"); *Jones & Laughlin Steel Corp. v. Marshall*, 636 F.2d 32, 33 (3d Cir.1980) (an "agency is not free to apply its own view of the statute in contravention of the precedent"); *ITT World Communications v. FCC*, 635 F.2d 32, 43 (2d Cir.1980) (An agency "is not a court nor is it equal to this court in matters of statutory interpretation."); *Mary Thompson Hospital, Inc. v. NLRB*, 621 F.2d 858, 864 (7th Cir.1980) ("flagrant disregard of judicial precedent must not continue… [the agency is] obligated under the principles of stare decisis to follow this court's decision"); *Allegheny General Hospital v. NLRB*, 608 F.2d 965, 970 (3d Cir.1979) ("[O]ur judgments … are binding on all inferior courts and litigants …  and also on administrative agencies when they deal with matters pertaining thereto.").

Like the Church, the purposes and activities of the UDV church in *O Centro* are religious within the meaning of I.R.C. § 501(c)(3) and its supporting regulations.  Had they not been so,

the Supreme Court would not have ruled that the UDV church was entitled to protection of its

free exercise rights under the RFRA.  By the Defendants' own admission, the activities of the

Church are "strikingly similar" to those of the UDV church in *O Centro*.  (J.A. Ex. 12 at 9).

(APP. 0321, Final Adverse Det. P. 9).

The UDV church in the *O Centro* case was then, and is still now, recognized as an

organization described in I.R.C. § 501(c)(3) and as a church within the meaning of I.R.C.

§ 170(b)(1)(A)(i).  *See* SMF at ¶ 46.  On October 8, 2020, the Defendants issued a favorable

determination letter to Sanctuary of Our Lady Ayahuasca, recognizing it as a § 501(c)(3)

organization and a church within the meaning of § 170.  *See* SMF at ¶ 47.  Because the Church's

purposes and activities are virtually identical to those of the UDV church in *O Centro*, there is

gross and inexplicable inconsistency in Defendants' classification of the Church's purposes and

activities as illegal, and its denial of tax-exemption and church status to the Church.

### c.  The Church's Other Purposes and Activities Are Also Exempt Under I.R.C. § 501(c)(3).

The Church's primary exempt purpose and its activities are religious within the meaning

of I.R.C. § 501(c)(3).  While ancillary to these core purposes and activities, the Church's other

purposes and activities are also recognized as exempt under the statute.  These include the

education of the public, the relief of the poor and distressed, and the promotion of social welfare.

In sum, the entirety of the Church's purposes and activities are exempt and charitable under

I.R.C. § 501(c)(3).

Treasury Regulation § 1.501(c)(3)-1(d)(3) provides that the term "educational," as used

in I.R.C. § 501(c)(3), relates to the instruction or training of the individual for purposes of

improving or developing his or her capabilities, or the instruction of the public on subjects useful

to the individual and beneficial to the community.  The Church will conduct workshops

providing education on sacred Indigenous cultures and practices involving the use of Ayahuasca as a healing medicine and spiritual tool. *See* SMF at ¶ 31. It will also offer educational events for the public including, but not limited to, group meditations, Mother Earth (Pachamama) devotionals, and spiritual, emotional and physical wellness events. *Id.* The Church also intends to raise awareness of local Native American tribes as well as South American and Amazonian tribes. *See* SMF at ¶ 32. In addition to these educational activities, the Church maintains a robust website containing information about its doctrines and belief systems, the use of Ayahuasca in religious ceremonies and its other various activities. *See* SMF at ¶ 34.

In addition to qualifying as an organization described in Internal Revenue Code § 501(c)(3) for the foregoing reasons, the Church's activities will also constitute the relief of the poor and distressed, a recognized charitable purpose under Treasury Regulation § 1.501(c)(3)-1(d)(2). Ayahuasca is a spiritual medicine, and is used by Ayahuasca churches to treat individuals suffering from a variety of health conditions and disorders, including depression and Post-Traumatic Stress Disorder ("PTSD"). The Church will offer veterans of the United States Armed Forces the ability to participate in its religious ceremonies, Integration, group therapy and other healing activities for free or at a reduced cost, and has contacted a number of veteran relief organizations to develop cooperative arrangements with them including Wounded Warrior Project, Veterans of Foreign Wars and the United States Department of Veterans Affairs. *See* SMF at ¶ 33.

The promotion of social welfare is a recognized charitable purpose under Treasury Regulation § 1.501(c)(3)-1(d)(2), and another means by which an organization may qualify for tax-exempt status. Treasury Regulation § 1.501(c)(4)-1(a)(2) addresses organizations that promote social welfare and provides that, "[a]n organization is operated exclusively for the

promotion of social welfare if it is primarily engaged in promoting in some way the common good and general welfare of the people of the community."   All of the Church's charitable activities are directed towards the betterment of the common good, safety and general welfare of its members and all people around them.

## 2.   The Church is a "Church" Within the Meaning of I.R.C. § 170(b)(1)(A)(i).

In addition to qualifying as an organization described in I.R.C. § 501(c)(3), the Plaintiff simultaneously qualifies as a church within the meaning of I.R.C. § 170(b)(1)(A)(i).  There is no definition of "church" within the Internal Revenue Code or its supporting regulations.  There are essentially two tests employed by the courts in determining whether a religious organization also qualifies as a church, including a criteria-based test developed by the Internal Revenue Service and an "associational test" developed through case law.  The current test routinely employed by Defendants is based upon criteria that were formulated by the Internal Revenue Service but do not have statutory or regulatory support.  *See* I.R.S. G.C.M. 38,699 (April 23, 1981).  The Internal Revenue Service's position is that in order to be classified as a church, an organization must satisfy at least some of the following criteria: (1) a distinct legal existence; (2) a recognized creed and form of worship; (3) a definite and distinct ecclesiastical government; (4) a formal code of doctrine and discipline; (5) a distinct religious history; (6) a membership not associated with any other church or denomination; (7) ordained ministers ministering to the congregation; (8) ordained ministers selected after completing prescribed courses of study; (9) a literature of its own; (10) established places of worship; (11) regular congregations; (12) regular religious services; (13) Sunday schools for the religious instruction of the young; and (14) schools for the preparation of ministers. *Id.*

Chief Counsel for the Internal Revenue Service acknowledged the limited application of the 14-point "church criteria" in General Counsel Memorandum 38,699.  I.R.S. G.C.M. 38,699 at

*2.  In the memorandum, Chief Counsel stated that, "the list of the criteria is merely a tool which the Service finds helpful in making a particular fact determination".  *Id.*  Chief Counsel then went on to state that:

> [T]he criteria are not exclusive and are not to be mechanically applied, but are to serve only as a list of some of the characteristics that may be used in determining whether an organization is a church and that some of these characteristics may be given more weight than others in a given case.

*Id.* at 3.

Finally, Chief Counsel recommended that a fifteenth criterion be added to read, "any other facts and circumstances which may bear upon the organization's claim for church status".  *Id.*

The courts have similarly circumscribed the importance of the 14 criteria developed by the Internal Revenue Service.  As an example, the United States Court of Appeals for the Federal Circuit agreed with the trial court's concern about the Internal Revenue Service's 14-point church criteria on the ground that it, "appears to favor some forms of religious expression over others in a manner in which, if not inconsistent with the letter of the Constitution, the court finds troubling when considered in light of the constitutional protections of the Establishment and Free Exercise Clauses."  *Found. of Human Understanding v. U.S.*, 614 F. 3d 1383, 1387 (Fed. Cir. 2010).

Turning to the "associational test" for determining qualification for church status, Defendants cite this Court's opinion styled *American Guidance Foundation, Inc. v. United States*, 490 F. Supp. 304 (D.D.C. 1980), as authority for their position that the Church fails this test and therefore does not qualify for church status under I.R.C. § 170(b)(1)(A)(i).  (APP. 0318, 0323, Final Adverse Det., P. 6, 11).  In *American Guidance*, this Court addressed the government's denial of an applicant organization's request for classification as a church.  The applicant organization was already recognized as a § 501(c)(3) organization, with the Court

noting that, "[i]t is well to begin by stating what is *not* at issue.  The IRS concedes that plaintiff is a religious organization, qualifying for exemption under sections 501(c)(3) and 509(a) of the Code.  The benefits accruing from such a determination are not in jeopardy." *Id.* at 306.

The organization at issue in *American Guidance* consisted of the founder and no more than five members of his immediate family, who assembled in the founder's apartment for their religious activities.  *Id.* at 305.  In evaluating the matter for church qualification, the Court acknowledged the Internal Revenue Service's 14-point church criteria, but also noted the inherent difficulty in determining whether a religious organization is in fact a church, stating that Congress has offered "virtually no guidance" as to what it meant by the term "church" *Id.* at 306.  The Court went on to state that, "[t]here is no bright line beyond which certain organized activities undertaken for religious purposes coalesce into a "church" structure.  And the range of "church" structures extant in the United States is enormously diverse and confusing."  *Id.*

As Defendants correctly noted in the final adverse determination letter, the *American Guidance* Court ultimately relied upon an associational test in finding that the applicant organization ("AGF") did not qualify for "church" status, stating that, "[a]t a minimum, a church includes a body of believers or communicants that assembles regularly in order to worship.  Unless the organization is reasonably available to the public in the conduct of its worship, its educational instruction, and its promulgation of doctrine, it cannot fulfill this associational role." *Id.*  The Court went on to state that, "[i]n this instance, AGF does not employ recognized, accessible channels of instruction and worship.  There is little if any evidence that it seeks to reach or serve a congregation.  Private religious beliefs, practiced in the solitude of a family living room, cannot transform a man's home into a church."  *Id.* at 307.

The United States Court of Appeals in *Foundation of Human Understanding* attempted to synthesize the Internal Revenue Service's 14-point criteria test and the judicially developed associational test by reducing them to their common, fundamental elements. *Found. of Human Understanding*, 614 F.3d at 1390. In doing so, the court stated that, "[t]hus, whether applying the associational test or the 14 criteria test, courts have held that in order to be considered a church under section 170, a religious organization must create, as part of its religious activities, the opportunity for members to develop a fellowship by worshipping together." *Id.* at 1389.

The Church has demonstrated its qualification for "church" status under both the Internal Revenue Service's 14-point criteria test and the associational test. With respect to the former, the Church satisfies, or will satisfy, at least eight of the stated criteria. The Church was incorporated in 2018 as an Iowa non-profit corporation and specifically as a religious corporation under section 504.141(38) of the Iowa Code, marking its distinct legal existence. *See* SMF at ¶ 1, 2. It is qualified to do business in both Iowa and Florida. *See* SMF at ¶ 3.

The Church has a recognized creed and form of worship, as well as its own religious literature. The Church's creed and religious doctrine are contained in the *Ayahuasca Manifesto,* which serves as the foundation for all of its doctrine and beliefs. *See* SMF at ¶ 17. Its doctrine and literature also include the *Universal Laws of Respect*, and procedures for participating in sacramental ceremonies are found in the *Rules and Regulations for Participating in the Sacrament of Ayahuasca*. *See* SMF ¶ 16, 18. The center of the Church's form of worship is the consumption of the Sacrament of Ayahuasca, which takes place after a ceremony's opening prayers and songs, smudging, reflections and readings from the Ayahuasca Manifesto. *See* SMF at ¶ 17. Following ceremonies, members participate in Integration and group prayer to enhance their individualized experiences with the sacrament. *See* SMF at ¶ 20.

29

The Church's formal code of doctrine and discipline are found in the *Ayahuasca Manifesto* and the *Rules and Regulations for Participating in the Sacrament of Ayahuasca*. *See* SMF ¶ 6-8. Those documents contain numerous rules and protocols to prepare the body for the receipt of the sacrament, post-ceremony care and disciplines for everyday life.

The use of Ayahuasca in religious ceremonies has a long and distinct history. *See* SMF at ¶ 6-8. While relatively new to Europe, the United States and Asia, Ayahuasca churches under the names of Church of Santo Daime, Uniao do Vegetal and Barquinha have existed for decades. *See* SMF at ¶ 8. The use of Ayahuasca represents the basis of spiritual practice for at least 75 different indigenous tribes across the lower and upper Amazonian regions. *See* SMF at ¶ 6.

The Church does not currently have an established, permanent place of worship, but intends to secure one or more as soon as possible. The Church originally intended to purchase land in Iowa upon which to build its permanent facilities, but then decided to establish a Florida location first. *See* SMF at ¶ 23, 24. The Church conducted all of its ceremonies at the same location in Florida prior to suspending its ceremonies while awaiting IRS and DEA approvals of its applications. *See* SMF at ¶ 27-29.

With regard to maintaining a regular congregation and religious services, the Church's membership had grown to 20 members when it was conducting its regular weekend ceremonies in 2019. *See* SMF at ¶ 25. Four of these members attended the Church's ceremonies on multiple weekends. *Id.* During that time, the Church conducted regular ceremonies beginning on Friday nights and ending on Sunday afternoons. *See* SMF at ¶ 19, 20. The Church's members could participate in regular Integration services on Sundays even when they were unable to attend in person. *See* SMF at ¶ 21. The Church will maintain this same weekend ceremony schedule when its religious services resume.

Some of the criteria established by the IRS do not lend themselves to the Church's doctrine and customs.  The Church welcomes individuals of all religions to become members and participate in its ceremonies, whereas the IRS criteria suggest that a church's membership should not be associated with any other church or denomination.  Several of the criteria touch upon the ordination of ministers after formal schooling in preparation for their ministries.  The Church's faith teaches that the deity calls and prepares its shamans and healers for ministry, and that their spiritual skills are largely innate.  Certain skills, such as the making of the sacramental tea, are taught by experienced church members and shamans, but spiritual and healing skills are believed to be gifts from Mother Earth to the individual.

The Church similarly qualifies as a "church" under the judicially developed associational test.  The *American Guidance* Court found that at a minimum, a church includes a body of believers or communicants that assembles regularly to worship, and that an organization must be reasonably available to the public in the conduct of its worship, educational instruction and promulgation of its doctrine.  *American Guidance,* 490 F. Supp. 304 at 307.  In ruling against the organization seeking church status, the Court noted that there was little, if any, evidence that the organization sought to reach or serve a congregation.  *Id.*  The importance of having a congregation who could worship together and develop a fellowship was also central to the court's holding in *Foundation of Human Understanding*, 614 F. 3d at 1387-88.

The Church actively sought to grow its membership from its inception, and had developed a congregation of 20 members before suspending its ceremonies.  *See* SMF at ¶ 25.  Several of the original 20 members were residents of Florida but residents from other states and Sweden also joined the Church, with four of them attending multiple weekend ceremonies.  (J.A. Ex. 9 at 4-5)(APP. 0212-213, 2nd Information Request, pp. 3-4); *See* SMF at ¶ 25.  The Church's

membership drive and the reach of its members was decidedly distinct from the group of immediate family members who met in an apartment in *American Guidance*. The Church held weekend ceremonies at the same location on a regular basis during the months of May, June, July and August of 2019 prior to suspending them, and plans to resume these regular in-person worship services at one or more permanent locations following the conclusion of this litigation and the DEA application process. *See* SMF at ¶ 27.   The Church anticipates that its membership will grow substantially once this occurs.

Even assuming, arguendo, that the Church is unsuccessful in securing church classification under I.R.C. § 170(b)(1)(A)(i), it would nevertheless be entitled to exemption as a religious organization under I.R.C. § 501(c)(3).   As noted in *Foundation of Human Understanding*, "an entity that engages in religious teaching may be a "religious organization" but still not qualify as a "church" for purposes of section 170." *Found. of Human Understanding*, 614 F. 3d at 1388; *see also American Guidance Found.*, 490 F. Supp. at 306.  In light of the Defendants' admission that the Church is strikingly similar to the *O Centro* UDV church, however, denying the Church status as a church would require a significant distinction between the two organizations.   The same is true with respect to Sanctuary of Our Lady Ayahuasca, which was granted I.R.C. § 501(c)(3) status and church status under I.R.C. § 170(b)(1)(A)(i) as recently as 2020.  *See* SMF at ¶ 47.

C.    **The Church's Use of Ayahuasca During its Religious Ceremonies is a Sincere Exercise of Religion Under the First Amendment to the United States Constitution and is Therefore Entitled to Protection Under the Religious Freedom Restoration Act of 1993.**

The United States Supreme Court in *O Centro* found that the sacramental use of Ayahuasca in religious ceremonies is a sincere exercise of religion under the First Amendment to the United States Constitution.  Importantly, the petitioner government conceded this fact in that

32

case. *O Centro*, 546 U.S. at 423. The petitioner further conceded that its seizure of the Church's Hoasca tea substantially burdened the UDV church's exercise of its religion under the RFRA. *Id.* at 426.

In the instant case, the Defendants have admitted the striking similarities between the Church's religious activities and those of the UDV church in *O Centro*, and have made no challenge to the sincerity of the Church's religious use of the Sacrament of Ayahuasca in its ceremonies. (J.A. Ex. 12 at 9). (APP. 0321, Final Adverse Det. P. 9).

As demonstrated by the facts and legal authorities above, the Church's exercise of its First Amendment rights is entitled to the same protections under the RFRA as those of the UDV church in *O Centro*.

> **D.   The Defendants Violated the RFRA by Substantially Burdening the Church's and its Members' Free Exercise of Religion under the First Amendment Without Justification; Accordingly, the Church is Entitled to Summary Judgment on its Claim Two.**

Defendants' denial of the Church's request for tax-exempt status under I.R.C. § 501(c)(3) and for church recognition under § 1.170(b)(1)(A)(i) by virtue of their summary conclusion that the Church's purposes and activities are "illegal" has placed a substantial burden on the Church's and its members' free exercise of religion under the First Amendment. Because of this substantial burden, Defendants are required under the RFRA to demonstrate that their action was in furtherance of a compelling governmental interest, and was the least restrictive means of furthering that interest. 42 U.S.C. § 2000 bb - 1(b). Defendants have not identified a compelling governmental interest in denying the Church's application, nor taken the subsequent step of defending the denial as the least restrictive means of doing so.

The RFRA provides protection and a remedy system for those whose rights to freely exercise their religion are unduly burdened by government action. Furthermore, the RFRA

prohibits the federal government from burdening a person or organization's exercise of religion, "even if the burden results from a rule of general applicability," unless the government can demonstrate the burden furthers a compelling government interest, and is the least restrictive means of doing so. 42 U.S.C. § 2000bb–1(a), (b). "The least-restrictive means standard is exceptionally demanding." *Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682, 728 (2014).  The statute goes on to provide that, "laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise".  42 U.S.C. § 2000bb(a)(2).

As previously noted, rights to the free exercise of religion are not without limitation and the government is permitted to burden one's rights to free exercise under specific statutory conditions.  The RFRA provides that the term "exercise of religion" means religious exercise as defined in 42 U.S.C. § 2000cc-5.  *Id.* at § 2000bb-2(4).   Under that statute, "religious exercise" is defined to include, "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  *Id.* at § 2000cc-5(7)(A).

### 1.  The Church has made a Prima Facie Claim for Protection Under the RFRA.

In order to establish a *prima facie* claim for protection under the RFRA, a plaintiff must prove the following three elements: (1) a substantial burden imposed by the federal government on a (2) sincere (3) exercise of religion.  *Kikumura v. Hurley*, 242 F.3d 950, 960; *see also Singh v. Carter*, 168 F. Supp. 3d 216, 227 (D.D.C. 2016), citing *Gonzalez v. O Centro Beneficente do Vegetal*, 546 U.S. 418 at 428 (2006).

In light of *O Centro* and the other authorities cited above, it is indisputable that the Church's sacramental use of Ayahuasca is a sincere exercise of religion under the First Amendment, which satisfies two of the three elements of its prima face claim under RFRA. With regard to the third element, the Defendants' denial of the Church's exemption application

under the blanket rationale of illegality substantially burdened the Church's exercise of its religion, thus entitling it to seek relief from this Court under the RFRA. *Id.* at § 2000bb-1(c).

The Church's exercise of religion has been burdened by Defendants' denial of its application and the burden has been substantial; essentially prohibiting the Church and its members from practicing their faith at all. Fearing law enforcement interference with its religious ceremonies and subsequent prosecution under the CSA, the Church suspended its religious ceremonies in August of 2019, and has not had a ceremony using Ayahuasca in nearly three years. *See* SMF at ¶ 28-30. The UDV church in *O Centro* similarly suspended its use of Hoasca in the United States after the government seized its ceremonial tea and threatened prosecution under the CSA. *O Centro Espirita Beneficente v. Ashcroft*, 342 F.3d 1170, 1175 (10th Cir. 2003). It is noteworthy that the UDV church in the *O Centro* case felt it necessary to move for a preliminary injunction prior to trial so that it could safely continue to practice its faith pending trial on the merits. *O Centro*, 546 U.S. at 418-19.

The Church's fears of prosecution are well-founded, given the criminal penalties attached to violations of the CSA and similar state statutes. Violation of the CSA is a felony punishable by imprisonment of up to 20 years and a fine of up to $1 million dollars. 21 U.S.C. 841(C) (2022). Under Iowa law, violation of the Iowa Controlled Substances Act is a Class C felony, carrying a possible prison term of up to 10 years, a fine of no less than $1,000.00 and no more than $50,000.00, and a crime services surcharge equal to 15% of the fine imposed. Iowa Code § 902.9(1)(d)(2022); Iowa Code § 124.401(1)(c)(9)(2022); Iowa Code § 911.1(1)(2022). Under Florida law, violations are classified as a Felony in the Second Degree, possibly resulting in imprisonment of up to 15 years and a fine of up to $10,000.00. Fla. Stat. § 893.13(2)(2022),

amended by FL LEGIS 2022-129, 2022 Fla. Sess. Law Serv. Ch. 2022-129 (C.S.H.B. 95); Fla. Stat. § 775.082(3)(d)(2022); Fla. Stat. § 775.083(1)(b)(2022).

In addition, the Church has received no membership revenue whatsoever during the suspension of its ceremonies, leaving it with no continuing resources to further its ministry.

> **a. Defendants' Erroneous Designation of the Church's Activities as "Illegal" has Chilled the Church's and its Members' Exercise of their Religion.**

While the United States Supreme Court has not explicitly extended the application of "chilling effect" beyond the free speech and association context under the First Amendment, a number of circuit courts have used chilling as a tool in free exercise cases to determine whether the government has substantially burdened a plaintiff's religious practices. *See The Presbyterian Church (U.S.A.) v. U.S.*, 870 F.2d 518 (9th Cir. 1989); *Catholic High School Ass'n of Archdiocese of N.Y. v. Culvert*, 753 F.2d 1161(2d Cir. 1985); *Cheffer v. Reno*, 55 F.3d 1517 (11th Cir. 1995). For example, the Ninth Circuit has invoked the chilling effect to analyze whether INS surveillance of a church's worship services constituted a "substantial burden." Answering in the affirmative, the court observed that both the church itself and its individual members suffered significant injury as a result of the government's actions:

> When congregants are chilled from participating in worship activities, when they refuse to attend church services because they fear the government is spying on them and taping their every utterance … we think the church suffers organizational injury because its ability to carry out its ministries has been impaired … The churches in this case are not claiming simply that the INS surveillance has "chilled" them from holding worship services. Rather, they claim that the INS surveillance has chilled *individual congregants* from attending worship services, and that this effect on the congregants has in turn interfered with the churches' ability to carry out their ministries. The alleged effect on the *churches* is not a mere subjective chill on their worship activities; it is a concrete, demonstrable decrease in attendance at those worship activities. The injury to the churches is "distinct and palpable." Allen v. Wright, 468 U.S. 737, 751 (1984) (citations omitted).

*The Presbyterian Church,* 870 F.2d at 522-23.

This Court itself has applied chilling effect analysis to cases involving the free exercise of religion.  *Singh v. Carter*, 168 F. Supp. 3d 216, 234 (D.D.C. 2016).  In *Singh*, this Court addressed a motion for a temporary restraining order to enjoin an order from the United States Army's senior command to the plaintiff, a practicing Sikh soldier, which would have required him to undergo several days of specialized testing with his helmet and protective mask to ensure that his articles of faith (unshorn hair, beard and a head covering) would not interfere with the equipment's ability to provide adequate protection.  *Id.* at 218-19.  The plaintiff requested a religious accommodation from the Uniform Code of Military Justice, which requires hairstyles and grooming standards that conflicted with his faith.  *Id.* at 220.  After a series of delays with respect to his request, the plaintiff filed a Verified Complaint and an Application for Temporary Restraining Order seeking to prohibit the defendants from subjecting him to the specialized equipment testing or any other "unusual or discriminatory" testing, and to grant him a permanent religious accommodation for his articles of faith while serving in the army.  *Id.* at 222.  In ruling in favor of the plaintiff and granting injunctive relief, this Court applied a chilling effect analysis and stated as follows:

> [D]enial of the injunctive relief sought in the plaintiff's pending motion would sanction the defendants' imposition of targeted, specialized testing requirements on a decorated officer simply because he requested a religious accommodation to the Army's grooming and appearance regulations.  This would likely have, as the plaintiff points out, a chilling effect on religious minorities, not only Sikhs, who desire lawfully to practice their religion while serving this country in the Armed Forces.

*Id.* at 234.

In the instant case, Defendants' actions in labeling the Church's religious practices as illegal have had a chilling effect on the Church's and its members' free exercise of their religion. Defendants issued a final adverse determination letter to the Church citing the reason for the

denial as the Church's "illegal" purposes and activities.  The determination letter is binding on the Church and no other entity.  By their actions, Defendants have not just substantially burdened the Church's and its members' exercise of religion, they have brought it to a grinding halt.  As previously stated by the United States Supreme Court, "[i]t has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  In the Church's case, the loss of its First Amendment freedoms has been ongoing for nearly three years.  In addition, Defendants' actions have deprived the Church of its primary source of revenue in the form of membership and ceremonial fees, creating a very real and demonstrable injury to the Church and its members.

On a final note, Defendants cannot claim surprise by the Church's Claim Two.  The Church first notified Defendants that it had suspended its religious ceremonies because of Defendants' delays and fear of law enforcement intrusion when it responded to Defendants' third Information Request, which the Church filed on February 24, 2020.  (J.A. Ex. 11 at 5).(APP 242, Response to 3d Information Request, P. 4).  The Church again raised these same concerns, including wrongful prosecution under the CSA, in its protest of the Defendant's proposed adverse determination letter, which it filed on July 13, 2020.  (J.A. Ex. 14 at 2).(APP. 297, Protest, P. 1).  In short, Defendants have been on notice of the Church's reliance upon *O Centro* and the RFRA since the Church filed its original exemption application on January 10, 2019, but never took their own obligations under the law into account before summarily declaring the Church's purposes and activities to be "illegal".

### 2.  Defendants Failed to Meet Their Burdens of Proof under the RFRA, Entitling the Church to Summary Judgment on its Claim Two.

Once a finding of substantial burden on the sincere exercise of religion has been made, the statutory burden of proof shifts and the RFRA next requires the government to demonstrate

that the burden furthers a compelling governmental interest.   42 U.S.C. §§ 2000bb-1(b)(1). Defendants have not met this burden and have consistently ignored the *O Centro* opinion, the RFRA and other authority repeatedly offered by the Church since its original exemption application was filed on January 10, 2019.  *See* SMF at ¶ 35.  Instead, Defendants have offered no more justification for the denial of the Church's application than broad, categorical statements that its purposes and activities are illegal, with not even an acknowledgment of the *O Centro* considerations or their obligations under the RFRA.

In the *O Centro* case, the government attempted to demonstrate a compelling governmental interest for its seizure of the UDV church's Hoasca and its application of the CSA under the theories of: (1) protecting the health and safety of UDV members; (2) preventing the diversion of Hoasca from the UDV church to recreational drug users; and (3) complying with the 1971 United Nations Convention on Psychotropic substances.   *O Centro*, 546 U.S. at 426. Notably, the government did not argue that preventing the violation of the CSA was, in itself, a sufficiently compelling governmental interest under the RFRA, as Defendants presumably do here.  The Supreme Court noted that the District Court concluded that the evidence on health risks was "in equipoise" and that the evidence on diversion risk was "virtually balanced".  *Id.* The Court went on to note the District Court concluded that the 1971 United Nations Convention did not apply to Hoasca.  *Id.*  With respect to the government's first two theories, the Supreme Court agreed with the lower courts that an equal balance of evidence was sufficient to determine that the government had not met its burden in establishing a compelling governmental interest for its actions.  *Id.* at 437-38.  The Supreme Court disagreed with the lower court's finding that the 1971 United Nations Convention did not apply to Hoasca, but ruled that the government had offered no evidence whatsoever to support its claim that compliance with that convention was a

compelling governmental interest.  *Id.*  Because the government failed to demonstrate any compelling governmental interest, the Supreme Court was not required to address the subsequent test of whether the government's actions did so under the RFRA's least restrictive means test. As a result, the Supreme Court ruled that the lower courts did not err in determining that the government failed to demonstrate, at the preliminary injunction stage, a compelling governmental interest in barring the UDV church's sacramental use of Hoasca.  *Id.* at 437.

Just as the government in *O Centro* failed to meet its burden of establishing a compelling governmental interest for its actions, Defendants have also failed to do so here.  Defendants cite several Revenue Rulings in support of their position that all charitable organizations are subject to the requirement that their purposes may not be illegal.  (J.A. Ex. 12 at 5-6).(APP. 0317-318, Final Adverse Det. at 5-6).  The Church does not dispute this general proposition, but it completely fails to acknowledge religious exceptions carved by *O Centro* and the RFRA under the First Amendment.  As the Supreme Court noted in *O Centro*:

> RFRA, and the strict scrutiny test it adopted, contemplate an inquiry more focused than the Government's categorical approach.  RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law "to the person" - the particular claimant whose sincere exercise of religion is being substantially burdened.

*Id.* at 419-20.

The Court then went on to emphasize the additional focus required by the RFRA and the government's inability to satisfy the compelling governmental interest test through mere generalities:

> Under the more focused inquiry required by RFRA and the compelling interest test, the Government's mere invocation of the general characteristics of Schedule I substances, as set forth in the Controlled Substances Act, cannot carry the day. It is true, of course, that Schedule I substances such as DMT are exceptionally dangerous.  See, *e.g., Touby v. United States*, 500 U.S. 160, 162 (1991). Nevertheless, there is no indication that Congress, in classifying DMT, considered

the harms posed by the particular use at issue here - the circumscribed, sacramental use of *hoasca* by the UDV … Congress' determination that DMT should be listed under Schedule I simply does not provide a categorical answer that relieves the Government of the obligation to shoulder its burden under RFRA.

*Id.* at 432.

Because the Defendants have offered nothing more than a naked assertion of general illegality to justify their denial of the Church's exemption application, they have failed to meet the compelling governmental interest test of the RFRA.  As a result, this Court need not even consider whether Defendants' denial of the Church's application was the least restrictive means of doing so.  Because Defendants have failed to provide any evidence with respect to a compelling governmental interest in defense of their actions, an essential element of their case, the Church is entitled to Summary Judgment on its Claim Two.  *See Holcomb v. Powell,* 433 F.3d 889, 895 (D.C. Cir. 2006) (citing to *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## IV.    CONCLUSION

Dating back to the submission of the Church's exemption application more than three years ago, the Church has demonstrated its qualification for recognition by Defendants as an organization described in I.R.C. § 501(c)(3) and as a church within the meaning of I.R.C. § 170(b)(1)(A)(i).  As the Defendants concede, the Church's purposes and activities bear striking similarities to the UDV church in the *O Centro* opinion, which is itself recognized by Defendants as a § 501(c)(3) organization and a church to this day.

The Church has made a prima facie case for its entitlement to protection and relief under the RFRA, having clearly demonstrated that its use of the Sacrament of Ayahuasca in its religious ceremonies is a sincere exercise of religion, and that the Defendants have substantially burdened that exercise by wrongly labelling its purposes and activities as illegal.  By not

demonstrating a compelling governmental interest for their actions, or that their actions were the least restrictive means of doing so, Defendants have failed to meet their burden under the RFRA.

For the foregoing reasons, the Church respectfully requests that this Court grant its motion for summary judgment and thereafter enter declaratory judgments stating that: (1) the Church is entitled to recognition by Defendants under I.R.C. §§ 501(c)(3) and 170(b)(1)(A)(i) retroactive to the date of its incorporation; (2) the Church's sacramental use of Ayahuasca in its ceremonies is a sincere exercise of religion under the First Amendment to the United States Constitution and therefore entitled to protection under the RFRA; and (3) the Defendants have violated the RFRA by summarily denying the Church its requested exempt status without satisfying its statutory burdens of proof.

Respectfully submitted,

/s/ William A. Boatwright
William A. Boatwright (*Pro Hac Vice*)
Michael A. Gilmer (*Pro Hac Vice)*
Dentons Davis Brown PC
215 10th Street, Ste. 1300
Des Moines, Iowa 50309
Telephone: (515) 288-2500
Facsimile: (515) 243-0654
Email: Bill.Boatwright@dentons.com
Date: _____, 2022                     Email: Michael.Gilmer@dentons.com


/s/ Kenneth J. Pfaehler
Kenneth J. Pfaehler
D.C. Bar No. 461718
Dentons US LLP
1900 K Street, N.W.
Washington, D.C. 20006
Phone:   (202) 496-7500
Fax:      (202) 496-7756
Email:   Kenneth.Pfaehler@dentons.com

Date: _____, 2022                     *Attorneys for Plaintiff*

Copies To:

MERRICK B. GARLAND
United States Attorney General

MATTHEW M. GRAVES
United States Attorney, District of
Columbia

DAVID A. HUBBERT
Deputy Assistant Attorney General

EMILY K. MILLER         (KY #97725)
JOSEPH E. HUNSADER    (DC #453328)
KRISTINA M. PORTNER  (DC #1002793)
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 227
Washington, D.C. 20044
Phone:   202-353-7509
Fax:      202-514-6866
Email:   Emily.K.Miller@usdoj.gov
Email:   Joseph.E.Hunsader@usdoj.gov
Email:   Kristina.M.Portner@usdoj.gov
*Counsel for the United States of America*

<div style="border:1px solid black">

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument
was served upon all parties to the above cause to each
of the attorneys of record herein at their respective
addresses disclosed on the pleadings on _____,
2022, by:

___ U.S. Mail              ___ Overnight Courier
___ Hand Delivered     ___ Other
___ Email                     _X_ EDMS

Signature:  */s/William A. Boatwright*
</div>